IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAWN GREEN, ANDREA GALLEGOS,
and SASHA DOMINGUEZ,

      Plaintiffs,

v.                                     No. 1:19-cv-751

Officer CHRISTOPHER PADILLA,
Officer JUSTIN N. SANDERS,
Officer MALCOLM J. GONZALES,
Former Warden JOHN SANCHEZ,
Former Warden EBETH CRUZ-MARTINEZ,
Warden MARIANNA VIGIL,
And Captain ROBERT GONZALES,
in their individual capacities,

      Defendants.

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS,
STATE TORT CLAIMS AND DAMAGES**

      Plaintiffs Dawn Green, Andrea Gallegos and Sasha Dominguez, through their counsel of record Erlinda Johnson and Justine Fox-Young, hereby bring this Complaint pursuant to the First and Eighth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, and 42 U.S.C. § 1988, and New Mexico state law, and as grounds therefore state as follows:

**JURISDICTION, VENUE, AND PARTIES**

      1.     This Court has jurisdiction over this action pursuant to 42 U.S.C. §§1983 and 1988 and 28 U.S.C. § 1343, with pendent jurisdiction over the state law claims. Venue is proper in this district, as Defendants are residents of New Mexico, and all of the acts complained of occurred in New Mexico. Plaintiffs' causes of action arose in New Mexico.

      2.     Plaintiff Dawn Green is a New Mexico resident. At all times material to this Complaint, Ms. Green was an inmate at the Springer Correctional Center ("SCC"), a women's prison situated in Springer, New Mexico.

3. Plaintiff Andrea Gallegos is a New Mexico resident. At all times material to this Complaint, Ms. Gallegos was an inmate at SCC.

4. Plaintiff Sasha Dominguez is a New Mexico resident. At all times material to this Complaint, Ms. Dominguez was an inmate at SCC.

5. At all times material to this Complaint, Defendants Christopher Padilla, Malcolm Gonzales and Justin Sanders were correctional officers with the New Mexico Corrections Department ("NMCD"). Defendants are sued in their individual capacity and were acting under color of state law during the acts complained of.

6. During some of the events complained of in this complaint, Defendant John Sanchez was the Warden of SCC and was employed by the New Mexico Corrections Department ("NMCD"). Defendant Sanchez is sued in his individual capacity and was acting under color of state law during the acts complained of.

7. During some of the events complained of in this complaint, Defendant Ebeth Cruz-Martinez was the Warden of SCC and was employed by the New Mexico Corrections Department ("NMCD"). Defendant Cruz-Martinez is sued in her individual capacity and was acting under color of state law during the acts complained of.

8. During some of the events complained of in this complaint, beginning in approximately April 2018 and continuing to the present, Defendant Marianna Vigil has been the Warden of SCC and has been employed by the New Mexico Corrections Department ("NMCD"). Defendant Vigil is sued in her individual capacity and was acting under color of state law during the acts complained of.

9. At all times material to this Complaint, Defendant Robert Gonzales was a Captain and Chief of Security with SCC and employed by the New Mexico Corrections Department ("NMCD"). Defendant Gonzales is sued in his individual capacity and was acting under color of state law during the acts complained of.

**FACTUAL ALLEGATIONS**

10. Springer Correctional Center ("SCC") was formally the New Mexico Boys School.

11. In November 2005, the state Children, Youth & Families Department decided to close the juvenile facility, and the New Mexico Corrections Department ("NMCD") determined it would be suitable to house Level 1 & 2 inmates. The NMCD requested and received funding to operate the facility from the 2006 legislature, and SCC officially opened on January 1, 2007.

12. On or approximately January 2007, the New Mexico Corrections Department converted SCC into a prison facility for the purpose of housing Level 1 & 2 inmates.

13. Upon information and belief, the main compound covers approximately 40 acres and includes approximately 22 buildings. This includes eight dormitories, two level one housing units, several multi-programs buildings, maintenance buildings, and kitchen, dining and warehouse facilities.

14. In October 2016, the state of New Mexico moved approximately 750 female prison inmates from a privately-operated prison near Grants to SCC.

15. Upon information and belief, SCC has a capacity of between 400 and 500 inmates.

16. Upon information and belief, during all times material to this complaint, SCC was understaffed, with a very high inmate to correctional officer ratio.

17. Poor management of the facility made it highly likely for sexual assault to occur for reasons including but not limited to: the state's continued employment of correctional officers including Defendants Padilla, Sanders and Malcolm Gonzales despite their known assaultive behavior; the large number of areas that were not monitored by cameras; and the overall lack of controls to properly protect female inmates who are supervised by largely male correctional officers.

18. Upon information and belief, on or about December 31, 2016, Correctional officer Malcom J. Gonzales was hired to work at SCC as a correctional officer and continued to be employed during all times material to this complaint.

19. Upon information and belief, on or about September 24, 2016, Correctional officer

Justin N. Sanders was hired to work at SCC as a correctional officer and continued to be employed during all times material to this complaint.

20. Upon information and belief, on or about June 20, 2015, Correctional officer Christopher R. Padilla was hired to work at SCC as a correctional officer and continued to be employed during all times material to this complaint.

21. Defendants Sanchez, Cruz-Martinez and Vigil served as successive wardens at SCC over the period spanning the allegations in this complaint.

22. Each warden had control over the management of the facility during his or her tenure, including with regard to decisions to hire and fire correctional officers.

## Facts Specific to Plaintiff Dawn Green

23. Plaintiff Dawn Green arrived at SCC on or about October 3, 2016.

24. Ms. Green worked on a crew in the kitchen beginning in approximately mid-October, 2016.

25. In approximately December, 2016, Defendant Christopher Padilla was placed in charge of the kitchen and of the inmates working there.

26. Padilla therefore had complete control over Ms. Green's activities and movement in the kitchen and also had the power to take her job away should he choose to.

27. Right away, Padilla began making inappropriate and unwanted comments about Ms. Green's body.

28. He would comment on the size of her nipples, which he said were visible through her prison-issued t-shirt.

29. Repeatedly, Padilla instructed Ms. Green to show him her breasts and told her that, in exchange, he would let her take food out of the kitchen.

30. Over a period of almost two months, Padilla instructed Ms. Green to show him her breasts, and repeatedly she went to the bathroom and revealed her breasts as he had commanded her to do.

4

31. During this time, it was obvious to Padilla's supervisors and other staff that Padilla was abusive to and preyed on a number of inmates.

32. For instance, it was well known that he would seek out women who did not have the money "on their books" to purchase food from the commissary and would direct them to reveal their bodies in exchange for food from the kitchen.

33. Padilla chose and groomed these women to do sexual favors for him because he thought them less likely to report him than others would be.

34. Despite this behavior, Padilla was promoted to maintenance supervisor in or about February or March, 2017.

35. This promotion gave him greater flexibility as well as greater and more regular access to all the housing units including Ms. Green's.

36. In the spring of 2017, Padilla began directing Ms. Green to go to her room so he could meet her there.

37. Padilla would also instruct Ms. Green to submit work orders for maintenance requests in order to give him excuses to go to her room.

38. Padilla would visit her room and told her repeatedly that he "wanted to know what she tasted like."

39. Ms. Green rebuffed him and put him off but Padilla persisted in asking her to "show him what she tasted like."

40. Ms. Green was embarrassed that Padilla would ask this of her and didn't know what to do to make him stop.

41. Padilla was undeterred and returned to ask Ms. Green to put a jolly rancher in her vagina so he could taste her.

42. Ms. Green tried to decline, but Padilla later brought watermelon flavored Jolly Rancher candy to her and instructed her to insert them in her vagina.

43. Embarrassed and disgusted, she complied, and then he took them back so he could

dissolve them in his mouth and "taste her."

44. This pattern repeated for several weeks. Padilla would bring candies, instruct her to insert them in her vagina and then proceed to eat them in front of her.

45. In or about March of 2017, at least one other inmate, including Rebecca Martinez, reported Padilla for sexual abuse and harassment through the Prison Rape Elimination Act ("PREA") hotline and or to the SCC administration.

46. On information and belief, inmates had difficulty reporting sexual abuse and harassment at SCC because the "PREA" hotline number that officials posted was a wrong number.

47. On information and belief, Ms. Martinez reported that Padilla had harassed and abused other women, including Ms. Green.

48. Shortly after Ms. Martinez's report, two New Mexico State Police officers came to interview Ms. Green, and she reported some of what Padilla had done to her.

49. The officers took notes on Ms. Green's statement and generated a report.

50. Defendant Sanchez was present at the time of Ms. Green's statement and aware that state police were there to interview her and others.

51. Despite this, Defendant Sanchez took no action to remove Defendant Padilla from the facility or to otherwise protect the inmates from his predatory behavior.

52. After the interview with state police, Ms. Green filed an informal grievance with the prison complaining about Padilla.

53. When she subsequently checked on the status of her grievance, prison officials told her they had no record that she had submitted it.

54. Sometime after she gave the statement and made the complaint, in or about late March of 2017, Padilla began coming to Ms. Green's cell and ordering her to masturbate while he watched.

55. Padilla also repeatedly told Ms. Green that he would masturbate thinking about her breasts.

56. Padilla also regularly shook down Ms. Green's cell so that he could go pick through her underwear. This occurred with great frequency over a period of approximately six months.

57. In late March or early April, Ms. Green was called to meet with members of the administration regarding the informal grievance that the administration had previously denied receiving.

58. The committee informed her that the recommendation for resolution of her grievance was to send her for mental health treatment.

59. For months she received no mental health treatment whatsoever.

60. Finally, in September 2018, Ms. Green put in a request for mental health and began to have electronic visits with a telepsychiatry provider.

61. Ms. Green reported to the telepsychiatry provider that she was having serious anxiety because Padilla was still coming around her cell.

62. Ms. Green later began seeing a therapist, Ms. Serna, and over the next three months, she revealed Mr. Padilla's abuse of her in therapy sessions.

63. As a result of the abuse, Ms. Green was prescribed several medications with serious side effects.

64. In or about September 1, 2017, while Ms. Green was at work in the kitchen, two investigators came to see her regarding Padilla.

65. She answered their questions and revealed the same information she had previously told state police.

66. Ms. Green was subsequently fired from her job in the kitchen although she was never written up for any infractions.

67. The firing was in retaliation for reporting Padilla.

68. A few days later, she was moved out of the honor housing unit and into another housing unit despite the fact that she had not been written up or disciplined for any infractions.

69. In the honor housing unit, she had a private room, a washer and dryer, no curfew and

7

first pick of commissary items.

70. When she was moved, she lost all these privileges.

71. The housing change and removal of privileges was made in retaliation for reporting Padilla.

72. Ms. Green asked Defendant Malcolm Gonzales, the unit manager for the honor housing unit, why she had been moved out.

73. He responded that he had learned about her report regarding Padilla and told her she was a liar and to get the hell out of his face.

74. After Ms. Green was moved, Padilla remained in his position as maintenance supervisor and retained full access to all housing units.

75. As long as Ms. Green was in custody, Padilla continued to come to the unit where she lived, just to intimidate and frighten her.

76. As a result of these events, Ms. Green suffered significant emotional distress and deteriorating physical and mental health.

### *Facts Specific to Plaintiff Andrea Gallegos*

77. Plaintiff Andrea Gallegos was an inmate at SCC from on or about August 2017 through February 14, 2019.

78. During this time, Defendant Malcolm Gonzales was employed as a correctional officer by SCC.

79. On her first day at SCC, Gonzales wrote her up for a minor infraction in order to get her attention.

80. He began harassing her immediately, commenting that he liked it when she got mad because it was sexy.

81. The housing units at SCC, including the bathroom areas and showers, were patrolled and supervised by male correctional officers.

82. Officers would routinely come and go through the bathroom areas where they could

8

see directly into the toilets and showers and could and did watch the female inmates use the bathroom and shower.

83. Although policies required male officers to announce, "man on the floor," when they came into the bathroom areas, Defendants including Defendant Gonzales did not do so.

84. On at least one occasion, Ms. Gallegos discovered Gonzales in the bathroom performing sexual acts with another inmate.

85. After this, Gonzales acted very paranoid around Ms. Gallegos.

86. He made it a point to harass and annoy her, often waking her at night by putting a flashlight in her face while she was asleep in her bunk.

87. Gonzales began spending more and more time in Ms. Gallegos' housing unit and began to verbally harass her more and more.

88. Ms. Gallegos asked him to stop, but his behavior only worsened and he began to harass her sexually.

89. Gonzales would ask her questions like, "what color are your nipples?" and "why are you so shy?"

90. In May and June of 2018, Gonzales became more brazen and began directing Ms. Gallegos to show him her bare breasts.

91. Thinking she had no choice, as Gonzales controlled the food she ate, her housing assignment, her ability to move through the facility, and other privileges, she revealed her breasts.

92. In the next couple months, Gonzales asked Ms. Gallegos to kiss Plaintiff Sasha Dominguez in front of him on several occasions.

93. They did so.

94. On or between June and July 2018, Gonzales directed Ms. Gallegos and Ms. Dominguez to kiss in front of him while he watched and pleasured himself.

95. They did so.

96. On or about July 2018, Gonzales instructed Ms. Gallegos and Ms. Dominguez to go

to the bathroom and kiss each other in the shower while he watched them and grabbed himself.

97. Ms. Gallegos felt belittled and ashamed and reported some of Gonzales' behavior to a mental health counselor.

98. She considered reporting Gonzales to administrators, but she was afraid that prison officials would retaliate against her by throwing her in segregation as they had other inmates who had reported unlawful behavior by correctional officers.

99. Ms. Gallegos asked mental health personnel to have her moved because she wasn't comfortable around Gonzales.

100. Ultimately, Ms. Gallegos did report Defendant Gonzales to Defendant Vigil, who was then the warden and who did nothing but direct her to go to Defendant Robert Gonzales with her complaints.

101. Ms. Gallegos then reported Gonzales' behavior to Defendant Robert Gonzales and pleaded that he move her to another housing unit so that she wouldn't have contact with Malcolm Gonzales anymore. He responded that "half the unit isn't comfortable with him," and that, "if I move you, I have to move half the girls."

102. Defendant Robert Gonzales had the discretion to move Ms. Gallegos to another housing unit because he was a Captain and Chief of Security at the facility.

103. Ms. Gallegos made two written requests to be moved to a different unit and turned them in to Captain Gonzales.

104. He threw one of the requests in the trash right in front of Ms. Gallegos and did nothing to act on either of them.

105. In retaliation for reporting Malcolm Gonzales, Ms. Gallegos' cell was raided.

106. Defendant Robert Gonzales told Ms. Gallegos and many other inmates that they would be punished if they so much as spoke to "PREA" auditors when they visited the facility.

107. He threatened to "lock them down" and take away their good time if they reported sexual abuse and harassment.

108. Ms. Gallegos suffered severe emotional distress as a result of the actions and omissions of Defendant Malcolm Gonzales, Defendant Robert Gonzales, Defendant Sanchez, Defendant Cruz-Martinez and Defendant Vigil.

### *Facts Specific to Plaintiff Sasha Dominguez*

109. On or about October 2016, Plaintiff Sasha Dominguez was moved to SCC to serve her sentence.

110. In May 2018, Ms. Dominguez was moved into segregation where she was held for three days.

111. During the time Ms. Dominguez was in segregation, Defendant Justin Sanders began to talk to her about playing with his penis.

112. Every half hour, he would turn on the light, wake her up and make derogatory comments to her.

113. Sanders controlled every detail of Ms. Dominguez's life in segregation, to include whether the lights were on and whether she was fed or not.

114. He made crude comments about her body, including commenting that Ms. Dominguez's breasts were very large, and asking if they were real.

115. Sanders also directed Ms. Dominguez to show him her breasts, which she did, while he grabbed and pleasured himself.

116. Sanders instructed Ms. Dominguez to masturbate in front of him.

117. Ms. Dominguez reported the incident that had occurred with Defendant Sanders to Security Threat Intelligence Unit (STIU) Correctional Officer Fernandez.

118. Fernandez referred to Sanders as Sasha Dominguez's boyfriend. He dismissed her report, saying "I heard about you and that you show your boobs to Sanders" and laughed at her.

119. Subsequently, STIU officers found letters written between another inmate and Defendant Sanders.

120. Sanders went on leave for a couple of weeks, and, on information and belief,

Defendant Robert Gonzales told him to "get his shit together and stop messing with the hoes."

121. Sanders returned to work and picked up right where he had left off in his abusive behavior of inmates.

122. After he returned, Ms. Dominguez was sent to segregation again, and Sanders was again working there.

123. Sanders asked Ms. Dominguez "if her boobs had gotten bigger."

124. Sanders also asked her "where all the drugs were" because he had heard that women get "all hot and bothered" if they take suboxone so he wanted her to take it.

125. Another correctional officer was present, so Sanders did not openly ask Ms. Dominguez to show her breasts but instead continually gave her hand signals directing her to flash him.

126. When she was not in segregation, Defendant Malcolm Gonzales was assigned to her unit.

127. Gonzales went out of his way to spend time with Ms. Dominguez and would pull her into his office to have long conversations with him.

128. He told her she was attractive and commented on her ethnicity.

129. Between May and June 2018, Gonzales began asking Ms. Dominguez to come into his office and talk to him.

130. Once in the office, Gonzales would instruct Ms. Dominguez to kiss him and to show him her breasts.

131. Ms. Dominguez complied and in response, on at least one occasion, Gonzales grabbed her breasts and fondled her for several minutes.

132. While he was fondling her, Gonzales' penis grew visibly hard.

133. On several occasions, during the month of June 2018, while Ms. Dominguez was in Gonzales' office, he directed her to show him her vagina.

134. On at least one occasion, Ms. Dominguez complied and showed him, and Gonzales

proceeded to touched her vagina, exclaiming that it was "real soft."

135. Sometime after this, Gonzales was moved to a different housing unit, and Ms. Dominguez didn't see him for several weeks.

136. When she ultimately did see him again, he told her he "was being watched."

137. Despite this, between June and July 2018, Defendant Malcolm Gonzales directed Plaintiff Andrea Gallegos to kiss Ms. Dominguez in front of him, on several occasions.

138. When the two would comply and kiss, Gonzales would touch and pleasure himself.

139. Ms. Dominguez felt degraded and ashamed as a result of Sanders' and Gonzales' treatment of her.

140. Ms. Dominguez declined to report the abuse because she was afraid prison officials would retaliate against her by moving her to a different facility, moving her back to segregation or taking away her good time as had happened to other inmates who had reported unlawful behavior on the part of correctional officers.

141. Defendant Robert Gonzales had threatened her, among others, with a lockdown and lost good time in retaliation for talking to PREA auditors, and she took that threat seriously.

142. As a result of Defendants' actions and omissions, Ms. Dominguez suffered significant emotional distress and deteriorating physical and mental health.

**COUNT I – CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT
(against Defendants Padilla, Sanders, Malcolm Gonzales, Sanchez, Vigil and Robert Gonzales)**

143. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

144. By and through the actions described above, including both the specific incidents of sexual assault and the continuing, daily threat of renewed assaults, Defendants Christopher Padilla, Malcolm Gonzales, Justin Sanders, Malcolm Gonzales, John Sanchez, Marianna Vigil and Robert Gonzales violated the Eighth Amendment right of Plaintiffs Green, Gallegos and Dominguez to

be free from cruel or unusual punishment.

145. In particular, Defendants violated Plaintiffs' right to be afforded a reasonable degree of safety from serious bodily attack and to be secure in their bodily integrity. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) ("an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards.").

146. The actions of Defendants in assaulting Plaintiffs and violating their clearly established constitutional rights were conducted in a manner that was objectively unreasonable, intentional, willful, and wanton, and done in gross and reckless disregard of Plaintiffs' rights.

147. Defendants' unlawful sexual assaults, their violation of Plaintiffs' bodily integrity and right to personal security, and the ongoing threat of further such violations, proximately caused Plaintiffs to suffer damages and injuries.

148. These damages include physical injuries, pain and suffering, lost liberty and psychological and emotional distress.

WHEREFORE, Plaintiffs request compensatory and punitive damages against Defendants, together with all costs and attorneys' fees.

### COUNT II – RETALIATION IN VIOLATION OF THE FIRST AMENDMENT
### (Against Defendant Malcolm Gonzales and Defendant Robert Gonzales)

149. Plaintiffs incorporate by reference all preceding paragraphs as though they were fully set forth herein.

150. Defendants retaliated against Plaintiff Green for reporting Defendant Padilla's misconduct, sexual harassment and unlawful actions as previously alleged.

151. Defendants retaliated against her in numerous ways including but not limited to the following: moving her out of the honor housing unit, firing her from her job in the kitchen although she had committed no infractions, failing to appropriately investigate her claims, refusing to acknowledge and timely act upon her grievance regarding Padilla's conduct.

152. The pattern and timing of Defendant's actions and omissions as described above

clearly indicate a retaliatory motive.

153. Ms. Green's ability to complain of and seek redress for the ongoing abuse she suffered is an activity protected under the First Amendment to the United States Constitution.

154. Defendants' retaliation was unlawful and would chill an ordinary person in the exercise of her First Amendment rights.

155. Ms. Green suffered damages as a result of Defendants' conduct.

WHEREFORE, Plaintiffs request compensatory and punitive damages against Defendants, together with all costs and attorneys' fees.

### COUNT III – INTENTIONAL TORT CLAIMS
### (against Defendants Padilla, Malcolm Gonzales and Sanders)

156. Plaintiffs incorporate by reference all preceding paragraphs as though they were fully set forth herein.

157. Defendants intentionally sexually assaulted, battered, falsely imprisoned and intentionally inflicted emotional distress on Plaintiffs as described above.

158. Defendants' actions as set forth above proximately caused Plaintiffs' damages and injuries. These damages include physical pain and suffering, lost liberty, and psychological and emotional distress.

WHEREFORE, Plaintiffs request compensatory damages against Defendants, together with an award of attorney's fees and costs as allowed by law.

### COUNT IV: NEGLIGENT OPERATION OR MAINTENANCE OF A PUBLIC FACILITY
### (against Defendants Sanchez, Cruz-Martinez, Vigil & Robert Gonzales)

159. Plaintiffs restate each of the preceding allegations as if fully stated herein.

160. Defendants owed Plaintiffs a duty to protect their health and safety in their operation and maintenance of SCC.

161. Defendants breached this duty as set forth above, *inter alia*, by failing to ensure Plaintiffs were housed in a facility where they were not subjected to sexual abuse, coercion and harassment by correctional officers.

162. The negligent conduct of Defendants constitutes negligent operation or maintenance of a public facility for which immunity is waived pursuant to NMSA 1978, § 41-4-6 as against Defendants.

WHEREFORE, Plaintiffs request compensatory damages against Defendants, together with an award of attorney's fees and costs as allowed by law.

## JURY DEMAND

163. Plaintiffs hereby demand a trial by jury on all counts so triable.

Respectfully submitted,

*/s/ Erlinda O. Johnson*
Erlinda O. Johnson
620 Roma Ave., NW
Albuquerque, NM 87102
(505) 792-4048 / F: (505) 792-7268

&

*/s/ Justine Fox-Young*
Justine Fox-Young, P.C.
201 12th St. NW
Albuquerque, NM 87112
505.796.8268

*Attorneys for Plaintiff*