## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAWN GREEN, ANDREA
GALLEGOS, and SASHA DOMINGUEZ,

        Plaintiffs,

vs.                                    No. CIV 19-0751 JB\JFR

OFFICER CHRISTOPHER PADILLA,
OFFICER JUSTIN N. SANDERS, OFFICER
MALCOM J. GONZALES, FORMER WARDEN
JOHN SANCHEZ, FORMER WARDEN EBETH
CRUZ-MARTINEZ, WARDEN MARIANNA VIGIL,
and CAPTAIN ROBERT GONZALES,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Motion to Dismiss, filed November 11,

2019 (Doc. 15)("Motion").  The primary issues are: (i) whether Defendants John Sanchez, Ebeth

Cruz-Martinez, Marianna Vigil, and Robert Gonzales ("the Supervisory Defendants") are entitled

to qualified immunity against Plaintiffs Dawn Green, Andrea Gallegos, and Sasha Dominguez'

("Female Inmates") claims under the Eighth Amendment to the Constitution of the United States

of America; and (ii) whether the Supervisory Defendants are immune from liability against the

Female Inmates' state law negligence claim under N.M. Stat. Ann. § 41-4-6, because the Female

Inmates do not allege that the Supervisory Defendants maintained a dangerous condition at

Springer Correctional Center ("Springer Correctional") in Springer, New Mexico, by failing to

prevent sexual abuse that the Female Inmates suffered.  The Court concludes that: (i) Green makes

no factual allegations against Vigil or R. Gonzales, and so the Court dismisses Green's Eighth

Amendment claim against them; (ii) Gallegos makes no factual allegations against Sanchez, and

so the Court dismisses Gallegos' Eighth Amendment claim against Sanchez; (iii) Dominguez makes no allegations against Sanchez and Vigil, and so the Court dismisses Dominguez' Eighth Amendment claim against Sanchez and Vigil; (iv) Green states a plausible Eighth Amendment claim against Sanchez; (v) Gallegos does not state a plausible Eighth Amendment claim against Vigil or R. Gallegos, because she does not allege that they knew about Defendant Malcolm Gonzales' abuse; (vi) Dominguez states a plausible Eighth Amendment claim against R. Gonzales; (vii) Sanchez is not entitled to qualified immunity from Green's Eighth Amendment claim against him, because his deliberate indifference to Defendant Christopher Padilla's sexual abuse violates clearly established law; (viii) R. Gonzales is entitled to qualified immunity from Dominguez' Eighth Amendment claim against him, because his deliberate indifference did not cause a constitutional violation; and (ix) the Female Inmates state a plausible negligence claim against the Supervisory Defendants under § 41-4-6, because the Supervisory Defendants reasonably should have known about rampant sexual abuse against female inmates at Springer Correctional, and their inaction created a dangerous condition.  The Court will permit the Female Inmates to submit a motion to amend the complaint consistent with D.N.M.LR-Civ. 15.1.  Accordingly, the Court grants in part and denies in part the Motion.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint for Civil Rights Violations, State Tort Claims and Damages, filed August 15, 2019 (Doc. 1)("Complaint").  The Court provides these facts for background.  It does not adopt them as the truth, and it recognizes that these facts are largely the Female Inmates' version of events.

This lawsuit arises from sexual abuse that the Female Inmates experienced from prison guards at Springer Correctional.  Since 2016, New Mexico has incarcerated between 400 and 500 female inmates at Springer Correctional, a forty-acre, twenty-two-building compound in the State's northeastern region.  See Complaint ¶¶ 13-14, at 3.  The Female Inmates allege that Springer Correctional is "understaffed, with a very high inmate to correctional officer ratio," and that "[p]oor management of the facility made it highly likely for sexual assault to occur[.]"  Complaint ¶¶ 16-17, at 3.  The Female Inmates attribute this risk to: (i) Springer Correctional's "continued employment of correctional officers including Defendants [Christopher] Padilla, [Justin] Sanders and Malcom Gonzales despite their known assaultive behavior"; (ii) "the large number of areas that were not monitored by cameras"; and (iii) the "overall lack of controls to properly protect female inmates who are supervised by largely male correctional officers."  Complaint ¶ 17, at 3.

Padilla, Sanders, and M. Gonzales began working as correctional officers at Springer Correctional between 2015 and 2016.  See Complaint ¶¶ 18-20, at 3-4.  During the same time period, Sanchez, Cruz-Martinez, and Vigil "served as successive wardens at Springer Correctional[.]"  Complaint ¶ 21, at 4.  Wardens at Springer Correctional manage the facility's daily operations, including making decisions about hiring and firing correctional officers.  See Complaint ¶ 22, at 4.

### 1.    Green's Allegations.

Green began her incarceration at Springer Correctional on October 3, 2016 and, shortly thereafter, began working "on a crew in the kitchen."  Complaint ¶¶ 23-24, at 4.  In December, 2016, "Padilla was placed in charge of the kitchen and of the inmates working there," including

Green, over whom he "had complete control . . . and the power to take her job away should he choose to" do so.  Complaint ¶ 25, at 4.  "Right away, Padilla began making inappropriate and unwanted comments about Ms. Green's body," including "on the size of her nipples," and repeatedly "instructed Ms. Green to show him her breasts and told her that, in exchange, he would let her take food out of the kitchen."  Complaint ¶¶ 27-29, at 4.  These and similar comments persisted for months, and Green complied with Padilla's demands that she show him her breasts.  See Complaint ¶ 30, at 4.

"During this time, it was obvious to Padilla's supervisors and other staff that Padilla was abusive and preyed on a number of inmates," including seeking out "women who did not have the money on their books to purchase food from the commissary and [he] would direct them to reveal their bodies in exchange for food from the kitchen."  Complaint ¶ 32, at 5.  "Despite this behavior, Padilla was promoted to maintenance supervisor in or about February or March, 2017."  Complaint ¶ 34, at 5.  In the spring of 2017, Padilla began regularly visiting Green's room, coercing her to insert Jolly Rancher candies in her vagina, and he would "then proceed to eat them in front of her."  Complaint ¶¶ 37-44, at 5-6.

In March, 2017, another inmate named Martinez and "at least one other inmate" attempted to report Padilla's sexual abuse, including his abuse against Green, through Springer Correctional's Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, 117 Stat. 972 (2003)("PREA"), hotline, but had difficultly doing so, because Springer Correctional posted an incorrect telephone number for the hotline.  Complaint ¶ 45, at 6.  Eventually, Martinez' complaint reached the Springer Correctional administration; shortly thereafter, two New Mexico State Police officers interviewed Green, who "reported some of what Padilla had done to her."  Complaint

¶¶ 47-48, at 6.  Sanchez was present at the interview but "took no action to remove Defendant Padilla from the facility or to otherwise protect the inmates from his predatory behavior." Complaint ¶¶ 50-51, at 6.  After the interview, Green "filed an informal grievance with the prison complaining about Padilla," but Springer Correctional officials later told her that "they had no record" of the report.  Complaint ¶¶52-53, at 6.  Around the time that Green reported Padilla's abuse, the abuse escalated, with Padilla frequently "coming to Ms. Green's cell and ordering her to masturbate while he watched."  Complaint ¶ 54, at 6.  Padilla also "regularly shook down Ms. Green's cell so that he could go pick through her underwear."  Complaint ¶ 56, at 7.

In "late March or early April," 2018, Green "was called to meet with members of the administration regarding the informal grievance" she submitted against Padilla which the administration "had previously denied receiving," and the "committee informed her  that the recommendation for resolution for her grievance was to send her for mental health treatment." Complaint ¶¶ 57-58, at 7.  She did not receive any mental health treatment, however, until September, 2018, after Green requested treatment.  See Complaint ¶¶ 59-60, at 7.  Green told her counselor that "she was having serious anxiety because Padilla was still coming around her cell," and she later detailed Padilla's abuse to "Ms. Serna," a therapist.  Complaint ¶¶ 61-62, at 7.  On September 1, 2018, while Green was working in the Springer Correctional kitchen, "two investigators came to see her regarding Padilla," and Green "revealed the same information she had previously told state police."  Complaint ¶¶ 64-65, at 7.  She was thereafter fired from her job in the kitchen, and Green alleges that she was fired "in retaliation for reporting Padilla."  Complaint ¶¶64-67, at 7.  She was also moved out of "honor housing," in which she "had a private room, a washer and dryer, no curfew and first pick of commissary items," into a different unit without

these privileges.  Complaint ¶¶ 68-70, at 7-8.  Green alleges that the "housing change and removal of privileges was made in retaliation for reporting Padilla."  Complaint ¶ 71, at 8.  When Green asked R. Gonzales, the "unit manager for the honor unit," why she had lost her privileges, he "responded that he had learned about her report regarding Padilla and told her she was a liar and to get the hell out of his face."  Complaint ¶¶ 72-73, at 8.  Padilla remained in his position as maintenance supervisor with full access to all housing units, and, for the duration of Green's incarceration, he "continued to come to the unit where she lived, just to intimidate and frighten her."  Complaint ¶¶ 74-75, at 8.  Green never received written notice that she had committed any infractions or rules violations during her time at Springer Correctional.  See Complaint ¶ 68, at 7.

### 2.    __Gallegos' Allegations.__

Gallegos was incarcerated at Springer Correctional from August, 2017, to February 14, 2019.  See Complaint ¶ 77, at 8.  Upon her arrival at Springer Correctional, M. Gonzales "began harassing her, . . . commenting that he liked it when she got mad because it was sexy."  Complaint ¶¶ 79-80, at 8.  Male correctional officers at Springer Correctional regularly "patrolled" bathroom areas and showers, and "could and did watch the female inmates use the bathroom and shower" without announcing their presence.  Complaint ¶¶ 81-83, at 8-9.  On one instance, Gallegos "discovered [M.] Gonzales in the bathroom performing sexual acts with another inmate," after which M. Gonzales increasingly harassed Gallegos and forced her to show him her bare breasts.  Complaint ¶¶ 84-91, at 9.  M. Gonzales also forced Gallegos and Dominguez "to kiss in front of him while he watched and pleasured himself."  Complaint ¶ 94, at 9.

Gallegos was afraid to report M. Gonzales' abuse to Springer Correctional administrators, because she was "afraid that prison officials would retaliate against her by throwing her in

segregation as they had [done to] other inmates who had reported unlawful behavior by correctional officers." Complaint ¶ 98, at 10. Instead, at first she asked "mental health personnel to have her moved because she wasn't comfortable around [M.] Gonzales." Complaint ¶ 99, at 10. Eventually, Gallegos reported M. Gonzales to Vigil, who "did not nothing but direct her to go to Defendant Robert Gonzales with her complaints." Complaint ¶ 100, at 10. When Gallegos reported M. Gonzales' behavior to R. Gonzales, who, as Captain and Chief of Security "had discretion to move Ms. Gallegos to another unit," Complaint ¶ 102, at 10, R. Gonzales responded that "half the unit isn't comfortable with [M. Gonzales]," and that, if he moved Gallegos, he would have to "move half the girls" in the unit, Complaint ¶ 101, at 10. Gallegos subsequently submitted two written transfer requests to R. Gonzales, who "threw one of the requests in the trash right in front of Ms. Gallegos and did nothing to act on either of them." Complaint ¶ 104, at 10. "In retaliation for reporting Malcolm Gonzales, Ms. Gallegos' cell was raided." Complaint ¶ 105, at 10. R. Gonzales also "told Ms. Gallegos an many other inmates that they would be punished if they so much as spoke to PREA auditors when they visited the facility." Complaint ¶ 106, at 10.

### 3. Dominguez' Allegations.

Dominguez began her incarceration at Springer Correctional in October, 2016. See Complaint ¶ 109, at 11. In May, 2018, Dominguez "was moved into segregation where she was held for three days." Complaint ¶ 110, at 11. During this time, Sanders began to sexually harass Dominguez. See Complaint ¶ 111, at 11. "Every half hour, he would turn on the light, wake her up, and make derogatory comments to her." Complaint ¶ 112, at 11. Sanders also forced Dominguez to show him her breasts while he masturbated. See Complaint ¶¶ 114-116, at 11.

Dominguez reported Sanders' behavior to Springer Correctional's Security Threat Intelligent Unit ("STIU") officer "Fernandez."   Complaint ¶ 117, at 11.   Fernandez belittled the complaint and referred to Sanders as Dominguez' "boyfriend."   Complaint ¶ 118, at 11.   STIU officers later "found letters written between another inmate and Defendant Sanders," after which "Sanders went on leave for a couple of weeks," and R. Gonzales told him to "get his shit together and stop messing with the hoes."   Complaint ¶¶ 120-121, at 11-12.   After Sanders returned to work, he continued working in segregation, but he was never again alone with Dominguez.   See Complaint ¶ 125, at 12.   Because another correctional officer was present, Sanders "did not openly ask Ms. Dominguez to show her breasts but instead continually gave her hand signals directing her to flash him."   Complaint ¶ 125, at 12.

"When [Dominguez] was not in segregation, [M.] Gonzales was assigned to her unit."   Complaint ¶ 126, at 12.   In May and June, 2018, M. Gonzales would "pull her into his office," where he would "instruct" her to kiss him and, "on at least one occasion, [M] Gonzales grabbed her breasts and fondled her for several minutes."   Complaint ¶¶ 127=131, at 12.   "Sometime after this, [M.] Gonzales was moved to a different housing unit, and Ms. Dominguez didn't see him for several weeks."   Complaint ¶ 135, at 13.   When she next saw him, he told her "he was being watched," but he nonetheless brought Dominguez and Gallegos into his office, where he made them kiss each other while he masturbated.   Complaint ¶ 136, at 13.   See id. ¶¶ 137-38, at 13.

## PROCEDURAL HISTORY

The Female Inmates filed the Complaint on August 15, 2019, alleging four causes of action. See Complaint at 12-15.   First, the Female Inmates allege "cruel and unusual punishment in violation of the Eighth Amendment" against Padilla, Sanders, M. Gonzales, Sanchez, Vigil, and

R. Gonzales.  Complaint ¶ 143, at 13.  The Female Inmates allege that the Defendants "violated Plaintiffs' right to be afforded a reasonable degree of safety from serious bodily attack and to be secure in their bodily integrity."  Complaint ¶ 145, at 14 (citing Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993)).  In Count II, Green alleges "retaliation in violation of the First Amendment" to the Constitution against M. Gonzales and R. Gonzales.  Complaint ¶ 149, at 14.  The Female Inmates in Count III allege assault, battery, false imprisonment, and intentional infliction of emotional distress against Padilla, M. Gonzales, and Sanders.[1]  See Complaint ¶ 157, at 15.  In Count IV, the Female Inmates allege that Sanchez, Cruz-Martinez,[2] Vigil, and R. Gonzales negligently maintained the Springer Correctional, and that they have waived their immunity under N.M. Stat. Ann. ¶ 162, at 16.  The Female Inmates seek compensatory damages and attorney's fees.  See Complaint ¶ 158, at 15.

### 1.    The Motion.

The Supervisory Defendants move to dismiss Counts I and IV under rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion at 1.  After summarizing the legal standard for rule 12(b)(6) motions and the law regarding qualified immunity, the Supervisory Defendants allege that the Female Inmates "have grafted three different, separate lawsuits into one."  Motion at 3. See id. at 1-2.  The Supervisory Defendants contend that there is "only the most minimal overlap or connection between the material conduct applicable to Ms. Green, and that applicable to Ms. Gallegos and/or Ms. Dominguez, respectively, apart from the fact that the three women were

---

[1]On May 12, 2020, the Female Inmates dismissed Count III. See Stipulation of Dismissal of Count III of Plaintiffs' Complaint at 1, filed May 12, 2020 (Doc. 35).

[2]On January 20, 2020, the Female Inmates dismissed their claims against Cruz-Martinez. See Stipulation of Dismissal at 1, filed January 20, 2020 (Doc. 26).

inmates at [Springer Correctional]."   Motion at 3-4 (citing Fed. R. Civ. P. 20(a)(1)(A)).   The Supervisory Defendants do not assert misjoinder, but the Supervisory Defendants contend that the Female Inmates do not each assert claims against each Defendant, and so the Court may dismiss certain claims out of hand.   See Motion at 4-5.

For example, the Supervisory Defendant contend that Green, Gallegos, and Dominguez make "no factual allegations against" Cruz-Martinez, and that Gallegos and Dominguez "make absolutely no allegations whatsoever regarding Warden Sanchez" despite naming him as a Defendant in Count I.   Motion at 5.   The Supervisory Defendants further argue that Green and Dominguez make no "specific factual allegations regarding Warden Vigil's alleged unconstitutional acts, conduct or behavior," but rather that the Female Inmates base Vigil's liability on her status as warden when the abuse happened.   Motion at 6.   Last, the Supervisory Defendants contend that Green makes no specific factual allegations against R. Gonzales "apart from the fact that he was Captain and Chief of Security."   Motion at 6.   As for the other Female Inmates' claims against R. Gonzales, the Supervisory Defendants contend that Gallegos' and Dominguez' allegations that R. Gonzales threatened them are "not tied to any allegedly cruel and unusual punishment imposed on" them.   Motion at 7-8.

The Supervisory Defendants next assert that the Female Inmates allege supervisory liability, contravening the Supreme Court of the United States of America's § 1983 caselaw.   See Motion at 8 (citing Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009)("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.")).   The Supervisory Defendants argue that, where a plaintiff seeks to hold a state official liable for conduct arising from his or her supervisory responsibility, "she must prove 'not only that

the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well.'"  Motion at 9 (quoting Dobbs v. Richardson, 614 F.3d 1185, 1198 (10th Cir. 2010); and citing Winters v. Bd. of Cty. Comm'rs, 4 F.33d 848, 855 (10th Cir. 1993); Meade v. Grubbs, 841 F.2d 1512, 1527-28 (10th Cir. 1988)).  The Supervisory Defendants also contend that a supervisor's liability "'must be predicated on the supervisor's deliberate indifference, rather than mere negligence.'"  Motion at 9 (quoting Langley v. Adams Cty, Colo., 987 F.2d 1473, 1481 (10th Cir. 1993)).  The Supervisory Defendants assert that, in the prison context, "deliberate indifference . . . has both an objective and a subjective component: the prison official must be aware of the facts from which an inference of constitutional harm could be drawn, and he or she also must in fact draw the inference[.]"  Motion at 10 (emphasis in Motion)(citing Farmer v. Brennan, 511 U.S. 825, 837-38 (1994)).  They also assert that "there must be evidence" of deliberate indifference.  Motion at 10 (citing Langley v. Adams Cty., Colo., 987 F.2d at 1481).

The Supervisory Defendants assert that the Female Inmates have not stated a plausible Eighth Amendment claim.  See Motion at 11.  Regarding Sanchez, the Supervisory Defendants aver that Green's allegation that Sanchez was present when Green spoke to the State Police officers is insufficient to state an Eighth Amendment claim against Sanchez.  See Motion at 11.  They contend that a "prison official cannot be held liable based on a showing that a particular risk of harm was obvious and that a reasonable official would have known about it; the prison official must be aware of the risk."  Motion at 11 (citing Farmer v. Brennan, 511 U.S. at 837-38).  The Supervisory Defendants also argue that the Complaint "is ambiguous" as to whether the Female Inmates allege that Sanchez was present when Green spoke with NM State Police officers, "or

merely was present inside the prison complex." Motion at 11. They argue that this ambiguity is fatal to Green's Eighth Amendment claim against Sanchez, because Green does not allege that Sanchez "became subjectively conscious" of the risks that Green faced. Motion at 12.

As for Vigil, the Supervisory Defendants argue that Gallegos' allegations lack requisite specificity about what Gallegos reported to Vigil and that Gallegos does not "allege that Warden Vigil subjectively drew the inference" that Gallegos was at risk of constitutional violations. Motion at 12. They contend that, as to R. Gonzales, Dominguez and Gallegos' allegations fail as a matter of law, because they do not "specify exactly what behavior" they reported to R. Gonzales, and so they do not show that R. Gonzales was subjectively aware of the risks they faced regarding M. Gonzales. Motion at 12. Although the Supervisory Defendants detail the allegations that the Female Inmates make regarding R. Gonzales, the Supervisory Defendants contend that these allegations do not state a "plausible claim for relief under the Eighth Amendment." Motion at 12. See id. at 13. The Supervisory Defendants ask that the Court dismiss the Complaint's Count I insofar as it makes allegations against them, because the Complaint does not allege "'unnecessary and wanton infliction of pain'" or that the Supervisory Defendants had a "'sufficiently culpable state of mind.'" Motion at 13 (quoting Farmer v. Brennan, 511 U.S. at 834).

Turning to the Plaintiff's State law claim, the Supervisory Defendants contend that the Female Inmates have not alleged facts that would trigger a waiver of the Supervisory Defendants' immunity. See Motion at 14. The Supervisory Defendants note that the New Mexico Tort Claims Act ("NMTCA"), N.M. Stat. Ann. § 41-4-1 to -30, provides a limited waiver of New Mexico State officials' sovereign immunity, and that the "statute is valid and constitutional as to the immunity itself and the express, limited waivers of immunity." Motion at 14 (citing Ferguson v. State

Highway Comm'n, 1982-NMCA-180, 656 P.2d 244).  The Supervisory Defendants aver that the

Supreme Court of New Mexico has "squarely held" that the waiver relevant to the Female Inmates'

claim -- N.M. Stat. Ann. § 41-4-6 -- "does <u>not</u> waive immunity where the negligence at issue

involves an 'administrative function associated with the operation of the corrections system' or for

acts and omissions involving the 'security, custody, and classification' of inmates."  Motion at 14-

15 (quoting <u>Archibeque v. Moya</u>, 1993-NMSC-079, ¶ 8, 866 P.2d 344, 347, and citing <u>Espinoza</u>

<u>v. Town of Taos</u>, 1995-NMSC-070, ¶ 8, 905 P.2d 718, 721)(emphasis in Motion).  The

Supervisory Defendants assert that "this principle . . . goes back at least thirty years, and has never

been questioned."  Motion at 15 (citing <u>Wittkowski v. State</u>, 1985-NMCA-066, ¶ 17, 710 P.2d 93,

97, <u>overruled by</u> <u>Silva v. State</u>, 1987-NMSC-107, 745 P.2d 380, <u>and holding modified by</u> <u>Abalos</u>

<u>v. Bernalillo Cty. Dist. Atty's Office</u>, 1987-NMCA-026, 734 P.2d 794).  The Supervisory

Defendants argue that § 41-4-6 waives immunity "only where the public employees being sued

'have a duty to operate or maintain a structure' and their negligence in performing such duty

creates a dangerous condition in the building or on the premises."  Motion at 16 (quoting <u>Johnson</u>

<u>v. Holmes</u>, 455 F.3d 1133, 1339 (10th Cir. 2006), and citing <u>Cobos v. Doña Ana Cty. Hous. Auth.</u>,

1998 NMSC-049, 970 P.2d 1143).

The Supervisory Defendants argue that the Female Inmates do not allege that they "had

any duty to operate or maintain the twenty-two physical structures constituting the Springer

Correctional, or that there was anything about the building or physical premises of the prison that

caused the alleged harm to Plaintiffs."  Motion at 17.  They further assert that the torts that the

Female Inmates allege pertain to the Supervisory Defendants' administrative functions, for which

§ 41-4-6 does not waive immunity.  <u>See</u> Motion at 17.  They argue that the Female Inmates point

to the Supervisory Defendants' "failure to move the Plaintiffs to a different housing unit or to reprimand or discipline a particular Correctional Officer," and that these actions do not amount to a dangerous condition at Springer Correctional within § 41-4-6's meaning.  Motion at 17.  The Supervisory Defendants accordingly argue that the Female Inmates' State tort claim is "simply not actionable," and so request that the Court dismiss Count IV as it pertains to the Supervisory Defendants.  Motion at 17.

　　　　2.　　**The Response**.

　　　　The Female Inmates respond.  See Plaintiffs' Response to Defendants John Sanchez, Ebeth Cruz-Martinez, Marianna Vigil, and Robert Gonzales' Motion to Dismiss Based on Qualified Immunity at 1, filed January 15, 2020 (Doc. 24)("Response").  The Female Inmates summarize their Eighth Amendment claim against the Supervisory Defendants: the "movants' failures either to encourage reports of prison rape and or to take any action whatsoever in response to Plaintiffs' claims of abuses, of which they were put on notice, constituted deliberate indifference to the widely known problem of sexual abuse at the Springer Correctional."  Response at 2.  The Female Inmates ask that the Court deny the Motion, because the Complaint "clearly supports plausible claims against Defendants for violations of Plaintiffs' Eighth Amendment rights to be free from cruel and unusual punishment as well as claims for which immunity is waived pursuant to the [NMTCA]" Response at 2.  After noting that the Court must accept all well-pled allegations as true, see Response at 2 (citing McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 997 (10th Cir. 2002)), the Female Inmates aver that they have stated plausible claims for relief, and so the Court should deny the Motion, see Response at 3.

The Female Inmates aver that, for supervisory liability to attach under § 1983, "[p]ersonal participation is an essential allegation," but that "'[d]irect participation'" is not necessary. Response at 4 (quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990); and citing Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)).  Instead, the Female Inmates aver that the "'requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"  Response at 4 (quoting Snell v. Tunnell, 920 F.2d at 700).  The Female Inmates also argue that liability attaches when a policymaking official endorses or creates a policy that is itself a constitutional violation, or that creates an unnecessary risk of a constitutional violation occurring.  See Response at 4 (citing Dodds v. Richardson, 614 F.3d at 1199).  They further assert that a supervisory defendant is liable when he or she "authorized, supervised, or participated in conduct which caused the constitutional violation."  Response at 4 (citing D.T. by M.T. v. Indep. Sch. Dist., 894 F.2d 1176, 1187 (10th Cir. 1990)).  Summarizing their asserted standard, the Female Inmates aver that they must allege that the Supervisory Defendants were personally involved in the harm that the Female Inmates suffered, that the Supervisory Defendants involved caused the harm, and that the Supervisory Defendants had the requisite state of mind. See Response at 5 (citing Dodds v. Richardson, 614 F.3d at 1199; Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013)).  They also contend that Ashcroft v. Iqbal limited but did not eliminate qualified immunity.  See Response at 5 (citing Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)).

The Female Inmates aver that the Complaint satisfies this standard.  See Response at 5. They allege that a prison officials' assault against an inmate is an Eighth Amendment violation.

See Response at 6 (citing <u>Taylor v. Salazar</u>, 516 F.3d 912, 916 (10th Cir. 2008); <u>Schwenk v. Hartford</u>, 204 F.3d 1187, 1197 (9th Cir. 2000)).  They assert that Sanchez, Vigil, and R. Gonzales "had personal involvement" in the sexual assaults that the Female Inmates suffered, because they created a policy that enabled the assaults.  Response at 5.  The Female Inmates also assert that a prison official's failure to protect an inmate from a known harm may constitute an Eighth Amendment violation.  See Response at 5 (citing <u>Hovater v. Robinson</u>, 1 F.3d at 1068; <u>Nunez v. Goord</u>, 172 F. Supp. 2d 417, 430 (S.D.N.Y. 2001)(Marrero, J.)).

The Female Inmates contend that they "allege sufficient facts to support more than a plausible claim against Defendants Sanchez, Vigil, and Robert Gonzales."  Response at 8.  They say that the Complaint alleges that the Supervisory Defendants poorly managed Springer Correctional by keeping it understaffed "with a very high inmate to correctional officer ratio" and "lack of controls to properly protect female inmates," and that this poor management "made it highly likely for sexual assault to occur."  Response at 8.  They contend that Sanchez and Vigil served as Springer Correctional's wardens when the assaults occurred, and that the Complaint alleges that "each warden had control of the management of the facility during his or her tenure, including with regard to decisions to hire and fire correctional officers."  Response at 8.

Responding to the Supervisory Defendants' argument that the Complaint combines unrelated allegations, the Female Inmates contend that "it is in great part the ongoing, repetitive and flagrant sexual abuse at Springer Correctional over a long period of time and affecting numerous individual inmates that makes movants['] refusal to act to protect Plaintiffs from sexual assault so egregious and so clearly contrary to the Eighth Amendment."  Response at 8-9.  Regarding the Supervisory Defendants' argument that the Complaint lacks requisite specificity,

the Female Inmates argue, for example, that Sanchez was Springer Correctional's warden when Padilla began assaulting Green, and that Sanchez "was present during Plaintiff Green's interview with police officers as well as the interview of other inmates who were victims of abuse." Response at 9 (citing Complaint ¶ 50, at 6). The Female Inmates assert that the Court can reasonably infer from these allegations that Sanchez "knew not only that officers were questioning Green but that the interview with state police addressed the sexual abuse to which Ms. Green had been subjected by a correctional officer." Response at 9 (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)). The Female Inmates argue that Sanchez' subsequent inaction means he personally was involved, for § 1983's purposes, in Padilla's later sexual abuse. See Response at 9 (citing Gonzales v. Martinez, 403 F.3d 1179, 1186-87 (10th Cir. 2005); Poore v. Glanz, 724 F. App'x 635, 640-43 (10th Cir. 2018)(unpublished)).

Regarding Vigil, the Female Inmates say Vigil directing Gallegos to bring her complaints about M. Gonzales' abuse to R. Gonzales without taking further action to protect Gallegos "constitutes individual inaction which further proves the affirmative link between Defendant Vigil and the constitutional violation to Ms. Gallegos' constitutional right to be secure in her bodily integrity and free from attack by prison guards." Response at 10. Regarding R. Gonzales, the Female Inmates contend that he dismissed Gallegos' complaints and then "retaliated against plaintiffs for coming forward" when he told them they would be punished if they complained to PREA auditors. Response at 10-11. The Female Inmates contend that the Complaint therefore alleges sufficient facts to "infer that defendants were personally involved in failing to take action . . . to prevent further sexual abuse at Springer Correctional." Response at 11 (citing Tafoya v. Salazar, 516 F.3d 912, 920 (10th Cir. 2008)). The Female Inmates accordingly contend that the

Supervisory Defendants' vicarious liability arguments are "moot."  Response at 11. The Female Inmates then argue that the Complaint alleges that the Supervisory Defendants' inaction caused the Female Inmates Eighth Amendment violations.  See Response at 12.

The Female Inmates also contend that the Complaint demonstrates that the Supervisory Defendants "acted with deliberate indifference to the known dangers to the Plaintiffs."  Response at 13.   The Female Inmates assert that the Supervisory Defendants knew about the risks that the Female Inmates faced but did nothing, which supports an inference of deliberate indifference.  See Response at 13 (citing Tafoya v. Salazar, 516 F.3d at 916).  The Female Inmates contend that the deliberate-indifference standard does not require them to show that the Supervisory Defendants "intentionally sought" to harm the Female Inmates, but rather that they acted "with knowledge that harm . . . would result."  Response at 13 (citing Farmer v. Brennan, 511 U.S. at 835-36).  The Female Inmates aver that each of the Supervisory Defendants' conduct evinces deliberate indifference, because they either did nothing to protect the Female Inmates from sexual abuse or punished them for speaking out.  See Response at 13-14.  The Female Inmates contend that the United States Court of Appeals for the Tenth Circuit has held that a prison official's inaction despite correctional officers' known sexual abuse violates the Eighth Amendment, and so the Complaint alleges violations of clearly established law.  See Response  14 (citing Keith v. Koerner, 707 F.3d 1185, 1188 (10th Cir. 2013)("Keith I")).  They assert that, in Keith I, the Tenth Circuit "denied qualified immunity to a warden after a correctional officer sexually assaulted a female inmate," because the warden knew that the correctional officer had sexually assaulted inmates and that the prison lacked enough security cameras to monitor inmates and staff.  Response at 14 (citing 707 F.3d at 1189).  The Female Inmates assert that a warden's failure to adequately staff a prison

with correctional officers can also support a finding of deliberate indifference.  <u>See</u> Response at 15 (citing <u>Lopez v. LeMaster</u>, 172 F.3d 756, 759 (10th Cir. 1999)).  The Female Inmates thus contend that the Supervisory Defendants violated the Female Inmates' clearly established rights by ignoring their complaints, by failing to remove Padilla and M. Gonzales, and by maintaining an inadequately staffed facility.  <u>See</u> Response at 15-16.

The Female Inmates next assert that the Supervisory Defendants are not immune from the Female Inmates' negligence claims, because they maintained a dangerous condition at Springer Correctional.  <u>See</u> Response at 16-17.  The Female Inmates acknowledge that § 41-4-6 does not waive immunity for actions pertaining to "security, custody, and classification of inmates," but they argue that State officials are liable when their actions create a dangerous condition or defect in a government building.  Response at 17 (citing <u>Archibuque v. Moya</u>, 1993-NSMC-079, ¶ 8, 866 P.2d at 347; <u>Bober v. N.M. State Fair</u>, 1991-NMSC-031, 808 P.2d 614).  The Female Inmates contend that, in the prison context, New Mexico's courts have held that § 41-4-6 waives liability when correctional officials do not prevent inmates' foreseeable violence.  <u>See</u> Response at 17 (citing <u>Callaway v. N.M. Dep't of Corr.</u>, 1994-NMCA-049, ¶ 19, 875 P.2d 393, 399).

The Female Inmates aver that the Supervisory Defendants "erroneously argue that Count IV is based on claims of administrative acts," and that the Complaint's allegations instead are analogous to the facts in <u>Callaway v. New Mexico Department of Corrections</u>.  Response at 18. The Female Inmates argue that the Supervisory Defendants' inaction in the face of the Female Inmates' complaints "combined to create a condition that is dangerous to a particular class of people that use" Springer Correctional.  Response at 18 (citing <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040, ¶¶ 21-25, 141 P.3d 1259, 1264-65).   The Female Inmates argue that the

Complaint's allegations against Sanchez, Vigil, and R. Gonzales "fall comfortably within the ambit of current New Mexico precedent construing Section 41-4-6[.]"  Response at 18.  The Supervisory Defendants' inaction and retaliation, the Female Inmates aver, "placed more than a single individual at risk and have a clear nexus to the operation and maintenance of a building." Response at 18.  The Female Inmates accordingly argue that their tort claims are viable under § 41-4-6.  See Response at 18-19.

Last, the Female Inmates say that, if the Court concludes that the Supervisory Defendants are entitled to qualified immunity, or that the Female Inmates do not state a claim under § 41-4-6, the Court should grant them leave to amend the Complaint.  See Response at 20.  The Female Inmates argue that rule 15 of the Federal Rules of Civil Procedure provide that courts should freely grant leave to amend the Complaint.  See Response at 20 (citing Fed. R. Civ. P. 15(a)(2)).  They aver that amendment would not be futile, although they do not detail the allegations or claims that an amended complaint would assert.  See Response at 20

### 3.    **The Reply**.

The Supervisory Defendants reply.  See Reply in Support of Motion to Dismiss Based on Qualified Immunity at 1, filed February 14, 2020 (Doc. 31)("Reply").   The Supervisory Defendants contend that the Female Inmates do not dispute that Gallegos and Dominguez

> made no allegations whatsoever . . . regarding Defendant Sanchez; that Plaintiffs Green and Dominguez made no factual allegations regarding Defendant Vigil (apart from the bare allegation that as the warden, she was in charge of Springer Correctional 'during some of the events' complained of); that Plaintiff Green made no factual allegations about Defendant Robert Gonzales (apart from the bare facts that his rank was captain and that he was chief of security at the prison); and that none of the Plaintiffs made any factual allegations whatsoever about Defendant Cruz-Martinez.

Reply at 1-2 (emphasis in Reply).  The Supervisory Defendants "stand by their assertion: this is, in reality, three different, separate actions melded into one."  Reply at 2.

Turning to the Female Inmates' Eighth Amendment claim, the Supervisory Defendants also stand by their assertion that the Female Inmates allege impermissible vicarious liability claims against them, and that they "pay lip service to the teaching of the Supreme Court in <u>Ashcroft v. Iqbal</u>; that whatever an official's title or position, he or she may be held liable only for his or her own personal misconduct, and not for misconduct perpetrated by his or her subordinates or other people."  Reply at 2.  They contend that, in the Response, the Female Inmates "continue to muddy the waters with arguments that amount to collective guilt and supervisory, respondeat superior liability."  Reply at 3 (citing Response at 8, 12).  The Supervisory Defendants aver that the Female Inmates cannot state a viable Eighth Amendment unless they allege plausibly that each of the Supervisory Defendants, "by his or her own personal conduct and each with the requisite intent, inflicted cruel and unusual punishment on each of the Plaintiffs."  Reply at 3.  The Supervisory Defendants argue that the Female Inmates' claims resemble closely the kind of allegations that the Supreme Court determined in <u>Ashcroft v. Iqbal</u> to be insufficient.  <u>See</u> Reply at 3-4.  After summarizing that case's facts and holding, the Supervisory Defendants assert that the case sets a high bar for plaintiffs who sue supervisors, such that it is not enough "to make a bare, conclusory allegation that the supervisor had knowledge of an unconstitutional acts, or that he had the requisite state of mind; there must be more."  Reply at 6.  <u>See</u> <u>id.</u> at 4-5.

The Supervisory Defendants say that the Court must match the Complaint's factual allegations from each Plaintiff to each Supervisory Defendant, and then dismiss those claims that do not correspond with allegations specific to each Supervisory Defendant.  <u>See</u> Reply at 6.  They

thus contend that: (i) Gallegos and Green lodge no allegations against Sanchez; (ii) Green and Dominguez make no allegations against Vigil; and (iii) Green asserts no allegations against R. Gonzales.  See Reply at 6.  The Supervisory Defendants thus contend that the Court must dismiss: (i) the Complaint's Count I as to Green and Gallegos' claims against Sanchez; (ii) Green and Dominguez' claims against Vigil; and (iii) and Green's claim against R. Gonzales.  See Reply at 6-7.  The Supervisory Defendants say that the Female Inmates have clarified that they do not allege that Sanchez was present when NM State Police officers interviewed Green, and the Supervisory Defendants contend that this allegation does not sufficiently allege Sanchez' personal, direct involvement in the harm that Green suffered.  See Reply at 7-8.  The Supervisory Defendants also note that Complaint says that Green reported "'some of what" Padilla had done to her, and that this ambiguity forecloses Sanchez' liability, because the Female Inmates make no specific allegation that Sanchez knew about the abuse that Green was suffering.  Reply at 9.  To suggest otherwise, the Supervisory Defendants contend, is "pure, unbridled speculation and cannot constitute the sole basis of a plausible claim against Sanchez based on his own personal actions." Reply at 9 (citing Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983)).

Regarding Gallegos' Eighth Amendment claim against Vigil, the Supervisory Defendants contend, "by common sense," that Vigil's referral of Gallegos' complaints to R. Gonzales "would not be unusual or inappropriate in a facility housing about [750] inmates," because R. Gonzales was the prison's Chief of Security.  Reply at 10.  The Supervisory Defendants further aver that the Complaint does not specify what Gallegos told Vigil, leaving the Court to "guess and speculate, and to assume factual averments not made."  Reply at 11.  The Supervisory Defendants accordingly

argue that Gallegos does not state a plausible Eighth Amendment claim against Vigil.  See Reply at 11.

Turning to Dominguez' Eighth Amendment claim, the Supervisory Defendants assert that she makes "two bare factual allegations to support her . . . claim against Robert Gonzales in his individual capacity."  Reply at 11.  Regarding Dominguez' allegation that R. Gonzales told her not to take to PREA auditors, the Supervisory Defendants say that the Complaint does not tie this threat to any abuse that Dominguez suffered, or allege that R. Gonzales "was made aware of the facts from which an inference of constitutional harm as to Ms. Dominguez could be drawn and that he subjectively drew such an inference."  Reply at 11.  They also assert, "as a matter of law," that there is a "material distinction" between inmates reporting abuse and PREA auditors' visits to prison facilities.  Reply at 12 (citing 28 C.F.R. §§ 115.51, 115.93).  The Supervisory Defendants assert that there is "an obvious, common-sense distinction between instructing [750] female inmates not to interfere with the auditors, . . . and telling them not to report sexual abuse[.]"  Reply at 12.  They assert that the Complaint is ambiguous and so requires the Court "to create averments that simply have not been alleged."  Reply at 12.  The Supervisory Defendants thus assert that, because there is a plausible, non-malicious characterization of R. Gonzales' statements to Dominguez, the Court should dismiss Dominguez' Eighth Amendment claim against R. Gonzales.  See Reply at 12.

The Supervisory Defendants apply the same arguments to Gallegos' Eighth Amendment claim against R. Gonzales -- that there is a plausible, benign reason for his statement regarding PREA auditors -- and they argue that there are "myriad . . . alternative, legitimate reasons" for R. Gonzales' refusal to transfer Gallegos to a different housing unit.  Reply at 13.  The Supervisory

Defendants assert that construing the Complaint to allege that R. Gonzales refused to transfer Gallegos as blatant inaction in the face of a known threat is "speculation," and so Gallegos does not state a plausible Eighth Amendment claim against R. Gonzales. Reply at 13. The Supervisory Defendants thus assert that the Court must dismiss: (i) Gallegos and Green's Eighth Amendment claim against Sanchez; (ii) Green and Dominguez' Eighth Amendment claim against Vigil; and (iii) Green's Eighth Amendment claim against R. Gonzales. See Reply at 6.

Turning to the Complaint's State tort claim, the Supervisory Defendants contend that the Complaint "fail[s] to make the allegation necessary to state a claim under § 41-4-6: that the supervisors had a duty to operate or maintain the subject building or premises." Reply at 14 (citing Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049, ¶ 17, 970 F.2d at 1150). The Supervisory Defendants acknowledge that caselaw "certainly extends the waiver beyond physical problems in physical structures," but they argue that the Female Inmates allege only that the Supervisory Defendants had a duty to protect the Female Inmates' safety. Reply at 14-15. According to the Supervisory Defendants, "such an allegation, and such a duty, do[] not waive immunity for negligence in the operation or maintenance of any building under the New Mexico case law." Reply at 15 (internal quotation marks omitted). They argue that the Complaint's allegations concern "nothing more or less than . . . 'administrative function[s] associated with the operation of the corrections system' or involving the 'security [or] custody' of prison inmates or the failure to supervise subordinate employees, and as such, the claim is not justiciable under § 41-4-6." Reply at 15 (quoting Archibeque v. Moya, 1993-NMSC-079, ¶ 8, 866 P.2d at 347)(alterations in Reply and not in Archibeque v. Moya). The Supervisory Defendants thus request that the Court dismiss the Complaint's Count IV. See Reply at 15.

Last, the Supervisory Defendants assert that the Female Inmates seek leave to amend the Complaint, because they "recogniz[e] the potential insufficiency of their claims[.]" Reply at 15. The Supervisory Defendants argue that, because the Female Inmates have not submitted any proposed amendments, D.N.M.LR-Civ. 15.1 forecloses the Court from granting leave to amend until the Female Inmates produce a proposed amendment. See Reply at 16. The Supervisory Defendants thus ask that the Court deny the Female Inmates amendment request until they submit their proposed amendment. See Reply at 16.

### 4.    The Hearing.

The Court held a hearing on the Motion on March 12, 2020. See Draft Transcript of Motion Hearing (held March 12, 2020), at 2:23-25 (Court)("Tr.").[3] The Court began the hearing by asking whether the Motion mounts an "Iqbal-Twombly challenge or . . . a motion to dismiss on qualified immunity[.]" Tr. at 3:5-7 (Court). The Supervisory Defendants responded that the Motion raises "substantively" a challenge under Ashcroft v. Iqbal and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)("Twombly"), but that the Motion also asserts the Supervisory Defendants' entitlement to qualified immunity "based on the substantive standard set out in primarily Iqbal." Tr. at 3:12-18 (Dickman). The Supervisory Defendants asserted, however, that, if the Complaint does not state a plausible claim under Twombly, "that in itself would . . . ipso facto entitle them to qualified immunity." Tr. at 4:1-3 (Dickman). The Court responded that, if the problem is with the Complaint's allegations, then the Court should grant the Female Inmates leave to amend. See Tr. at 4:8-10 (Court). The Supervisory Defendants replied that their arguments overlap, because they

---

[3]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version. Accordingly, page and line numbers are subject to slight change in the final, filed transcript.

assert that the Female Inmates do not allege plausibly facts that support an inference that the Supervisory Defendants subjectively were aware of the risks that the Female Inmates faced, and so the Complaint does not state an Eighth Amendment claim against them.  See Tr. at 6:19-7:3 (Dickman).  The Supervisory Defendants then re-summarized the facts and holding in Ashcroft v. Iqbal, which they contend is "extraordinarily analogous to a case like this."  Tr. at 12:4-5 (Dickman).

After summarizing the Reply's arguments about the relationship between each Female Inmate and each Supervisory Defendants, see Tr. at 7:4-8:9 (Dickman), the Supervisory Defendants noted that the Complaint states no allegations against Cruz-Martinez, see Tr. at 8:9-10 (Dickman).  The Supervisory Defendants acknowledged that the Female Inmates have dismissed their claims against Cruz-Martinez, but the Supervisory Defendants said that they "bring [] up" Cruz-Martinez "to show the paucity of the allegations made."  Tr. at 8:10-11 (Dickman).  The Supervisory Defendants reiterated their argument that the Female Inmates' claims against Sanchez and Vigil rely only on their status as Springer Correctional wardens, and so are not viable under Ashcroft v. Iqbal.  See Tr. at 8:23-9:24 (Dickman).  Noting that the Reply does not argue for full dismissal of all the Female Inmates' Eighth Amendment claims, the Supervisory Defendants asserted that there remains Green's claim against Sanchez, Gallegos' claim against Vigil, and Gallegos' and Dominguez' claims against R. Gonzales.  See Tr. at 11:11-19 (Dickman).

After summarizing at length Ashcroft v. Iqbal's facts and holdings, the Supervisory Defendants argued that, just as the Supreme Court held implausible allegations that the Attorney General of the United States and the Director of the Federal Bureau of Investigation approved a policy of violating detainees' constitutional rights, the Female Inmates' allegations that the

Supervisory Defendants approved the repeated abuse that the Female Inmates suffered are equally implausible.  See Tr. at 13:2-14:16 (Dickman).  For each of the Female Inmates' Eighth Amendment claims, the Supervisory Defendants contended that the Complaint lacks specificity, and that the Court should not equate the Female' Inmates reporting to counselors or unnamed administrators' with the Supervisory Defendants' subjective knowledge of the abuse that the Female Inmates suffered.  See, e.g., Tr. at 18:23-19-4 (Dickman).  Regarding Green's claims against Sanchez, the Supervisory Defendants asserted that the Court can "discount all the allegations against the administration, the committee, the members of the administration, [and] prison officials because those are not allegations against Mr. Sanchez personally."  Tr. at 15:15-18 (Dickman).  They further reiterated their argument that the Court may discount Green's allegations against Sanchez, because the Complaint does not specify what she reported to the NM State Police officers, and does not specify the information of which Sanchez was subjectively aware.  See Tr. at 17:2-20 (Dickman); id. at 18:3-6 (Dickman).  The Supervisory Defendants thus asserted that Green's allegations against Sanchez are implausible.  See Tr. at 18:8-10 (Dickman).

Turning to Gallegos' Eighth Amendment claim against Vigil, the Supervisory Defendants argued that the Complaint does not provide precisely what Gallegos told Vigil about M. Gonzales' abuse.  See Tr. at 19:9-12 (Dickman).  They assert that the Complaint also does not state specifically what Gallegos told the Springer Correctional's counselors and does not allege that Vigil was aware of Gallegos' reporting to the counselors.  See Tr. at 19:15-18 (Dickman).  They reiterated that Vigil directing Gallegos' complaints to R. Gonzales is "not an inappropriate thing to do . . . and there are more plausible explanations than that [Vigil] drew an inference that Ms.

Gallegos was being sexually assaulted and decided to do nothing." Tr. at 20:2-5 (Dickman). To conclude otherwise, they argued, is "pure speculation." Tr. at 20:6-7 (Dickman).

Turning to Dominguez' Eighth Amendment claim against R. Gonzales, the Supervisory Defendants aver that the "key allegation[s]" are that R. Gonzales placed Sanders on administrative leave after he learned of Sanders' abuse of another inmate, and that R. Gonzales threatened Dominguez with "a lockdown and lost good time in retaliation for talking to PREA auditors." Tr. at 21:9 (Dickman). See id. at 21:6-21 (Dickman). The Supervisory Defendants assert that these allegations are "totally ambiguous," and that the threat regarding PREA auditors is "not tied to any specific sexual abuse . . . [or] knowledge of facts giving rise to any sexual abuse." Tr. at 22:7-9 (Dickman). They assert that the Court must look at the Complaint and ask whether "there are more likely explanations" that do not support liability rather than resolving inferences in the Female Inmates' favor. Tr. at 23:4-7 (Dickman). Similarly, the Supervisory Defendants argued that the Complaint "doesn't say what behavior" Gallegos reported to R. Gonzales, and that M. Gonzales' comment that "half the unit isn't comfortable with [M. Gonzales]" does not support an inference that R. Gonzales was aware of M. Gonzales' abusive behavior. Tr. at 24:18-20 (Dickman). See id. at 24:13-24 (Dickman). According to" the Supervisory Defendants, the "more plausible explanation is that [he] can't be moving inmates around at their convenience." Tr. at 24:24-25 (Dickman). They concluded by stating that the Female Inmates "have the thinnest allegations and don't even come close to stating a plausible claim for an Eighth Amendment violation." Tr. at 25:23-24 (Dickman).

The Female Inmates asked that the Court grant them leave to amend the Complaint if the Court "is inclined to find that qualified immunity applies[.]" Tr. at 26:19-21 (Johnson). They

noted that under rule 20 of the Federal Rules of Civil Procedure, "plaintiffs may join in one action . . . if they assert any right to relief jointly, severally, or in the alternative with respect to acts that arise out of the same transaction or series of transactions." Tr. at 28:10-14 (Johnson). The Female Inmates argued that they are properly joined under rule 20, because their allegations arise out of similar transactions against similar defendants, and they share common questions of law. See Tr. at 28:18-22 (Johnson).

The Female Inmates acknowledge that supervisors' § 1983 liability requires personal involvement in the constitutional tort, but they argued that liability does not require personal involvement. See Tr. at 29:1-6 (Johnson). They pointed to D.T. by M.T. v. Independent School District No. 16 of Pawnee County, Oklahoma to assert that a supervisor, affirmatively or by omission, who authorizes or ratifies a subordinate's unconstitutional actions may be liable for his or her personal involvement. See Tr. at 29:7-10 (Johnson); id. at 29:15-18 (Johnson). They also cited Keith I as a factually analogous case standing for the proposition that wardens may be liable for" pervasive sexual abuse in prisons. See Tr. at 29:20-22 (Johnson); id. at 30:12-17 (Johnson). The Court asked whether that has "been any questioning" of Snell v. Tunnell, Tr. at 29:23-24 (Court), and whether plaintiffs still can pin a supervisor's liability on what he or she "should have known," Tr. at 30:20-22 (Court). The Female Inmates responded that the United States Court of Appeals for the Tenth Circuit concluded in Keith I that courts may infer a supervisor's subjective awareness. See Tr. at 30:29-31:2 (Johnson). The Female Inmates averred that they "have alleged more" than what the Tenth Circuit concluded was sufficient in Keith I. See Tr. at 31:3 (Johnson).

Turning to the Supervisory Defendants' entitlement to qualified immunity, the Female Inmates asserted that the Supervisory Defendants have conceded that a correctional officer's

sexual abuse of an inmate is an Eighth Amendment violation, and that the Tenth Circuit has affirmed this point in Tafoya v. Salazar.  See Tr. at 31:8-11 (Johnson).   Regarding Sanchez' supervisory liability, the Female Inmates contended that the Court may infer that he was "present during" Green's interview with NM State Police officers, because the Female Inmates "didn't allege he was present on the ground," and so the Court may "reasonably infer from those facts that it wasn't that he was just somewhere on the premises."  Tr. at 32:2-7 (Johnson).  The Court responded that, under Ashcroft v. Iqbal, the Court must "be careful about [] inferring that sort of fact."  Tr. at 32:10-12 (Court).  The Female Inmates responded that their asserted inference is fair under Ashcroft v. Iqbal, but that, if the Court disagrees, they could amend the Complaint "to clarify it more succinctly[.]"  Tr. at 32:25-33:1 (Johnson).  They further argued that Sanchez' presence at Green's interview, and his subsequent inaction and decision not to "remove Officer Padilla from his job . . . to protect the inmates, [is] exactly what you have in [Keith I]."  Tr. at 33:7-12 (Johnson). They asserted that the allegations in Keith I are "more general," because, in that case "you have just an audit that shows that there is pervasive sexual abuse," whereas here the Female Inmates allege that Sanchez specifically was aware that Padilla had been assaulting Green.  See Tr. at 33:15-18 (Johnson).  The Female Inmates asserted that, in Gonzales v. Martinez, the Tenth Circuit affirmed that a supervisor's inaction in the face of knowledge of constitutional violations can give rise to liability under § 1983.  See Tr. at 33:25-34:3 (Johnson).  The Female Inmates thus contended that Green has stated a viable Eighth Amendment claim against Sanchez.  See Tr. at 35:4-6 (Johnson).

Regarding Vigil, the Female Inmates said that Gallegos reported M. Gonzales' abuse to Vigil, so "now you have personal participation[, because] she's made aware just like the warden

in Keith[v. Koerner,] . . . and just like the sheriff in Tafoya v. Salazar." Tr. at 36:15-19 (Johnson).

They asserted that the "fact that she tells Ms. Gallegos go talk to Robert Gonzales is

inconsequential because as a prison official she has the duty . . . to take action to protect the

inmate." Tr. at 36:22-37:2 (Johnson). The Female Inmates asserted that, under Keith I, "failing

to act can serve both as proof of the causation element and the state of mind [element]," and so

Vigil's failure to protect Gallegos gives rise to liability. Tr. at 37:19-22 (Johnson). Regarding

R. Gonzales, the Female Inmates assert that his threatened retaliation against the Gallegos and

Dominguez for speaking to PREA auditors, along with his knowledge that correctional officers

were assaulting the inmates, gives rise to liability. See Tr. at 38:3-8 (Johnson). The Female

Inmates thus argued that, "even under the Iqbal standard," they have stated valid Eighth

Amendment claims against Vigil, Sanchez, and R. Martinez. Tr. at 38:9 (Johnson). See id. at 12-

16 (Johnson).

      The Court said that "the problem" is that, if it denies the Motion, "it becomes immediately

appealable," which puts the Court "out on a limb," because of the "very thin record here in this

complaint." Tr. at 39:9-19 (Court). The Female Inmates asked that the Court permit them to "file

a motion to stay or to not rule on this but allow the plaintiffs to amend the complaint[.]" Tr.

at 39:21-24 (Johnson). They said that, because the Court has not entered a scheduling order in this

case, the Court may allow the Female Inmates to amend the Complaint. See Tr. at 40:10-18

(Johnson).

      The Supervisory Defendants noted that, while the Complaint may assert that Sanchez was

present for Green's interview with NM State Police, and the Female Inmates asserted at the hearing

that he was present, the Female Inmates state in their Response that Sanchez was present at

Springer Correctional rather than present in the interview room.  See Tr. at 43:8-22 (Dickman).
The Supervisory Defendants contended that, "from having seen the State Police Report," Sanchez
was not present in the interview room.  Tr. at 42:24 (Dickman).  They also asserted that the Court
may draw from its "judicial experience" to infer that, "when police officers come to interview the
alleged victim of a crime, they do not have people in the room with them who may be complicit
in the crime[.]"  Tr. at 43:2-5 (Dickman).  Summarizing, the Supervisory Defendants contended
that it is implausible that the they were aware of the sexual abuse that the Female Inmates suffered:
"If you say Defendant Sanchez ordered the Martians to come and kidnap so and so, and he had
personal knowledge they did so, that doesn't plausibly state a claim that that happened."  Tr. at
44:5-9 (Dickman).  The Supervisory Defendants declined to address qualified immunity's clearly-
established prong, because they asserted that the Complaint does not state a constitutional
violation.  See Tr. at 46:3-8 (Dickman).  The Supervisory Defendants accordingly asked the Court
to determine whether the Complaint alleges a constitutional violation, rather than addressing only
the clearly-established prong, despite the Supreme Court of the United States' instructions for
district courts ruling on qualified immunity.  See Tr. at 46:11-13 (Dickman).  The Supervisory
Defendants conceded, however, that, if the Female Inmates reported sexual abuse to the
Supervisory Defendants, and the Supervisory Defendants did nothing despite this knowledge, then
the Female Inmates assert a clearly established right.  See Tr. at 49:13-19 (Court, Dickman).  The
Supervisory Defendants contended, however, that the "Complaint doesn't allege that[.]"  Tr.
at 48:22-23 (Dickman).

The Female Inmates asserted that the Supervisory Defendants' arguments are best analyzed
under rule 12(b)(6), rather than under the qualified immunity standard, which bolsters the Female

Inmates' request for leave to amend the Complaint.  See Tr. at 46:22-47:6 (Johnson).  The Supervisory Defendants asserted that, because the Female Inmates have not submitted any proposed amendments, they are unable to take a position on the Female Inmates' rule 15 request. See Tr. at 50:5-10 (Dickman).  The Supervisory Defendants contended, however, that they put a "tremendous amount of effort" into briefing the Motion, Tr. at 51:12 (Dickman), and so asked that the Court rule on the Motion and decide whether the Supervisory Defendants are entitled to qualified immunity, reserving its ruling on the Female Inmates' amendment request until they submit a proposed amendment, see Tr. at 51:14-18 (Dickman).

Turning to the Female Inmates' state law claim, the Supervisory Defendants contended that immunity waivers are "to be strictly construed," and that plaintiffs suing prison officials for sexual assault "routinely" invoke § 41-4-6, because are not considered law enforcement officers under the NMTCA.  Tr. at 55:4-11 (Dickman).  The Supervisory Defendants cited the Court's Order in Ortiz v. Bearden, No CIV 18-0028 JB\LF, and said that, in that case, the Court dismissed a plaintiff's § 41-4-6 claim regarding a prison official's sexual abuse, and so the Court's decision in that case is "governing."[4]  Tr. at 56:15 (Dickman).  See id. at 55:20-56:15 (Dickman).  They contended that the Complaint alleges "failure to discipline or fire subordinate employees[,] the failure to change inmate housing assignments," and "failing to protect inmates from predatory behavior by specific correctional officers."  Tr. at 56:16-22 (Dickman).  They argued that these

---

[4]The Supervisory Defendants cited to the Court's Order at 1-2, filed September 10, 2018 (Doc. 27 in No. CIV 18-0028 JB/LF), in which the Court dismissed the plaintiff's state law claim, but the Court notes that, in the Order, the promised that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for this decision."  Order at 1 n.1.  See Tr. at 56:2-8 (Dickman)(noting that the Court's Order is "kind of cursory," because the Order is not a "full opinion").

allegations do not pertain to a building's operation or maintenance, but rather to administration functions for which immunity is not waived. <u>See</u> Tr. at 57:2-7 (Dickman). The Supervisory Defendants assert that the Female Inmates attempt to hang liability on the Supervisory Defendants' negligent supervision, and that § 41-4-6 does not waive immunity for negligent supervision. <u>See</u> Tr. at 58:22-59:6 (Dickman). The Court responded that, in its estimation, New Mexico's courts "had somewhat loosened the immunity and broadened it to include [this] class of claims," in which the government's negligent endangered a "broad range" of a building's users. Tr. at 59:16-19 (Court). The Court asked the Supervisory Defendants whether immunity is waived "in a situation where the allegations are that in a broad segment the guards are sexually [abusive]." Tr. at 59:24-60:1 (Court). The Supervisory Defendants acknowledged that § 41-4-6 has been expanded lately, <u>see</u> Tr. at 60:3-4 (Dickman), but they asserted that "jails and prisons are different," and so are entitled to narrower readings of the immunity statutes, Tr. at 60:20-22 (Dickman). They argued that New Mexico's courts have "never wavered from the idea that administrative associations[] associated with prison operations are not covered by [§ 41-4-6]." Tr. at 61:8-10 (Dickman)(citing <u>Saiz v. Franco</u>, No. CIV 15-0587 JCH\WPL, 2016 U.S. Dist. LEXIS 123235 (D.N.M. Sept. 12, 2016)(Herrera, J.)).

The Female Inmates responded that their claims do not pertain to the Supervisory Defendants' administrative functions. <u>See</u> Tr. at 65:8-10 (Johnson). They averred that the Supervisory Defendants, by insufficiently staffing Springer Correctional and retaining guards whom they knew to be abusive, created and maintained a condition that was dangerous to female inmates at Springer Correctional. <u>See</u> Tr. at 65:14-20 (Johnson). They asserted that <u>Callaway v. New Mexico Department of Corrections</u> is most analogous to their claims and supports their

assertion that the Supervisory Defendants have waived their immunity under § 41-4-6.  See Tr. at 66:20-25 (Johnson).   They further asserted that, contrary to the Supervisory Defendants' arguments, "this is not an issue of classification" or other administrative function, like "whether or not good time was taken away from these inmates; this is an issue of safety."  Tr. at 67:9-13 (Johnson).  They averred that, instead of prisons being presumptively unique under § 41-4-6, they present an instance in which the State has a "special relationship of custody and control over a class of individuals," which New Mexico's courts have typically concluded supports a waiver of immunity.  Tr. at 67:17-22 (Johnson).  The Supervisory Defendants replied that they retain their immunity, because the Complaint alleges that they have a duty to protect the Female Inmates' health and safety, which is not "the essential element" under § 41-4-6.  Tr. at 69:12-14 (Dickman).  They further assert that the Female Inmates do not allege a condition that is dangerous to a class of inmates, because they assert three separate lawsuits, and because "this is not the same correctional officer roaming around sexually assaulting women."  Tr. at 70:4-12 (Dickman).  The Female Inmates asserted that the Court of Appeals of New Mexico "rejected" the Supervisory Defendants' argument in Quevedo v. New Mexico Children Youth, and Families Department, 2016-NMCA-101, 385 P.3d 657.  Tr. at 72:8-9 (Johnson).  They noted their allegations that several officers engaged in abusive conduct at Springer Correctional against various inmates and said that they therefore allege more than negligent supervision.  See Tr. at 72:18-22 (Johnson).  The Court took the Motion under advisement.  See Tr. at 75:11-14 (Court).

## LAW REGARDING RULE 20

Rule 20 addresses permissive parties.  Joinder under rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby

preventing multiple lawsuits." League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 558

F.2d 914, 917 (9th Cir. 1977)(citing Mosley v. General Motors Corp., 497 F.2d 1330 (8th Cir.

1974)). "Under the Rules, the impulse is toward entertaining the broadest possible scope of action

consistent with fairness to the parties; joinder of claims, parties and remedies is strongly

encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. at 724.

Rule 20 provides:

(a)    **Persons Who May Join or Be Joined.**

(1)    ***Plaintiffs***.  Persons may join in one action as plaintiffs if:

(A)    they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B)    any question of law or fact common to all plaintiffs will arise in the action.

(2)    ***Defendants***.  Persons -- as well as a vessel, cargo, or other property subject to admiralty process in rem -- may be joined in one action as defendants if:

(A)    any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B)    any question of law or fact common to all defendants will arise in the action.

(3)    ***Extent of Relief***.  Neither a plaintiff nor a defendant need be interested in obtaining or defending against all the relief demanded.  The court may grant judgment to one or more plaintiffs according to their rights, and against one or more defendants according to their liabilities.

(b)     **Protective Measures**.  The court may issue orders -- including an order for separate trials -- to protect a party against embarrassment, delay, expense, or other prejudice that arises from including a person against whom the party asserts no claim and who asserts no claim against the party.

Fed. R. Civ. P. 20.  Thus, rule 20(a) requires only that: (i)  the claims by or against the party to be joined arise from the same transaction, occurrence, or series of transactions or occurrences underlying the claims by or against the party it seeks to join; and (ii) the claims by or against the party to be joined share at least one question of law or fact with the claims by or against the party it seeks to join.  See Fed. R. Civ. P. 20(a).

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555 (citation omitted).  See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of

action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate." Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Twombly, 550 U.S. at 570)(internal citations omitted). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125; Gossett v. Barnhart, 139 F. App'x 24, 25 (10th Cir. 2005)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint."). Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004), states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint." 91 F. App'x at 85.  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the

motion." 627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23; Mocek v. City of

Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concluded that the Court may consider a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.; SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING AMENDMENTS TO PLEADINGS

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading. See Fed. R. Civ. P. 15(a). Otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires" -- to amend his or her pleading. Rule 15(a) provides:

(a)     Amendments Before Trial.

   (1) Amending as a Matter of Course.  A party may amend its pleading once as a matter of course within:

     (A) 21 days serving it, or

     (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

   (2) Other Amendments.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

   (3) Time to Respond.  Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.).  The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Foman v. Davis, 371 U.S. 178, 182 (1962).  Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

  A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile."  Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d

848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An

amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v.

Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny

leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith

or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357,

1365-66 (10th Cir. 1993)).  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule

15(a) ] is to provide litigants the maximum opportunity for each claim to be decided on its merits

rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Sch., No. 05-1165, 2007

WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co.,

451 F.3d 1196, 1204 (10th Cir. 2006)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal

and state officials from liability for discretionary functions, and from 'the unwarranted demands

customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of

Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Under § 1983, a

plaintiff may seek money damages from government officials who have violated his or her

constitutional or statutory rights.  To ensure, however, that fear of liability will not "unduly inhibit

officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. at 638, the officials

may claim qualified immunity; so long as they have not violated a "clearly established" right, the

officials are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.   <u>Saucier</u>

<u>v. Katz</u>, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff must

demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights;

and (ii) that the right was clearly established at the time of the alleged misconduct.   <u>See</u> <u>Riggins v.</u>

<u>Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009); <u>Pueblo of Pojoaque v. New Mexico</u>, 214 F. Supp.

3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.      **Procedural Approach to Qualified Immunity.**

The Supreme Court revisited the proper procedure for lower courts to evaluate a qualified

immunity defense in 2009.   In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances of the particular

case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory,

Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the

Constitution, and then the court determines if the right violated was clearly established -- will often

be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach,

the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right

is not clearly established but far from obvious whether in fact there is such a right," and that such

an approach burdens district courts and Courts of Appeals with "what may seem to be an

essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior

mandatory approach "departs from the general rule of constitutional avoidance and runs counter

to the older, wiser judicial counsel not to pass on questions of constitutionality unless such

adjudication is unavoidable."  555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566

U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified

immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports

with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address

only"[5] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[5]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts."  Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d at 1180-81.  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'"   Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context.  Camreta v. Greene, 563 U.S. at 706-07.  See Kerns v. Bader, 663 F.3d at 1181.[6]  "Courts should think carefully before expending

---

(2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

[6]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

<hr>

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)(unpublished)("If dispositive of the claim, we ordinarily need address only the second element of qualified immunity, that is, whether the law supporting a constitutional violation was clearly established."  (citing Kerns v. Bader, 663 F.3d at 1180)).  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5.

The Tenth Circuit does not always undertake the clearly established law analysis before the constitutional violation analysis.  See, e.g., Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir. 2019)(unpublished); Rudnick v. Raemisch, 774 F. App'x 446, 449 (10th Cir. 2019)(unpublished); Serrano v. United States, 766 F. App'x at 565.  Since Kerns v. Bader, the Tenth Circuit has commented:

> Although it is within the court's sound discretion to determine which of the two elements to address first, Pearson, 555 U.S. at 236 . . . , "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances,  Kerns, 663 F.3d at 1180 (quoting Camreta v. Greene, 563 U.S. [at] 707 . . . .)).

Serrano v. United States, 766 F. App'x at 565.  In Serrano v. United States, the Tenth Circuit stated that the district court addressed only the constitutional violation prong after concluding that Serrano had not established a constitutional violation and approved the district court's analysis, because the district court "also had to consider the reasonableness of the team's use of force for purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-60,] claims."  Serrano v. United States, 766 F. App'x at 565.

The Court believes, as a general rule, that the constitutional violation analysis should receive more attention.  On remand from Kerns v. Bader, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to

provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment."  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people --

_____

and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  Since Kerns v. Board of Commissioners, the Court has also observed:

> The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.

> A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[7]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.    Clearly Established Rights.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that he or she violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and

---

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

[7]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)[8](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the

---

[8]Lobozzo v. Colo. Department of Correction, is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value"). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Serrano v. United States, 776 F. App'x 561, 569 (10th Cir. 2019); Rudnick v. Raemisch, 774 F. App'x 446 (10th Cir. 2019); Savage v. Troutt, 774 F. App'x 574 (10th Cir. 2019); Choate v. Huff, 773 F. App'x 484 (10th Cir. 2019); Perry v. Durborow, 892 F.3d 1116 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552 (10th Cir. 2017); Youbyoung Park v. Gaitan, 680 F. App'x 724 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906 (10th Cir. 2017); Sanchez v. Labate, 564 F. App'x 371 (10th Cir. 2014); Wilson v. City of Lafayette, 510 F. App'x 775 (10th Cir. 2013); Yadon v. Hilton, 516 F. App'x 694 (10th Cir. 2013); Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011); Wallin v. Dycus, 381 F. App'x 819 (10th Cir. 2010); and Hall v. Burke, 12 F. App'x 856 (10th Cir. 2001), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. at 308 (quoting Malley v. Briggs, 475 U.S. at 341).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. The Supreme Court has stated: "[T]he clearly established right must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, see City of Escondido v. Emmons, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances"). See Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)("[T]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" (quoting Mullenix v. Luna, 136 S. Ct. at 308)); District of Columbia v. Wesby, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent

-- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").

The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, "clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances." A.N. by & through Ponder v. Syling, 928 F.3d 1191, 1198 (10th Cir. 2019). The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law." A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (quoting White v. Pauly, 137 S. Ct. at 552). According to the Tenth Circuit, "In other words, '[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.' And this is so 'even though the very action in question has not previously been held unlawful.'" A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (first quoting Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018), and then quoting Hope v. Pelzer, 536 U.S. 730 (2002)). The Tenth Circuit has cautioned that such an approach is inappropriate where a case involves "relevant ambiguities." Colbruno v. Kessler, 928 F.3d 1155, 1165 (10th Cir. 2019)(citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir. 2016)("Aldaba II"); Wilson v. City of Lafayette, 510 F. App'x 775, 778 (10th Cir. 2013)(unpublished); Thomson v. Salt Lake Cty., 584 F.3d at 1315-17).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Fed. Heights, 509 F.3d at 1284 ("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have

since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba II, 844

F.3d at 876.  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777

F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the

Supreme Court vacated its decision in light of Mullenix v. Luna.  In concluding that it had

previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . .  by relying on excessive-force cases markedly different from this one.
> Although we cited Graham v. Connor, 490 U.S. 386 (1989) to lead off our clearly-
> established-law discussion, we did not just repeat its general rule and conclude that
> the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-
> scale approach measuring degrees of egregiousness in affirming the denial of
> qualified immunity.  We also relied on several cases resolving excessive-force
> claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10

(10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the Hope Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances."  Id. at 741
> . . . .  This calls to mind our sliding-scale approach measuring the egregiousness of
> conduct.  See Morris v. Noe, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the
> Supreme Court has vacated our opinion here and remanded for us to reconsider our
> opinion in view of Mullenix, which reversed the [United States Court of Appeals
> for the] Fifth Circuit after finding that the cases it relied on were "simply too
> factually distinct to speak clearly to the specific circumstances here."  136 S. Ct.
> at 312.  We also note that the majority opinion in Mullenix does not cite Hope v.
> Pelzer . . . .  As can happen over time, the Supreme Court might be emphasizing
> different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. at 551.  In

White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly

established' analysis: It failed to identify a case where an officer acting under similar

circumstances as Officer White was held to have violated the Fourth Amendment." White v.

Pauly, 137 S. Ct. at 552.[9]   The Supreme Court's per curiam reversals appear to have the Tenth

---

[9]The Supreme Court signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those signals to the district courts. See Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 556 (10th Cir. 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies"). Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's view of the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. at 1153, yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled approach is to minimize the expansion of the judicially created clearly established

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, 773 F. App'x 484, 487-88, at *2 (10th Cir. 2019)(unpublished); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir.

---

prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

    Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to agree with the Court, see, e.g., Casey v. City of Federal Heights, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colo. Springs, 709 F. App'x 906, 915-16 (10th Cir. 2017), and willing to reverse district court decisions.

2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017)(unpublished); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017)(unpublished); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (concluding that the publication of information about an arrested and detained juvenile violated clearly established equal protection law prohibited treating the juvenile differently than similarly situated juveniles); Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").  The Court notes, however, that the Tenth Circuit recently has relied on the sliding scale analysis.  See Easter v. Cramer, 785 F. App'x 602, 607 (10th Cir. 2019)(unpublished)("Thus, when addressing claims of excessive force, we apply a sliding scale in which '[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'").

## LAW REGARDING THE EIGHTH AMENDMENT

When a prisoner is incarcerated after being indicted, the Eighth Amendment protects him from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. at 828 (quoting Helling

v. McKinney, 509 U.S. 25, 28 (1993)).   "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."   Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).   An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."   Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted). The second condition represents the functional application of the deliberate indifference standard. See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." (internal quotation marks omitted)(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003))).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused."   Helling v. McKinney, 509 U.S. 25, 36 (1993).   Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."   Helling v. McKinney, 509 U.S. at 36 (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."   Helling v. McKinney, 509 U.S. at 36.   The Eighth Amendment does

not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action."). The Tenth Circuit has noted that, "in Hudson, the Supreme Court evidenced its 'commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury.'" United States v. LaVallee, 439 F.3d 670, 688 (10th Cir. 2006). Were it otherwise, the Tenth Circuit reasoned, "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." United States v. LaVallee, 439 F.3d at 688. See Hudson v. McMillian, 503 U.S. at 13 (Blackmun, J., concurring)("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). Thus, to establish excessive force in violation of the Eighth Amendment, the plaintiff need not establish that he or she "suffered a certain level or type of injury." United States v. LaVallee, 439 F.3d at 688.

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry to determine whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated

deliberate indifference with recklessness."   Farmer v. Brennan, 511 U.S. at 836. The Supreme

Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be
> aware of facts from which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837.  For Eighth Amendment purposes, the Tenth Circuit has

equated deliberate indifference with recklessness.  See Belcher v. United States, 216 F. App'x 821,

823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court addressed whether a

plaintiff could assert both Eighth Amendment violations and substantive due-process violations in

the same suit against government officials alleging that they engaged in physically abusive

conduct.  See 490 U.S. at 394-95.  More specifically, it held that, when a specific constitutional

amendment provides "an explicit textual source of constitutional protection against this sort of

physically intrusive governmental conduct," courts should analyze all constitutional claims under

that amendment's standards rather than under "the more generalized notion of 'substantive due

process.'"  490 U.S. at 395.  The Supreme Court gave as an example for this principle "the Eighth

Amendment's ban on cruel and unusual punishments," because it is one of the "two primary

sources of constitutional protection against physically abusive governmental conduct."  490 U.S.

at 395.  The Supreme Court later clarified that its holding in Graham v. Connor "simply requires

that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth

or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific

provision, not under the rubric of substantive due process."  United States v. Lanier, 520 U.S. 259,

272 n.7 (1997).  To illustrate this point, the Supreme Court has recognized that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory.  See Cty. of Sacramento v. Lewis, 523 U.S. at 843-44 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . .  Graham's more-specific-provision rule is therefore no bar to respondents' suit.")(quoting U.S. Const. amend. IV).

In Riddle v. Mondragon, 83 F.3d 1197 (10th Cir. 1996), the Tenth Circuit addressed a case where the plaintiff asserted claims that they were "denied necessary medical care [in prison] in violation of their rights under the Eighth and Fourteenth Amendments."  83 F.3d at 1202.  In determining whether to apply Eighth Amendment standards or substantive due-process standards when reviewing the plaintiffs' claims in Riddle v. Mondragon, the Tenth Circuit noted that, "where constitutional protection is afforded under specific constitutional provisions, alleged violations of the protection should be analyzed under those provisions and not under the more generalized provisions of substantive due process."  83 F.3d at 1202 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990)).  Thus, the Tenth Circuit reviewed the plaintiffs' claims for denial of medical care in prison under the Eighth Amendment and did not consider the plaintiffs' substantive due-process theory.  See Riddle v. Monragon, 83 F.3d at 1202 ("Accordingly, we will review plaintiffs' claims under the Eighth Amendment as made applicable to the states through the Fourteenth Amendment.").  See also Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *30-32.

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2(A). The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A). As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A). The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(C). The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).

A plaintiff may not sue a New Mexico governmental entity or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees. See Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d at 256 ("Consent to be sued may not be implied, but must come within one of the exceptions to

immunity under the Tort Claims Act."),[10] rev'd on other grounds sub nom. Smialek v. Begay,

1986-NMSC-049, 721 P.2d 1306. "A plaintiff also may not sue a governmental entity or its

employees for a damage claim arising out of violations of rights under the New Mexico

Constitution unless the NMTCA contains a waiver of immunity." Lymon v. Aramark Corp., 728

F. Supp. 2d 1222, 1251 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir.

2012)(unpublished).  Accord Barreras v. State of N.M. Corr. Dep't, 2003-NMCA-027 ¶ 24, 62

P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently

declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New

Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims

Act.");[11] Chavez v. City of Albuquerque, 1998-NMCA-004 ¶ 8, 952 P.2d 474, 477 (noting that a

---

[10]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Begay v. State, that, for a plaintiff to sue a governmental entity, the entity must come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental entity's consent to suit. Section 41-4-2 provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act."  N.M. Stat. Ann. § 41-4-2.  The NMTCA also states that governmental entities and public employees acting in the scope of their duties shall be immune from liability for torts except as the NMTCA waives.  See N.M. Stat. Ann. § 41-4-4.  The Supreme Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must apply.  See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021 ¶ 6, 397 P.3d 1279, 1281; Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 6, 916 P.2d at 1313; Silva v. State, 1987-NMSC-107, ¶ 41, 745 P.2d 380, 388.

[11]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies.  In Begay v. State, the Supreme Court of New Mexico dismissed plaintiff's state constitutional claims against a governmental entity, because no NMTCA waiver applied.  See Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 ("We have determined that plaintiffs may not sue the state without its consent and that there is no express waiver for the medical examiner under the Tort Claims Act.").  The Court notes that in

plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity);[12] Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127 ¶ 11, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board);[13] Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that protects the "free exercise of religion"). The NMTCA does not limit the availability of many forms of equitable relief. See N.M. Stat. Ann. § 41-4-17(A) ("Nothing in this section shall be construed to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto."); El Dorado Utils. Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036 ¶ 28, 109 P.3d 305, 312 ("The Tort Claims Act would not bar a claim for injunctive relief.").[14]

---

Begay v. State, as discussed supra n.16, clarifies that "[c]onsent to be sued may not be implied" under the NMTCA. Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d 252, 256.

    [12]For the reasons discussed supra n.13, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in Chavez v. City of Albuquerque.

    [13]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Rubio v. Carlsbad Municipal School District, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in sections 41-4-5 to -12. See N.M. Stat. Ann. §§ 41-4-5 to -12. As discussed supra n.16, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

    [14]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with El Dorado Utilities, Inc. v. Eldorado Area Water and Sanitation District, that nothing in the NMTCA bars a separate claim for injunctive relief. While the Supreme Court of New Mexico has clarified that the NMTCA is "the exclusive remedy for any action for damages against the government," Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d 1132, 1135, the Act only limits damages brought against the state or

Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 1985-NMCA-117 ¶ 8, 723 P.2d at 255.

## LAW REGARDING NMTCA § 41-4-6

Section 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."  N.M. Stat. Ann. § 41-4-6.  Section 41-4-6's exemption balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care."  Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 6, 970 P.2d 1143, 1145 (citations and internal quotation marks omitted).  To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability, [and] waive[s] that immunity in certain defined circumstances." Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 6, 970 P.2d at 1145.  Section 41-4-6

> allows individual claims against governmental entities that are based on "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings."  [NMTCA § 41-4-6].  For the waiver to apply, the negligent "operation or maintenance" must create a dangerous condition that threatens the general public or a class of users of the building.

Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.

---

state employees acting within the scope of their duty and does not limit plaintiffs from seeking other forms of injunctive relief, see Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d at 1135.

The Supreme Court of New Mexico has adopted a broad interpretation of what constitutes a "building, public park, machinery, equipment, or furnishings."  N.M. Stat. Ann.  § 41-4-6.  Like common-law premises liability, the § 41-4-6 waiver may apply even when the negligence at issue occurred outside the boundaries of property owned and operated by the government.  "[T]he duty of a landowner to exercise ordinary care to avoid creating, or permitting an unreasonable risk of harm to others is not determined by . . . the happenstance that the accident and resulting injury occur inside or outside the property boundary."  Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 12, 808 P.2d 614, 618-19.  The Supreme Court of New Mexico explained, furthermore, that "[w]hile [§] 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal."  Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 9, 970 P.2d at 1146 (quoting N.M. Stat. Ann. § 41-4-6).  Also, like common-law premises liability, § 41-4-6 does not require that the negligence be related to a physical aspect of the building, machinery, or equipment.  "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building.")  Encinias v. Whitener Law Firm, P.A., 2013-NMCA-045 ¶ 10, 299 P.3d 424, 428 (quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 9, 141 P.3d at 1261).  Section 41-4-6 instead "contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government."  Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 27, 808 P.2d at 623 (citations and internal quotation marks omitted).

The Supreme Court of New Mexico has also interpreted § 41-4-6's phrase "operation and maintenance" somewhat broadly.  See N.M. Stat. Ann. § 41-4-6.  "[Operation and maintenance] is not 'limited [in] its applicability strictly to defects in the physical building.'"  Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1139 (10th Cir. 2006)(quoting Upton v. Clovis Mun. Sch. Dist., 2005-NMCA-085 ¶ 6, 141 P.3d at 1260-61).  New Mexico's courts have, however, found that § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v. Cordova, 1987-NMCA-020 ¶ 5, 734 P.2d at 256,[15] negligent design, see Rivera v. King, 1988-NMCA-093 ¶¶ 29-34, 765 P.2d 1187, 1194, cert. denied, No. 18,041, 765 P.2d 758 (1988)(unpublished table opinion),[16] negligent inspection, see Martinez v. Kaune, 1987-NMCA-

---

[15]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with Pemberton v. Cordova, that negligent supervision generally does not waive immunity.  The Supreme Court of New Mexico clarified in Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 14, 310 P.3d 611, 617, that while there is no waiver of immunity for negligent supervision, "prisons cannot turn a blind eye to threats to their inmates' safety."  2013-NMSC-045 ¶ 14, 310 P.3d at 617.  Although the Supreme Court of New Mexico clarified in Encinias v. Whitener Law Firm, P.A. that the Court of Appeals of New Mexico's narrow read of § 41-4-6(A) has since been discredited, it acknowledged that "its central premise, when analyzed under a premises liability theory, is still valid."  Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 13, 310 P.3d at 617.  Negligent supervision alone is not enough to waive immunity under § 41-4-6(A), but allegations that a governmental entity was negligent "in failing to exercise reasonable care to discover and prevent dangerous conditions caused by people on its premises," even where that care is supervisory in nature, might waive immunity under § 41-4-6(A).  See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 13, 310 P.3d at 617.  In Espinoza v. Town of Taos, 1995-NMSC-070, 905 P.2d 718, the Supreme Court of New Mexico stated: "However, Section 41-4-6 does not grant a waiver for claims of negligent supervision. . . ."  Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (citing Pemberton v. Cordova, 1987-NMCA-020 ¶ 5, 734 P.2d at 256).

[16]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with Rivera v. King that negligent design does not fit within § 41-4-6's grounds for an immunity waiver, based on Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent design)(citing Rivera v. King, 1988-NMCA-093 ¶¶ 29-34, 765 P.2d at 1194).

131 ¶¶ 5-10, 745 P.2d 714, 716-17, <u>cert. denied</u>, No. 17,361, 744 P.2d 912 (1987)(unpublished table opinion),[17] negligent regulation and investigation of violations, <u>see</u> <u>Caillouette v. Hercules, Inc.</u>, 1992-NMCA-008 ¶ 31, 827 P.2d 1306, 1312;[18] or negligent classification of a prison inmate, <u>see</u> <u>Archibeque v. Moya</u>, 1993-NMSC-079 ¶¶ 9-12, 866 P.2d at 348.

Although negligent supervision alone is not enough to trigger the § 41-4-6 waiver, "a claim that involves elements of negligent supervision can still fall under the waiver if that supervision is directly tied to the operation . . . of the building." <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 16, 141 P.3d at 1263. <u>See</u> <u>Leitheid v. City of Santa Fe</u>, 1997-NMCA-041 ¶¶ 3-4, 940 P.2d

---

[17]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would with <u>Martinez v. Kaune</u> that negligent inspection does not fit within § 41-4-6's grounds for an immunity waiver, based on <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent inspection)(citing <u>Martinez v. Kaune</u>, 1987-NMCA-131 ¶¶ 5-10, 745 P.2d at 716-17).

[18]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico in <u>Caillouette v. Hercules, Inc.</u> that negligent regulation and investigation of violations alone does not fall within the scope of the § 41-4-6 waiver, based on the Supreme Court of New Mexico's decision in <u>Romero v. State</u>, 1991-NMSC-071, 851 P.2d 628, and its denial of certiorari after <u>Caillouette v. Hercules</u>. In <u>Romero v. State</u>, the Supreme Court of New Mexico concluded that the New Mexico State Highway Department's statutory responsibilities constituted supervision of "maintenance" and fell within the § 41-4-6 waiver's scope. 1991-NMSC-071 ¶ 6, 815 P.2d at 630. The Supreme Court of New Mexico stated that "the greater supervisory responsibilities contemplated by the 1986 law included more than issuing regulations. Those responsibilities could have included supervising the county's actual day-to-day maintenance of the roadway." <u>Romero v. State</u>, 1991-NMSC-071 ¶ 9, 815 P.2d at 630. In <u>Romero v. State</u>, the Supreme Court of New Mexico suggested that, if the Highway Department's only responsibility had been to issue regulations, its actions would not have constituted maintenance. <u>See</u> 1991-NMSC-071 ¶ 9, 815 P.2d at 630. Although the Court is reluctant to read too much into the denial of a petition for certiorari, the Supreme Court of New Mexico did deny certiorari in <u>Caillouette v. Hercules</u>, evincing a disinclination to reconsider the Court of Appeals of New Mexico's decision in <u>Caillouette v. Hercules</u>. <u>See</u> <u>Caillouette v. Archibeque</u>, No. 20,355, 826 P.2d 573 (1992)(unpublished table decision).

459, 467;[19] <u>Romero v. State</u>, 1991-NMSC-071 ¶ 9, 815 P.2d 628, 630 (noting that the Highway

Department's maintenance responsibilities included "supervising the county's actual day-to-day

maintenance of the roadway"), <u>receded from on other grounds</u> by <u>Dunleavy v. Miller</u>, 1993-

NMSC-059, 862 P.2d 1212.  In <u>Leitheid v. City of Santa Fe</u>, city pool lifeguards failed to ask for

children's ages and heights, although pool regulations required adult supervision for children

younger than seven and shorter than forty-eight inches.  <u>See</u> <u>Leitheid v. City of Santa Fe</u>, 1997-

NMCA-041 ¶ 2, 940 P.2d at 460-61.  The Court of Appeals of New Mexico found that when the

"lifeguards did not adequately perform duties that were essential to public safety, they negligently

operated the swimming pool and thereby created a condition on the premises that was dangerous

to [the child] and the general public."  <u>Leitheid v. City of Santa Fe</u>, 1997-NMCA-041 ¶ 12, 940

P.2d at 462.  The school's conduct in <u>Upton v. Clovis Municipal School District</u> went beyond

negligent supervision, because: "(i) the school ignored information that the plaintiffs provided

them; (ii) the school failed to warn the substitute teacher about the student's condition; and (iii)

the school failed to follow through with the proper emergency procedures."  <u>C.H. v. Los Lunas</u>

---

[19]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with the reasoning of the Court of Appeals of New Mexico in <u>Leitheid v. City of Santa Fe</u>, in which the Court of Appeals of New Mexico concluded that the City's failure to provide adequate lifeguard supervision constituted negligent operation of a swimming pool, because the City's negligence created a "dangerous condition on the physical premises which affects the swimming public at large."  <u>Leitheid v. City of Santa Fe</u>, 1997-NMCA-041 ¶ 15, 940 P.2d at 463. In <u>Seal v. Carlsbad Independent School District</u>, 1993-NMSC-049 ¶¶ 10-11, 860 P.2d 743, 746, the Supreme Court of New Mexico suggested that, by not providing lifeguards, a school district may have waived immunity because its negligence caused an unsafe, dangerous, or defective condition on property owned and operated by the government.  <u>See</u> 1993-NMSC-049 ¶¶ 10-11, 860 P.2d at 746.  In <u>Espinoza v. Town of Taos</u>, the Supreme Court of New Mexico cited to <u>Seal v. Carlsbad Independent School District</u> as an example of a case under § 41-4-6 concerning negligent conduct that itself created an unsafe condition for the public, permitting a waiver of immunity.  <u>See</u> <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶ 14, 905 P.2d at 722.

Schools Bd. of Educ., 852 F. Supp. 2d at 1353 (citing Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 18, 141 P.3d at 126).  In Rave v. Board of Commissioners for the County of Bernalillo, 2017 WL 3600452, at *10, Judge Brack found that § 41-4-6's waiver applied where "the County's employees ignored information [plaintiff] gave them about his medical condition, failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and failed to follow through with and/or enforce its policies related to inmates with medical issues."  Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10.

In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in [§] 41-4-6, does not include the security, custody, and classification of inmates. . . .  Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." Archibeque v. Moya, 1993-NMSC-079 ¶ 8, 866 P.2d at 347 (citations omitted).  In Archibeque v. Moya, Chris Archibeque, an inmate at the Central New Mexico Correction Facility, was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico.  See 1993-NMSC-079 ¶ 2, 866 P.2d at 346.  Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population.  See 1993-NMSC-079 ¶ 2, 866 P.2d at 346.  Archibeque informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and Moya-Martinez, without checking an available list of current inmates, informed Archibeque that Gallegos was no longer at the prison.  See 1993-NMSC-079 ¶ 2, 866 P.2d at 346.  Archibeque was released into general population, and Gallegos assaulted him that night.  See 1993-NMSC-079 ¶ 2, 866 P.2d at 346.  Archibeque sued Moya-Martinez, other corrections officers, and the New Mexico

Department of Corrections in federal court for violations under 42 U.S.C. § 1983 and the NMTCA.

See 1993-NMSC-079 ¶ 3, 866 P.2d at 346.  The district court interpreted § 41-4-6 narrowly and

held that the statute did not waive immunity for negligent security and custody of inmates at the

penitentiary.  See 1993-NMSC-079 ¶ 4, 866 P.2d at 346.  Thereafter, Archibeque's § 1983 claims

were resolved in favor of Moya-Martinez and the other corrections employees.  See 1993-NMSC-

079 ¶ 4, 866 P.2d at 346.  The federal district court denied Archibeque's motion for

reconsideration.  See 1993-NMSC-079 ¶ 4, 866 P.2d at 346.  Archibeque appealed, and the Tenth

Circuit certified a question to the Supreme Court of New Mexico:

> Does [Section 41-4-6] of the New Mexico Tort Claims Act, [NMTCA Sections
> 41-4-1 to -29], provide immunity from tort liability to an employee of the state
> penitentiary whose alleged negligence in releasing a prisoner into the general
> prison population, which included known enemies of the prisoner, resulted in the
> prisoner being beaten and injured by one of his enemies?

See 1993-NMSC-079 ¶ 1, 866 P.2d at 345-46.  Archibeque argued that Moya-Martinez was

participating in the operation of the penitentiary when she classified Archibeque as an inmate who

could safely be released into the general prison population, and he argued that Moya-Martinez's

alleged negligence in misclassifying him and releasing him into the general population constituted

negligent operation of the penitentiary, thereby waiving immunity under § 41-4-6.  See 1993-

NMSC-079 ¶ 5, 866 P.2d at 346-47.  The Supreme Court of New Mexico found that § 41-4-6 did

not waive Moya-Martinez' immunity, stating: "The 'operation' and 'maintenance' of the

penitentiary premises, as these terms are used in Section 41-4-6, does not include the security,

custody, and classification of inmates."  1993-NMSC-079 ¶ 8, 866 P.2d at 347 (quoting N.M. Stat.

Ann. § 41-4-6).  The Supreme Court of New Mexico reasoned that Moya-Martinez was not

operating and maintaining the prison's physical premises when she negligently classified Archibeque.

> Rather, she was performing an administrative function associated with the operation of the corrections system.  Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions.  To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute.  See State v. Riddall, 112 N.M. 78, 80, 811 P.2d 576, 578 (Ct. App.)(stating that when interpreting a statute, an appellate court is required to consider the plain meaning of the words used and the intended purpose of the statute), cert. denied, 112 N.M. 21, 810 P.2d 1241 (1991).

1993-NMSC-079 ¶ 8, 866 P.2d at 347.  The Supreme Court of New Mexico further explained:

> While Moya-Martinez's misclassification of Archibeque put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population.  Reading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act, which recognizes that government, acting for the public good, "should not have the duty to do everything that might be done," and limits government liability accordingly.  See Section 41-4-2(A).

1993-NMSC-079 ¶ 11, 866 P.2d at 348.  According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6 whenever injury results from a negligently performed administrative task "would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate."  1993-NMSC-079 ¶ 14, 866 P.2d at 349.  Chief Justice Ransom stated that, whereas a "discrete administrative decision" does not waive immunity, a "general condition of unreasonable risk from negligent security practices" could waive immunity.  Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266 (quoting Archibeque v. Moya, 1993-NMSC-079 ¶ 16, 866 P.2d at 349 (Ransom, C.J., concurring)).

The Court has concluded that Chief Justice Ransom determined that § 41-4-6 applies when alleged negligence changes the condition of the premises in question, and when the plaintiff's injuries arise from the premises' condition.  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. In the context of inmate misclassification claims, the Court has concluded that a conclusory allegation that one inmate's misclassification created a danger for the inmate population could not support finding a waiver under § 41-4-6, and found that, to come within Chief Justice Ransom's footnote, inmate misclassification -- allegedly performed negligently -- must raise security risks, not health risks.  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266.  "The Court is reluctant to expand Chief Justice Ransom's possible exception to other areas beyond prison security." Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266-67.

New Mexico caselaw after Archibeque v. Moya suggests that, for negligent supervision, operation, or security practices to constitute negligent operation and maintenance, the negligent condition created must threaten the safety of the public or of a class of users -- not merely one individual.  In Archibeque v. Moya, the Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable."  1993-NMSC-079 ¶ 14 n.3, 866 P.2d at 349 n.3.  Chief Justice Ransom's concurring opinion noted:

> I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life.  The classification of Archibeque did not change the condition of the premises.  I see Archibeque's injuries as having been proximately caused by a discrete administrative decision.  As an alternative to releasing Archibeque into the general population, he could have been placed in administrative segregation, a form of protective custody.  The risk arose not from a condition of the premises (as with the wild dogs in Castillo or, arguably, the inadequate health care facilities in Silva [v. State, 1987-NMSC-107, 745 P.2d 380]); it arose from the classification itself.

1993-NMSC-079 ¶ 17, 866 P.2d at 350 (Ransom, C.J., concurring).  After <u>Archibeque v. Moya</u>, the Supreme Court of New Mexico clarified that, for § 41-4-6's waiver to apply, the question is not whether the alleged negligence created an actual risk of harm for only a single individual, but rather whether the alleged negligence created a condition that poses a potential risk to the general public or to a class of people using the premises in question.  See <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.

In <u>Leitheid v. City of Santa Fe</u>, the Court of Appeals of New Mexico determined that the plaintiffs' claim was not merely negligent supervision, but rather negligent operation, creating a dangerous condition with a potential risk for more than just a single individual.  See <u>Leitheid v. City of Santa Fe</u>, 1997-NMCA-041 ¶ 5, 940 P.2d at 467.  In <u>Upton v. Clovis Municipal School District</u>, the Supreme Court of New Mexico held that, "[i]f the only alleged misconduct toward Sarah had been the substitute P.E. teacher failing to watch her while she participated in physical exercise, the Upton's claim . . . would be practically identical to the single claim of negligent supervision we found inadequate in <u>Espinoza</u>."  <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040-¶ 21, 141 P.3d at 1264.  In <u>Espinoza v. Town of Taos</u>, the Supreme Court of New Mexico concluded that, for § 41-4-6's waiver to apply, "the critical question is whether the condition creates a potential risk to the general public."  1995-NMSC-070 ¶ 9, 905 P.2d at 683.  Section 41-4-6's waiver may also apply if the negligent operation or maintenance creates a dangerous condition that threaten "a class of users of the building."  <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.  See <u>Rave v. Bd. of Comm'rs for Cty. of Bernalillo</u>, 2017 WL 3600452, at *10 (defining the class of building users as "incarcerated inmates with medical issues."); <u>Castillo v. Cty. of Santa Fe</u>, 1988-NMSC-037 ¶ 9, 755 P.2d at 51 (holding that, "[g]iven

the potential for the safety of Valle Vista residents and invitees to be compromised by this situation, we find that, under the right circumstances, loose-running dogs could represent an unsafe condition upon the land").

New Mexico's courts also have required that, for § 41-4-6's waiver to apply, the public employees knew or should have known of the danger posed by the condition.  In Callaway v. New Mexico Department of Corrections, 1994-NMCA-049 ¶ 19, 875 P.2d at 399,[20] the Court of Appeals of New Mexico held that the New Mexico Department of Corrections "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable."  1994-NMCA-049 ¶ 19, 875 P.2d at 399.  The Court of Appeals of New Mexico additionally noted, in "support for [its] holding[,]" that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate." 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (alterations added).  See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251-56; C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d at 1358-59 (holding that allegations of negligence against

---

[20]The Court predicts that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico in Callaway v. New Mexico Department of Corrections that § 41-4-6's waiver applies where a prison knew certain inmates were dangerous and failed to supervise them, based on the Supreme Court of New Mexico's favorable citations to Callaway v. N.M. Dep't of Corr.  See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 10, 310 P.3d at 616 ("A prison creates a dangerous condition by allowing known gang members to congregate in a recreation room that is shielded from observation by guards.  Callaway, 1994-NMCA-049, ¶¶ 4, 19, 117 N.M. 637, 875 P.2d 393."); Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 23, 141 P.3d at 1264 (citing Callaway v. New Mexico Department of Corrections for the assertion that, for § 41-4-6's purposes, a condition must be at least potentially dangerous to the particular class of people using a building or facility in question, rather than actually dangerous to the entire public); Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 13, 905 P.2d at 722 (discussing Callaway v. N.M. Dep't of Corr. and quoting the Court of Appeals of New Mexico's findings).

the defendants fell within the § 41-4-6 waiver, in part, because the plaintiff "adequately allege[d] that the defendants knew or should have known of the dangerous condition").

The Court has also addressed waiver of NMTCA immunity under § 41-4-6 in several other opinions.  In Stark-Romero v. National Railroad Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145 (D.N.M. 2011)(Browning, J.), the Court held that immunity was not waived under § 41-4-6 for the plaintiffs' ingress and egress from a waste transfer facility, because, although New Mexico is liberal in protecting people traveling on public land, such a duty would be without limits.  See 805 F. Supp. 2d at 1177.  The Court found that the plaintiffs' injuries, in that case, did not arise from an unsafe, dangerous, or defective condition of the defendant's property.  See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d at 1182.  In Trujillo v. Salazar, No. CIV 04-0689 JB/WDS, 2006 WL 1228827 (D.N.M. March 1, 2006)(Browning, J.), the Court found that immunity was not waived under § 41-4-6, because "the gravamen of the negligent operation claim against Salazar was not that Salazar himself ha[d] committed negligence by showing up to work every day, but that [the Central New Mexico Correctional Facility ("CNMCF")] negligently operated the facility by allowing Salazar to continue working at the facility."  2006 WL 1228827, at *9 (emphasis omitted).  The Court further held that, "[t]o the extent that Trujillo may be arguing that Salazar negligently operated CNMCF by carrying on his employment at CNMCF after the first two alleged incidents, his decision to persist in his job was not a condition on the premises." Trujillo v. Salazar, 2006 WL 1228827, at *9.  In Williams v. Board of Regents of University of New Mexico, 20 F. Supp. 3d 1177, 1195 (D.N.M. 2014)(Browning, J.), the Court concluded that a claim brought under § 41-4-6 on the basis of negligent misclassification of an inmate would likely fail if the alleged negligence only exposed a plaintiff to health risks, rather than security

risks.  The Court cited <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1266, in which the Court stated that, to fall within Chief Justice Ransom's concurrence in <u>Archibeque v. Moya</u>, a misclassification "must raise security risks, not health risks."  <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1266.

More recently, in <u>Tanner v. McMurray</u>, No CIV 18-0876, 2018 WL 6050675 (D.N.M. Nov. 18, 2018)(Browning, J.), the Court held that state prison officials did not waive their immunity under § 41-4-6 when they failed to render adequate obstetric care to a pretrial detainee who went into labor in custody.  <u>See</u> 2018 WL 6050675, at *45-46.  The plaintiff in that case alleged as negligence a nurse's delay in rendering medical treatment, and the plaintiff argued that "negligence affecting a single defendant can be used to extrapolate an effect on an entire group of defendants."  <u>Tanner v. McMurray</u>, 2018 WL 6050675, at *45.  The Court concluded that this argument would place no limits on § 41-4-6's waiver, and the Court noted that, "[e]ven in its broadest interpretation of § 41-4-6's applicability, the Supreme Court of New Mexico maintains that the waiver's application requires more than a single instance of misconduct."  2018 WL 6050675, at *46 (citing <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 21, 141 P.3d at 1264). The Court concluded that a prison official's delay in rendering aid to a single inmate does not amount to a policy or practice that threatened a class of inmates, as § 41-4-6's waiver requires. <u>See</u> 2018 WL 6050675, at *46.  The Court's caselaw thus reflects, as does New Mexico courts' caselaw, Chief Justice Ransom's concurring opinion in <u>Archibeque v. Moya</u> that the defining feature of § 41-4-6's waiver is its application only to negligence that endangers a class of a building's users.

<u>**ANALYSIS**</u>

The Court first concludes that the Female Inmates are properly joined under rule 20, because they assert common questions of law or fact, and their allegations tend to arise out of the same or similar occurrences at Springer Correctional.   Second, although the Supervisory Defendants assert qualified immunity, they direct their arguments primarily towards the pleadings' sufficiency under rule 12(b)(6).   They focus on the Complaint's specificity and plausibility -- arguments that pertain primarily to rule 12(b)(6) and not to qualified immunity.   Moreover, at the hearing, the Supervisory Defendants conceded that it is a violation of a clearly established right for a prison official to consciously disregard knowledge that another official is assaulting and abusing sexually an inmate.   <u>See</u> Tr. at 49:13-19 (Court, Dickman).   Accordingly, although the Supervisory Defendants ask that the Court rule on their entitlement to qualified immunity as a matter of law, the Court concludes that their Motion primarily is one for dismissal under rule 12(b)(6).   The Court concludes, however, that the Female Inmates generally do not provide sufficient factual detail to state claims for relief under the Eighth Amendment, although they do state plausible state law claims.   Because the Court decides the Complaint's sufficiency under rule 12(b)(6), and so dismisses the Complaint's Count I as to the Supervisory Defendants, the Court invites the Female Inmates, consistent with D.N.M.LR-Civ. 15.1, to submit a proposed amended complaint.   Nonetheless, where the Female Inmates state a plausible Eighth Amendment claim, the Court evaluates whether the respective Supervisory Defendant is entitled to qualified immunity.   The Court concludes that Gallegos does not state an Eighth Amendment claim against the Supervisory Defendants, because the Complaint lacks specificity about the timing of the abuse she suffered, and the Complaint lacks specificity about the Supervisory Defendants' subjective

awareness of the risk of sexual abuse.  The Court further concludes that, although Dominguez states a plausible Eighth Amendment claim against R. Gonzales, she does not allege that R. Gonzales violated her clearly established rights, and so R. Gonzales is entitled to qualified immunity from Dominguez' Eighth Amendment claim against him.  The Court also concludes that Green states a plausible Eighth Amendment claim against Sanchez, and that Sanchez violated her clearly established rights, and so Sanchez is not entitled to qualified immunity from Green's Eighth Amendment claim against him.  Last, the Court concludes that the Female Inmates state a viable claim against the Supervisory Defendants under the NMTCA.  Accordingly, the Court grants in part and denies in part the Motion.

## I.    THE FEMALE INMATES ARE PROPERLY JOINED.

Although the Supervisory Defendants do not request specifically that the Court sever the Female Inmates' claims, the Supervisory Defendants assert that the Female Inmates "have grafted three different, separate lawsuits into one."  Motion at 3.  The Court thus evaluates the Female Inmates' joinder under rule 20.  Joinder under rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits."  League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency, 558 F.2d 914, 917 (9th Cir. 1977)(citing Mosley v. General Motors Corp., 497 F.2d 1330 (8th Cir. 1974)). "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).  For plaintiffs to join under rule 20, they need assert only: (i) that their claims arise from the same transaction,

occurrence, or series of transactions and occurrences; and (ii) that their claims share at least one question or law or fact.  See Fed. R. Civ. P. 20(a).

Neither the Female Inmates nor the Supervisory Defendants are misjoined.  Although the Complaint lodges factual allegations specific to each Female Inmate, they all assert roughly the same claim against Vigil, Sanchez, and R. Gonzales: that the Supervisory Defendants knew that the Female Inmates were suffering sexual abuse and assault, and that the Supervisory Defendants did nothing to protect the Female Inmates.  See Mosley v. Gen. Motors Corp., 497 F.2d at 1333 ("Absolute identity of all events is unnecessary.").  Further, questions of law are common to each of the Female Inmates' claims against the Supervisory Defendants -- the Court must determine, for each Plaintiff, whether she alleges plausibly that the Supervisory Defendants consciously disregarded her risk of sexual abuse and assault.  See Haynes v. Peters, 403 F. Supp. 3d 1072, 1085 (D.N.M. 2019)(Browning, J.).  Each of the Female Inmates allege injuries arising from the same general policy of ignoring rampant sexual assaults at Springer Correctional.  Cf. United States v. Mississippi, 380 U.S. 128, 142-43 (1965)(concluding that there was misjoinder of State elections officials that acted as part of a state-wide policy of selectively and discriminatorily enforcing voter registration rules, despite the fact that different defendants harmed different plaintiffs).  This rule applies particularly so on the Supervisory Defendants' Motion to Dismiss, which asserts equivalent arguments against each Female Inmate.  Accordingly, there is no misjoinder here.

Nor should the Court sever the Female Inmates' claims under rule 21.  See Fed. R. Civ. P. 21 ("Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party.").  A district court may sever claims under rule 21 if the claims are discrete and

separate, meaning that one claim's outcome does not affect the other's outcome.  See, e.g., Gaffney v. Riverboat Servs. of Indiana, Inc., 451 F.3d 424, 442 (7th Cir. 2006).  Here, given the similarity of the Female Inmates' claims, there is bound to be overlap in the Court's legal conclusions regarding each Supervisory Defendant.  The Court must also consider judicial economy, and severance here would require the Court to duplicate its efforts.  See Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC, 333 F. Supp. 3d 1179, 1198 (D.N.M. 2018)(Browning, J.).  The Motion calls for similar legal analysis as to each of the Female Inmates' Eighth Amendment claims.  Severance would require the Court to do in three separate lawsuits what it can accomplish in one Memorandum Opinion and Order.  The Court thus declines to sever.  Should the Supervisory Defendants persist in their belief as to the separateness of the Female Inmates' claims, they may seek separate trials under rule 24 of the Federal Rules of Civil Procedure.

## II.    GREEN STATES AN EIGHTH AMENDMENT CLAIM AGAINST SANCHEZ ONLY, AND SANCHEZ IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Green alleges that Padilla began harassing and abusing her in December, 2016.  See Complaint ¶¶ 25-30, at 4.  She says that it "was obvious to Padilla's supervisors and other staff that Padilla was abusive to and preyed on a number of inmates."  Complaint ¶ 31, at 5.  As an example, she alleges that it "was well known that he would seek out women who did not have the money 'on their books' to purchase food from the commissary and would direct them to reveal their bodies in exchange for food from the kitchen."  Complaint ¶ 32, at 5.  Green alleges that, despite this behavior, Padilla received a promotion in February or March, 2017.  See Complaint ¶ 34, at 4.  In the spring of 2017, Padilla "began directing Ms. Green to go to her room so he could meet her there," where he would abuse her.  Complaint ¶ 36, at 5.  "In or about March of 2017, at least one other inmate, including Rebecca Martinez, reported Padilla for sexual abuse and

harassment through the [PREA] hotline and or to the Springer Correctional administration." Complaint ¶ 45, at 6.  Green alleges that Martinez "reported that Padilla had harassed and abused other women, including Ms. Green."  Complaint ¶ 47, at 6.  Shortly after Martinez made her complaint, two NM State Police officers interviewed Green, who "reported some of what Padilla had done to her."  Complaint ¶ 48, at 6.  "Sanchez was present at the time of Ms. Green's statement and [he was] aware that state police were there to interview her and others."  Complaint ¶ 50, at 6. After the interview with NM State Police, Green "filed an informal grievance . . . complaining about Padilla," but Springer Correctional officials later "told her they had no record that she had submitted it."  Complaint ¶¶ 52-53, at 6.

During this time, Padilla's abuse escalated.  See Complaint ¶¶ 54-57, at 6-7.  In "late March or early April," 2018, Green met "with members of the administration regarding the informal grievance;"  the committee recommended that she receive mental health treatment, but several months passed before she saw and mental health counselor.  Complaint ¶¶ 57-59, at 7.  On September 1, 2017, two "investigators" spoke to Green about Padilla's abuse.  Complaint ¶ 64, at 7.  Springer Correctional officials retaliated against her for reporting Padilla's abuse -- they fired her from her job in the kitchen, moved her from Springer Correctional's honor housing, and revoked her privileges.  See Complaint ¶¶ 66-73, at 7-8.

Green makes no allegations against Vigil or R. Gonzales.  Without any express assertion that Vigil or R. Gonzales "kn[e]w of and disregard[ed]" the risk that Padilla posed, generalized allegations about poor conditions at Springer Correctional are not enough to state an Eighth Amendment claim against them.  Farmer v. Brennan, 511 U.S. at 837.  The Court thus dismisses Green's Eighth Amendment claim against Vigil and R. Gonzales.

## A.   ASHCROFT V. IQBAL DOES NOT REQUIRE DISMISSAL OF GREEN'S CLAIMS AGAINST SANCHEZ.

The Supervisory Defendants, relying heavily on <u>Ashcroft v. Iqbal</u>, assert that the Court can discount Green's allegations that Sanchez knew about the risk of sexual abuse that Green and other inmates faced.  <u>See</u>, <u>e.g.</u>, Motion at 3-5.  The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  <u>See</u> <u>Garcia v. Casuas</u>, 2011 WL 7444745, at **25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  <u>Ashcroft</u>

v. Iqbal adds doctrinally to <u>Bell Atlantic Corp. v. Twombly</u>, however, by requiring district courts to exclude a complaint's "legal conclusions" before applying the latter case's plausibility standard to the remaining factual allegations.  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678-79.  The Supervisory Defendants focus at length on <u>Ashcroft v. Iqbal</u>, summarizing its facts and holding to contend that it allows the Court to discount as implausible the Female Inmate's claims regarding the Supervisory Defendant's knowledge and personal involvement in the sexual abuse that the Female Inmates suffered.  <u>See</u> Reply at 4-5.

<u>Ashcroft v. Iqbal</u>'s meaning has been debated at length, as the Supreme Court entangled its procedural and substantive holdings.  The Supervisory Defendants here seek to import <u>Ashcroft v. Iqbal</u>'s substantive holding into the Court's procedural ruling on a rule 12(b)(6) motion.  As a preliminary matter, the Court notes that there are significant differences between <u>Ashcroft v. Iqbal</u> and cases like this one.  First, unlike the common law <u>Bivens</u> actions that were at issue in <u>Ashcroft v. Iqbal</u>, § 1983's language -- imposing liability on "every person who . . . subjects, <u>or causes to be subjected</u>, any citizen of the United States . . . to the deprivation of any rights . . . ," 42 U.S.C. § 1983 (emphasis added), provides for supervisory liability.  Second, unlike the Equal Protection claim at issue in <u>Ashcroft v. Iqbal</u>, the Female Inmates need not allege discriminatory purpose to state an Eighth Amendment claim.  <u>See</u>, <u>e.g.</u>, <u>Jackson v. Goord</u>, 664 F Supp. 2d 307, 324 n.7 (S.D.N.Y. 2009)(Daniels, J.)("In contrast [to  <u>Ashcroft v. Iqbal</u>], in this and many other prison-condition cases, the underlying constitutional right of the inmate is to be free of injurious deliberate indifference by their jailers. . .  In these cases, then, deliberate indifference by supervisors to known injury-causing conditions should still trigger liability.");  <u>Chao v. Ballista</u>, 630 F. Supp. 2d 170, 178 n.2 (D. Mass. 2009)(Gertner, J.)(noting that "the state of mind required to make out a

supervisory claim under the Eighth Amendment -- i.e., deliberate indifference -- requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit against Ashcroft and Mueller").  Last, the plaintiff in Ashcroft v. Iqbal asserted common-law discrimination claims against the two of the highest ranking officials in the United States government -- the Attorney General and the Director of the Federal Bureau of Investigation, officials "whom the [Supreme] Court has historically afforded the highest level of protection from suit."  Karen M. Blum, Supervisory Liability after Iqbal: Misunderstood but Not Misnamed, 43 Urb. Law. 541, 543 (2011).  The defendants in Ashcroft v. Iqbal thus were many more levels removed from the constitutional violations at issue in that case than are the Supervisory Defendants here, who are mid- and upper-level administrators at a state correctional facility.

Nonetheless, confusion exists regarding the extent to which Farmer v. Brennan supplies the operative standard for a prison supervisor's mental state.  In that case, the Supreme Court, acknowledging that "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a government official," distinguished the objective deliberate indifference standard that it used in City of Canton v. Harris, 489 U.S. 378 (1989).  Farmer v. Brennan, 511 U.S. at 841.  The Supreme Court then further clarified that an official's deliberate indifference entails subjective awareness of a risk of constitutional harm.  See Farmer v. Brennan, 511 U.S. at 839.  The Supreme Court acknowledged, however, that a plaintiff can prove actual knowledge through circumstantial evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Farmer v. Brennan, 511 U.S. at 839.  Tenth Circuit caselaw since Ashcroft v. Iqbal suggests that this standard is still operative in supervisory liability cases under the Eighth Amendment.  In Dodds v. Richardson, the Tenth Circuit confirmed that plaintiffs state a claim for supervisory liability where the defendant possesses the constitutionally required state of mind, which varies with the constitutional violation's nature.  614 F.3d at 1205 (concluding that, after Ashcroft v. Iqbal, a plaintiff "can no longer succeed on a § 1983 claim" by showing only that he or she behaved "knowingly or with 'deliberate indifference'" that a subordinate would violate the plaintiff's constitutional rights, "*unless* that is the same state of mind required for the constitutional deprivation he alleges" (emphasis in original)).  Accordingly, the Tenth Circuit's pre-Ashcroft v. Iqbal test for Eighth Amendment supervisory liability remains operative.  See, e.g., Keith I, 707 F.3d at 1188.

The Supervisory Defendants nonetheless contend that the Court may discount the Female Inmates' allegations regarding the Supervisory Defendants' state of mind.  The Court subjects the Female Inmates' claims to Ashcroft v. Iqbal's procedural prescriptions -- it separates the Female Inmates' legal conclusions and screened the remaining factual contentions for plausibility.  See Ashcroft v. Iqbal, 556 U.S. at 679.  Ashcroft v. Iqbal does not require the Court to discount entirely a plaintiff's plausible factual allegations, so the Courts suspects that the Supervisory Defendants' contentions regarding Ashcroft v. Iqbal are based on an opinion that the Female Inmates' allegatmiions regarding the Supervisory Defendants' state of mind are legal conclusions disguised as factual allegations.  The Supreme Court in Ashcroft v. Iqbal construed as a legal conclusion the plaintiff's allegations that Ashcroft and Mueller "each knew of, condoned, and willfully and maliciously agreed to subject [the plaintiff]" to unconstitutional confinement conditions "as a

matter of policy, solely on account of [his] religion, race, and/or national origin for no legitimate penological interest," and that Ashcroft was this policy's "principal architect" while Mueller was "instrumental" in implementing the policy. <u>Ashcroft v. Iqbal</u>, 556 U.S. at 679 (internal quotation marks omitted). The Supreme Court characterized these allegations as "bare assertions," that "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim,'" and so were legal conclusions couched as factual allegations. 556 U.S. at 679 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555).

The Tenth Circuit has since made clear, however, that not all allegations which include legal characterizations are conclusory, and that <u>Ashcroft v. Iqbal</u> does not abolish the basic principles of notice pleading. In a recent case, the Tenth Circuit construed as plausible a plaintiff's allegation that a prison official "purposely and knowingly used physical force against [the plaintiff] by touching her breasts[.]" <u>Ullery v. Bradley</u>, 949 F.3d at 1288 (internal quotation marks omitted)(first alteration in <u>Ullery v. Bradley</u>). The Tenth Circuit confirmed that, under rule 8, "'specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim and the grounds upon which it rests.'" <u>Ullery v. Bradley</u>, 949 F.3d at 1288 (quoting <u>S.E.C. v. Shields</u>, 744 F.3d 633, 641 (10th Cir. 2014)). It concluded that, when "read in the context of the entire complaint, rather than in isolation, this allegation provides Defendant sufficient notice of the ground upon which Plaintiff's claim for relief rests." <u>Ullery v. Bradley</u>, 949 F.3d at 1288 (citing <u>Burnett v. Mortg. Elec. Registration Sys.</u>, 706 F.3d 1231, 1236 (10th Cir. 2013)).

Green's allegations regarding Sanchez' role in Padilla's abuse are more than formulaic legal conclusions couched as factual allegations, and so are entitled to a presumption of truth under rule 12(b)(6). As the Court discusses below, Green alleges sufficient factual allegations regarding

her and other inmates' reporting about Padilla's abusive behavior to support that Sanchez knew about the risk. She alleges that she and other inmates reported Padilla's abuse to prison administrators, NM State Police, and PREA auditors, and that Sanchez was aware of this reporting. She details interacting with Springer Correctional administrators regarding her grievance and alleges that Padilla's abuse continued after this reporting. Sanchez' awareness here is not implausible. Unlike in Ashcroft v. Iqbal, where the plaintiff alleged that the highest-ranking officials in the United States knew about unconstitutional practices and so designed or implemented those practices, Sanchez is not far removed from the alleged constitutional violations -- he runs a mid-sized state prison facility. As the Tenth Circuit has made clear since Ashcroft v. Iqbal, a plaintiff's factual allegations are still entitled to reasonable inferences for the legal conclusions that they support. See, e.g., Ullery v. Bradley, 949 F.3d 1282, 1289 (10th Cir. 2020)(noting that a plaintiff is entitled to reasonable inferences on a rule 12(b)(6) motion asserting qualified immunity from the plaintiff's Eighth Amendment supervisory claim); Keith I, 707 F.3d at 1189 (same). Similarly, Green's allegations provide fair notice to Sanchez the claims she asserts. In parsing out individual sentences to construe those claims as conclusory, the Supervisory Defendants do what the Tenth Circuit concluded is incompatible with notice pleading -- they read factual allegations in isolation, rather than in the Complaint's context. See Ullery v. Bradley, 949 F.3d at 1288. Ashcroft v. Iqbal's procedural holding thus do not compel the Court to construe as implausible Green's factual allegations about Sanchez' state of mind.

**B.  GREEN STATES AN EIGHTH AMENDMENT CLAIM AGAINST SANCHEZ, BECAUSE SHE PLAUSIBLY ALLEGES FACTS DEMONSTRATING THAT HE CONSCIOUSLY DISREGARDED PADILLA'S PATTERN OF SEXUAL ABUSE.**

The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial risk of serious harm" implicates the Eighth Amendment. Farmer v. Brennan, 511 U.S. at 828. "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d at 759. It is undisputed that a prison official's sexual assault against an inmate constitutes an Eighth Amendment violation. See Farmer v. Brennan, 511 U.S. at 838-39. Gallegos does not allege, however, that R. Gonzales assaulted her; instead she asserts supervisory liability under § 1983. See Complaint ¶¶ 143-148, at 13-14. Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998). "[I]t is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." Keith I, 707 F.3d at 1188. Similarly, because "a prison official's failure to protect an inmate from a known harm may constitute a constitutional violation," the Tenth Circuit has held that inmates have "a constitutional right to expect" that jail officials will "reasonabl[y] protect[]" them from such abuse. Keith v. Koerner, 843 F.3d 833, 847 (10th Cir. 2016)("Keith II")(internal quotation marks and citation omitted). Additionally, the plaintiff must assert that he or she suffered abuse after the supervisory official became aware of the risk. Cf. Barney v. Pulsipher, 143 F.3d at 1308 (holding that a sheriff was not liable for an inmate's sexual abuse where the sheriff was "unaware of any previous incidents involving the sexual assault of an inmate"). A defendant need not be aware, however, of the "specific [individual] who eventually committed the assault . . . and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for

reasons personal to him or because all prisoners in his situation face such a risk." Farmer v. Brennan, 511 U.S. at 843. An official nonetheless may be "free from liability," if he or she "responded reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. at 844. To state a viable Eighth Amendment claim in these circumstances, therefore, Gallegos must allege plausibly that R. Gonzales subjectively was aware that she faced a substantial risk of harm, and that he deliberately disregarded that harm such that his inaction was a contributing factor in Gallegos' subsequent assault. See, e.g., Poore v. Glanz, 724 F. App'x at 641-43.

The Tenth Circuit has held repeatedly that correctional supervisors are liable for failing to protect inmates from abuse by the supervisors' staff. In Tafoya v. Salazar, the Tenth Circuit concluded that a sheriff was liable for failing to prevent sexual assaults in a jail, because he maintained a jail in which sexual assault was exceedingly likely. See 516 F.3d at 918-19. The sheriff: (i) maintained staff who "did not report rapes, assaults and illegal activities"; failed to enforce a "no contact policy, . . . because there was not always a female detention officer on duty"; did not minimize "blind spots where assaults could, and did, take place"; and knew that "having some cameras in the jail was not enough to deter assaults in unmonitored areas." 516 F.3d at 918-19. The Tenth Circuit thus concluded that the requisite knowledge under the Eighth Amendment "need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur." 516 F.3d at 916. Similarly, in Keith II, the Tenth Circuit concluded that a prison warden was not entitled to qualified immunity after a subordinate sexually assaulted a female inmate, because prior incidents of "undue familiarity" between inmates and guards, and "opportunities for employees to be outside of other people's eyesight, outside of

cameras," and inside inmates' rooms put the warden on notice that sexual assault was substantially likely.  843 F.3d at 841.  All this is to say that a supervisory correctional official is liable for an inmate's sexual assault when the supervisory official knew that there was an unacceptable risk of assault but did nothing to protect an inmate who was subsequently assaulted.

The Supervisory Defendants assert that Green's allegations lack the specificity that Aschroft v. Iqbal requires to state a claim for supervisory liability; they complain that Green does not articulate what abuse she reported or to whom she reported it.  See Motion at 5-6.  They aver that the Complaint is ambiguous whether Green alleges that Sanchez witnessed her interview with NM State Police, and they allege that, based on police reports that only they have seen, Sanchez was not present.  See Motion at 5-6; Tr. at 42:24 (Dickman).  In the Response, Green asserts that Sanchez "was present at Springer Correctional on the day of the interview and aware that it was being conducted," from which "it is reasonable to infer . . . [that] Sanchez knew not only that officers were questioning Green but that the interview with state police addressed the sexual abuse to which Ms. Green had been subjected by a correctional officer."  Response at 9.

Green has clarified that she does not allege that Sanchez witnessed her interview with NM State Police.[21]  See Response at 9.  Green's Eighth Amendment claim against Sanchez relies on the premise that she and other inmates brought sufficient factual matter to Springer Correctional officials' attention for the Court to infer that Sanchez knew about the risk that Padilla posed.  See

---

[21]Although the Supervisory Defendants said that police reports demonstrate that Sanchez was not present for Green's interview with NM State Police, the Court does not rely on this assertion in ruling on the Motion.  See, e.g., Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d at 1199 (noting that, at the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face").

Response at 9.  For example, Green asserts that it "is reasonable to infer from these allegations that then Warden Sanchez knew . . . that the interview with state police addressed the sexual abuse to which Ms. Green had been subjected by a correctional officer."  Response at 9.

It is worth pausing to considering the state of supervisory liability for correctional official's sexual abuse of inmates.  While the Court concludes above that Ashcroft v. Iqbal's procedural rules do not compel the Court to discount the Female Inmates' factual allegations, Ashcroft v. Iqbal's substantive holdings have limited supervisory liability.  A year before the Supreme Court decided Ashcroft v. Iqbal, the Tenth Circuit in Tafoya v. Salazar addressed Eighth Amendment claims against the same sheriff who it had previously concluded had engaged in a pattern of deliberate indifference to constitutional violates at a jail he was responsible for overseeing.  See Tafoya v. Salazar, 516 F.3d at 916-17 (citing Gonzales v. Martinez, 403 F.3d at 1187-89).  After the Tenth Circuit's decision in Gonzales v. Martinez, the sheriff established a no-contact policy for male officers and female inmates, installed new surveillance cameras, hired additional female staff, and implemented a half-day training on the new no-contact policy.  See Tafoya v. Salazar, 516 F.3d at 918.  Nonetheless, the sheriff maintained his well-documented "'lackadaisical attitude toward his responsibility to run'" the prison and, despite further allegations of rampant abuse, did not establish an adequate grievance procedure for inmates, did not take disciplinary action against officers known to abuse inmates, and did not enforce the no-contact rule.  Tafoya v. Salazar, 516 F.3d at 917 (quoting Gonzales v. Martinez, 403 F.3d at 1187).  The Tenth Circuit reversed the district court's entry of summary judgment in the defendant's favor, concluding that the plaintiff presented enough evidence "from which a jury might reasonably infer that the prison official was actually aware of a constitutionally infirm condition."  516 F.3d at 922.

Tafoya v. Salazar remains good law since Ashcroft v. Iqbal.  In 2016, the Tenth Circuit in Keith II relied on Tafoya v. Salazar to conclude that a supervisory defendant could not avoid liability by asserting that he was unaware of specific risk of sexual abuse.  The plaintiff in that case pointed to insufficient security camera coverage, and to "reports of at least 54 incidents of sexual misconduct and 33 incidents of undue familiarity between 2005 and 2009[,] and to a 2005 lawsuit over strip searches at [the prison], suggesting that [the defendant] may have had knowledge of these accounts."  707 F.3d at 1189.  Although the defendant argued that he did have any "indication" of potential harm to the plaintiff, the Tenth Circuit relied on Tafoya v. Salazar to conclude that a plaintiff need not allege that that a supervisory defendant knew of a substantial risk to a "'*particular* inmate, or . . . of the particular manner in which injury might occur.'"  707 F.3d at 1189 (quoting Tafoya v. Salazar, 516 F.3d at 916 (emphasis in Tafoya v. Salazar).  Accordingly, structural problems, along with a supervisory defendant's knowledge of previous incidents of assaults, can give rise to supervisory liability despite a supervisor's lack of awareness regarding a specific risk of sexual abuse.

Nonetheless, supervisory liability requires the supervisor's subjective awareness of an unacceptable risk of sexual abuse.  The Tenth Circuit in Hovater v. Robinson concluded that a supervisory defendant is not liable where a plaintiff's only premise is that every female inmate faces a risk of harm from every male prison guard.  See Hovater v. Robinson, 1 F.3d at 1068.  Similarly, in Barney v. Pulsipher, the Tenth Circuit held that a prison's policy of requiring two jailers to be present when removing a female inmate from her cell is not enough to allege a supervisory official's subjective knowledge of risk.  See Barney v. Pulsipher, 143 F.3d at 1310-11.  The Tenth Circuit noted that the plaintiff did not allege any "sexual misconduct in [the

defendant's] background or any evidence of previous incidents of sexual misconduct by [other] jailers" that preceded the plaintiff's assault.  143 F.3d at 1311.

Although perhaps lacking the detail of the allegations in Tafoya v. Salazar and Keith II, Green's Eighth Amendment claim is closer to those cases than it is to cases like Hovater v. Robinson and Barney v. Pulsipher.  The Tenth Circuit in Tafoya v. Robinson concluded that the plaintiff's "most troubling allegation" was that the defendant-sheriff "failed to implement an adequate grievance procedure through which inmates could make complaints without fear of retribution, and which included serious investigation and response."  516 F.3d at 920.  The Tenth Circuit similarly concluded in Gonzales v. Martinez that a defendant's blithe dismissal of inmates' complaints can amount to deliberate indifference.  See 403 F.3d at 1187.  And in Keith II, the Tenth Circuit, in concluding that a prison warden was not entitled to qualified immunity, relied in part on the warden's pattern of declining to investigate seriously inmates' complaints about officials' sexual misconduct.  See 843 F.3d at 841-43.

In a scenario with allegations similar to Green's, the Honorable Duross Fitzpatrick, Senior United States District Court Judge for the United States District Court for the Middle District of Georgia, in Brown v. Smith, 5:05-CV-475 (DF), 2006 WL 1890192 (M.D. Ga. July 10, 2006)(Fitzpatrick, J.), concluded that the inmate's allegations that the defendant "improperly and inadequately trained and supervised his staff, [and] failed to investigate incidents of alleged sexual assaults . . . ," sufficiently pleaded facts that would establish violation of clearly established law to overcome the defendant's assertion of qualified immunity under § 1983 for the inmate's alleged sexual assault by a prison guard.  2006 WL 1890192, at *7.  Judge Fitzpatrick relied on the United

States Court of Appeals for the Eleventh Circuit's decision in LaMarca v. Turner, 995 F.2d 1526

(11th Cir. 1993), to reason that

> any reasonable prison or jail supervisor would conclude that his failure to
> implement training and supervisory measures to prevent sexual assaults by his own
> employees . . . [and] a prison supervisor's failure to respond to numerous reports
> signaling an atmosphere within the prison that subjected inmates to the continuous
> threat of violence, including sexual assault, was unlawful, and could subject him to
> supervisory liability under § 1983.

2006 WL 1890192, at *7.  Similarly, within the Tenth Circuit, the Honorable Terrence C. Kern,

United States District Judge for the United States District Court for the Northern District of

Oklahoma, concluded that a plaintiff-inmate's allegations that the defendant sheriff "has a custom

of maintaining inadequate supervision and safety precautions with respect to known areas that are

not monitored via surveillance equipment, or blind spots, within the jail," were sufficient to state

a claim for § 1983 liability for the inmate's rape in prison.  Henderson v. Glanz, No. CIV 12-68-

TCK-FHM, 2012 WL 5931546, at *4 (N.D. Okla. Nov. 27, 2012)(Kern, J.).  Judge Kern reasoned

that the plaintiff-inmate's allegations established that the "custom is affirmatively linked to her

harm," because the sexual assault took place in a blind spot, and because she alleged that the

defendant "was aware of prior sexual assaults and sexual encounters occurring in these 'blind

spots' within the Jail . . . [and] maintained a policy of understaffing these blind spots, despite his

awareness of frequent sexual assaults or encounters[.]"  2012 WL 5931546, at *4.  Judge Kern

concluded that these allegations "adequately [pled] facts relevant to causation and [the defendant's

required] mental state, i.e., his deliberate indifference to a known serious risk of improper sexual

conduct occurring in blind spots such as the tub room."  2012 WL 5931546, at *4.  Nonetheless,

the caselaw since Ashcroft v. Iqbal suggests that generalized conditions at a prison, without

subjective knowledge of specific incidents of sexual assault, are insufficient to state an Eighth

Amendment violation.  Cf. Keith II, 843 F.3d at 838-39 (suggesting that, post-Ashcroft v. Iqbal, a supervisory defendant can no longer be held liable solely on his or her failure to train subordinates). For this reason, Green must allege more than generalized conditions at the prison, like inadequate staffing and security camera shortages; she must plead Sanchez's subjective awareness of prior incidents of sexual abuse, and that his resulting inaction caused subsequent abuse.

Green's allegations, taken as true and reasonably construed in the light most favorable to her, plead sufficient facts from which the Court can plausibly infer that Sanchez deliberately "engaged" in a custom of suppressing reporting of and disregarding incidents of sexual abuse that, together, caused the constitutional violations of which she complains.  Green alleges that Springer Correctional, while Sanchez was Warden, maintained an inadequate staff-to-inmate ratio and housed female inmates well over its capacity.  See Complaint ¶ 15, at 3.  She alleges a pattern of refusing to discipline correctional officers known to be abusive towards female inmates.  See Complaint ¶ 17, at 3.  She asserts that many areas  in which correctional officers and female inmates interacted had no video surveillance.  See Complaint ¶ 17, at 3.  She asserts that these conditions, combined, "made it highly likely for sexual assault to occur."  Complaint ¶ 17, at 3. While similar allegations supported liability in Tafoya v. Salazar, Keith I, and Keith II, Green alleges additional facts specific to herself, Sanchez, and Padilla.  She and other inmates complained about Padilla's abuse to Springer Correctional officials while Sanchez was warden.  See Complaint ¶¶ 45-50, at 6.  Green initially had difficulty reporting Padilla's abuse, because Springer Correctional posted an incorrect telephone number for its PREA reporting hotline.  See Complaint ¶ 46, at 6.  Around this time, another inmate complained to Springer Correctional administrators that Padilla was abusing her, Green, and other inmates.  See Complaint ¶¶ 45-47, at 6.  Shortly

thereafter, two NM State Police officers interviewed Green, who reported "some of what Padilla had done to her."  Complaint ¶ 48, at 6.  Green alleges that Sanchez was aware of what she had reported.  See Complaint ¶ 50, at 6.  Green then submitted an informal grievance about Padilla's abuse, which prison officials first denied receiving and then responded sluggishly and ineffectively.  See Complaint ¶¶ 51-57, at 6-7.  When Green met with Springer Correctional officials regarding her grievance, they recommended that she speak with a mental health counselor -- which they delayed in procuring -- but did nothing to reduce Padilla's access to Green, and so the abuse persisted.  See Complaint ¶¶ 58-60, at 7.  Finally, after Green spoke with NM State Police and other investigators, Springer Correctional officials retaliated against her by terminating her from her work position, revoking various privileges, and transferring her to a more restrictive unit.  See Complaint ¶¶ 66-71, at 8.  M. Gonzales told Green that he learned about her grievance, and "told her she was a liar and to get the hell out of his face."  Complaint ¶ 73, at 8.  Padilla nonetheless retained his position as maintenance supervisor, retaining full access to all housing units, and he used this access to "intimidate and frighten" Green throughout her incarceration. Complaint ¶¶ 74-75, at 8.

While pre-Ashcroft v. Iqbal cases like Brown v. Smith imposed liability on supervisory defendants for failure to train and to adequately investigate allegations of sexual assault, Green goes beyond alleging that Springer Correctional and Sanchez merely failed to train the staff to prevent further sexual assault, or implement policies for the same; she alleges that Sanchez affirmatively did the opposite.  Her allegations of retaliation against the inmates for sexual assault reports, while ignoring those reports' allegations and making it difficult to speak with PREA auditors, make plausible that Sanchez' policies and customs not only failed to address the

prevention of further sexual assaults, but created an environment in which sexual assaults of inmates were more likely.   Whereas Judge Kern concluded that the defendant's failure affirmatively to place more staff on duty "despite his awareness of frequent sexual assaults . . . occurring in [known] spots," Henderson v. Glanz, 2012 WL 5931546, at *4, was sufficient to make a plausible claim for § 1983 liability for the plaintiff's alleged sexual assault, Green specifically alleges Padilla's previous instances of sexual abuse in female inmates' rooms, and that Sanchez was aware of this abuse from her and other inmates' reporting, but that the official response was to retaliate while leaving Padilla with unfettered access to female inmates' rooms.   These allegations are sufficient to state an Eighth Amendment claim against Sanchez.

## C.   SANCHEZ IS NOT ENTITLED TO QUALIFIED IMMUNITY ON THE PLEADINGS.

As the Court mentions above, the Supervisory Defendants acknowledged that a supervisory corrections official violates a plaintiff's clearly established Eighth Amendment rights by failing to take reasonable measures to protect the inmate against prison guards' known sexual abuse.   See Tr. at 48:13-19 (Court, Dickman).   The Court agrees.   The Tenth Circuit repeatedly has held that supervisory prison officials are not entitled to qualified immunity for failing to take reasonable measures to protect inmates from a known risk of sexual abuse.   See, e.g., Poore v. Glanz, 724 F. App'x at 642-43 ("We have held corrections supervisors liable for failing to protect inmates from sexual abuse from staff on several occasions.").   A supervisor's knowledge of prior instances of sexual misconduct from prison staff, along with "structural policy problems" like insufficient surveillance systems, understaffing, and undertraining, give rise to a supervisor's liability under § 1983.   Keith I, 707 F.3d at 1189.   See Poore v. Glanz, 724 F. App'x at 624-43 (gathering cases).

On-point Tenth Circuit cases with different results do not support qualified immunity here. In Barney v. Pulsipher, "a constitutional violation was not found because the only proof of prison officials' knowledge of a substantial risk of serious harm to a female inmate and failure to protect was predicated on the existence of per se violation of a written jail policy." Gonzales v. Martinez, 403 F.3d at 1186. See Keith I, 707 F.3d at 1190 (noting that the plaintiff in Barney v. Pulsipher "presented no evidence of actual knowledge required for § 1983 liability for deliberate indifference"). Similarly, in Hovater v. Robinson, the plaintiff's claim was based on nothing beyond "the fact she was a female inmate." Keith I, 707 F.3d at 1190. Here, Green has alleged that she and other inmates made known to Springer Correctional officials Padilla's proclivity to sexually abuse female inmates and that Sanchez was aware that NM State Police had opened an investigation into this abuse; she also alleges structural problems like understaffing, lack of discipline, unresponsiveness or dismissiveness towards female inmates' reporting, and a shortage of surveillance cameras. Green thus alleges that Sanchez violated her clearly established rights, and so Sanchez is not entitled to qualified immunity from Green's Eighth Amendment claim against him.

## III. GALLEGOS DOES NOT STATE AN EIGHTH AMENDMENT CLAIM AGAINST ANY OF THE SUPERVISORY DEFENDANTS, BECAUSE HER COMPLAINT LACKS SPECIFICITY AS TO THEIR SUBJECTIVE AWARENESS OF THE ABUSE SHE SUFFERED.

Gallegos' allegations are specific to Vigil and R. Gonzales; she makes no factual allegations against Sanchez. See Complaint ¶¶ 77-108, at 8-11. Section 1983 supervisory liability requires each defendant's personal involvement in the plaintiff's constitutional injury, see, e.g., Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009), and so Gallegos does not state a claim

for relief against Sanchez.   Regarding Vigil and R. Gonzales, the Court concludes that the Complaint lacks the requisite specificity, and so dismisses Gallegos' Eighth Amendment claims under rule 12(b)(6).  The Court will grant Gallegos leave to file a motion to amend the Complaint, however, because, although Gallegos has not submitted her proposed amendment, the Court can discern that amendment would not be futile.

Gallegos purports to state an Eighth Amendment claim against Vigil and R. Gonzales.  She alleges that M. Gonzales engaged in a pattern of sexual abuse, harassment, and assault.  See Complaint ¶¶ 78-109, at 8-11.  She alleges that she reported this abuse first to Vigil, who "did nothing but direct her to go to Robert Gonzales with her complaints."  Complaint ¶ 100, at 10. Gallegos says that she then "reported [M.] Gonzales' behavior" to R. Gonzales, who told her that "half the unit isn't comfortable with [M. Gonzales,]" and that, if he transferred Gallegos, he would "have to move half the girls."  Complaint ¶ 101, at 10.  Gallegos does not specify when she made this report to R. Gonzales, what she reported, and whether M. Gonzales' abuse persisted after the report.  She further asserts that R. Gonzales told her "and many other inmates that they would be punished if they so much as spoke to PREA auditors when they visited the facility."  Complaint ¶ 106, at 10.  The Supervisory Defendants focus primarily on the Complaint's specificity and plausibility.  See, e.g., Tr. at 19:9-18 (Dickman)(arguing that the Complaint does not specify whether Gallegos' reports to R. Gonzales were "in person" or "by memorandum"); id. at 24:21-25:1 (asserting that the "more plausible explanation is that [he] can't be moving inmates around at their convenience").  The Supervisory Defendants state, however, that Gallegos' allegation against R. Gonzales "probably comes the closest to making a claim" under the Eighth Amendment.  Tr. at 23:19-20 (Dickman).

The Court concludes that Gallegos does not state a claim against Vigil or R. Gonzales for a straightforward reason: she does not allege that M. Gonzales continued to abuse her after she reported his abuse to Vigil and R. Gonzales.  She provides some dates and time periods in which M. Gonzales abused her, but she does not specify when she complained of this abuse to Vigil and R. Gonzales.  This information is essential, because Vigil's and R. Gonzales' liability depends on their subjective knowledge of M. Gonzales' abuse; if Gallegos suffered abuse only before Vigil and R. Gonzales knew about the abuse, their deliberate indifference cannot be said to have caused the abuse.  While a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," Farmer v. Brennan. 511 U.S. at 842, Gallegos does not establish a timeline of events by which the Court can conclude that the risk of M. Gonzales' abusing inmates should have been obvious to Vigil or R. Gonzales.  Although a defendant need not be aware of the "specific [individual] who eventually committed the assault," Farmer v. Brennan, 511 U.S. at 843, the Complaint is too vague about the assaults' timing and the Female Inmates' reporting for the Court to attribute subjective knowledge to Vigil and R. Gonzales.  Finally, the Court cannot impute Sanchez' knowledge of Padilla's abuse to Vigil's knowledge of M. Gonzales' abuse.  See Quintana v. Santa Fe Cty. Bd. of Comm'rs, __ F.3d __, 2020 WL 5087899, at *4 (10th Cir. Aug. 28, 2020)("But since the complaint limits this allegation to Officer Chavez, we see no reason to export allegations of this knowledge onto the other individual defendants.").

Further, as the Court discusses above, generalized conditions at the prison, without allegations regarding specific instances of sexual abuse, are insufficient to state a supervisory Eighth Amendment violation after Ashcroft v. Iqbal, so Gallegos' omission of the timing of the

abuse she suffered and Vigil and R. Gonzales' awareness of the abuse is material.  This omission on Gallegos' part may have been an oversight, if she meant to clarify that M. Gonzales' abuse persisted, in which case amendment will be a simple fix.  Alternatively, this omission or may flow necessarily from the facts, if M. Gonzales' abuse did not persist past Gallegos' reporting, in which case Gallegos would not state an Eighth Amendment claim against Vigil or R. Gonzales, because it could signify that the Supervisory Defendants took reasonable measures to protect Gallegos. See Farmer v. Brennan, 511 U.S. at 825.

As for R. Gonzales' threat that he would punish Gallegos and others if they spoke to PREA auditors, the Complaint similarly lacks the requisite specificity -- Gallegos also does not specify when R. Gonzales issued this threat or that M. Gonzales' abuse persisted after the threat.  Without alleging that M. Gonzales' abuse persisted after R. Gonzales' threat, the Complaint lacks the requisite causality and subjective indifference to state an Eighth Amendment claim.  The Court thus dismisses Gallegos' Eighth Amendment claim under rule 12(b)(6) for failure to state a claim. If Gallegos can allege, consistent with rule 11 of the Federal Rules of Civil Procedure, that M. Gonzales' abuse persisted after she reported the abuse to Vigil and R. Gonzales, or other facts that support Vigil and R. Gonzales' subjective knowledge of the risk of abuse, she should submit a proposed amended complaint, consistent with D.N.M.LR-Civ. 15.1.[22]

_____

[22]As the Court notes above, "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment."  Keith I, 707 F.3d at 1188.  Were Gallegos to amend the Complaint to allege that Vigil and R. Gonzales knew of and disregarded M. Gonzales' pattern of abuse against Gallegos, and that the abuse persisted after Vigil and R. Gonzales consciously disregarded that abuse, she would state a valid Eighth Amendment claim and Vigil and Gallegos likely would not be entitled to qualified immunity.  See Tafoya v. Salazar, 516 F.3d at 916 (stating that a correctional supervisor violates an inmate's clearly established Eighth Amendment right when the supervisor "knows of and disregards an excessive risk to inmate health or safety").

IV.   **DOMINGUEZ STATES AN EIGHTH AMENDMENT CLAIM AGAINST R. GONZALES, BUT R. GONZALES DID NOT VIOLATE DOMINGUEZ' <u>CLEARLY ESTABLISHED RIGHTS</u>.**

Dominguez alleges that Sanders began harassing her in May, 2018.  <u>See</u> Complaint ¶ 110, at 11.  She says that she later reported this abuse to "[STIU] Officer Fernandez," who dismissed her report and referred to Sanders as her "boyfriend."  Complaint ¶¶ 117-118, at 11.  Dominguez states that, after she reported Sanders to Fernandez, "STIU officers found letters written between another inmate and Defendant Sanders," after which Sanders "went on leave for a couple of weeks, and . . . Defendant Robert Gonzales told him to 'get his shit together and stop messing with the hoes.'"  Complaint ¶¶ 119-120, at 11-12 (quoting R. Gonzales).  She alleges that, when Sanders returned from leave, he continued harassing her when she was next placed in segregation, but that another correctional officer was present, which mitigated Sanders' ability to harass her.   <u>See</u> Complaint ¶¶ 121-125, at 12.  She contends that, when she was not in segregation, M. Gonzales would abuse and assault her.  <u>See</u> Complaint ¶¶ 126-134, at 12-13.  "Sometime after" M. Gonzales' abuse, he "was moved to a different housing unit, and Ms. Dominguez didn't see him for several weeks."  Complaint ¶ 135, at 13.  "When she ultimately did see him again, he told her he 'was being watched.'"  Complaint ¶ 136, at 136 (quoting M. Gonzales).  Nonetheless, M. Gonzales' abuse persisted in the summer of 2018.  <u>See</u> Complaint ¶¶ 137-139, at 13.  Dominguez "declined to report the abuse because she was afraid prison officials would retaliate against her," and R. Gonzales later threatened her with "lockdown and lost good time" if she spoke with PREA auditors.  Complaint ¶¶ 140-141, at 13.

A.   **DOMINGUEZ STATES AN EIGHTH AMENDMENT CLAIM AGAINST R. GONZALES.**

As a preliminary matter, Dominguez makes no allegations against Vigil and Sanchez, and so does not allege sufficient factual matter for the Court to draw a plausible inference that they violated her Eighth Amendment rights.  See, e.g., Farmer v. Brennan, 511 U.S. at 837-38 (noting that Eighth Amendment liability requires an official's "consciousness" of the risk of constitutional injury that the plaintiff faced); Keith II, 843 F.3d at 838 (noting that a supervisory defendant's liability depends on his or her personal participation in the constitutional violation).  Nor do the Complaint's generalized allegations that sexual abuse was rampant at Springer Correctional support an Eighth Amendment claim against Vigil and Sanchez, because the Supreme Court has rejected a civil recklessness standard and instead held that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837.  Dominguez thus does not state an Eighth Amendment claim against Vigil and Sanchez.

As for Dominguez' Eighth Amendment claim against R. Gonzales, the Complaint asserts expressly that R. Gonzales was aware that Sanders had inappropriate relations with female inmates, that R. Gonzales placed Sanders on leave and told him to "'get his shit together and stop messing with the hoes,'" and that Sanders continued harassing Dominguez when he returned to work.  Complaint ¶¶ 119-120, at 11-12 (quoting R. Gonzales).  She asserts, however, that, although Sanders continued harassing her when she was next placed in segregation, another correctional officer was present, which mitigated Sanders' ability to harass her.  See Complaint ¶¶ 121-125, at 12.  Dominguez thus alleges that R. Gonzales subjectively was aware that Sanders posed a risk to female inmates, but that Springer Correctional apparently took some remedial measures to mitigate Sanders' ability to abuse inmates by ensuring that he was not alone with female inmates.

Similarly, regarding R. Gonzales' role in M. Gonzales' abuse against Dominguez, she alleges that M. Gonzales abused her but that Springer Correctional eventually moved him to a different housing unit such that she "didn't see him for several weeks."  Complaint ¶¶ 135, at 13.  "When she ultimately did see him again, he told her he 'was being watched,'" although his abuse persisted nonetheless.  Complaint ¶ 136, 140, at 13 (quoting M. Gonzales).  Dominguez admits, however, that she "declined to report the abuse because she was afraid prison officials would retaliate against her."  Complaint ¶ 140, at 13.

 As the Court discusses above, Dominguez must allege that R. Gonzales was aware of previous, similar instances of abuse at Springer Correctional, and that this awareness preceded at least some of the abuse that she suffered.  See Perry v. Durborow, 892 F.3d 1116, 1126 (10th Cir. 2016).  For example, in Tafoya v. Salazar, the defendant-sheriff had already "faced three civil suits" arising from male correctional officers' sexual assaults against female inmates by the time that the plaintiff was assaulted.  516 F.3d at 915.  Similarly, in Gonzales v. Martinez, the Tenth Circuit relied on the defendant sheriff's knowledge of previous sexual misconduct in concluding that he was not entitled to qualified immunity.  403 F.3d at 1187-88.  The same rule held in Lopez v. LeMaster, where the defendant was aware of "at least one prior attack at the jail."  172 F.3d at 761.  Dominguez need not show, however, that R. Gonzales "specifically knew [Sanders] posed a substantial risk of harm to her."  Gonzales v. Martinez, 403 F.3d at 1187.  See Tafoya v. Salazar, 516 F.3d at 916 ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur.").  Instead, the Supreme Court in Farmer v. Brennan held that a supervisory prison official cannot escape liability by showing that, although "he was aware of an obvious, substantial risk to inmate

- 106 -

safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843. "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Farmer v. Brennan, 511 U.S. at 843. Prison officials can avoid liability, however, by taking "'reasonable measures to guarantee the safety of inmates.'" Farmer v. Brennan, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). The Tenth Circuit has held that such "reasonable measures" include "serious investigation and response" when a prison official becomes aware of a risk of sexual assault against inmates. Tafoya v. Salazar, 516 F.3d at 920. "[I]f a prison official responds reasonably to a risk of harm, he will not be held liable even if the harm ultimately is not prevented." Barney v. Pulsipher, 143 F.3d at 1311 n.12.

The Court concludes that Dominguez states an Eighth Amendment claim against R. Gonzales regarding Sanders' abuse, but not regarding M. Gonzales' abuse. Dominguez plausibly alleges that R. Gonzales subjectively was aware that Sanders was prone to abuse inmates; she expressly alleges that Sanders was placed on leave for improper relationships with female inmates, and that R. Gonzales was aware of this pattern of impropriety. See Complaint ¶¶ 119-130, at 11-12. She alleges that Sanders' abuse persisted after R. Gonzales became aware that Sanders posed a risk to female inmates. See Complaint ¶¶ 125-130, at 12. Despite the Supervisory Defendants' arguments, Dominguez need not allege specifically that R. Gonzales was aware that Sanders was abusing Dominguez, but rather that Sanders posed a risk to female inmates. See Tafoya v. Salazar, 516 F.3d at 916 ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury

might occur.").  Dominguez thus alleges that R. Gonzales had the requisite state of mind to state an Eighth Amendment claim against him for his role in Sanders' abuse.

The same is not true of R. Gonzales' role in M. Gonzales' abuse against Dominguez.  The Complaint says that M. Gonzales harassed and groped Dominguez in May and June, 2018, but that "[s]ometime after this, [M.] Gonzales was moved to a different unit, and Ms. Dominguez didn't see him for several weeks."  Complaint ¶ 134, at 12-13.  See id. ¶¶ 129-133, at 12.  When "she ultimately did see him again, he told her he 'was being watched,'" but in June and July, 2018, M. Gonzales directed Dominguez and Gallegos to kiss each other.  Complaint ¶¶ 136-138, at 13 (quoting M. Gonzales).  Dominguez asserts, however, that she declined to "report the abuse because she was afraid prison officials would retaliate against her."  Complaint ¶ 140, at 13. Dominguez, accordingly, does not allege that M. Gonzales subjectively was aware that M. Gonzales' posed a risk of harm.  Similarly, the allegations specific to the other Female Inmates do not specify when R. Gonzales became aware that M. Gonzales had been abusing female inmates at Springer Correctional.  The Complaint accordingly does not allege that R. Gonzales knew about M. Gonzales' abuse and that this knowledge preceded any instance of abuse.  Dominguez does not allege that R. Gonzales was both aware of "the facts from which the inference could be drawn that a substantial risk of serious harm exists," and so cannot allege that R. Gonzales drew that inference, as required to state an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. at 837.  If Dominguez is aware of specific facts giving rise to such awareness, she may submit her proposed amended allegations to the Court for it to determine whether an amended complaint is proper under rule 15(a).

**B.    R. GONZALES IS ENTITLED TO QUALIFIED IMMUNITY FROM DOMINGUEZ' EIGHTH AMENDMENT CLAIM AGAINST HIM.**

Although Dominguez states an Eighth Amendment claim against R. Gonzales for his role in Sanders' abuse, the Complaint acknowledges that remedial measures succeeded this acknowledgement and that these measures mitigated Sanders' ability to abuse her.  R. Gonzales is thus entitled to qualified immunity.  Dominguez alleges that, after Sanders returned from leave, she was never again alone with him, because another correctional officer accompanied him constantly, and that this mitigated Sanders' ability to abuse her.  See Complaint ¶¶ 123-125, at 12. She alleges that, when she next saw Sanders, he asked her  "if her boobs had gotten bigger" and "where all the drugs were," because he had heard that women get "all hot and bothered" if they take suboxone, "so he wanted her to take it."  Complaint ¶¶ 123-124, at 12.  She states, however, that another correctional officer was present, "so Sanders did not openly ask Ms. Dominguez to show her breasts but instead continually gave her hand signals directing her to flash him." Complaint ¶ 125, at 12.

First, the Complaint acknowledges that R. Gonzales took remedial measures by preventing Sanders from ever being alone with Dominguez, satisfying his duty to take reasonable measures to protect Dominguez from Sanders' abuse.  See Tafoya v. Salazar, 516 F.3d at 920.  Although Sanders' abuse persisted, albeit in a form far less severe than before, "if a prison official responds reasonably to a risk of harm, he will not be held liable even if the harm ultimately is not prevented." Barney v. Pulsipher, 143 F.3d at 1311 n.12.  Similarly, Sanders' actions in making crude comments and hand gestures at Dominguez do not rise to the level of an Eighth Amendment violation.  An alleged Eighth Amendment deprivation must be objectively "sufficiently serious," depriving the

inmate of "'the minimal civilized measure of life's necessities.'" Wilson v. Seiter, 501 U.S. 294, 298 (1991)(quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

Sexual assault unquestionably is sufficiently serious to state an Eighth Amendment violation, see Barney v. Pulsipher, 143 F.3d at 1310 ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."), but the Court has not found, and the Female Inmates have not cited, any case demonstrating that a correctional official violates an inmate's constitutional rights by making crude comments and obscene hand gestures to the inmate.  To the contrary, in Barney v. Pulsipher, the Tenth Circuit concluded that "verbal harassment and intimidation . . . alone are not sufficient to state a claim under the Eighth Amendment."  143 F.3d at 1310 n.11 (citing Adkins v. Rodriguez, 59 F.3d 1034, 1037 (10th Cir. 1995)).  The Tenth Circuit instead concluded that verbal harassment is "only actionable '[i]n combination' with [sexual] assaults."  Barney v. Pulsipher, 143 F.3d at 1310 n.11 (quoting Prisoners v. Dist. of Columbia, 877 F. Supp. 634, 655 (D.D.C. 1994)(Green, J.)(first alteration in Barney v. Pulsipher)).  R. Gonzales therefore was not personally involved in a violation of Dominguez' constitutional rights, because no violation occurred after he became aware that Sanders posed a risk to female inmates.  Further, even if Sanders' verbal harassment against Dominguez amount to a constitutional violation, R. Gonzales would be entitled to qualified immunity, because the Complaint acknowledges that R. Gonzales took measures to minimize the risk that Sanders posed by ensuring that he never again was alone with Dominguez.  See Complaint ¶ 125, at 12 ("Another correctional officer was present, so Sanders did not openly ask Ms. Dominguez to show her breasts but instead continually gave her hand signals directing her to flash him.").  When a prison official responds reasonably to a known threat to inmates, that

official cannot be deemed deliberately indifferent to inmates' safety.  See Barney v. Pulsipher, 143

F.3d at 1311 n.12 (citing Farmer v. Brennan, 511 U.S. at 844-45).  Accord Howard v. Waide, 534

F.3d 1227, 1239 (10th Cir. 2008).  Once R. Gonzales became aware that Sanders posed a risk to

Dominguez and to other inmates, steps were taken such that Sanders did not violate Dominguez'

Eighth Amendment rights.  Accordingly, to the extent that Dominguez attempts to state an Eighth

Amendment claim against R. Gonzales, he is entitled to qualified immunity, because he did not

violate Dominguez' constitutional rights.  Cf. U.S. Gypsum Co. v. Indiana Gas Co., 350 F.3d 623,

626 (7th Cir. 2003)("A litigant may plead itself out of court by alleging (and thus admitting) the

ingredients of a defense.").

## V.   THE FEMALE INMATES STATE A PLAUSIBLE CLAIM UNDER N.M. STAT. ANN. § 41-4-6, BECAUSE THEY ALLEGE THAT THE DEFENDANTS MAINTAINED A DANGEROUS CONDITION AT SPRINGER CORRECTIONAL, AND THAT THIS CONDITION POSED A DANGER TO A CLASS OF INMATES AT SPRINGER CORRECTIONAL.

In the Complaint's Count II, the Female Inmates allege that the Supervisory Defendants

"owed Plaintiffs a duty to protect their health and safety in their operation and maintenance of

[Springer Correctional]."  Complaint ¶ 160, at 15.  The Female Inmates further allege that the

Supervisory Defendants "breached this duty . . . by filing to ensure Plaintiffs were housed in a

facility where they were not subjected to sexual abuse, coercion and harassment by correctional

officers."  Complaint ¶ 161, at 15.  They allege that the Supervisory Defendants' negligence falls

under § 41-4-6's immunity waiver.  See Complaint ¶ 162, at 15-16.  The Supervisory Defendants

assert that the Female Inmates' allege negligent supervision over correctional officers, for which

they are immune under the NMTCA.  See Motion at 15.  They further contend that prisons take

sui generis status under the NMTCA, with New Mexico courts having concluded uniformly that

§ 41-4-6 does not waive immunity "for administrative acts related to security, custody, and classification of inmates."  Motion at 15.  The Female Inmates acknowledge that § 41-4-6 retains New Mexico officials' immunity for claims arising out of inmates' security, custody, and classification, but the Female Inmates contend that prison officials' practice of ignoring predictable dangers to inmates can give rise to liability under § 41-4-6.  See Response at 15, 18.  The Female Inmates argue that the "series of acts and omissions" that they allege "placed more than a single individual at risk and have a clear nexus to the operation and maintenance of a building."  Response at 18.  They argue that Vigil and Sanchez' roles as wardens obliged them to "properly manage and control the facility and its staff in a way that protected Plaintiffs from correctional officers' sexual abuse," and that, as Chief of Security, R. Gonzales' "job required him to ensure the inmates were secure and yet, he failed."  Response at 19.

Section 41-4-6 of the NMTCA waives immunity "for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment, or furnishings."  N.M. Stat. Ann. § 41-4-6.  This waiver "may appropriately be termed a 'premises liability' statute."  Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 27, 808 P.2d at 614.  The Supreme Court of New Mexico interprets the waiver broadly to waive immunity "where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government."  Castillo v. Cty. Of Santa Fe, 1988-NMSC-037 ¶ 3, 755 P.2d at 48.  "The waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building."  Upton v. Clovis Mun. Sch. Dist., 2006-

NMSC-040 ¶ 9, 141 P.3d at 1259.  Consistent with § 41-4-6's construction as a premises liability statute, the Supreme Court of New Mexico has held that State officials may be liable for third parties' foreseeable intentional torts that amount to a dangerous condition on government property. See, e.g., Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 14, 310 P.3d at 618.  In Encinias v. Whitener Law Firm, P.A., in the context of addressing a legal malpractice claim, the Supreme Court of New Mexico concluded that school officials could be held liable for one student's assault against another student in an area which one officials called a "hot zone for student violence."  2013-NMSC-045, ¶ 18, 310 P.3d at 619.  The official "was in a position to know the location and frequency of student fights," but the school had not installed security cameras or take preventive measures.  2013-NMSC-045, ¶ 18, 310 P.3d at 619.

The Supervisory Defendants assert that "jails and prisons are different," and so prison officials rarely may be held liable for torts committed on prison premises.  Tr. at 60:19-24 (Dickman).  There are two New Mexico cases addressing § 41-4-6 in the prison context.  In Archibeque v. Moya, the Supreme Court of New Mexico, a prison official asked a newly transferred inmate whether he had any enemies, but, after the inmate told the official who his enemy was, the official, without checking an available list of the prison's population, incorrectly told the inmate that the enemy was no longer incarcerated.  See 1993-NMSC-079, ¶¶ 2, 8, 866 P.2d at 346-47.  The official released the inmate into the general population and the inmate's enemy assaulted him that night.  See 1993-NMSC-079, ¶ 2, 866 P.2d at 346.  The Supreme Court of New Mexico, on certification from the Tenth Circuit, held that the official's failure to check the list of inmates was "an administrative function associated with the operation of the corrections system."  1993-NMSC-079, ¶ 8, 866 P.2d at 347.  Holding the official liable for such an

administrative function, the Supreme Court of New Mexico held, would "be contrary to the plain language and intended purpose of the statute."  1993-NMSC-079, ¶ 8, 866 P.2d at 347 (citing N.M. Stat. Ann. 41-4-2(A) (providing that the government, acting for the public good, "should not have the duty to do everything that might be done")).  Under this limiting construction, the Supreme Court of New Mexico concluded that the negligence to which § 41-4-6 refers must "create an unsafe condition on the prison premises as to the general population."  1993-NMSC-079, ¶ 8, 866 P.2d at 347.  The Supreme Court of New Mexico thus equated administrative functions in prisons with actions that pertain only to single individuals.

Since the Supreme Court of New Mexico decided <u>Archibeque v. Moya</u>, it consistently has taken a more expansive view of § 41-4-6.  A year after <u>Archibeque v. Moya</u>, the Court of Appeals of New Mexico in <u>Callway v. New Mexico Department of Corrections</u> held that prison officials maintain a dangerous condition within § 41-4-6's meaning when they release inmates into a poorly monitored space with known gang members and items that can be used as weapons.  <u>See</u> 1994-NMCA-049, ¶¶ 4, 19, 875 P.2d at 399.  The Court of Appeals of New Mexico distinguished <u>Archibeque v. Moya</u>, because there the plaintiff did not argue that the enemy assailant amounted to a dangerous condition in the prison, but rather that the dangerous condition was the official's failure to check the list of inmates.  <u>See</u> 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (citing <u>Archibuque v. Moya</u>, 1993-NMSC-079, ¶ 8, 866 P.2d at 350 (Ransom, C.J., concurring)(noting that it was "telling that Archibeque did not argue that his assailant should have been removed from the general prison population, but only that Archibeque himself should have been placed in administrative segregation.")).  The Supreme Court of New Mexico has cited approvingly <u>Callaway v. New Mexico Department of Corrections</u> such that the Court can draw from the case in interpreting § 41-

4-6 in the prison context.  See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 10, 310

P.3d at 616 ("A prison creates a dangerous condition by allowing known gang members to

congregate in a recreation room that is shielded from observation by guards.  Callaway, 1994-

NMCA-049, ¶¶ 4, 19, . . . 875 P.2d 393."); Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040

¶ 23, 141 P.3d at 1264 (citing Callaway v. New Mexico Department of Corrections for the

assertion that, for § 41-4-6's purposes, a condition must be at least potentially dangerous to the

particular class of people using a building or facility in question, rather than actually dangerous to

the entire public).

Further, the Supreme Court of New Mexico consistently has applied Callaway v. New

Mexico Department of Corrections' rule that an official is liable for negligence that endangers a

class of a building's users even though an official's negligence may result in specific harm or

endanger peculiarly a specific person.  Upton v. Clovis Municipal School District illustrates this

point.  In that case, the Supreme Court of New Mexico held that a public school creates a dangerous

condition for its students when it violates students' individualized education programs and then

fails to follow proper emergency procedures.  See Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-

040, ¶¶ 18-21, 141 P.3d at 1263-64.  The case arose when a student  who had long suffered from

asthma -- a condition noted on her individualized education plan with the school -- suffered an

acute asthma attack, but her physical education teacher refused to let her stop the strenuous activity

that had induced the attack.  See 2006-NMSC-040, ¶¶ 2-3, 141 P.3d at 1260.  In the student's next

class, she collapsed, but no school official "ever administered CPR or any other emergency

protocol," and the officials waited fifteen minutes before calling 911, at which point the child had

died.  2006-NMSC-040, ¶¶ 4-5, 141 P.3d at 1260.

The Supreme Court of New Mexico held that the student's individualized education plan and emergency protocols "are important for the operation of any school building," and that the school district's failure to adhere to the individualized education plan and emergency protocols posed a danger to all students with specialized needs.  Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶¶ 13-14, 141 P.3d at 1262-63.  Accordingly, although the school district's negligence affected negatively a single student, the negligence potentially endangered similarly situated students and so amounted to a dangerous condition within § 41-4-6's meaning.  See 2006-NMSC-040, ¶¶ 18-21, 141 P.3d at 1263-64.  The Supreme Court of New Mexico thus held that the child's parents had that the school district maintained a dangerous condition in the school within § 41-4-6's meaning.  These cases reflect New Mexico courts' more expansive reading of § 41-4-6 since Archibeque v. Moya.  See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 13, 310 P.3d at 617 (noting that New Mexico courts' earlier, narrow reading of § 41-4-6 "has since been discredited").

The Female Inmates state a claim under § 41-4-6 against the Supervisory Defendants.  The Supervisory Defendants' inaction in the face of correctional officers' frequent sexual abuse amounts to a dangerous condition at Springer Correctional.  See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 13, 310 P.3d at 617.  The Supervisory Defendants thus are incorrect in characterizing the Female Inmates' claims as pertaining only to supervisory functions.  Section 41-4-6 "applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building."  Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 9, 141 P.3d at 1261.  The Female Inmates allege practices that, together, made Springer Correctional unsafe for female inmates.  They allege that the

Supervisory Defendants continued to employ correctional officers with known proclivities to sexually abuse and assault female inmates, and whom the Supervisory Defendants continued to permit access to female inmates.  See Complaint ¶ 17, at 3.  They allege that the Supervisory Defendants routinely ignored female inmates' complaints about correctional officials' misconduct, intimidating female inmates from reporting misconduct and retaliating against female inmates who did report misconduct.  See Complaint ¶¶ 107, 141, at 10, 13.  The Female Inmates also allege that Springer Correctional did not install security cameras in areas where assaults frequently occurred, and that Springer Correctional was consistently understaffed such that male correctional officials frequently were alone with female inmates.  See Complaint ¶ 17, at 3.  The Female Inmates' allegations regarding the abusive correctional officers  thus more closely resemble the free-moving, violent gangs in Callaway v. New Mexico Department of Corrections than they resemble a single prison official's failure to consult a registry of inmates in Archibeque v. Moya.

Further, unlike the standard for Eighth Amendment violations, which require a supervisory defendant's subjective knowledge of the risk of a constitutional violation, § 41-4-6 imposes a should-have-known negligence standard.  As the Supreme Court of New Mexico has stated:

> The question is not about general supervision; the question under a premises liability theory of recovery involving third-party conduct is whether the government exercised reasonable care to discover and prevent dangerous conditions caused by people on its premises.  The government does not "have the duty to do everything that might be done," § 41-4-2(A), but it can be liable for the violent acts of a third party if the government reasonably should have discovered and could have prevented the incident.

Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 17, 310 P.3d at 619.  The Female Inmates allege sufficient facts to state a claim that each of the Supervisory Defendants should have known about Padilla, M. Gonzales, and Sanders' abuse -- the Complaint alleges widespread abuse

of which the Supervisory Defendants should have known.  Gallegos alleges that she reported M. Gonzales' abuse to Vigil, who referred her to R. Gonzales but then did nothing to ensure that M. Gonzales was no longer in a position to abuse female inmates at Springer Correctional.  See Complaint ¶¶ 100-104, at 10.  Green alleges that Sanchez knew of Padilla's abuse from Green and another inmate's reporting, but that Sanchez did nothing to protect the female inmates from Padilla.  See Complaint ¶¶ 45-49, at 6.  Gallegos and Green allege that R. Gonzales knew that M. Gonzales' abuse was widespread, and instead of intervening to protect them, R. Gonzales threatened them with punishment if they spoke to PREA auditors .  See Complaint ¶ 141, at 13. The Supervisory Defendants knew or should have known about Padilla, Sanders, and M. Gonzales' proclivity to abuse female inmates but did nothing to inhibit their access to female inmates.  This inaction, combined with structural problems like staffing and camera shortages, amount to negligence within § 41-4-6's meaning.  In short, Green, Gallegos, and Dominguez allege that the Supervisory Defendants' negligence made Springer Correctional dangerous to female inmates. Accordingly, the Female Inmates allege a plausible negligence claim against the Supervisory Defendants under § 41-4-6.

**IT IS ORDERED** that: (i) the Motion to Dismiss, filed November 11, 2019 (Doc. 15), is granted in part and denied in part; (ii) Plaintiff Dawn Green's Eighth Amendment claims against Defendants Marianna Vigil and Robert Gonzales are dismissed; (iii) Plaintiff Andrea Gallegos' Eighth Amendment claim against Defendants John Sanchez, Vigil and R. Gonzales are dismissed; (iv) Plaintiff Sasha Dominguez' Eighth Amendment claims against Sanchez, Vigil and R. Gonzales are dismissed; and (v) Green, Gallegos, and Dominguez may file a motion to amend the Complaint, filed August 15, 2019 (Doc. 1), consistent with D.N.M.LR-Civ. 15.1.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

--and--

Justine Fox-Young
Justine Fox-Young, P.C.
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Douglas E Gardner
Robles Rael & Anaya PC
Albuquerque, New Mexico

     *Attorneys for Defendants Christopher Padilla, Justin*
      *Sanders, and Malcolm Gonzales*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

     *Attorney for Defendants John Sanchez, Ebeth Cruz-Martinez,*
      *Marianna Vigil, and Robert Gonzales*