IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAWN GREEN; ANDREA GALLEGOS and
SASHA DOMINGUEZ,

       Plaintiffs,

vs.                                         No. CIV 19-0751 JB/JFR

Officer CHRISTOPHER PADILLA; JUSTIN
N. SANDERS, Officer; MALCOM J.
GONZALES, Former Warden; JOHN
SANCHEZ, Former Warden; EBETH CRUZ-
MARTINEZ, Former Warden; MARIANNA
VIGIL, Warden, and ROBERT GONZALES,
Captain,

       Defendants.

**MEMORANDUM OPINION AND AMENDED ORDER[1]**

    **THIS MATTER** comes before the Court on: (i) Defendant John Sanchez's Motion for

Summary Judgment Based on Qualified Immunity, filed November 19, 2020 (Doc. 43)("MSJ");

(ii) Sanchez' Motion to Stay Discovery Based on Qualified Immunity, filed December 2, 2020

(Doc. 46)("Stay Motion"); and (iii) Declaration of Erlinda O. Johnson, Esq. Requesting Limited

Discovery Pursuant to Fed. R. Civ. P 56(D), to Respond to Motion for Summary Judgment based

on Qualified Immunity, filed December 21, 2020 (Doc. 50-5)("Rule 56(d) Decl."). The Court

held a hearing on the motions on August 18, 2021. Clerk's Minutes at 1 (taken August 18,

2021), filed August 18, 2021 (Doc. 68). The primary issues are: (i) whether John Sanchez is

entitled to qualified immunity with respect to Plaintiff Dawn Green's constitutional violation

---

[1]This Opinion supplements and amends the Court's order denying Sanchez' MSJ, filed
November 19, 2020 (Doc. 43), and granting Sanchez' Stay Motion, filed December 2, 2020
(Doc. 46). See Order at 1, filed September 30, 2021 (Doc. 69).

claims, including whether: (a) Green satisfies the elements of a claim under the Eighth Amendment to the Constitution of the United States under 42 U.S.C. § 1983, and (b) it is clearly established that deliberate indifference to a prison guard's sexual abuse violates the Eighth Amendment or is particularly egregious; (ii) whether there is a genuine dispute of material fact pertinent to Green's claim that Sanchez violated her Eighth Amendment rights through his deliberate indifference to a prison guard's sexual abuse and through inaction; (iii) whether discovery should be stayed; and (iv) whether Green's request for discovery under rule 56(d) of the Federal Rules of Civil Procedure is appropriate based on the necessity of further discovery. On the facts presented and drawing all reasonable inferences in favor of Green as the non-moving party, the Court concludes that: (i) Sanchez is not entitled to qualified immunity for the Eighth Amendment cruel-and-unusual punishment claim, because Green has met her burden of demonstrating that the right to be free from deliberate indifference to sexual assault in prison was clearly established at the time of the alleged incident, and because deliberate indifference to prison rape is particularly egregious such that no reasonable officer could conclude it does not offend the Constitution; (ii) Sanchez is not entitled to summary judgment on the Eighth Amendment violation claim, because there is a dispute regarding whether he had subjective knowledge about the high risk of sexual assault to female inmates, including to Green specifically, in Springer Correctional Facility ("Springer Correctional") in Springer, New Mexico, and whether the actions, or lack thereof, he took after learning of Padilla's alleged sexual misconduct allowed Padilla's further sexual abuse of Green; (iii) the case will not be stayed, because the Court concludes that Sanchez is not entitled to qualified immunity; and (iv) Green is not entitled to discovery under rule 56, because the discovery is unnecessary to

defend against the MSJ.  Accordingly, the Court will (i) deny the MSJ; (ii) deny the Stay

Motion; and (iii) deny Green's request for limited discovery under rule 56(d).

## FACTUAL BACKGROUND

This case arises from a prison guard's alleged sexual assault on an inmate.  See

Complaint for Civil Rights Violations, State Tort Claims and Damages, ¶ 28-76, at 4-8, filed

August 15, 2019 (Doc. 1)("Complaint").  The Court takes its facts from the MSJ; Plaintiff Dawn

Green's Response to Defendant John Sanchez's Motion for Summary Judgment Based on

Qualified Immunity, filed December 21, 2020 (Doc. 50)("Response"); and Defendant John

Sanchez' Reply Brief in Support of Motion for Summary Judgment Based on Qualified

Immunity, filed February 04, 2021 (Doc. 58)("Reply").  Many of the facts are disputed.  The

Court states in the text the undisputed material facts and the disputed facts that the Court must

draw in the non-movant's favor.  See Fed. R. Civ. P. 56.  The Court states the disputed facts and

the purportedly disputed facts in the footnotes.

### 1.    **Background**.

Sanchez began working for the State of New Mexico Corrections Department ("NMCD")

in 1995 and remains an NMCD employee today.  See MSJ ¶ 1, at 6 (asserting this fact)(citing

Affidavit of John Sanchez ¶ 5 at 2, (dated November 18, 2020), filed November 19, 2020 (Doc.

43-1)("Sanchez Aff.").[2]  Sanchez served as warden of Springer Correctional from 2012 through

April 17, 2017, "after which date he no longer had any duties related to [Springer Correctional]

_____

[2]Green purports to lack sufficient information to dispute this sentence's facts, but she does not deny the allegations.  See Response ¶ 1, at 4. Because Green does not controvert specifically the allegations, the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

and did not work at the facility."  MSJ ¶ 1, at 6 (asserting this fact); see Sanchez Aff. ¶ 5, at 2.[3]

Springer Correctional's chain of command dictates that correctional officers "report[] to

Sergeants, who in turn report[] to Lieutenants, who in turn report[] to the Captain, who in turn

report[] to two Unit Managers, who in turn report[] to the Warden."  MSJ ¶ 2, at 7 (asserting this

fact).[4]

During his tenure as warden, Sanchez "operated the facility with a 50% staff vacancy

rate."  Response ¶ 1, at 7 (asserting this fact).  See Videotaped Deposition of John Sanchez at

44:14-22 (dated November 4, 2020), filed December 21, 2020 (Doc. 50-1)("Sanchez Depo. I");

Reply ¶ 1,[5] at 15-16 (admitting this fact).[6]  This vacancy rate forced staff to work "significant

_____

[3]Green purports to lack sufficient information to dispute this sentence's facts, but she does not deny the allegations.  See Response ¶ 1, at 4.  Because Green does not controvert specifically the allegations, the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[4]Green purports to lack sufficient information to dispute this sentence's facts, but she does not deny the allegations.  See Response ¶ 2, at 4.  Because Green does not controvert specifically the allegations, the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[5]The District of New Mexico Local Rules of Civil Procedure provide that, upon a motion for summary judgment, a nonmovant may assert additional material facts in her response, and that "[e]ach additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M. LR-Civ 56.1(b).  The nonmovant's reply, in turn,

> must contain a concise statement of those facts set forth in the response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.

D.N.M. LR-Civ 56.1(b).  Here, Green uses a numbered list in her Response to assert her additional material facts, immediately after she used a separate numbered list for her objections

overtime" and caused them to "perform[] poorly on the job due to sleep-deprivation."  Response

¶ 2, at 7 (asserting this fact).   See Zoom Videoconference and Videotaped Deposition of

Christopher Padilla at 67:20-68:9 (taken November 6, 2020), filed December 21, 2020 (Doc. 50-

4)("Padilla Depo. I").[7]  In addition, Springer Correctional "has historically employed very few

female correctional officers -- in fact, a large proportion of days show no female officers at all on

---

to the MSJ.  See Response ¶¶ 1-37, at 7-11.  Sanchez, in turn, uses a numbered list to dispute
Green's additional material facts.  See Reply ¶¶ 1-36, at 15-19.  Citations to the Response and
the Reply in this MOO will note both the paragraph number within the numbered list and the
page number where it occurs.

[6]Sanchez, in his Reply, admits this fact, and also adds that "the deposition testimony
attached by Plaintiff contains additional facts, such as 'we worked really hard to make sure we
had enough staff to cover the positions at the facility."  Reply ¶ 1, at 15-16.

[7]Sanchez, in his Reply, states: "Disputed that Mr. Padilla testified that "staff performed
poorly at the job but otherwise undisputed."  Reply ¶ 2, at 16.  In Padilla's deposition, he stated:

> Q: Many people had to work a lot of overtimes?
>
> A: Yes, ma'am.
>
> Q: Did that impact C.O.'s ability to do their jobs well?
>
> A: I would say yes.
>
> Q: How so?
>
> A: Due to sleep deprivation.  Yes.

Padilla Depo. I. at 68:4-8.  Green asserts that "staff worked significant overtime and performed
poorly on the job due to sleep deprivation."  Response ¶ 1, at 7.  Here, according to the record,
Padilla testifies that the vacancy rate caused "a lot of officers and personnel . . . to work
doubles."  Padilla Depo. I at 67:25-68:1.  Padilla then admits that working overtime impacted
correctional officers' "ability to do their jobs."  Padilla Depo. I at 68:4-6.  Finally, Padilla
testifies that the impact on officers' ability to do their jobs was "[d]ue to sleep deprivation."
Padilla Depo. I at 68:6-8.  Given these statements on the record, the Court draws the reasonable
inference in the non-movant's favor that sleep deprivation, resulting from a high staffing
vacancy, caused staff to perform poorly at their jobs.

the premises -- meaning that the inmates are mainly supervised by male correctional officers and therefore far more likely to be subjected to sexual abuse." Response ¶ 4, at 7 (asserting this fact). See Padilla Depo. I at 48:10-49:3; id. at 68:21-69:20. [8]

Springer Correctional and NMCD "maintain[]" a written, "zero tolerance" policy that prohibits abuse, sexual misconduct, and any type of sexual relationship between employees and inmates. MSJ ¶ 4, at 7 (asserting this fact). See NMCD Policy CD-150100 and Procedures CD-150101, Offender Protection Against Abuse and Sexual Misconduct, at 4-9 (dated February 10, 2015), filed November 19, 2020 (Doc. 43-3)("NMCD Policy I"); Response ¶ 4, at 5 (admitting this fact).[9] The written policy requires that employees and inmates immediately report any abuse

_____

[8]Sanchez, in his Reply, disputes that the Padilla deposition "states what Plaintiff claims it states." Reply ¶ 4, at 16. Sanchez asserts, instead, that Padilla, in Padilla Depo. I, testifies that he "'honestly can't recall' how often a situation would occur when no female officers were on duty, 'possibly twice a week' but that 'the only impact it had' was 'limited to searches.'" Reply ¶ 4, at 16 (no citations for quotations). At the summary judgment stage, the Court views the evidence in the light most favorable to the nonmovant. See Fed. R. Civ. P. 56(a). According to the record, Padilla testifies that correctional officers such as Padilla had to request a female officer "to come and do . . . pat-downs of female inmates." Padilla Depo. I at 48:11-19. Padilla testifies that "possibly twice a week" there were no female officers working at Springer Correctional. Padilla Depo. I at 49:2-3. Padilla testifies that, when no female officers were present, Padilla and the other officers would conduct their searches by searching the female inmates' "jackets and aprons," which the inmates had removed, instead of conducting pat-downs. Padilla Depo. I at 49:9-11. Padilla testifies that he would have appreciated "better training[,]" particularly "[t]raining from personnel that had already worked with female inmates." Padilla Depo. I at 67:1-5. Finally, although Padilla testifies that Springer Correctional "would have r[u]n a lot better" with more female officers on staff, Padilla also testifies that the lack of female officers only impacted "searches." Padilla Depo. I at 68:21-23. Given these statements on the record, the Court draws the reasonable inference in Green's favor that female inmates may be at higher risk of sexual abuse when they are subjected overwhelmingly to male correctional officers; when these male officers have expressed want for better training on how to deal with female inmates; and when the female inmates are forced to remove clothing for searches.

[9]Green, in her Response, admits that NMCD "may have written policies" prohibiting sexual abuse and outlining steps for relief and disciplinary action. Response ¶ 4, at 5. Green avers, in addition, that these policies "are often disregarded." Response ¶ 4, at 5. Green does

or sexual misconduct that they experience or witness, and that the reporting person shall not be subject to retaliation for doing so.  See MSJ ¶ 4, at 7 (asserting this fact); NMCD Policy I at 4-9. See Response ¶ 4, at 5 (admitting this fact).[10]   The policy also provides that any employee who fails to report abuse or misconduct "is subject to disciplinary action, up to and including termination of employment."  MSJ ¶ 4, at 7-8 (asserting this fact).  See NMCD Policy I at 4-9; Response ¶ 4, at 5 (admitting this fact).[11]  "[NMCD] [P]olicy CD-150102 requires a detention facility's administrator to separate a victim of sexual abuse from the assailant once sexual abuse is reported."  Response ¶ 36, at 11 (asserting this fact).  See NMCD Policy CD-150102 and Procedures CD-150101, Coordinated Response to Sexual Assaults, at 1 (dated February 10, 2015), filed December 21, 2020 (Doc. 50-3)("NMCD Policy II"); Reply ¶ 35, at 19 (admitting this fact).  "[NMCD] policy also requires that upon report of a sexual assault incident, the

---

not, however, controvert specifically the fact that NMCD has written policies prohibiting sexual abuse, and, therefore, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[10]Green, in her Response, admits that NMCD "may have written policies" prohibiting sexual abuse, and outlining steps for relief and disciplinary action.  Response ¶ 4, at 5.  Green avers, in addition, that these policies "are often disregarded."  Response ¶ 4, at 5.  Green does not controvert specifically the fact that NMCD has written policies prohibiting sexual abuse and, therefore, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.).

[11]Green, in her Response, admits that NMCD "may have written policies" prohibiting sexual abuse, and outlining steps for relief and disciplinary action.  Response ¶ 4, at 5.  Green avers, in addition, that these policies "are often disregarded."  Response ¶ 4, at 5.  Green does not controvert specifically the fact that NMCD has written policies prohibiting sexual abuse and, therefore, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.).

Warden shall make an immediate report to the PREA coordinator."  Response ¶ 36, at 11.  See NMCD Policy II, at 1; Reply ¶ 35, at 19 (admitting this fact).

###    2.    Green's Alleged Abuse at Springer Correctional.

In approximately January, 2017, Padilla "was working as a kitchen officer, in charge of overseeing inmates who worked in the kitchen," including Green.  Response ¶ 10, at 8 (asserting this fact).  See Reply ¶ 10, at 17 (admitting this fact).  By the third week of January, 2017, Padilla began to "request 'trade-offs' from Ms. Green[,]" and began to "make comments about Ms. Green's breasts and the size of her nipples" during work sessions in the kitchen.  Response ¶¶ 11-12, at 8-9 (asserting this fact).  See Declaration of Dawn Green ¶ 2, at 7, filed December 21, 2020 (Doc. 50-2)("Green Decl."); Reply ¶¶ 11-15, at 17 (admitting this fact).[12]  "Over a period of several weeks between February through March 2017," Padilla instructed Green to "show him her breasts so that he would allow her to take food back to her cell."  Response ¶ 14, at 9 (asserting this fact).  See Green Decl. ¶ 8, at 2; Reply ¶¶ 11-15, at 17 (admitting this fact).[13]  Green complied with Padilla's instruction and "would then proceed to the bathroom near the

---

[12]Sanchez, in his Reply, admits "that Dawn Green has made such averments[,]" but states that it is "unknown whether, in fact, any such acts ever occurred."  Reply ¶¶ 11-15, at 17.  Stating that the accuracy of an assertion is unknown does not dispute the assertion.  Because Sanchez does not controvert specifically the assertion that Padilla requested trade-offs from Green and made sexual comments regarding Green's body, and because the Court views the evidence in the light most favorable to the nonmovant at summary judgment stage, the Court deems this fact undisputed.  See Fed. R. Civ. Pro. 56(a); D.N.M. LR-Civ 56.1(b).

[13]Sanchez, in his Reply, admits "that Dawn Green has made such averments[,]" but states that it is "unknown whether, in fact, any such acts ever occurred."  Reply ¶¶ 11-15, at 17.  Stating that the accuracy of an assertion is unknown does not dispute the assertion.  Because Sanchez does not controvert specifically the assertion that Padilla instructed Green to reveal her breasts in exchange for taking food back to her cell, and because the Court views the evidence in the light most favorable to the nonmovant at summary judgment stage, the Court deems this fact undisputed.  See Fed. R. Civ. Pro. 56(a); D.N.M. LR-Civ 56.1(b).

kitchen and she would show Padilla her breasts."  Response ¶ 15, at 9 (asserting this fact).  <u>See</u>

<u>Green</u> Decl. ¶¶ 9-10, at 2; Reply ¶¶ 11-15, at 17 (admitting this fact).[14]

Then, "[i]n approximately the first week of February 2017, Officer Padilla began to take

Jolly Rancher candies to Ms. Green" in her room.  Response ¶ 16, at 9 (asserting this fact).  <u>See</u>

<u>Green</u> Decl. ¶ 11, at 2.[15]  Padilla directed Green to put the candies in her vagina and return the

candies back to Padilla so that Padilla would know what Green "tasted like."  Response ¶ 17-18,

at 9 (asserting this fact).  <u>See</u> Green Decl. ¶ 12, at 2.[16]  This series of events occurred "several

----

[14]Sanchez, in his Reply, admits "that Dawn Green has made such averments[,]" but states
that it is "unknown whether, in fact, any such acts ever occurred."   Reply ¶¶ 11-15, at 17.
Stating that the accuracy of an assertion is unknown does not dispute the assertion.  Because
Sanchez does not controvert specifically the assertion that Green complied with Padilla's
instruction by proceeding to the bathroom to show Padilla her breasts, and because the Court
views the evidence in the light most favorable to the nonmovant at summary judgment stage, the
Court deems this fact undisputed.  <u>See</u> Fed. R. Civ. Pro. 56(a); D.N.M. LR-Civ 56.1(b).

[15]Sanchez, in his Reply, disputes this fact on the basis that Green "never made any such
allegations to any of the New Mexico State Police Officers when they interviewed her on March
30, 2017 and September 1, 2017" as part of the investigation into her complaint against Padilla.
Reply ¶ 16-18, at 17.  Despite arguing that Green did not make the allegations in her interview,
Sanchez does not controvert specifically the assertion that Padilla took candies to Green in her
cell, and, therefore, the Court deems this fact undisputed.  <u>See</u> D.N.M. LR-Civ. 56.1(b)("All
material facts set forth in the Memorandum will be deemed undisputed unless specifically
controverted.").

[16]Sanchez, in his Reply, disputes this fact on the basis that Green "never made any such
allegations to any of the New Mexico State Police Officers when they interviewed her on March
30, 2017 and September 1, 2017" as part of the investigation into her complaint against Padilla.
Reply ¶¶ 16-18, at 17.  Despite arguing that Green did not make the allegations in her interview,
Sanchez does not controvert specifically the assertion that Padilla instructed Green to insert the
candies in her vagina and return them to him, and, therefore, the Court deems this fact
undisputed.  <u>See</u> D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will
be deemed undisputed unless specifically controverted.").

times over a period of several weeks in February and March 2017." Response ¶ 18, at 9 (asserting this fact). See Green Decl. ¶ 13, at 2.[17]

### 3. __Martinez' and Green's Allegations, and Springer Correctional's Response.__

On the evening of March 29, 2017, inmate Rebecca Martinez spoke to Joseph Brashear, a Springer Correctional Lieutenant, and "made allegations about sexual advances" by Padilla, which "allegedly occurred in February and early March 2017." MSJ ¶ 8, at 9 (asserting this fact). See Sanchez Aff. ¶ 11, at 4-5.[18] Brashear reported the allegations to a Springer Correctional Lieutenant and Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, 117 Stat. 972 (2003)("PREA"), coordinator, Shawn Rosenbarker, and to a mental health counselor, both of whom subsequently re-interviewed Martinez regarding her allegations. See MSJ ¶ 8, at 9-10 (asserting this fact); Sanchez Aff. ¶ 12, at 5.[19] The mental health counselor created an incident

---

[17]Sanchez, in his Reply, disputes this fact on the basis that Green "never made any such allegations to any of the New Mexico State Police Officers when they interviewed her on March 30, 2017 and September 1, 2017" as part of the investigation into her complaint against Padilla. Reply ¶16-18, at 17. Despite arguing that Green did not make the allegations in her interview, Sanchez does not controvert specifically the assertion that the Padilla made these requests of Green several times during February and March, 2017, therefore, the Court deems this fact undisputed. See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[18]Green states that she lacks sufficient information to dispute the fact that Martinez spoke to Brashear about Padilla's sexual advances, but she does not deny the allegations. See Response ¶ 8, at 5. Because Green does not controvert specifically the fact in the text, the Court deems this fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[19]Green purports to lack sufficient information to dispute the fact that Brashear reported Martinez' allegations to a PREA coordinator and to a mental health counselor, but she does not deny the allegations. See Response ¶ 8, at 5. Because Green does not controvert specifically the fact that Brashear reported Martinez' allegations to a PREA coordinator and to a mental health counselor, the Court deems this fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

report and a crisis intervention form, asked Martinez to complete a handwritten statement, and then advised Rosenbarker that Martinez could return to her cell. See MSJ ¶ 8, at 9-10 (asserting this fact); Sanchez Aff. ¶ 11, at 4-5.[20]   Rosenbarker, meanwhile, "drafted a 'serious incident report' and a memorandum addressed to [Sanchez]" and Springer Correctional's captain and chief security officer, Robert Gonzales.   MSJ ¶ 9, at 10 (asserting this fact)(no citation for quotation). See Sanchez Aff. ¶ 12, at 5.[21]   Sanchez also was alerted to the situation that night by telephone.  See MSJ ¶ 9, at 10 (asserting this fact); Sanchez Aff. ¶ 12, at 5.[22]  Gonzales contacted the New Mexico State Police ("NM State Police"), reported Martinez' allegations to NMCD's Office of Professional Standards, and reviewed surveillance camera video to "corroborate the allegations," but was unable to locate any relevant footage.  MSJ ¶ 10, at 10 (asserting this fact).

---

[20]Green purports to lack sufficient information to dispute that the mental health counselor created an incident report and a crisis intervention form, asked Martinez to complete a handwritten statement, and then advised Rosenbarker that Martinez could return to her cell, but she does not deny the allegations.  See Response ¶ 8, at 5.  Because Green does not controvert specifically the allegations, the Court will deem the fact that the mental health counselor created an incident report and a crisis intervention form, asked Martinez to complete a handwritten statement, and then advised Rosenbarker that Martinez could return to her cell undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[21]Green purports to lack sufficient information to dispute whether Rosenbarker submitted a serious incident report to Sanchez and Gonzales, but she does not deny the allegations.  See Response ¶ 8, at 5.  Because Green does not controvert specifically the allegations, the Court will deem the fact that Rosenbarker submitted a serious incident report to Sanchez and Gonzales undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[22]Green purports to lack sufficient information to dispute whether Sanchez was alerted that night by telephone, but she does not deny the allegations.  See Response ¶ 9, at 5.  Because Green does not controvert specifically the allegations, the Court will deem the fact that Sanchez was alerted that night by telephone undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

See Sanchez Aff. ¶ 13, at 5-6.[23]   "Neither the memorandum by [Rosenbarker] summarizing inmate Martinez' allegations, nor the handwritten statement drafted and signed by Ms. Martinez, mentioned [Green]." MSJ ¶ 15, at 12 (asserting this fact). See Sanchez Aff. ¶ 16, at 6-7.[24]

The next morning, on March 30, 2017, two NM State Police officers interviewed Gonzales at Springer Correctional in the prison conference room regarding Martinez' allegations against Padilla. See MSJ ¶ 11, at 11 (asserting this fact); Sanchez Aff. ¶ 14, at 5.[25]   The officers also interviewed Martinez and Padilla. See MSJ ¶ 13, at 11 (asserting this fact); Sanchez Aff.

_____

[23]Green purports to lack sufficient information to dispute whether Gonzales contacted NM State Police reported Martinez' allegations to NMCD's Office of Professional Standards, and reviewed surveillance camera video, but was unable to locate any relevant footage, but she does not deny the allegations. See Response ¶ 10, at 6. Because Green does not controvert specifically the allegations, the Court will deem the fact that Gonzales contacted NM State Police reported Martinez' allegations to NMCD's Office of Professional Standards, and reviewed surveillance camera video, but was unable to locate any relevant footage undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[24]Green, in her Response, disputes the facts set forth in paragraph fifteen of Sanchez' MSJ. See Response ¶ 15, at 6. Paragraph fifteen of Sanchez' MSJ contains several allegations, including the assertion that Sanchez "has no recollection of an inmate named Dawn Green," and that Rosenbarker's memo and Martinez' handwritten statement did not reference Green. MSJ ¶ 15, at 12. Green, however, in her Response, controverts only the portions of the paragraph that allege Sanchez "has no recollection of an inmate named Dawn Green," by averring that Sanchez brought Green into his office and spoke with her there. Reply ¶ 15, at 12. Because Green does not controvert specifically Sanchez' assertion that Rosenbarker's memo and Martinez' handwritten statement did not reference Green, the Court will deem undisputed the assertion that the memo and the handwritten statement made no reference to Green. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[25]Green purports to lack sufficient information to dispute whether NM State Police officers interviewed Martinez about her allegations against Padilla, but she does not deny the allegations. See Response ¶ 11, at 6. Because Green does not controvert specifically the allegations, the Court deems the fact that NM State Police officers interviewed Martinez about her allegations against Padilla undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

¶ 15, at 6.[26]   Although Sanchez was "aware . . . that two [police officers] were interviewing [Martinez and Padilla,]" Sanchez was not present for any of the interviews.  See MSJ ¶ 13, at 11 (asserting this fact); Sanchez Aff. ¶ 15, at 6.[27]

Sometime in March, 2017, Green became "aware" that Martinez "reported Officer Padilla for sexually harassing and assaulting" Martinez, and, on March 30, 2017, Green was escorted to Springer Correctional administration offices.  Response ¶¶ 19-20, at 9 (asserting this fact).  See Green Decl. ¶¶ 14-15, at 2; Reply ¶¶ 19-20, at 17 (admitting this fact).  While Green waited in the administration offices to be interviewed by New Mexico State Police, Sanchez escorted Green into his office and "asked her what had happened."  Response ¶ 21, at 9 (asserting this fact).  See Green Decl. ¶ 16, at 2.[28]  Green told Sanchez that Padilla had directed

---

[26]Green purports to lack sufficient information to dispute whether officers interviewed Martinez and Padilla, but she does not deny the allegations.  See Response ¶ 13, at 6.  Because Green does not controvert specifically the allegations, the Court deems the fact that officers interviewed Martinez and Padilla undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[27]Green purports to lack sufficient information to dispute whether Sanchez knew that the interviews took place but was not present during the interviews, but she does not deny the allegations.  See Response ¶ 13, at 6.  Because Green does not controvert specifically the allegations, the Court deems the fact that Sanchez knew that the interviews took place but was not present during the interviews undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[28]Sanchez, in his Reply, disputes this fact on the basis that "Plaintiff never made such averment to the New Mexico State Police officers who interviewed her on September 1, 2017, and in fact twice told them that she did not want to report Officer Padilla; and her Complaint contains no such allegations."  Reply ¶¶ 21-23, at 17.  See State of New Mexico Incident Report, at 12, (dated August 8, 2017), filed December 21, 2020 (Doc. 50-6)("NM State Police Incident Report").  Despite arguing that Green did not make the allegations in her interview or her Complaint, Sanchez does not controvert specifically the assertion that Sanchez escorted Green into his office and briefly asked her what happened.  The Court, therefore, deems the fact that Sanchez escorted Green into his office and asked her what happened undisputed.  See D.N.M.

her to reveal her breasts "in exchange for allowing her to take food out of the kitchen," to which

Sanchez responded "okay" and informed Green that the State Police would interview her

"shortly."   Response ¶¶ 22-23, at 10 (asserting this fact).   See Green Decl. ¶¶ 17-18, at 2-3.[29]

Sanchez remained present at Springer Correctional "[w]hile Ms. Green was being interviewed by

police officers on March 30, 2017."   Response ¶ 24, at 10 (asserting this fact).   See Green Decl.

¶ 19, at 3; Reply ¶ 24, at 18 (admitting this fact).   During her interview, Green told the police

officers that she "was very upset about getting her name involved in the incident."   MSJ ¶ 17, at

12 (asserting this fact).   See Sanchez Aff. ¶ 17, at 9; Response ¶ 17, at 6 (admitting this fact).

Once the interview concluded, Green was "was sent back to her cell and was not assessed or

interviewed by health personnel."   Response ¶ 25, at 10 (asserting this fact).   See Green Decl.

¶ 21, at 3; Reply ¶ 25, at 18 (admitting this fact).[30]   Soon thereafter, while Sanchez was still

---

LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed
unless specifically controverted.").

   [29]Sanchez, in his Reply, disputes this fact on the basis that "Plaintiff never made such
averment to the New Mexico State Police officers who interviewed her on September 1, 2017,
and in fact twice told them that she did not want to report Officer Padilla; and her Complaint
contains no such allegations."   Reply ¶¶ 21-23, at 17 (citations omitted).   See NM State Police
Incident Report, at 12.   Despite arguing that Green did not make the allegations in her interview
or her Complaint, Sanchez does not controvert specifically the assertions that Green told
Sanchez, in his office, that Padilla had instructed her to reveal her breasts in exchange for taking
food to her cell, or that Sanchez, in turn, told Green that NM State Police officers would be
interviewing her.   The Court, therefore, deems the fact that Green told Sanchez that Padilla had
instructed her to reveal her breasts in exchange for taking food to her cell, or that Sanchez told
Green that NM State Police officers would be interviewing her undisputed.   See D.N.M. LR-Civ.
56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless
specifically controverted.").

   [30]Sanchez, in his Reply, does not dispute this allegation, but notes that he does not
dispute the allegation, "because Plaintiff never reported her allegations to anyone at NMCD or
[Springer Correctional]."   Reply ¶ 25, at 18.

warden, Green submitted a grievance to Springer Correctional's administration, "complaining about Officer Padilla's sexual misconduct against her[,]" but when Green received no response, she inquired and "was told it had not been received."  Response ¶¶ 26-27, at 10 (asserting this fact).  See Green Decl. ¶¶ 23-24, at 3.[31]

Following Green's and Martinez' allegations, Padilla denied Green's and Martinez' complaints against him and offered to take a polygraph test, according to the police records made at the time.  See MSJ ¶ 18, at 12 (asserting this fact); NM State Police Incident Report, at 12; Sanchez Aff. ¶ 17, at 7.[32]  Sanchez, meanwhile, did not initiate any disciplinary action against Padilla.  See Response ¶ 8, at 8 (asserting this fact); Sanchez Depo. I at 106:22-25; Reply ¶ 8, at 17 (admitting this fact).[33]  Instead, Sanchez promoted Padilla to the position of maintenance

---

[31]Sanchez, in his Reply, disputes this fact on the basis that "there is no record that [Green] ever submitted any grievance" regarding the alleged conduct.  Reply ¶¶ 26-27, at 18. Green, in her affidavit, asserts that she submitted a grievance.  Because the Court views the evidence in the light most favorable to the nonmovant at summary judgment stage, however, the Court accepts Green's statement that she submitted a grievance, which she was told was never received.  See Fed. R. Civ. Pro. 56(a).

[32]Green purports to lack sufficient information to dispute whether Padilla denied Green's and Martinez' complaints, and whether Padilla offered to take a polygraph test, but she does not deny the allegations.  See Response ¶ 18, at 7.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that Padilla denied Green's and Martinez' complaints, and that Padilla offered to take a polygraph test, undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[33]Sanchez, in his Reply, admits this fact and adds that he viewed the complaints against Padilla as unproven allegations.  See Reply ¶ 8, at 17.

supervisor "[s]hortly after [Green and Martinez] were interviewed by police officers."  Response ¶ 28, at 10 (asserting this fact).  See Green Decl. ¶ 25, at 3.[34]

On April 17, 2017, Sanchez left Springer Correctional and was assigned as the "Compliance Monitor for Northeast New Mexico Correctional Facility in Clayton, New Mexico, a privately-operated prison administered by a corporation on behalf of NMCD."  MSJ ¶ 1, at 6 (asserting this fact).  See Sanchez Aff. ¶ 1, at 6-7.[35]  Sanchez' departure meant that he ceased to have any "supervisory responsibilities over inmates or employees at [Springer Correctional] after that date."  MSJ ¶ 20, at 13 (asserting this fact).  See Sanchez Aff. ¶ 19, at 8.[36]  The District

_____

[34]Sanchez, in his Reply, purports to dispute Green's asserted timeline, and argues that Padilla was promoted to "Physical Plant Manager for Maintenance on March 13, 2017, approximately two weeks before the police interviews occurred."  Reply ¶ 28, at 18.  See Zoom Videoconference and Videotaped Deposition of Christopher Padilla at 9:15-16 (dated November 6, 2020), filed February 4, 2021 (Doc. 58-1)("Padilla Depo. II")("2017, March 13th, I became the physical plant manager for maintenance.").  The Green Decl. asserts: "Shortly after I was interviewed by police officers about Officer Padilla, he began to work as supervisor of maintenance."  Green Decl. ¶ 25, at 3.  Because the Court views the evidence in the light most favorable to the nonmovant at summary judgment stage, and because the evidence is in conflict, the Court will accept Green's version of the facts, as the nonmovant.  See Fed. R. Civ. P. 56(a).

[35]Green purports to lack sufficient information to dispute that Sanchez left Springer Correctional and began working at Northeast New Mexico Correctional Facility, but she does not deny the allegations.  See Response ¶ 1, at 4.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that Sanchez left Springer Correctional and began working at Northeast New Mexico Correctional Facility undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[36]Green purports to lack sufficient information to dispute that Sanchez did not have any supervisory responsibility over inmates and employees after April 17, 2017, but she does not deny the allegations.  See Response ¶ 20, at 7.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that Sanchez did not have any supervisory responsibility over inmates and employees after April 17, 2017, undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Attorney, meanwhile, declined to file any criminal charges against Padilla following the allegations, "due to lack of cooperation" by Martinez.  MSJ ¶¶ 20-21, at 13-14 (asserting this fact).  See Sanchez Aff. ¶¶ 19-21, at 8-9.[37]  Martinez, who stated that her attorney advised her "not to speak with anybody[,]" "refused to cooperate" with the investigation that the NMCD Office of Professional Standards opened into her allegations.  MSJ ¶ 21, at 13-14 (asserting this fact).  See Sanchez Aff. ¶ 21, at 13-14.[38]  The Office of Professional Standards investigators concluded, accordingly, that "there was insufficient evidence to clearly prove or disprove the allegations" against Padilla.  MSJ ¶¶ 20-21, at 13-14 (asserting this fact).  See Sanchez Aff. ¶¶ 19-21, at 8-9.[39]  Because he had departed from Springer Correctional, Sanchez was "not

---

[37]Green purports to lack sufficient information to dispute whether the District Attorney declined to file any criminal charges against Padilla following the allegations because of Martinez' lack of cooperation, but she does not deny the allegations.  See Response ¶¶ 20-21, at 7.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that the District Attorney declined to file any criminal charges against Padilla following the allegations because of Martinez' lack of cooperation fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[38]Green purports to lack sufficient information to dispute that, pursuant to her attorney's advice, Martinez did not provide any statements during the NMCD's investigation into her allegations, but she does not deny the allegations.  See Response ¶ 21, at 7.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that, pursuant to her attorney's advice, Martinez did not provide any statements during the NMCD's investigation into her allegations undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[39]Green purports to lack sufficient information to dispute whether the Office of Professional Standards concluded that there was insufficient evidence to prove or disprove Martinez' allegations, but she does not deny the allegations.  See Response ¶¶ 20-21, at 7.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that the Office of Professional Standards concluded that there was insufficient evidence to prove or disprove Martinez' allegations undisputed.  See

aware of the resolution or conclusions reached regarding the allegations" against Padilla, and he learned only through reviewing documents in connection with "the instant civil litigation" in 2020 that the District Attorney and the Office of Professional Standards ultimately declined to take disciplinary action against Padilla.  MSJ ¶¶ 20-21, at 13-14 (asserting this fact).  <u>See</u> Sanchez Aff. ¶¶ 19-21, at 8-9.[40]  Martinez was transferred, at her request, to the Western New Mexico Correctional Facility in Grants, New Mexico, following her allegations against Padilla. <u>See</u> MSJ ¶ 14, at 11 (asserting this fact); Sanchez Aff. ¶ 19, at 8.[41]

### 4.  <u>Green's Additional Allegations</u>

In his new position as maintenance supervisor, "Padilla was responsible for every aspect" of the Springer Correctional facility and "as such had access to every part of the prison." Response ¶ 29, at 10 (asserting this fact).  <u>See</u> Sanchez Depo. I at 153:11-18; Reply ¶ 29, at 18 (admitting this fact)(noting that Padilla's responsibilities were "limited to inspections and repairs of the physical plant and supply inventory.").  Padilla had "access to inmates" in this position,

---

D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[40]Green purports to lack sufficient information to dispute that Sanchez did not know the outcome of the NMCD's investigation, but she does not deny the allegations.  <u>See</u> Response ¶¶ 20-21, at 7.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that Sanchez did not know the outcome of the NMCD's investigation undisputed.  <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[41]Green purports to lack sufficient information to dispute that Martinez was transferred to the Western New Mexico Correctional Facility, but she does not deny the allegations.  <u>See</u> Response ¶ 14, at 6.  Because Green does not controvert specifically the allegations with conflicting evidence or allegations, the Court deems the fact that Martinez was transferred to the Western New Mexico Correctional Facility undisputed.  <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

because he supervised several maintenance staff, who in turn oversaw several inmates assigned to work maintenance.  Response ¶ 30, at 11 (asserting this fact).  See Sanchez Depo. I at 153:11-18; Padilla Depo. I at 11:18-23; id. at 12:10-12; Reply ¶ 30, at 18 (admitting this fact)(noting that "Padilla supervised three officers assigned to maintenance staff, who in turn each supervised two inmate maintenance workers, plus a welder.").  Green was housed in a single cell at Springer Correctional.  See Response ¶ 32, at 11 (asserting this fact); Green Decl. ¶ 26, at 4.[42]  Springer Correctional did not have security cameras that surveilled inmates' single cells, such as Green's.  See Response ¶ 32, at 11 (asserting this fact); Sanchez Depo. I at 158:19-22.[43]

"Almost immediately after Padilla was promoted to maintenance supervisor, he began to frequent [Green's] single cell and to demand that she touch her vagina in front of Padilla while he watched her."  Response ¶ 31, at 11 (asserting this fact).  See Green Decl. ¶ 27, at 4.[44]  "From

---

[42]Sanchez, in his Reply, responds to this fact by saying that it is "[u]nknown where [Green] was housed in that time period."  Reply ¶ 32, at 18.  Stating that it is unknown where Green was housed does not dispute the assertion that Green was housed in a single cell, or that Padilla had access to inmates.  Because Sanchez does not controvert specifically the assertion that Green was housed in a single cell, either with conflicting evidence or allegations, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[43]Sanchez, in his Reply, responds to this fact by saying that it is "[u]nknown where [Green] was housed in that time period."  Reply ¶ 32, at 18.  Stating it is unknown where Green was housed does not dispute the assertion that there were no security cameras surveilling her cell area.  Because Sanchez does not controvert specifically the assertion that there were no security cameras in single cells, either with conflicting evidence or allegations, the Court deems this fact undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[44]Sanchez, in his Reply, purports to dispute this fact on the basis that Green "never made any such allegations to any of the New Mexico State Police Officers when they interviewed her on March 30, 2017 and September 1, 2017" as part of the investigation into her complaint against Padilla.  Reply ¶ 31, at 18.  See NM State Police Incident Report, at 10-11.  Despite arguing that Green did not make the allegations in her interview, Sanchez does not controvert

April through September 2017, [Padilla] continued to frequent [Green's] cell, stand at the door[,] and ask that she 'play' with herself so that he could watch."  Response ¶ 34, at 11 (asserting this fact).  See Green Decl. ¶ 28, at 4.[45]  In exchange for watching Green masturbate, Padilla would give Green "pain pills."   Response ¶ 34, at 11 (asserting this fact).  See Green Decl. ¶ 28, at 4.[46]

On September 28, 2017, Padilla took a voluntary polygraph examination that the NM State Police administered.  See MSJ ¶ 19, at 12-13 (asserting this fact); Sanchez Aff. ¶ 18, at 7.[47]

---

specifically the assertions that Padilla frequented Green's cell and asked her to masturbate while he watched.  See Reply ¶ 31, at 18.  The Court, therefore, deems the fact that Padilla frequented Green's cell and asked her masturbate while he watched undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[45]Sanchez, in his Reply, purports to dispute this fact on the basis that Green "never made any such allegations to any of the NM State Police Officers when they interviewed her on March 30, 2017 and September 1, 2017" as part of the investigation into her complaint against Padilla.  Reply ¶ 34, at 18.  Despite arguing that Green did not make the allegations in her interview, Sanchez does not controvert specifically, either with conflicting evidence or allegations, the assertions that Padilla frequented Green's cell between April and September, 2017, and asked her to masturbate while he watched.  See Reply ¶ 34, at 18.  The Court, therefore, deems the fact that Padilla frequented Green's cell between April and September, 2017, and asked her to masturbate while he watched, undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[46]Sanchez, in his Reply, purports to dispute this fact on the basis that Green "never made any such allegations to any of the NM State Police Officers when they interviewed her on March 30, 2017 and September 1, 2017" as part of the investigation into her complaint against Padilla.  Reply ¶ 34, at 18.  Despite arguing that Green did not make the allegations in her interview, Sanchez does not controvert specifically, either with conflicting evidence or allegations,  the assertions that Padilla gave Green pain pills in exchange for Padilla watching Green masturbate.  The Court, therefore, deems the fact that Padilla gave Green pain pills in exchange for Padilla watching Green masturbate undisputed.  See D.N.M. LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[47]Green purports to lack sufficient information to dispute whether Padilla took a polygraph test, but she does not deny the allegations.  See Response ¶ 19, at 7.  Because Green does not controvert specifically, either with conflicting evidence or allegations, the assertion that Padilla took a polygraph test, the Court deems the fact that Padilla took a polygraph test

The examination posed to Padilla a series of questions regarding "whether he had touched, had his penis touched by or made any sexual comments to any inmate for sexual pleasure."  MSJ ¶ 19, at 12-13 (asserting this fact).  See Sanchez Aff. ¶ 18, at 7.[48]  Padilla's denials of these questions showed "no deception."  MSJ ¶ 19, at 12-13 (asserting this fact).  See Sanchez Aff. ¶ 18, at 7.[49]

## PROCEDURAL HISTORY

On August 15, 2019, Plaintiffs Green, Andrea Gallegos, and Sasha Dominguez filed the Complaint.  See Complaint at 1.  The Complaint advances four causes of action.  See Complaint ¶¶ 143-162, at 13-16.  In Count I, the Plaintiffs allege that Defendants Padilla, Sanders, M. Gonzales, Sanchez, Vigil, and R. Gonzales violated the Plaintiffs' rights, under the Eighth Amendment to be free from cruel-and-unusual punishment by engaging in or facilitating the

---

undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[48]Green purports to lack sufficient information to dispute whether Padilla was asked if he ever touched, had his penis touched, or made comments to an inmate for his sexual pleasure during the polygraph test, but she does not deny the allegations.  See Response ¶ 19, at 7.  Because Green does not controvert specifically, either with conflicting evidence or allegations, the fact that Padilla received these questions as part of his polygraph examination, the Court deems the fact that that Padilla was asked if he ever touched, had his penis touched, or made comments to an inmate for his sexual pleasure during the polygraph test undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[49]Green purports to lack sufficient information to dispute that the polygraph test showed Padilla had no deception in his answers, but she does not deny the allegations.  See Response ¶ 19, at 7. Because Green does not controvert specifically, either with conflicting evidence or allegations, the fact that Padilla's polygraph answers showed no deception, the Court deems the fact Padilla's polygraph answers showed no deception undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

sexual abuse of the Plaintiffs while they were incarcerated.  See Complaint ¶¶ 143-148, at 13-14.

In Count II, the Plaintiffs allege that M. Gonzales and R. Gonzales violated Green's First

Amendment rights by retaliating against her for reporting Padilla's alleged abusive and unlawful

conduct.  See Complaint ¶¶ 150-154, at 14-15.  In Count III, the Plaintiffs allege that Padilla, M.

Gonzales, and Sanders "intentionally sexually assaulted, battered, falsely imprisoned and

intentionally inflicted emotional distress" upon the Plaintiffs.[50]  Complaint ¶ 157, at 15.  In

Count IV, the Plaintiffs allege that Sanchez, Cruz-Martinez,[51] Vigil, and R. Gonzales (the

"Supervisory Defendants") negligently maintained Springer Correctional and that they have

waived their immunity under N.M.S.A. § 41-4-6.  See Complaint ¶¶ 161-162, at 15-16.  The

Plaintiffs seek compensatory damages and attorney's fees, see Complaint ¶ 158, at 15, and

demand a trial by jury on all counts, see Complaint ¶ 163, at 16.

### 1.   The 2020 Motion to Dismiss MOO.

The Supervisory Defendants moved to dismiss Counts I and IV of the Complaint under

rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion to Dismiss Based on Qualified

Immunity at 1, filed November 18, 2019 (Doc. 15)("MTD" at 1).  The Court held a hearing on

the motion on March 12, 2020.  Green v. Padilla, 484 F. Supp. 3d 1098, 1118 (D.N.M.

2020)(J. Browning).  After the hearing, the Court granted the motion in part and denied it in part,

concluding that:

> (i) Green makes no factual allegations against Vigil or R. Gonzales, and so the
> Court dismisses Green's Eighth Amendment claim against them; (ii) Gallegos

---

[50]On May 12, 2020, the Female Inmates dismissed Count III.  See Stipulation of Dismissal of Count III of Plaintiffs' Complaint at 1, filed May 12, 2020 (Doc. 35).

[51]On January 20, 2020, the Female Inmates dismissed their claims against Cruz-Martinez. See Stipulation of Dismissal at 1, filed January 20, 2020 (Doc. 26).

makes no factual allegations against Sanchez, and so the Court dismisses
Gallegos' Eighth Amendment claim against Sanchez; (iii) Dominguez makes no
allegations against Sanchez and Vigil, and so the Court dismisses Dominguez'
Eighth Amendment claim against Sanchez and Vigil; (iv) Green states a plausible
Eighth Amendment claim against Sanchez; (v) Gallegos does not state a plausible
Eighth Amendment claim against Vigil or R. Gonzalez, because she does not
allege that they knew about Defendant Malcolm Gonzales' abuse; (vi) Dominguez
states a plausible Eighth Amendment claim against R. Gonzales; (vii) Sanchez is
not entitled to qualified immunity from Green's Eighth Amendment claim against
him, because his deliberate indifference to Defendant Christopher Padilla's sexual
abuse violates clearly established law; (viii) R. Gonzales is entitled to qualified
immunity from Dominguez' Eighth Amendment claim against him, because his
deliberate indifference did not cause a constitutional violation; and (ix) the
Female Inmates state a plausible negligence claim against the Supervisory
Defendants under § 41-4-6, because the Supervisory Defendants reasonably
should have known about rampant sexual abuse against female inmates at
Springer Correctional, and their inaction created a dangerous condition. The Court
will permit the Female Inmates to submit a motion to amend the complaint
consistent with D.N.M.LR-Civ. 15.1.

Green v. Padilla, 484 F. Supp. 3d at 1106. Of the Plaintiffs' claims which the Motion to Dismiss

challenged, the Court leaves two standing: Green's Eighth Amendment claim against Sanchez

and the Plaintiffs' negligence claim against all Supervisory Defendants.[52]  See Green v. Padilla,

484 F. Supp. 3d at 1106.

Regarding Green's Eighth Amendment claim against Sanchez, the Court concluded that

Green's claim survived the MTD, because she alleged plausible facts -- which at least meet the

standard of a rule 12(b)(6) motion -- demonstrating that Sanchez consciously disregarded

Padilla's pattern of sexual abuse.  See Green v. Padilla, 484 F. Supp. 3d at 1155.  The Court

further concluded that, based on the pleadings, Sanchez was not entitled to qualified immunity.

See Green v. Padilla, 484 F. Supp. 3d at 1160.  A "supervisory corrections official [like Sanchez]

---

[52]The MTD did not challenge the Female Inmates' First Amendment claims and
intentional torts claim, Counts II and III of the Complaint, and these claims, therefore, remain
standing after the March 12, 2020 hearing.  See Motion to Dismiss at 1.

violates a plaintiff's clearly established Eighth Amendment rights by failing to take reasonable measures to protect the inmate against prison guards' known sexual abuse." Green v. Padilla, 484 F. Supp. 3d at 1160. Green alleges that she and other inmates reported Padilla's pattern of sexual abuse to Springer Correctional officials. See Green v. Padilla, 484 F. Supp. 3d at 1160. "Green thus alleges that Sanchez violated her clearly established rights, and so Sanchez is not entitled to qualified immunity from Green's Eighth Amendment claim against him." Green v. Padilla, 484 F. Supp. 3d at 1161.

   2.   **The Motion for Summary Judgment.**

   Sanchez filed his MSJ on November 19, 2020, pursuant to rule 56(a) of the Federal Rules of Civil Procedure, asking the Court to enter summary judgment in his favor as to Count I of the Complaint, in which Green brings a 42 U.S.C. § 1983 claim alleging that Sanchez violated her Eighth Amendment rights. See MSJ at 1. Sanchez argues that there exists no genuine dispute of material fact as to Count I, and that the "undisputed evidence" shows he is entitled to qualified immunity as an employee of the State of New Mexico and to judgment as a matter of law. MSJ at 1. In support of his MSJ, Sanchez attaches the Sanchez Aff. See MSJ at 6-14.

   In his MSJ, Sanchez argues that the "deliberate indifference" standard -- as the Supreme Court of the United States, the United States Court of Appeals for the Tenth Circuit, and the Court apply this phrase -- defines "the pertinent law of supervisory liability under the Eighth Amendment when applied to a subordinate's sexual abuse of a female prisoner, under 42 U.S.C. § 1983, and in the context of qualified immunity." See MSJ at 14. Sanchez argues that, to hold a prison official liable under the deliberate indifference standard, the plaintiff must prove that the official was "aware of the facts from which an inference of constitutional harm could be drawn, and he or she also must in fact draw the inference." MSJ at 14. Sanchez contends, therefore,

that he can be liable only if he was "subjectively . . . aware that [Green] faced a substantial risk of harm, and that he deliberately disregarded that harm such that his inaction was a contributing factor in [Padilla's] subsequent assault." See MSJ at 15 (quoting Green v. Padilla, 484 F. Supp. 3d at 1156)). Sanchez also argues that a supervisory official "may be free of liability" for a sexual assault that occurred on his watch so long as the official "responded reasonably to the risk, even if the harm ultimately was not averted." MSJ at 18 (quoting Farmer v. Brennan, 511 U.S. 825, 844 (1994)). Sanchez contends that the Eighth Amendment, in the context of § 1983 actions, "does not create a strict liability standard." MSJ at 18.

Sanchez further argues that he cannot be liable, because the "undisputed evidence" shows that he was never aware of "any risk of sexual assault on [Green] or any other inmate, by Christopher Padilla or any other subordinate employee, prior to March 29, 2017, the date when Ms. Martinez decided to come forward with her allegations." MSJ at 16-17. He states that he "did not even know [Green] had been interviewed by the police officers on March 30, 2017," or that she had made "allegations of sexual misconduct by Officer Padilla . . . until [Green] filed the instant civil action on August 15, 2019." MSJ at 17. Sanchez argues that, "as soon as the allegations by Rebecca Martinez came to light[,]" he "vigorously enforced" the New Mexico Corrections Department's "firm, unambiguous" policy of "investigating, prosecuting[,] and disciplining employees" who sexually abuse inmates. MSJ at 18. He did this task by taking "quick, vigorous action." MSJ at 18.

Finally, Sanchez argues that Padilla was working in a new role -- prison maintenance -- by the time Martinez made her complaint. See MSJ at 17. In this role, Sanchez avers that Padilla had "little if any contact with the female inmates." MSJ at 17. Sanchez also notes that Padilla subsequently "passed a police-administered polygraph test" after the

allegations surfaced.  MSJ at 17.  Sanchez, meanwhile, "left the [prison] for good just a few weeks after the incident was reported."  MSJ at 17.  Accordingly, Sanchez concludes that the Court should enter summary judgment in his favor because the undisputed evidence proves neither that he was subjectively aware of prior incidents of sexual abuse nor that he disregarded such awareness so as to cause further harm to Green.  See MSJ at 16-18.

   **3.      The Motion to Stay Discovery.**

   Sanchez filed his Stay Motion on December 12, 2020.  See Stay Motion at 1.  In his Stay Motion, Sanchez begins by requesting that the Court stay discovery based on his asserted qualified immunity defense.  See Stay Motion at 1.  In addition, he requests that the Court delay setting discovery deadlines.  See Stay Motion at 1.  He left open the option for Green to seek limited discovery via a Rule 56(d) affidavit.  See Stay Motion at 1. As the grounds for his argument, Sanchez pointed to his MSJ, which is based on a qualified immunity defense, and argued that he is "presumed to be qualifiedly immune."  Stay Motion ¶ 2, at 2 (citing Hidahl v. Gilpin Cnty. Dep't of Social Services, 938 F.2d 1150, 1155 (10th Cir. 1991)).  He argues that qualified immunity protects public officials "against the burdens of discovery" and that the Supreme Court encourages courts to resolve qualified immunity issues before discovery occurs.  Stay Motion ¶ 3, at 2-3 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982); Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987); Siegert v. Gilley, 500 U.S. 226, 231 (1991)).  He requested a stay pending the Court's resolution of the qualified immunity and MSJ issues.  See Stay Motion at 3.

   **4.      The Response to the Stay Motion.**

   Green filed her Response to Sanchez' Stay Motion on December 2, 2020.  See Plaintiff's Response to Defendant John Sanchez's Motion To Stay Discovery at 1, filed December 02, 2020

(Doc. 47)("Stay Motion Response").  In her Stay Motion Response, Green stated that while she did not "oppose a general stay of discovery," she did request that Sanchez still produce his required initial disclosures and that the Court allow her to "seek discovery pursuant to Federal Rule 56(D)."  Stay Motion Response at 1.  She asserted that Sanchez had not "provide[d] timely initial disclosures" before filing his MSJ and, instead, attached six exhibits to his MSJ.  See Stay Motion Response ¶¶ 5-6, at 2.  Despite his failure to timely disclose, Sanchez produced some initial disclosures, but Green claimed that these disclosures only contained five of the documents that Sanchez had already provided in the form of exhibits and that the disclosures identified no witnesses other than the defendants.  See Stay Motion Response ¶ 8, at 2.  She argued that despite Sanchez' claim to qualified immunity, she was entitled to all initial disclosures required by Rule 26(A)(i) and (ii), and that Sanchez was required to provide the information in a timely manner.  See Stay Motion Response ¶ 9, at 2.  Per the Stay Motion Response, Green had requested that Sanchez' attorneys include language in the Stay Motion that permitted Green both to request discovery pursuant to Rule 56(d) and to request the remaining initial disclosures.  See Stay Motion Response ¶ 10, at 2.  Sanchez' attorneys declined to include the language.  See Stay Motion Response ¶ 11, at 2.  Accordingly, Green requested that the Court specify, if there was a stay of discovery, that parties were still required to disclose pursuant to rule 26 and that she would be able to seek discovery through a rule 56(d) affidavit.  See Stay Motion Response at 3.

### 5. **The Reply in Support of Stay of Discovery Based on Qualified Immunity.**

Sanchez filed his Reply in Support of Stay of Discovery Based on Qualified Immunity on December 14, 2020.  See Reply in Support of Stay of Discovery Based on Qualified Immunity at 1, filed December 14, 2020 (Doc. 48)("Stay Motion Reply").  In his Stay Motion Reply, Sanchez does not controvert Green's request to submit a Rule 56(d) affidavit, but he does controvert

Green's request to enforce any further initial disclosures.  See Stay Motion Reply at 1.  He contends that, other than citing to Rule 26(a)(1), Green provided no support for this request.  See Stay Motion Reply at 1.  He argued that Green was incorrect to request further initial disclosures, because the Supreme Court, "has made clear that a stay of discovery based on qualified immunity stays all discovery as to all claims and all defendants, until the Court resolves the movant's entitlement to qualified immunity."  Stay Motion Reply at 2 (citing Ashcroft v. Iqbal, 556 U.S. 662, 686 (2009), Welch v. City of Albuquerque, Civ. No. 11-700 KG/RHS, 2014 WL 12687542 at *3 (D.N.M. 2014)(Gonzales, J.); Lowe v. State ex rel. King, No. 10-315 JH/LFG, 2010 WL 11622983 at *2 (D.N.M. 2010)(Garcia, J.); Horton v. Bristol, No. 06-1219-MLB, 2006 WL 8440479 (D. Kansas, 2006)(Humphreys, J.)).  Sanchez reiterated his request that the Court stay all discovery with the only exception being any Rule 56(d) discovery.  See Stay Motion Reply at 3.

### 6.  **The Response.**

Green filed her Response to Sanchez's MSJ on December 21, 2020.  See Response at 1. In her Response, Green begins by noting that the parties have not conducted any discovery.  See Response at 3.  She argues that limited discovery is needed so that she may "challenge the veracity of statements set forth in . . . Sanchez' affidavit," upon which he relies in his MSJ. Response at 3.  For example, Green avers that she "requires discovery to determine whether . . . Sanchez followed NMCD required policies" of immediately reporting an incident of sexual abuse to a Prison Rape Elimination Act, 34 USCA §§ 30301-30309, coordinator, noting that Sanchez "has provided no evidence that he did so."  Response at 4.

Green further argues that "a great number" of the facts which Sanchez characterizes as undisputed are "indeed disputed and directly contradicted," not only by Sanchez' sworn

testimony taken for a separate but related case, but also by Green's version of the facts. Response at 3.   For example, Green disputes Sanchez' assertion that Padilla had "little if any contact with female inmates" in his role as Maintenance Supervisor at the prison, the role that he occupied when Green made her allegations.   Response at 5.   Instead, Green avers that Padilla, in his role as maintenance supervisor, "directly supervised female inmates," MSJ at 5, and had "access to every part of the prison,"   Response at 10.   Based on this discrepancy, Green concludes that "there are significant and substantive disputes over [Sanchez'] asserted facts," and that, "on this basis alone," the Court must deny summary judgment.  Response at 13.

Finally, Green acknowledges that she "bears the burden of disproving [Sanchez'] entitlement to qualified immunity[,]"  but notes that the evidence must be construed in her favor given that Sanchez seeks summary judgment.  Response at 14.  She notes that she must "identify a clearly established statutory or constitutional right of which a reasonable person would have known, and then allege facts to show that the defendant's conduct violated that right."  Response at 14 (quoting Herring v. Keenan, 218 F.3d 1171, 1175 (10th Cir. 2000)).  In this vein, Green argues that "[i]t is undisputed that a prison official's sexual assault against an inmate constitutes an Eighth Amendment violation."  Response at 15.   She further argues that Sanchez' actions violated that right.  See Response at 18.   Green alleges that she notified Sanchez of Padilla's abusive behavior, yet Sanchez "failed to take any corrective, administrative, or disciplinary action against Padilla."   Response at 18.   Instead, Sanchez "promoted Padilla to maintenance supervisor," and, in that position, Padilla continued to harass and assault Green.  Response at 18.

Green notes that Sanchez counters, in his MSJ, by stating that he "had no knowledge of Ms. Green," and argued that he, therefore, "could not have been aware of a substantial risk of sexual abuse to Ms. Green."   Response at 20.   Green "vehemently disputes" this factual

assertion.  Response at 20.  Nonetheless, Green argues that such a contention is unimportant, because Green does not have to prove Sanchez knew of the risk of harm to Green, in particular. Response at 20.  She needs to prove merely that Sanchez, as prison warden, maintained "policies or customs he knows create a substantial risk of constitutional injury" to those in Green's position.  Response at 20 (citing Dodds v. Richardson, 614 F.3d 1185, 1206 (10th Cir. 2010)). Green argues that subjecting female inmates to an overwhelmingly male prison staff, and consistently operating short-staffed, created a substantial risk of harm of abuse to Green and other similarly situated female inmates.  See Response at 21.  Green concludes that these facts demonstrate Sanchez "deliberately chose to disregard Plaintiff Green's safety and well-being." Response at 22.

### a.  Green's Rule 56(d) Declaration.

Green attached to her Response counsel Erlinda O. Johnson's rule 56(d) declaration.  See Declaration of Erlinda O. Johnson, Esq. Requesting Limited Discovery Pursuant to Fed.R.Civ.P 56(D), to Respond to Motion for Summary Judgment based on Qualified Immunity, filed December 21, 2020 (Doc. 50-5)("Rule 56(d) Decl.").  In the Rule 56(d) Decl., Green reiterates that she has "not received any discovery or initial disclosures" from Sanchez.  Rule 56(d) Decl. ¶ 8, at 2.  She notes that, instead, Sanchez attaches several documents to his MSJ that "had not before been provided" to Green.  Rule 56(d) Decl. ¶ 10, at 2.

Next, Green reiterates that, to reach a decision on Sanchez' MSJ, the Court must "determine whether there are material facts in dispute relevant to the determination of supervisory liability under 42 U.S.C. § 1983."  Rule 56(d) Decl. ¶ 12, at 2.  According to Green, this issue means the Court must decide whether Sanchez "promulgated, created, implemented or possessed responsibility for the continued operation of a policy that caused Ms. Green

constitutional harm, and whether Sanchez acted with the state of mind [i.e., 'deliberate indifference'] required to establish the alleged constitutional deprivation." Rule 56(d) Decl. ¶ 11, at 2 (brackets included Rule 56(d) Decl.). Green argues that facts in the record demonstrate already that Sanchez deliberately was indifferent:

> Sanchez was in charge of implementing and enforcing NMCD policies with regard to sexual abuse of inmates, . . . and he was aware that Ms. Green was the victim of sexual abuse by Christopher Padilla. Yet, Defendant Sanchez failed to take steps to protect Ms. Green and other inmates like her from Defendant Padilla.

Rule 56(d) Decl. ¶ 13, at 3. Green also contends, however, that she requires "limited discovery" "to rebut the statements by Defendant Sanchez's affidavit supporting his motion[,]" to fully "respond" to Sanchez' MSJ, and to "justify" her opposition to Sanchez' MSJ. Rule 56(d) Decl. ¶ 14, at 3.

"Specifically," Green submits that she seeks "written discovery and . . . limited depositions" of Sanchez and Padilla on the following subjects:

- Defendant Sanchez's investigation of Ms. Green's complaint to him about Defendant Padilla's sexual assault of Ms. Green.

- Whether Defendant Sanchez reported Ms. Green's complaints on March 30, 2017, to a PREA coordinator, as required by NMCD policy.

- Whether Defendant Sanchez requested that Ms. Green be evaluated, after March 30, 2017, by a medical professional, as required by NMCD policy.

- Whether Defendant Sanchez took any steps to ensure that Defendant Padilla was kept separate from Ms. Green and other inmates to whom he may pose a risk of abuse, as required by NMCD policy.

- Whether Defendant Sanchez took steps to ensure that Defendant Padilla did not have access to female inmates after Ms. Martinez and Ms. Green came forward on March 30, 2017, with their complaints of sexual assaults by Padilla.

- What happened to the grievance Ms. Green submitted to SCC administration, while John Sanchez was still the warden, regarding Padilla's sexual misconduct.

- What is contained in the administrative file regarding Ms. Green's grievance submitted to John Sanchez's administration and the steps Mr. Sanchez took to address Ms. Green's written grievance regarding Defendant Padilla.

- The extent of Defendant Padilla's conversations with members of SCC administration, including Defendant Sanchez, about at least complaints against Padilla involving allegations of sexual misconduct.

- The knowledge of SCC's administration, including Defendant Sanchez, of allegations of sexual abuse by Defendant Padilla against Christina Martinez, Victoria Kirven, Jennifer "Gigi" Andrews, other inmates, occurring, in part, during the time John Sanchez was warden.

Rule 56(d) Aff. ¶ 14, at 3-4.   Green contends that discovery in these areas is "necessary" and will "create genuine issues of material fact about what Defendant Sanchez truly knew about the sexual assaults perpetrated against Ms. Green and the steps Defendant Sanchez took to protect inmates like Ms. Green from continued sexual assault by Padilla, after Sanchez was made aware of alleged sexual misconduct by Padilla."   Rule 56(d) Decl. ¶¶ 14-15, at 3-4.   Accordingly, Green seeks "additional time" to conduct "limited discovery," so that she may "supplement" her response to Sanchez' MSJ.  Rule 56(d) Decl. ¶ 17, at 4.

   **7.    The Reply**

   Sanchez filed his Reply to Green's Response on February 4, 2021.  See Reply at 1. Sanchez begins by reiterating that the "controlling legal issue" is not about what Padilla did or did not do.  Reply at 1.  The issue, according to Sanchez, is whether the record creates a genuine dispute about Sanchez' subjective awareness of prior incidents of assault and whether his inaction caused subsequent abuse against Green.  Reply at 1.

In this vein, Sanchez argues that the Court should not credit Green's testimony, which Sanchez contends is "blatantly contradicted by the contemporaneous documents and the Plaintiff's own pleading."  Reply at 13.  He relies on doctrine that provides for circumstances when the Court should "disregard a plaintiff's proffered version of the facts."  Reply at 11 (citing Simon v. Taylor, 252 F. Supp.3d 1196, 1228-29 (D.N.M. 2017)(Browning, J.)(discussing Scott v. Harris, 550 U.S. 372, 378-81 (2007))).  Specifically, Sanchez argues that, "when facts are depicted in objective, contemporaneous evidence, they control over a plaintiff's affidavit which contradicts such evidence."  Reply at 11 (citing Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010)).  He contends that no "'genuine' dispute is created under such circumstances."  Reply at 11.  Sanchez acknowledges that, on summary judgment, the Tenth Circuit will credit "even dubious testimony by plaintiff" which is contradicted by other witness testimony, "unless . . . there exists a 'videotape or similar evidence in the record to blatantly contradict [plaintiff's] testimony.'"  Reply at 12 (quoting Rhoads v. Miller, 352 F. App'x 289, 291 (10th Cir. 2009)(unpublished)).[53]

---

[53]Rhoads v. Miller is an unpublished opinion, but the Court can rely on a Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Rhoads v. Miller has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

Accordingly, Sanchez argues that Green's affidavit is "blatantly contradicted" by the record in several ways.  Reply at 12.  First, Sanchez argues that Green reported in two separate interviews with police that "she did not want to report Padilla's alleged conduct," but then states in her affidavit that "she did, in fact, report the conduct to the Warden that same day."  Reply at 12.  Sanchez notes that Green alleges that she also submitted a grievance to the administration, but the official records of the NMCD show no evidence of a grievance "ever having been made."  Reply at 12.  Second, Sanchez argues that the actions Sanchez and his staff took to respond to "similar allegations made one day earlier by inmate Rebecca Martinez" contradicts Green's contention that Sanchez responded merely with "okay" after she allegedly reported the abuse to him.  Reply at 13.  Third, Sanchez argues that Green now alleges "scandalous allegations," such as being told to masturbate in front of Padilla, despite not having made such allegations previously.  Reply at 13.

Next, Sanchez disputes Green's argument that Sanchez "did not take any steps to discipline Padilla" after Martinez made her allegations or that he otherwise failed to act to prevent further abuse.  Reply at 2-3 (citing Response at 19).  Sanchez argues that, to the contrary, following Martinez' allegations, he and his staff immediately made a serious incident report and PREA notification, contacted New Mexico State Police, and referred the case to the NMCD Office of Professional Standards to investigate the allegations.  See Reply at 2.  Sanchez contends that any disciplinary action against Padilla was not warranted, because, at the time, the allegations against him were "just that -- unproven allegations[,]" which did not provide for any "just cause."  Reply at 3.  Sanchez concludes, therefore, that his conduct, including the "immediate initiation of dual investigations into the allegations[,]" is "obviously" not inaction that subjects him to Eighth Amendment liability.  Reply at 4.

Finally, Sanchez asks the Court to disallow discovery.  See Reply at 19.   He argues that "the Court's otherwise broad discretion under rule 56(d) is circumscribed by the nature of qualified immunity[,]" and that the driving force behind qualified immunity doctrine was to protect government officials from having to undergo discovery for frivolous or unsubstantiated claims.  Reply at 19 (citing Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990)).  Sanchez argues, accordingly, that Green must demonstrate to the Court how discovery will enable her to "rebut a defendant's specific evidence," but that she fails to do so.  Reply at 19.  Sanchez also argues that Green "possesses" and has "utilized" in her Response a 181-page deposition transcript of Sanchez taken from preceding litigation that Martinez filed.  Reply at 19.  See Sanchez Depo. I.  Sanchez contends that "many if not all" items of information that Green seeks through further discovery, "including Sanchez' lack of knowledge of Plaintiff Green's claim[,]" could be found therein.  Reply at 19-20.  Sanchez concludes, therefore, that Green's request to depose him is "unnecessary and also would subvert one of the goals of qualified immunity: to protect state officials from discovery."  Reply at 20 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)).

**8.    The Hearing**

The Court held a hearing on the MSJ on August 18, 2021.  See Clerk's Minutes at 1, filed August 18, 2021 (Doc. 68).  The Court began by giving Sanchez the opportunity to argue in support of his MSJ.  See Draft Transcript of Motion Hearing at 3:6-8, (held August 18, 2020), (Court)("Tr.").[54]  Sanchez first reiterated that "this is an Eighth Amendment claim" by Green

---

[54]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Accordingly, page and line numbers are subject to slight change in the final, filed transcript.

and that the issue before the court involves Green's "claim [of] supervisory liability against John Sanchez[,]" who served formerly as the warden of Springer Correctional, where "Green was incarcerated at the time [of] this incident."  Tr. at 3:19-15 (Dickman).  Sanchez, recalling his argument set forth in the MSJ, explained that, under Farmer v. Brennan, 511 U.S. 825 (1994), for a supervisory defendant to be liable under the Eighth Amendment, the defendant must have been "aware of the facts from which an [inference] of constitutional harm . . . could be drawn," and the defendant must have "drawn the inference of harm, and deliberately disregarded it, such that his actions [were a] contributing factor in the subsequent harm that occurred."  Tr. at 5:7-13 (Dickman).  Sanchez further explained that a supervisory defendant still may avoid liability "if he or she responded reasonably to the risk even if the harm ultimately was not averted."  Tr. at 5:24-25 (Dickman).  Sanchez concluded, therefore, that his burden is to prove that he never drew an inference of constitutional harm, or that, even if he did draw such an inference, he "respond[ed] reasonably under the circumstances."  Tr. at 6:4-7 (Dickman).

Accordingly, Sanchez advanced two main arguments.  See Tr. at 26:12-14 (Dickman).  First, Sanchez contends that "contemporaneous official documents . . . blatantly contradict the idea" that Green told Sanchez about Padilla's misconduct and submitted an administrative grievance to Springer Correctional, and that, under Scott v. Harris, 550 U.S. at 378-81, Green's allegations must be discredited.  Tr. at 27:9-11 (Dickman).  Sanchez argues that the records from Green's interviews with the NM State Police and the Office of Professional Standards, specifically, indicate that Green did not want to report Padilla, noting that "[Sanchez has] an audiotape in which [Green] said twice 'I don't want to report this.'"  Tr. at 27:10-18; see id. at 28:23-24 (Dickman)(no citation for quotation).  Sanchez argues that these records suffice to create a blatant contradiction that controls over Green's testimony, because "it's not a hard and

fast rule that only video recordings or photographs can be used" to create a "blatant contradiction" under Scott v. Harris.  Tr. at 28:11-13 (Dickman).  Sanchez argued that, because the objective record contradicts Green's testimony, the Court should not credit Green's allegations and that, without crediting her allegations, Green does not create a genuine dispute of material fact and does not overcome the motion for summary judgment.  See Tr. at 30:4-6 (Dickman).

Second, Sanchez argues that, "even . . . if the Court decides to credit [Green's] affidavit as written[,]" Sanchez still avoids liability, because he "responded reasonably to the risk under the circumstances."  Tr. 30:14-17 (Dickman).  Sanchez contends that, if Green's allegations are taken at face value, they show that, at the time Green made her allegations, Padilla was no longer working in the kitchen and no longer had access to inmates; the NM State Police already were investigating Martinez' allegations of Padilla's misconduct in a criminal investigation; a PREA investigation already was ongoing; and the Office of Professional Standards was already conducting its own investigation into the matter.  See Tr. at 30-31:18-6.  Sanchez argues, in other words, that "everything was set in motion[,]" Tr. at 31:15-17, and "that's not an unreasonable response,"  Tr. at 31:7-8.

The Court then gave Green the opportunity to respond in opposition to the MSJ.  See Tr. at 34:1-2 (Court).  First, Green argued that the Green Decl. creates a genuine dispute of material fact.  See Tr. at 39:9-12 (Fox-Young).  Green noted several instances of disputed material facts, including, for example, Green's allegation in the Green Decl. that Padilla brought her candies and instructed Green to insert them into her vagina, an allegation which Sanchez denies.  See Tr. at 39-40:25-1 (Fox-Young).  Green defended against Sanchez' assertion that the Green Decl. is "something like a sham declaration" given the contrast between Green's statements that she did

not want to report Padilla and her contention that she reported Padilla's conduct to Sanchez.  Tr. at 38:14-16 (Fox-Young).  Green argued that her statements during interviews that she did not want to report Padilla are of "no consequence," and do not contradict or invalidate that Green ultimately did report Padilla.  Tr. at 38:22-24 (Fox-Young).  Green noted that, under a notice pleading standard, she is not required to "make every factual allegation in her complaint."  Tr. at 38:18-19 (Fox-Young).   She also noted that "the culture for women who are incarcerated . . . does not encourage reporting."  Tr. at 38:22-24 (Fox-Young).  Green argued, therefore, that her allegations should be credited and that they raise genuine disputes of material fact which deserve jury consideration.  See Tr. at 40:3-4.

Green also refuted Sanchez' assertion that Sanchez responded reasonably under the circumstances.   See Tr. at 39:13-14 (Fox-Young).   In response to Sanchez' contention that Sanchez could not fire Padilla based on allegations alone, and that Padilla already had been promoted to a position with little to no access to inmates, Green noted that "nothing could be further from the truth."  Tr. at 36:14-20 (Fox-Young).  Green argued that, instead, Sanchez knew that there were countless "holes" in surveillance of the prison where Padilla "could get away with abuse[,]" Tr. at 36:3-5 (Fox-Young), that Sanchez was aware of Martinez' allegations which contained "very explicit statements" of Padilla's abuse, Tr. at 38:1-3 (Fox-Young), and that Padilla, in his new position as maintenance supervisor, "if anything had more access" to Green and other female inmates, as he "had keys to everything."  Tr. at 35-36:21-3 (Fox-Young).  Green argued that Sanchez, nonetheless, "didn't put [Padilla] on administrative leave, didn't do anything to backtrack on [Padilla's] promotion, [and] didn't make sure that somebody was with [Padilla] at all times."  Tr. at 38:4-7 (Fox-Young).  Green argued that, under the circumstances, Sanchez' response is not reasonable, stating that she does not "know in what other workplace . . .

it would be bearable to let an alleged assaulter just have free reign" at the facility where the allegations took place and some of the alleged victims remain.  Tr. at 40:15-18 (Fox-Young).

Green concluded by contending that, should the Court not find "enough here for [Green] to prevail," she should be permitted limited discovery into Sanchez' failure to discipline Padilla following Martinez' allegations and what steps Sanchez took to protect inmates from future harm.  Tr. at 44:2-9 (Fox-Young).  Green stated that Green's 56(d) Decl. details "exactly why we ought to be able" to conduct such discovery.  Tr. at 44:1-4 (Fox-Young).  Green noted that the discovery would include "three limited depositions."  Tr. at 45:11 (Fox-Young).

The Court, after hearing Sanchez' brief rebuttal, indicated that it is inclined to deny the MSJ, because "there are some factual disputes here" and, as a result, the case needs to "go forward."  Tr. at 49:15-17 (Court).  The Court reasoned that this situation is not one where the evidence is "blatantly contradicted" by photographs or videotapes, as under Scott v. Harris, so as to allow the Court to "then ignore certain evidence."  Tr. at 49:15-17 (Court).  The Court stated that this case is was not one with "sham disputes[,]" where the Scott v. Harris line of argument is most pertinent.  Tr. at 49:9-11 (Court).  "As far as the motion to stay discovery," the Court ruled that it is inclined to grant the stay of discovery.  Tr. at 50:4-6 (Court).  When asked to clarify the extent of the stay, the Court noted that the stay bars discovery of Sanchez, but also Padilla, so as to prevent Sanchez' counsel "from having to attend and participate in that discovery."  Tr. at 51:12-15 (Court).

## LAW REGARDING 42 U.S.C § 1983 CLAIMS

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

> deprivation of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action and it does not create any

substantive rights; substantive rights must come from the Constitution or from a federal statute.

See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create

any substantive rights, but merely enforce[s] existing constitutional and federal statutory

rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan.

Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998))).  Section 1983 authorizes an injured person to

assert a claim for relief against a person who, acting under color of state law, violated the

claimant's federally protected rights.  To state a claim upon which relief can be granted under §

1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who

deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S.

42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused
> (3) by the conduct of a 'person' (4) who acted under color of any statute,
> ordinance, regulation, custom[,] or usage, of any State or Territory or the District
> of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M.

2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-

0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court has explained that, in alleging a § 1983 action against a government

agent in his or her individual capacity, "a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft

v. Iqbal, 556 U.S. 662 676 (2009).  Consequently, there is no respondeat superior liability under

§ 1983.  See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[55] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the

---

[55]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  Bivens, 403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. In Dodds v. Richardson, the Honorable Neal M. Gorsuch, then-United States Circuit Judge for the Tenth Circuit, stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199 (quoting 42 U.S.C. § 1983). Then-Judge Gorsuch noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers

committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations."  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state officials who have violated his or her constitutional or statutory rights.  See 42 U.S.C. § 1983.  Under Bivens, 403 U.S. 388, 397 (1971), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[56]  The Supreme Court, however,

---

[56]Bivens has been extended, however, to only a handful of constitutional rights.  See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending Bivens into new contexts.  See

deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978).  Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, (1987).  See Green v. Padilla, 484 F. Supp. at 1129 (explaining that qualified immunity protects government officials who perform discretionary functions if there is not prior, well established case law which would have put them on fair notice of their potential liability.).

If a government official has not violated a "clearly established" right, the official is shielded from personal liability.  Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  A court

> can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis:  "(1) protecting against 'unwarranted timidity on the part

---

Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v. Abbasi, 582 U.S. 120, 134 (2017), quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their duties." Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818). When a defendant asserts qualified immunity, it "creates a presumption that they are immune from suit," and not a presumption that they are immune from liability. Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016). When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" as much. Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020). See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009). See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.)(requiring that the plaintiff must demonstrate both prongs of the qualified immunity analysis in order to overcome a defendant's qualified immunity defense).

### 1.    The Procedural Approach to Qualified Immunity.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified immunity defense. Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court directed lower courts to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide

whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, made the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz's "rigid order of battle" had faced criticism from lower courts on "practical, procedural, and substantive grounds."  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Although the Supreme Court recognizes that the Saucier rule was "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise."  Pearson v. Callahan, 555 U.S. at 237.  The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel 'not to pass on questions of constitutionality unless such adjudication is unavoidable.'"  Pearson v. Callahan, 555 U.S. at 241 (quoting Scott v. Harris, 550 U.S. at 388; then quoting Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105 (1944)).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly

established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[57] qualified immunity's clearly established prong: when (i) the first, constitutional violation question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting

---

[57]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d at 1180-81 (10th Cir. 2011).  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court should exercise its discretion carefully.

Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the

Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before

the second prong in cases involving a recurring fact pattern, where guidance on the

constitutionality of the challenged conduct is necessary, and the conduct is likely to face

challenges only in the qualified immunity context.  Camreta v. Greene, 563 U.S. at 706-707.  See

Kerns v. Bader, 663 F.3d at 1181.[58]

---

[58]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was
not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified
immunity test before agreeing" with the plaintiff that the qualified immunity defense did not
protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law)
> question, we reverse without addressing the former (constitutional violation)
> question.  And we pursue this course because doing so allows us to avoid
> rendering a decision on important and contentious questions of constitutional law
> with the attendant needless (entirely avoidable) risk of reaching an improvident
> decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the
plaintiff's constitutional rights and stated that guidance on the particular constitutional issue
would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt
that the scope of the Constitution's protection for a patient's hospital records can be adequately
decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions
to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at
1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and
> opinions, the Court is troubled by this statement and the recent trend of the
> Supreme Court's hesitancy in § 1983 actions to address constitutional violations.
> A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil
> remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-
> 39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of
>> 1871 . . . and was enacted for the express purpose of "enforc(ing)
>> the Provisions of the Fourteenth Amendment." The predecessor of
>> § 1983 was thus an important part of the basic alteration in our

federal system wrought in the Reconstruction era through federal
legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of
"clearly established" law, but that

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense
in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for
constitutional violations where they reasonably believed that their conduct was
constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why
Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24
B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the
"clearly established" prong in reference to an officer's good faith and held that a
compensatory award would only be appropriate if an officer "acted with such an
impermissible motivation or with such disregard of the [individual's] clearly
established constitutional rights that his action cannot reasonably be characterized
as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In
Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the
clearly established prong became a part of the qualified immunity test.  See 457
U.S. at 818 ("We therefore hold that government officials performing
discretionary functions generally are shielded from liability for civil damages
insofar as their conduct does not violate clearly established statutory or
constitutional rights.").  It seems ironic that the federal courts would restrict a
congressionally mandated remedy for constitutional violations -- presumably the
rights of innocent people -- and discourage case law development on the civil
side -- and restrict case law development to motions to suppress, which reward
only the guilty and is a judicially created, rather than legislatively created,
remedy.  Commentators have noted that, "[o]ver the past three decades, the
Supreme Court has drastically limited the availability of remedies for
constitutional violations in" exclusionary rule litigation in a criminal case, habeas

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v.

---

corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments). It remains odd to suggest that the deficit of constitutional law should occur in the sphere of a factually shaky judge-made exclusionary rule and discourages constitutional law at the cost of Congressionally passed rule, and Judge Gorsuch's rational for qualified immunity.

Callahan, 555 U.S. at 236-37).[59]   See Camreta v. Greene, 563 U.S. at 707 ("In general, courts

should think hard, and then think hard again, before turning small cases into large ones.").   The

_____

[59]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.   It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.   Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.   The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.   In practice, Saucier v. Katz works better.

The "Saucier two-step" encourages courts to articulate the constitutional rights at issue. Before Pearson v. Callahan, 555 U.S. 223 (2009), made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.   Associate Justice Stephen Breyer wrote, before Pearson v. Callahan, that he "would end the failed Saucier experiment now." Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).   Joined by Associate Justices Ruth Bader Ginsburg and Stephen Breyer, Associate Justice John Paul Stevens criticized Saucier v. Katz because it was an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity."   Bunting v. Mellon, 541 U.S. 1019, 1019 (2004).   Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote: "We should either make clear that constitutional determinations are *not* insulated from our review . . . or else drop any pretense at requiring the ordering in every case."   Bunting v. Mellon, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting constitutional rights.   In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulated constitutional law. See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).   Chief Justice Rehnquist opined that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."   Wilson v. Layne, 526 U.S. 603, 609 (1999).   The evidence to support Chief Justice Rehnquist's assertion, however, is mixed.   See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine.").   See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights").   See also Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010).   The bottom line is that a trial

Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1028, 1082-83 (D.N.M. 2016)(Browning, J.).

### 2.      Clearly Established Rights.

A right is "clearly established" when it was "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. at 664). A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dep't of Corr., No. 10-1396, 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298

---

court often -- if not frequently -- needs to decide whether the constitutional right was violated before deciding if it was clearly established.

(10th Cir. 2004).   In other words, existing precedent must have placed the constitutional or statutory question "beyond debate."   Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'"   White v. Pauly, 580 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742.   The Supreme Court refers to this principle as a "longstanding principle." White v. Pauly, 580 U.S. at 79.   Nevertheless, the clearly established law must be "particularized" to the case's facts.   Anderson v. Creighton, 483 U.S. at 640.   If the clearly established law at issue is not sufficiently particularized, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."   Anderson v. Creighton, 483 U.S. at 639.   "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers.   United States v. Lanier, 520 U.S. 259, 271 (2017).   See White v. Pauly, 580 U.S. at 79 (reiterating this principle).   Importantly, the "unlawfulness must be apparent."   Anderson v. Creighton, 483 U.S. at 640.   See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established)).   A court therefore must "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances."   City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the

clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)). Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court has recently clarified that this closeness is not always required. See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor"). The Supreme Court, in a short per curiam opinion, suggested an objective, "no reasonable correctional officer" standard when it held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53. In Taylor, corrections officers housed an inmate in "shockingly unsanitary cells." Taylor, 141 S. Ct. at 53. One cell was covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'" 141 S. Ct. at 53 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)). Correctional officers confined the plaintiff in this cell for four days, but the plaintiff did not eat or drink, because he feared that his food and water would be contaminated. See 141 S. Ct. at 53. Correctional officers then moved the plaintiff to a second cell that was "frigidly cold" and was equipped with "only a clogged drain in the floor to dispose of bodily wastes." 141 S. Ct. at 53. The plaintiff held his bladder for more than twenty-four hours before finally involuntarily relieving himself, which caused the clogged drain to overflow and "raw sewage to spill across the floor." 141 S. Ct. at 53. Because the plaintiff was not provided a bed and was confined without clothes, the plaintiff was "left to sleep naked in sewage." 141 S. Ct. at 53.

The United States Court of Appeals for the Fifth Circuit held that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it granted the corrections officers qualified immunity because the law was not clearly established. See Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens, 946 F.3d 211, 222 (5th Cir. 2019)). The Fifth Circuit concluded that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional. Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. at 741). The Supreme Court reversed, holding that the Fifth Circuit erred when it granted qualified immunity on this basis. See Taylor, 141 S. Ct. at 53. Although the plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53. See Truman v. Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[60] One such unwritten signal is that "a nigh identical case must exist for the law to be clearly established." Caldwell v. University of N.M. Bd. of Regents, 510

---

[60]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

F.Supp.3d 982, 1031 n.14 (D.N.M. Dec. 31, 2020)(Browning, J.).[61]   As numerous Courts of

Appeals have recently noted, however, <u>Taylor</u> clarifies that it is no longer the case that an

_____

[61]The Court notes, as it has elsewhere, <u>see, e.g.</u>, <u>Caldwell v. University of N.M. Bd. of Regents</u>, 510 F.Supp.3d at 1031 n.14, that qualified immunity is a problematic doctrine.  This problem is particularly true of the Supreme Court's approach before <u>Taylor</u>.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  <u>Caldwell v. University of N.M. Bd. of Regents</u>, 510 F.Supp.3d at 1031 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  <u>See</u> <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in <u>York v. City of Las Cruces</u>?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," <u>Kisela v. Hughes</u>, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  <u>See</u> <u>Saenz v. Lovington Mun. Sch. Dist.</u>, 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  <u>See</u> Stephen R. Reinhardt, <u>The Demise of Habeas Corpus and the Rise of Qualified Immunity and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences</u>, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  <u>See also</u> <u>White v. Pauly</u>, 580 U.S. at 79 (2017)(criticizing the

Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment). In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue. As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this situation creates a Catch-22. See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring in part and dissenting in part)(opinion withdrawn on rehearing). The plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499. In short, "[n]o precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2 (U.S. Supreme Court, filed March 2, 2018)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act." Ziglar v. Abbasi, 582 U.S. 120, 158 (2017)(Thomas, J., concurring)(internal quotation marks omitted). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 582 U.S. at 159-60 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 536, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or deliberately were indifferent, the verdict should stand, and not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, always to decide the clearly established prong first and then always to say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit --

almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any

reasonable corrections officer should have understood the inmate in Taylor's conditions

. . . offended the Constitution, so too should any reasonable prosecutor understand that providing

a medical examiner fabricated evidence and then putting him on the stand to testify based on that

false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653,

660 (6th Cir. 2021)(explaining that the Supreme Court held in Taylor that "there does not need to

be a case directly on point" when no reasonable officer could have concluded that the challenged

action was constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. June 2, 2021)( noting that

Taylor reaffirmed that "the Supreme Court does not demand a case directly on point"); Roque v.

Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious

case,' general standards 'can clearly establish the answer, even without a body of relevant case

law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz,

Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The

---

 with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on
Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see,
e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth
Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v.
Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba v. Pickens, 844 F.3d 870, 874 (10th
Cir. 2016); Rife v. Jefferson, No. 17-7037 , 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of
Cty. Comm'rs for Cty. of Dona Ana, No. 16-2222, 707 Fed.App'x. 552 (10th Cir. 2017); Brown
v. City of Colo. Springs, No. 16-1206, 709 Fed.App'x. 906, 909 (10th Cir. 2017), and willing to
reverse district court decisions should the district court conclude that the law is clearly
established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir.
2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity,
because a caseworker would know that "child abuse and neglect allegations might give rise to
constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d
1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law
even though the three decisions invoked to satisfy that prong were not "factually identical to this
case," because those cases "nevertheless made it clear that the use of force on effectively
subdued individuals violates the Fourth Amendment").

Court's decision in *Taylor* sends the signal to the lower courts that they can deny qualify immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could simply clarify that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of Taylor would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that only applies in case with "extreme circumstances" or "particularly egregious" facts.  Second, Taylor could mean that a court must now ask whether the conduct at issue was particularly egregious such that no reasonable officer could have concluded that their actions are constitutional, and, if so, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about Taylor's scope.[62]  Since Taylor,

---

[62]Cases from the United States Court of Appeals for the Ninth Circuit illustrate the confusion within the Courts of Appeals about Taylor's scope.  Compare, for example, O'Doan v. Sanford, 991 F.3d 1027 (9th Cir. March 19, 2021) with Rico v. Ducart, 980 F.3d 1293 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part).  O'Doan v. Sanford noted that for law to be clearly established, "the right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates the right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  991 F.3d at 1036-37 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  The Ninth Circuit pointed to the importance of factually analogous precedential cases, stating that that:

courts have asked not just whether the law was clearly established through a factually similar

case from that Court of Appeals or from the Supreme Court, but also whether the conduct at

issue was "particularly egregious" such that "no reasonable officer could have concluded that"

their actions were constitutionally permissible.  Taylor, 141 S. Ct. at 53.  See Truman v. Orem

City, 1 F. 4th at 1240.  In other words, in addition to asking whether the officer was theoretically

---

> [T]he Supreme Court has reminded lower courts that "[u]se of excessive force is
> an area of the law 'in which the result depends very much on the facts of each
> case' and thus police officers are entitled to qualified immunity unless existing
> precedent 'squarely governs' the specific facts at issue."

O'Doan v. Sanford, 991 F.3d at (first citing Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018)(per curiam); then quoting Mullenix v. Luna, 577, U.S. 7, 13 (2015)(per curiam)).  The Ninth Circuit concluded that the plaintiff had not identified any precedent case law that had clearly established a right and emphasized the importance of specificity over general or categorical statements of Constitutional violations in qualified immunity cases.  See O'Doan v. Sanford, 991 F.3d at 1044 (describing limits applying to the obviousness principle and distinguishing O'Doan from Taylor because of situational ambiguity.)  Finally, the Ninth Circuit reiterated that "the obviousness principle [is] an exception to the specific-case requirement [and] is especially problematic in the Fourth Amendment context."  O'Doan v. Sanford, 991 F.3d at 1044 (quoting Sharp v. County of Orange, 871 F.3d 901, 912 (9th Cir. 2017)).

    On the other hand, the Honorable Judge Leslie E. Silver's concurrence in Rico v. Ducart, 980 F.3d at 1305, restates that the second prong of qualified immunity asks whether a reasonable official would have known that their actions were unconstitutional.  See Rico v. Ducart, 980 F.3d at 1305. Judge Silver then points out that requiring plaintiffs to show exceedingly specific and existing case law that addresses the lawfulness of the alleged misconduct, narrows the second prong in a way that the Supreme Court rejected in Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  See Rico v. Ducart, 980 F.3d at 1306 (explaining that determining whether there is precedent addressing "the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum-security facility built of concrete, metal, and steel" is functionally equivalent to necessitating a case on point).  The concurrence's crux is that, while specificity is necessary when considering a case's context and the alleged violative conduct, courts should not require unreasonable specificity when obvious issues such as "basic and clearly necessary requirements" arise in the context of qualified immunity.  See Rico v. Ducart, 980 F.3d at 1306. (stating that "[b]asic and clearly necessary requirements, such as sleep" are established beyond debate both because a reasonable official would know that depriving an inmate of sleep obviously violates an inmate's rights and because "[t]he right to adequate sleep, a well-recognized human need, is also established by persuasive authority").

on notice that they were acting unlawfully,[63] the court also must ask whether the conduct at issue

was "particularly egregious" -- an apparently objective question.  McCoy v. Alamu, 141 S. Ct.

1364, 1364 (2021)(vacating and remanding in light of Taylor even though the conduct at issue

was likely not "particularly egregious").[64]

---

[63]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments do regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court previously has noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[64]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v. Alamu: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of Comparative Qualified Immunity, 99 Tex. L. Rev. Online 217, 224 (2021)("Miller, The End of

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor did not affect whether three State legislators who took a public stand against the sale of State-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution."  HIRA Educ. Servs. N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious."  Lopez v. Sheriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021).  In Lopez v. Sheriff of Cook County, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly] that any reasonable officer would know they [were] violating the Constitution notwithstanding the lack of an analogous decision."[65]  993 F.3d at 991.  The United

---

Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

[65]The Court does not agree with the Seventh Circuit's conclusion.  An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the individual used as a human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights.  Lopez v. Sheriff of Cook Cnty., 993 F.3d 992.  Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as a flesh shield to protect an off-duty officer who had shot that very shield moments earlier.  Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations")(July 17, 1998), prohibit such

States Court of Appeals for the Ninth Circuit also distinguishes Taylor on the basis of the conduct's severity.  See Rico v. Ducart, 980 F.3d 1292, 1300 n.9 (9th Cir. 2020).  In Rico v. Ducart, the Ninth Circuit held that correctional officers who performed inmate-welfare checks that, because of the design of the prison, created loud noises every forty-five minutes were entitled to qualified immunity, because the facts were not "as extreme as those present in" Taylor.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also has decided that Taylor "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles."  O'Doan v. Sanford, 991 F.3d at 1044 (9th Cir. 2021).

The other Courts of Appeals, however, have characterized Taylor as only reaffirming an "extreme-circumstances" or "obvious-clarity" exception.  The Fifth Circuit, for example, has distinguished Taylor, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it did not apply to a case about mental healthcare in prison.  Landry v. Laborde-Lahoz, 852 Fed. App'x 123, at *129 (5th Cir. April 19, 2021).[66]  The Fifth Circuit,

---

conduct.  A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity.  The Seventh Circuit found that the situation was "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he had just shot multiple times was a violation that was "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct was a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields violates some other clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

[66]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result.  The Fifth Circuit reasons that Taylor did not support the

however, like other Courts of Appeals, has not adopted a consistent approach to Taylor.  The

Fifth Circuit also has noted that "it would have been 'obvious' to a reasonable officer that"

several officers using their body weight to apply pressure to an unarmed man who did not resist

arrest while the man was in the "maximal-restraint" position for five-and-a-half minutes so that

the man stopped breathing and his lips turned blue -- while officers nearby "milled around"--

would constitute "such a severe tactic against this particular person would be constitutionally

proscribed," and that the officer would "have no recourse to qualified immunity." Aguirre v.

City of San Antonio, 995 F.3d 395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).  The Fifth

Circuit further has cited Taylor to support its assertion that, "'in an obvious case,' general

standards 'can clearly establish the answer, even without a body of relevant law.'" Roque v.

Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(quoting Brousseau v. Haugen, 542 U.S. 194, 199

(2004)).  In Roque v. Harvel, however, the Fifth Circuit did not say what those "general

standards" might be, from where they might come, or where a court might look for them, and

then proceeded to characterize qualified immunity law as requiring a case on point in almost all

circumstances.  993 F.3d at 335.[67]  More recently, however, the Fifth Circuit acknowledged that

---

plaintiff's argument that County officials acted with deliberate indifference in violation of the
Eighth Amendment, because it was "factually distinct." Landry v. Laborde-Lahoz, No. 20-
20365, 852 Fed.App'x. at 129.  That Taylor is factually distinct has no bearing on the merits of a
deliberate-indifference claim, but impacts its applicability to the qualified immunity question.

[67]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not
consistent.  In Tucker v. City of Shreveport, 998 F.3d 165 (2021), the Fifth Circuit did not cite
Taylor, but writes that

> "[q]ualified immunity is justified unless *no* reasonable officer could have acted as
> [the defendant officers] did here, or *every* reasonable officer faced with the same
> facts would *not* have [acted as the defendant officers did]." Mason v. Faul, 929
> F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing

Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th 198, 206 (5th Cir. July 2, 2021)(quoting Taylor, 141 S. Ct. at 53-54).  The Fifth Circuit stressed, however, that this hurdle is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 3 F.4th at 206 (quoting Taylor, 141 S. Ct. at 53-54).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, No. 19-6187, 835 F. App'x. 379, 382 (10th Cir. 2020).  This treatment of Taylor asks about the relationship between a "general constitutional rule *already identified* in the decisional law" and the "conduct in question," and asks whether that rule applies with "obvious

---

District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018)("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know.")).

Tucker v. City of Shreveport, 998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See 141 S. Ct. at 54.  See Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

clarity." United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth

Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.'

That is, 'a general constitutional rule already identified in the decisional law may apply with

obvious clarity to the specific conduct in question.'" Huff v. Reeves, 996 F.3d 1082, 1088 (10th

Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d 1101, 1101 (10th Cir. 2009), and then

quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit wrote that "under certain 'extreme

circumstances' general constitutional principles established in the caselaw may give reasonable

government officials fair warning that their conduct is constitutionally or statutorily unlawful."

Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The

Tenth Circuit continued by noting that the situation before them -- several police officers

surrounding a man who asked one of the officers for a statement about the force the officer had

just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and

searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v.

Pelzer, 536 U.S. 730 (2002).  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than

having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat

an assertion of qualified immunity by meeting Taylor's "extreme circumstances" or "particularly

egregious" standard.  Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit held that, even without a prior precedent clearly

establishing the law, it was "obvious" that a prosecutor providing materially false information to

a medical examiner that influences his expert opinion whether a homicide occurred -- and then

putting that medical examiner on the stand to testify about that false information -- is "obviously

egregious." Truman v. Orem City, 1 F. 4th at 1240 (quoting District of Columbia v. Wesby, 138

S. Ct. 577, 590 (2018), and then <u>Pierce v. Gilchrist</u>, 359 F.3d 1279, 1298 (10th Cir. 2004)).  The

Tenth Circuit, in <u>Truman v. Orem City</u>, comparing the facts directly to those in <u>Taylor</u>,

continued: "Just like any reasonable correctional officer should understand the inmate in

Taylor's conditions of confinement offended the Constitution, so too should any reasonable

prosecutor understand that providing a medical examiner fabricated evidence and then putting

him on the stand to testify based on that false information offends the Constitution."  1 F. 4th at

1240.  In reaching its conclusion in <u>Truman v. Orem City</u>, the Tenth Circuit reiterated that its

qualified immunity analysis is "'not a scavenger hunt for prior cases with precisely the same

facts, and a prior case need not be exactly parallel to the conduct here for the officials to have

been on notice of clearly established law.'"  <u>Truman v. Orem City</u>, 1 F. 4th at 1235 (quoting

<u>Reavis v. Frost</u>, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concluded that

"the right not to be deprived of liberty as a result of the fabrication of evidence by a government

officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1236, it found

that the plaintiff had plausibly alleged a fabrication-of-evidence claim against the prosecutor, 1

F. 4th at 1237.  This treatment of <u>Taylor</u> does not just ask about the relationship between a

"general constitutional rule already identified in the decisional law" and whether it applies with

"obvious clarity" to the conduct, <u>Routt v. Howry</u>, No. 19-6187, 835 F. App'x at 382 (quoting

<u>United States v. Lanier</u>, 520 U.S. at 271), but instead focuses on the objective "particularly

egregious" standard, which applies even without any general constitutional principles that courts

have already promulgated, because "no reasonable officer" could have concluded the conduct to

be lawful,  <u>Taylor</u>, 141 S. Ct. at 53.

The Court does its best to follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[68]  The Court therefore will proceed with both lines of analysis.  An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020)(quoting Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016))("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official

---

[68]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier, and in Hope v. Pelzer, and stands for  the proposition that an officer is not entitled to qualified immunity when his or her conduct is "particularly egregious" such that "any reasonable officer should have realized" that his or her conduct offends the Constitution.  Taylor, 141 S. Ct. at 54. See Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)).  The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021). See Ramirez v. Guadarrama, 2 F.4th at 523-24 (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23.  On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts patch the hole in the defense's line of reasoning, since it is so wide that the nation can run a truck through it.

would have understood, that such conduct constituted a violation of that right.'"). <u>See also</u> <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009)("When a defendant asserts qualified immunity at summary judgment . . . the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); <u>Pueblo of Pojoaque v. New Mexico</u>, 214 F. Supp. 3d at 1079.

The Court previously has applied the "particularly egregious" standard to cases concerning sexual assault in prison. <u>See</u> <u>Ortiz v. New Mexico,</u> 550 F.Supp.3d 1020, 1175 (D.N.M. 2021)(Browning, J.). In <u>Ortiz v. New Mexico</u>, the Court concluded that any reasonable correctional officer should understand that sexually assaulting an inmate or "knowingly allowing [the sexual assault] to happen despite being aware that it was prohibited by State law and prison policy . . . 'offends the Constitution.'" 550 F. Supp. at 1175 (quoting <u>Truman v. Orem City</u>, 1 F.4th at 1240). The behavior the correctional officer exhibited was particularly egregious, because any reasonable officer would conclude that they were violating the Constitution. <u>See</u> <u>Ortiz v. New Mexico</u>, 550 F. Supp. 3d at 1175 (citing <u>Taylor</u>, 141 S. Ct. at 54). Under the "particularly egregious" standard, the Court concluded that the correctional officers were not entitled to qualified immunity. <u>See</u> <u>Ortiz v. New Mexico</u>, 550 F. Supp. 3d at 1175. The Court previously has applied the "particularly egregious" standard to other cases as well. <u>See</u> <u>Howes v. New Mexico Dept. of Health</u>, No. CIV 21-0256, 2023 WL. 1419832, at *78 (D.N.M. Jan. 31, 2023)(Browning, J.)(concluding that a doctor's allegations of violations of his liberty interest in his reputation were not "particularly egregious" such that a reasonable officer would have realized the conduct was unlawful); <u>Copar Pumice Co., Inc. v. Morris</u>, No. CIV 07-79, 2008 WL 2323488, at *28 (D.N.M. 2008)(Browning, J.)(concluding that an official's conduct is not

objectively reasonable if he or she enforces an ordinance in a "particularly egregious manner or in a manner which a reasonable officer would recognize exceed the bounds of the ordinance" (quoting Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 846-47 (2005)).

## LAW REGARDING CRUEL-AND-UNUSUAL-PUNISHMENT

When a prisoner is incarcerated, the Eighth Amendment protects him or her from "a prison official's 'deliberate indifference' to a substantial risk of serious harm," as well as from the intentional use of excessive force.  Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates."  Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  The second condition represents the functional application of the deliberate-indifference standard.  See Smith v. Cummings, 445 F.3d 1254, 1258 (10th Cir. 2006)("To establish a cognizable Eighth Amendment claim for failure to protect [an inmate from harm], the plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.")(quoting Verdecia v. Adams, 327 F.3d 1171, 1175 (10th Cir. 2003)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm

and the likelihood that such an injury to health will actually be caused." Helling v. McKinney,

509 U.S. at 36. Courts should also consider "whether society considers the risk that the prisoner

complains of to be so grave that it violates contemporary standards of decency to expose anyone

unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36. "In other words, the prisoner

must show that the risk of which he complains is not one that today's society chooses to

tolerate." Helling v. McKinney, 509 U.S. at 36.

The second element regarding the government official's state of mind is a subjective

inquiry. See Wilson v. Seiter, 501 U.S. at 298. Courts apply this subjective inquiry to determine

whether the allegations are that a "short-term" or "one-time" violation occurred, or that

"continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. The Supreme

Court has stated: "With deliberate indifference lying somewhere between the poles of negligence

at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated

deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. The Supreme

Court provided the following test for determining when this subjective element is met:

> [A] prison official cannot be found liable under the Eighth Amendment for
> denying an inmate humane conditions of confinement unless the official knows of
> and disregards an excessive risk to inmate health or safety; the official must both
> be aware of facts from which the inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. at 837. For Eighth Amendment purposes, the Tenth Circuit has

equated deliberate indifference with recklessness. See Belcher v. United States, 216 F. App'x

821, 823-24 (10th Cir. 2007)(quoting Smith v. Cummings, 445 F.3d at 1258). The plaintiff must

introduce evidence that shows the defendant "knowingly created a substantial risk of

constitutional injury." Keith v. Koerner, 843 F. 3d 833, 837 (10th Cir. 2016)("Keith II")(quoting

Schneider v. Grand Junction Police Dept., 717 F.3d 760, 769 (10th Cir. 2013). Inaction can be

sufficient to show the defendant knowingly created a substantial risk of constitutional injury, but the plaintiff must show that the defendant was aware of the risk and "fail[ed] to take reasonable steps to alleviate that risk." Keith II, 843 F.3d at 848 (quoting Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). The analysis does not focus on individual risks, but rather on whether "the combined circumstances created a risk for inmates in the plaintiff's situation." Keith II, 843 F.3d at 848 (citing Farmer v. Brennan, 511 U.S. at 843)

In Keith II, the Tenth Circuit addressed a case where the plaintiff asserted claims that her Eighth Amendment right was violated when the warden at her prison deliberately was indifferent towards the risk of sexual assault to female inmates. See Keith II, 843 F.39 at 849. Addressing the subjective prong, whether the warden's inaction constitutes deliberate indifference, the Tenth Circuit examined the evidence in aggregate to determine whether the warden was aware of the risk of sexual assault and to determine whether he had taken reasonable steps to alleviate it. See Keith II, 843 F.39 at 849. The Tenth Circuit considered the volume of complaints, whether there were individual or multiple complaints against employees, what the response to those complaints was, what policies were enacted, how frequently and strictly those policies were implemented, and the level of supervision in the prison. See Keith II, 843 F.39 at 849. The totality of the evidence presented thus allowed the Tenth Circuit to determine that the warden was aware of facts from which he could have drawn an inference that a substantial risk of sexual assault existed and took no steps to alleviate that risk. See Keith II, 843 F.39 at 849 ("[T]here is sufficient evidence from which a reasonable jury could infer that Warden Koerner was aware of but failed to address a substantial risk that his employees would engage in sexual misconduct and thereby harm TCF inmates, including Ms. Keith.").

### 1.    **Sexual Assault in Prison**

"Prison officials are required to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." Barney v. Pulsipher, 143 F.3d at 1310 (quoting Farmer v. Brennan, 511 U.S. at 832-33). In line with providing human conditions of confinement by guaranteeing inmate's safety, the Eighth Amendment protects prisoners against correctional officer's sexual abuse; an inmate has constitutionally guaranteed rights of both bodily integrity and freedom from prison guard's violence -- sexual or otherwise. See Barney v. Pulsipher, 143 F.3d at 1310 (citing Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993)). "The right to be secure in one's bodily integrity includes the right to be free from sexual abuse." Smith v. Cochran, 339 F.3d 1205, 1212 (10th Cir. 2003)(citing Barney v. Pulsipher, 143 F.3d at 1310).

Sexual assault in prison is sufficiently serious enough to satisfy the objective prong of an alleged Eighth Amendment violation. See Barney v. Pulsipher, 143 F.3d at 1310 ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). See also Smith v. Cochran, 339 F.3d at 1212 ("Sexual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim."). "[S]exual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" Boddie v. Schneider, 105 F.3d 857, 861 (2nd Cir. 1997)(quoting Farmer v. Brennan, 511 U.S. at 834).

The Court previously addressed an Eighth Amendment violation in the context of prison sexual assault in Ortiz v. New Mexico. 550 F. Supp. 3d at 1160.  The plaintiff asserted that a correctional officer sexually assaulted and raped him on multiple occasions, see Ortiz v. New Mexico, 550 F. Supp. 3d at 1160, and that other correctional officers were aware of the rape,  see Ortiz v. New Mexico, 550 F. Supp. 3d at 1160.  The Court concluded that the plaintiff satisfied the first, objective element of an Eighth Amendment claim because sexual abuse offends contemporary standards of decency and the deprivations it causes are sufficiently serious.  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1160.  The Court also concluded that the defendants were deliberately indifferent to the plaintiff's well-being because a reasonable jury could infer that the sexual relationship was not consensual and that the correctional officer was raping the plaintiff.  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1160.  The Court ultimately concluded the plaintiff's Eighth Amendment rights were violated. See Ortiz v. New Mexico, 550 F. Supp. 3d at 1160.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

Before the court can rule on a party's motion for summary judgment, the

moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u> *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 11-0757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." <u>Celotex</u>, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[69] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 324; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)("<u>Liberty Lobby</u>"). In <u>American Mechanical Solutions, LLC v. Northland Piping, Inc.</u>, 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. <u>See</u> 184 F. 3d at 1075-78. The Court reasoned that the plaintiff could

---

[69]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in <u>Celotex</u>, this sentence is widely understood to be an accurate statement of the law. <u>See</u> 10A Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, see 184 F. Supp. 3d at 1073, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, see 184 F. Supp. 3d at 1067, which the plaintiff had not provided, see 184 F. Supp. 3d at 1075.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case . . . render[ing] all other facts immaterial." Am. Mech. Sol., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (quoting Plustwik v. Voss of Nor. ASA, No. 11-00757, 2013 WL 1945082, at *1 (D. Utah 2013)(Sam, J.)).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (citing Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."   Fed. R. Civ. P. 56(c)(1)(A).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.   See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).

"In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. v. Omer, No. 07-2123-JAR , 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).   To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.   See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.

> "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted.

Liberty Lobby, 477 U.S. at 249.  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S.

at 249.   Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind

the actual quantum and quality of proof necessary to support liability."   Liberty Lobby, 477 U.S.

at 254.   Third, the court must resolve all reasonable inferences and doubts in the nonmoving

party's favor and construe all evidence in the light most favorable to the nonmoving party.   See

Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence

of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

(citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)); Tolan v. Cotton, 572 U.S.

650, 651 (2014).   Fourth, the court cannot decide any credibility issues.   See Liberty Lobby, 477

U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts.   In Scott v. Harris, 550 U.S. 372, the United States Supreme Court

concluded that summary judgment is appropriate where video evidence clearly contradicted the

plaintiff's version of the facts.   See 550 U.S. at 378-81.   The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts.   Fed. Rule Civ. Proc. 56(c).   As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .
> Where the record taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no 'genuine issue for trial.'"   *Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote
> omitted).   "[T]he mere existence of *some* alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact."
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .   When opposing
> parties tell two different stories, one of which is blatantly contradicted by the
> record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.

- 79 -

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty., third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*, [352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

Parties may allege new claims in motions for summary judgment. See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [A]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

### 1. **Summary Judgment with Relation to Qualified Immunity**.

Summary judgment is distinct in the context of qualified immunity. See Thomson v. Salt Lake Cnty., 584 F.3d at 1312. Whereas a nonmovant opposing a conventional motion for summary judgment need establish only a genuine dispute of material fact that would enable a reasonable jury to find in its favor at trial, a nonmovant opposing a motion for summary judgment based on qualified immunity faces a substantially higher burden: "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)(citing Pearson v. Callahan, 555 U.S. 223, 232 (2009). See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)("The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity.")

In evaluating the evidence that a nonmovant asserts in support of this two-pronged burden, courts view the facts and draw reasonable inferences in the light most favorable to the nonmovant, and, "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts."   Scott v. Harris, 550 U.S. at 378.   A plaintiff's version of the facts, however, "must find support in the record."   Thomson v. Salt Lake Cnty., 584 F.3d at 1312. Just as with any motion for summary judgment, "[w]hen opposing parties tell two different stories, one is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott v. Harris 550 U.S. at 280).   See Thomson v. Salt Lake Cnty., 584 F.3d at 1312.

Because a motion for summary judgment based on qualified immunity presents a question of law, however, "a federal court's factual analysis relative to the qualified-immunity question is distinct."   Cox v. Glanz, 800 F.3d 1231, 1243 (10th Cir. 2015).   See Thomson v. Salt Lake Cnty., 584 at 1326 (Holmes, J., concurring)("[T]he principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact is different [in a qualified immunity context] than it is in the traditional summary judgment analytic paradigm.")

> "[T]he objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury.  Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court."

Cox v. Glanz, 800 F.3d at 1243 (emphasis added)(quoting Thomson v. Salt Lake Cnty., 584 F.3d at 1326 (Holmes, J., concurring)).   If the plaintiff successfully establishes the violation of a clearly established right -- "the legal question before the court" -- based upon his or allegations

grounded sufficiently in the record, then the burden returns to the defendant to prove that he is entitled nonetheless to judgment as a matter of law.  See Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  Only at this point, once the nonmovant "crosses the legal hurdle comprised of his or her two-part burden" and shifts the burden to the defendants, should "the courts be concerned with the true factual landscape -- as opposed to the factual landscape as plaintiff would have it."  Thomson v. Salt Lake Cnty., 584 at 1326 (Holmes, J., concurring).  "Based upon that true factual landscape, courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law.  Thomson v. Salt Lake Cnty., 584 at 1326 (Holmes, J., concurring).  The Court has previously denied motions for summary judgment based on qualified immunity.  See Martin v. City of Albuquerque, 147 F. Supp. 3d 1298, 1330 (D.N.M. 2015) (Browning, J.); O'Farrell v. Bd. of Commissioners for Cnty. of Bernalillo, 455 F. Supp. 3d 1172, 1178 (D.N.M. 2020)(Browning, J.); Abila v. Funk, 220 F. Supp. 3d 1121, 1132 (D.N.M. 2016)(Browning, J.).

## LAW REGARDING MOTIONS TO STAY

A court has broad discretion in managing its docket, which includes decisions regarding issuing stays for all or part of a proceeding.  See Clinton v. Jones, 520 U.S. 681, 706 (1997)("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.")(citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)).

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

Landis v. N. Am. Co., 299 U.S. at 254-55.   Recognizing that district courts must exercise moderation in issuing stays, the Supreme Court has noted that there are no strict rules for the district court to apply, because "[s]uch a formula . . . is too mechanical and narrow."   Landis v. N. Am. Co., 299 U.S. at 255.

The party seeking a stay generally faces a difficult burden.   See Clinton v. Jones, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."); S2 Automation LLC v. Micron Tech., Inc., No. 11-0884 WDS, 2012 WL 3150412, at *2 (D.N.M. July 23, 2012)(Browning, J.)(citing Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir.1983)).   "In particular, where a movant seeks relief that would delay court proceedings by other litigants he must make a strong showing of necessity because the relief would severely affect the rights of others."   Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484.   "The underlying principle clearly is that '[t]he right to proceed in court should not be denied except under the most extreme circumstances.'"   Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir. 1971))(alteration added in Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.).

The Tenth Circuit has acknowledged a district court's discretion in issuing discovery stays.   In Cole v. Ruidoso Municipal Schools, 43 F.3d 1373 (10th Cir. 1994), the defendants argued "that they had an absolute right to a stay of discovery" after they filed a motion for qualified immunity and appealed to the Tenth Circuit because the district court imposed conditions on the stay.   43 F.3d at 1386.   The Tenth Circuit rebuffed the strict rules that the defendants suggested:

As a general rule, discovery rulings are within the broad discretion of the trial court. *Willner v. Budig*, 848 F.2d 1032, 1035-36 (10th Cir. 1988), *cert. denied sub nom. Willner v. Universiy of Kansas*, 488 U.S. 1031 . . . (1989).  The trial court's decision on discovery matters "will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).

Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386.

Whether to issue a discovery stay depends greatly on each case's facts and progress.  In S2 Automation LLC v. Micron Technology, Inc., the Court granted in part and denied in part the Motion to Stay Discovery, Extend Pretrial Deadlines, Vacate Trial Setting and for Protective Order.  See 2012 WL 3150412, at *1.  The Court denied the motion to the extent it requested a discovery stay, because, "[u]ltimately, a stay is unnecessary."  2012 WL 3150412, at *3.  The parties had made "significant progress on the disputed matters," and the Court had "issued rulings on many of the motions that Micron Technology contended needed to be resolved before the case proceeded."  2012 WL 3150412, at *3.  Instead of granting the discovery stay, the Court extended deadlines that it had previously set in the case based on the case's increasing complexity.  See 2012 WL 3150412, at *3.

In Walker v. THI of N.M. at Hobbs Ctr., No. 09-0060, 2011 WL 2728326 (D.N.M. June 28, 2011)(Browning, J.), the Court evaluated whether to stay deposition discovery until thirty days after it ruled on the motions to dismiss two of the defendants, which would determine whether those defendants would remain in the suit and participate in discovery.  See 2011 WL 2728326, at *1.  The plaintiffs argued that the Court had already extended discovery deadlines and that issuing a stay would require rescheduling deadlines.  See 2011 WL 2728326, at *1.  The Court noted that counsel for the two defendants who were subject to the motions to dismiss had

already indicated that they would not participate in deposition discovery.  See Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728326, at *2.  The Court denied the motion to stay, because it did "not see a benefit to staying discovery."  Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728326, at *2.  See Benavidez v. Sandia Nat'l Lab'ys, No. 15-0922, 2016 WL 6404798 (D.N.M. September 27, 2016)(Browning, J.)(denying stay when "[t]here [was] no reason to put the Defendants to the trouble and expense of having to wait and file another motion -- largely regarding the same issues that are already before the Court in the pending Motion to Dismiss -- while the Plaintiffs get all of their ducks in a row").

On the other hand, the Court has found "compelling" motions to stay when the movant "requests to stay his own efforts to obtain relief."  Howard v. City of Albuquerque, 349 F. Supp. 3d 1137, 1148 (D.N.M. 2018)(Browning, J.).  In Howard v. City of Albuquerque, the Court concluded that discovery delays were "reasonable given the doubts about Howard's competency," and granted Howard's motion to stay pending related incompetency proceedings before the State judge.  349 F. Supp. 3d at 1148.  Other factors that the Court considers when determining whether a stay will prejudice the non-moving party include the movant's ability to satisfy the non-moving party's discovery requests after the Court lifts the stay, the movant's stated willingness to cooperate with discovery following competency proceedings, and the non-moving party's ability to relitigate competency issues before the district court.  See Howard v. City of Albuquerque, 349 F. Supp. 3d at 1148.

The Court also has granted motions to stay when State official defendants move to stay discovery pending a decision on qualified immunity.  See, e.g., Saenz v. Lovington Mun. School Dist., No. 14-1005, 2015 WL 1906140 at *12 (D.N.M. April 6, 2015)(Browning, J.).  The Court particularly is inclined to stay discovery when defendants raise a qualified immunity defense at

the motion-to-dismiss stage. See Saenz v. Lovington Mun. School Dist., 2015 WL 1906140 at *10 ("Ordinarily, once a defendant files a motion to dismiss that raises qualified immunity, the Court should stay discovery.")(citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Additionally, because, at the motion-to-dismiss stage, the Court may consider only the facts which the plaintiff alleges in his or her complaint, it is less inclined to permit additional discovery that it otherwise would not consider at that stage. See Saenz v. Lovington Mun. School Dist., 2015 WL 1906140, at *11 ("[T]he only use that discovery could provide in responding to the MTD would be to allow Saenz to more fully understand her claims and then amend the Complaint. This use is not an appropriate use of discovery in response to a qualified immunity defense.").

## LAW REGARDING RULE 56(d)

Rule 56(d) provides:

(d) When Facts Are Unavailable to the Nonmovant.

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).[70] "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion." Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments. The rule permits a nonmovant to show by affidavit

---

[70]Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments.

or declaration the need for additional discovery; a formal affidavit is thus not required.  See Fed.

R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or

statement subscribed in proper form as true under penalty of perjury to substitute for an

affidavit." Fed. R. Civ. P. 56(c) advisory committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time

under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redev. Agency of Sandy

City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "Unless dilatory or lacking in merit," a party's

56[(d)] application "should be liberally treated."  Jensen v. Redev. Agency of Sandy City, 998

F.2d at 1554 (internal quotation marks and citations omitted).  "The general principle of Rule

56(d) is that summary judgment should be refused where the nonmoving party has not had the

opportunity to discover information that is essential to opposition." Price ex rel. Price v. W.

Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that

summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res.,

Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Ft. Collins, 903

F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d), the party filing the affidavit or declaration

must state with specificity how the desired time would allow it to meet its burden in opposing

summary judgment.  See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554.  Rule 56(d)

may not be invoked based solely upon the assertion that discovery is incomplete or that specific

facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redev. Agency of

Sandy City, 998 F.2d at 1554.  Moreover, while the summary judgment movant's exclusive

control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W.

Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary

judgment, see Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the

party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either

irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."

Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request and stating

that "the record reflects that plaintiffs were dilatory in pursuing discovery prior to the filing of

their 56[(d)] affidavit").   See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M.

2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the

discovery period that the court allowed, he did not obtain the discovery sought in his motion).

The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit
> furnished by the nonmovant.  Although the affidavit need not contain evidentiary
> facts, it must explain why facts precluding summary judgment cannot be
> presented.  This includes identifying the probable facts not available and what
> steps have been taken to obtain these facts.  In this circuit, the nonmovant also
> must explain[, with specificity,] how additional time will enable him to rebut
> movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (citations and internal quotation

marks omitted).   See Tadlock v. Lahood, 2013 WL 6284428, at *5 (10th Cir.

2013)(unpublished)(citing Price ex rel. Price v. W. Res., Inc. for the rule 56(d) requirements after

the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656,

658 (10th Cir. 2006)(stating that the affidavit must state how additional time will enable the

party to meet its burden "with specificity").  A rule 56(d) affidavit or declaration must state, with

specificity, exactly what additional discovery is believed necessary.  See Burke v. Utah Transit

Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325,

334 (10th Cir. 2005)(unpublished)("To resist summary judgment on this basis (56[(d)]), a party

must specifically identify what facts it seeks to discover and show how those facts would

materially aid its case on the dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 2013 WL 6284428, at *5.

The Court has previously denied rule 56(d) motions where the information sought does not relate to a relevant legal question. See Martinez v. Lucero, No. 11-10032012, WL 2175772, at *30 (D.N.M. May 31, 2012)(Browning, J.)("Because the information sought would not alter the Court's decision on either absolute or qualified immunity, the Court will deny the request for discovery pursuant to rule 56(d)."). Similarly, it has denied 56(d) requests where the party seeks duplicative information. See Todd v. Montoya, 877 F. Supp. 2d 1048, 1099 (D.N.M. 2012)(Browning, J.)("There is little difference between the discovery he seeks and what he would seek if Montoya had not raised a qualified-immunity defense."). Finally, the Court has dismissed rule 56(d) motions where the proponent does not submit a rule 56(d) affidavit. See Chavez v. Cty. of Bernalillo, 3 F. Supp. 3d 933, 991 (D.N.M. 2014)(Browning, J.)("He did not submit a rule 56(d) affidavit or declaration.").

## ANALYSIS

The Court (i) denies the MSJ; (ii) denies the Stay Motion; and (iii) denies Green's request for limited discovery under rule 56(d). First, the Court concludes that Sanchez is not entitled to qualified immunity, because Green has developed a factual record sufficient to permit a reasonable jury to conclude that Sanchez violated her clearly established Eighth Amendment rights. Second, the Court denies Sanchez' motion for summary judgment, because Sanchez has not established that no genuine dispute of material fact exists regarding whether he violated Green's Eighth Amendment rights. Third, the Court will deny the Stay Motion, because the Court concludes that Sanchez is not entitled to qualified immunity and the protection from

discovery that qualified immunity affords. Fourth, the Court will deny Green's request for limited discovery under rule 56(d), because the requested discovery is not necessary to defend against the MSJ.

**I.    GREEN HAS DEVELOPED A FACTUAL RECORD THAT WOULD PERMIT A REASONABLE JURY TO CONCLUDE THAT SANCHEZ VIOLATED HER CLEARLY ESTABLISHED EIGHTH AMENDMENT RIGHTS, AND, THEREFORE, SANCHEZ IS NOT ENTITLED TO QUALIFIED IMMUNITY.**

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. at 818. Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state officials who have violated his or her constitutional or statutory rights. 42 U.S.C. § 1983. Under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.   Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002).   Accordingly, § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.   The Supreme Court has clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Consequently, there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

When a prisoner is incarcerated, the Eighth Amendment protects him or her from "a prison official's 'deliberate indifference' to a substantial risk of serious harm."   Farmer v. Brennan, 511 U.S. 825, 828 (1994)(quoting Helling v. McKinney, 509 U.S. 25, 28 (1993)). "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).   An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively,

is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).

The Court concludes first that Green satisfies the elements of an Eighth Amendment violation under § 1983, because it is undisputed that sexual assault is a sufficiently serious harm to constitute a violation of the Eighth Amendment, and because Green alleges sufficient facts to permit a reasonable jury to conclude that Sanchez was deliberately indifferent to Green's risk of sexual assault. Second, the Court concludes that Sanchez violated Green's clearly established constitutional rights, because the Tenth Circuit has held that it is clearly established that sexual abuse by prison guards -- or deliberate indifference to it -- violates the Eighth Amendment. Therefore, the Court concludes that Sanchez is not entitled to qualified immunity.

> **A.  GREEN SATISFIES THE ELEMENTS OF AN EIGHTH AMENDMENT VIOLATION UNDER § 1983, BECAUSE SEXUAL ASSAULT IS A SUFFICIENTLY SERIOUS HARM TO CONSTITUTE A VIOLATION OF THE EIGHTH AMENDMENT, AND BECAUSE GREEN PRESENTS SUFFICIENT EVIDENCE TO PERMIT A REASONABLE JURY TO CONCLUDE THAT SANCHEZ COMMITTED A CONSTITUTIONAL VIOLATION THROUGH HIS OWN ACTIONS AND THROUGH HIS DELIBERATE INDIFFERENCE TOWARDS GREEN'S RISK OF SEXUAL ASSAULT.**

The Court first determines whether Green has established a constitutional violation. See Keith II, 843 F. 3d at 837.  To establish a constitutional violation under the Eighth Amendment, Green must prove that (i) a prison official has caused her injury which is, objectively, "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities," and that (ii) the prison official had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  Sexual assault is sufficiently serious to state an Eighth Amendment violation.  See Barney v. Pulsipher, 143 F.3d

at 1310 ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment.").

There is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).  The Tenth Circuit recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. 11-0011, 2011 WL 7444745, at *25-26 (D.N.M. December 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  In Dodds v. Richardson, then-United States Circuit Judge Gorsuch for the Tenth Circuit stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  Then-Judge Gorsuch noted, however, that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the

unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

Green alleges that Padilla, not Sanchez, sexually assaulted her.   See Reply ¶ 31, at 11. Because the Court only addresses the claims against Sanchez, in his capacity as warden, Green must prove that Sanchez committed a constitutional violation through his actions.   See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").   It is not enough that Sanchez "acted in a supervisory role" when Sanchez violated Green's constitutional rights.   Keith II, 843 F.3d at 837-39 (citing Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010)).   Rather, Green must prove an affirmative link between Sanchez' actions and Padilla's constitutionally violative actions.   See Keith II, 843 F.3d at 837-39.   Demonstrating this link "requires proof of three interrelated elements: (1) personal involvement; (2) causation; and (3) state of mind."   Keith II, 843 F.3d at 837-39 (citing Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013).   The Tenth Circuit, however, has not always "view[ed] these requirements as necessarily distinct."   Dodds v. Richardson, 614 F.3d at 1196.   In considering the several burdens that Green must satisfy to establish an Eighth Amendment violation against Sanchez, pursuant to § 1983, while overcoming Sanchez' defense of qualified immunity, the Court addresses the following issues in turn: (i) whether Green alleges an injury which is a "sufficiently serious" deprivation of her "minimal civilized measure of life's necessities;" (ii) whether Green establishes sufficient facts to demonstrate Sanchez' personal involvement in the violation of constitutional rights; (iii) whether Green establishes sufficient facts to demonstrate Sanchez

proximately caused the violation of her constitutional rights; and (iv) whether Green establishes sufficient facts to demonstrate Sanchez exhibited the required culpable state of mind -- deliberate indifference -- when the violation occurred.

> **1.     Green Satisfies the Objective Component of an Eighth Amendment Claim Pursuant to § 1983, Because a Prison Employee's Sexual Assault of an Inmate is a Sufficiently Serious Deprivation of an Inmate's Constitutional Rights.**

An Eighth Amendment claim's "objective" component under § 1983 requires that an alleged deprivation must be "sufficiently serious," so as to deprive the injured person of her "minimal civilized measure of life's necessities." Farmer v. Brennan, 511 U.S. at 834. A correctional officer's rape or sexual assault of an inmate is a "sufficiently serious" deprivation of the inmate's "minimal civilized measure of life's necessities" to satisfy the objective component of a cruel and unusual punishment claim. E.g., Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008)("There is no question that sexual assault of the kind suffered by Ms. Tafoya meets this objective component of an Eighth Amendment claim."). See Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993)("[A]n inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards."); Boddie v. Schnieder, 105 F.3d 857, 861 (2nd Cir. 1997)("[L]ike the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society."); Smith v. Cochran, 339 F.3d 1205, 1212 (10th Cir. 2003)("Sexual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim."); Barney v. Pulsipher, 143 F.3d at 1310 ("[P]laintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the

Eighth Amendment.").    In Barney v. Pulsipher, however, the Tenth Circuit concluded that "verbal harassment and intimidation . . . alone are not sufficient to state a claim under the Eighth Amendment."  143 F.3d at 1310 n.11 (citing Adkins v. Rodriguez, 59 F.3d 1034, 1037 (10th Cir. 1995)).  The Tenth Circuit instead concluded that verbal harassment is "only actionable '[i]n combination' with [sexual] assaults."   Barney v. Pulsipher, 143 F.3d at 1310 n.11 (quoting Prisoners v. Dist. of Columbia, 877 F. Supp. 634, 655 (D.D.C. 1994)(Green, J.)(first alteration in Barney v. Pulsipher)).   At the same time, the Tenth Circuit has proscribed physical or sexual intimidation of inmates, reasoning that the Eighth Amendment includes inmates' right to reasonably safe environment.  See Ramos v. Lamm, 639 F.2d 559, 572 (10th Cir. 1980).

The Court concludes that Green alleges sufficient evidence to establish that she suffered an injury which qualifies as a "sufficiently serious" deprivation of her Eighth Amendment rights. Green presents evidence that Padilla assaulted her on multiple occasions by demanding that Green reveal her breasts, insert candies into her vagina, or masturbate in front of Padilla.  See Response ¶ 14, at 9; Response ¶¶ 17-18, at 9; Response ¶ 34, at 11.  Green does not present evidence that Padilla physically contacted her or used force against her.  Green's evidence, then, may appear closer to the line of cases in which an inmate alleges only verbal abuse, than the line of cases in which physical sexual assault occurs, therefore raising doubt whether her evidence is sufficiently serious.  See Barney v. Pulsipher, 143 F.3d at 1310 n.11.  Such an appearance, however, does consider the power dynamics at play in the prison context.  See Graham v. Sheriff of Logan Cnty., 741 F.3d at 1126. The Tenth Circuit has noted that "'[t]he power dynamics between prisoners and guards make it difficult to discern consent from coercion'" in cases that raise the question whether an inmate can consent to sex with a prison employee.  Graham v. Sheriff of Logan Cnty., 741 F.3d at 1126 (quoting Wood v. Beauclair, 692 F.3d 1041, 1047 (9th

Cir. 2012)).  As the Ninth Circuit explains in <u>Wood v. Beauclair</u>, 692 F.3d 1041 (9th Cir. 2012),

other Courts of Appeals have recognized that prisoners are incapable of consenting to sexual

relations with a prison official.  <u>See</u> 692 F.3d at 1046-47.  The Ninth Circuit explains:

> The rationale underpinning these decisions rests primarily on the pronounced
> dichotomy of control between prison guards and prisoners. Prisoners have no
> control over most aspects of their daily lives. They cannot choose what or when to
> eat, whether to turn the lights on or off, where to go, and what to do. They depend
> on prison employees for basic necessities, contact with their children, health care,
> and protection from other inmates. <u>See</u> <u>Carrigan [v. Davis</u>], 70 F. Supp. 2d [448,]
> 458-59 (D. Del. 1999); <u>see also</u> Human Rights Watch Women's Rights Project,
> All Too Familiar: Sexual Abuse of Women in U.S. State Prisons 5 (1996)  . . .
> (documenting the sexual abuse of prisoners and finding that "[i]n prison,
> correctional employees have nearly absolute power over the well-being of
> prisoners.").

<u>Wood v. Beauclair</u>, 692 F.3d at 1047.

Although this understanding of the prison-guard power dynamic is applied most readily

to cases involving sexual relations between prisoners and guards, in which consent is in question,

the Court reasons that the same power dynamic is useful in evaluating whether Padilla's

instructions to Green amount to more than verbal harassment, and instead reaches a level of

sexual assault that constitutes a sufficiently serious deprivation of Green's Eighth Amendment

rights.  During Green's work in the kitchen crew, Padilla acted as Green's direct supervisor, and

he used his power as her supervisor to instruct her to reveal her breasts to him in exchange for

allowing her to take food back to her cell.  <u>See</u> Response ¶ 14, at 9.  At times, when Padilla

frequented Green's cell and asked her to masturbate in front of him, he served in a role --

maintenance supervisor -- that gave him "access to every part of the prison[,]" including,

presumably, the area proximate to Green's cell.  Response ¶ 29, at 10.  Viewing the evidence in

the light most favorable to Green, it is reasonable to conclude that Green complied with Padilla's

instructions only out of intimidation, because Padilla made his demands from a position of

power.  Padilla's instructions, in this light, were not merely verbal harassments, but power-laden coercions that forced Green to expose herself for Padilla's pleasure, which only avoid the automatic presumption of sexual assault because physical force was absent.   Padilla's instructions, therefore, violate Green's "constitutional right to be secure in her bodily integrity and free from attack by prison guards," Hovater v. Robinson, 1 F.3d at 1068.  This constitutes a "sufficiently serious" deprivation of her "minimal civilized measure of life's necessities," Farmer v. Brennan, 511 U.S. at 834, and accordingly, Green presents sufficient evidence to satisfy the objective component of an Eighth Amendment claim.

### 2.     Green Provides Sufficiently Credible Evidence to Establish Sanchez' Personal Involvement in the Alleged Constitutional Violation.

"Individual liability under § 1983 must be based on [the defendant's] personal involvement in the alleged constitutional violation." Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 768 (quoting Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997)(alteration in Schneider v. City of Grand Junction Police Dep't, but not in Foote v. Spiegel). "Before the Supreme Court's decision in *Ashcroft v. Iqbal*, a § 1983 plaintiff had some flexibility in how to establish a supervisory defendant's personal involvement: she could do so by showing personal participation; exercise of control or direction; failure to supervise; or 'promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights.'" Keith II, 843 F.3d at 838 (quoting Dodds v. Richardson, 614 F.3d at 1195). Ashcroft v. Iqbal created, however, a stricter liability standard for personal involvement by requiring that a plaintiff demonstrate "'each Government-official defendant, through the official's own individual actions, has violated the Constitution." Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 768 (quoting Ashcroft v. Iqbal, 556 U.S. at 676).  Although

"consensus" as to <u>Ashcroft v. Iqbal</u>'s precise effect on this body of law remains "elusive," <u>Dodds v. Richardson</u>, 614 F.3d at 1198, the Tenth Circuit has held in subsequent cases that a defendant-supervisor's failure to create or enforce policies that protect inmates from sexual abuse, <u>see</u> <u>Keith II</u>, 843 F.3d at 840, or showing that the defendant oversaw, directed, or controlled the alleged misconduct, <u>see</u> <u>McLemore v. Darr</u>, 736 F. App'x 753, 755 (10th Cir. 2018)(unpublished), may establish personal involvement. Personal involvement, in other words, does not require "direct participation," because § 1983 states that "[a]ny official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable." <u>Buck v. City of Albuquerque</u>, 549 F.3d 1269, 1279 (10th Cir. 2008)(quoting <u>Snell v. Tunnell</u>, 920 F.2d 673, 700 (10th Cir. 1990)).

Here, the Court concludes that Green proffers sufficient facts to demonstrate Sanchez' personal involvement with the alleged constitutional violation. New Mexico law sets forth the respective duties of wardens in its prisons and declares that the warden is the "director" of the facility. <u>See</u>, <u>e.g.</u>, N.M.S.A.. § 33-1-2(E) ("'Warden' . . . means the administrative director of a correctional facility.").

> The employees of the penitentiary shall perform such duties in the charge and oversight of the penitentiary, care of the property belonging thereto, and in the custody, government, employment and discipline of the convicts as shall be required of them by the corrections division <u>or the warden</u>, in conformity with law and rules and regulations prescribed for the government of the penitentiary.")

N.M.S.A. § 33-2-15 (emphasis added). Sanchez acknowledges in his MSJ that he sits atop Springer Correctional's chain of command; correctional officers report to Sergeants, who in turn report to Lieutenants, who in turn report to the Captain, who in turn report to two Unit Managers, who in turn report to the warden. <u>See</u> MSJ ¶ 2, at 7; Sanchez Aff. ¶ 6, at 1. As Springer Correctional's warden, then, Sanchez was responsible for the policies or customs that

- 100 -

operated, and that Springer Correctional subordinates enforced, and for any failure to train adequately his subordinates.  See Wilson v. Montano, 715 F.3d 847, 857 (10th Cir. 2013).

Green presents evidence that, during Sanchez' tenure as warden, there were two important policies at play.  First, Sanchez "operated the facility with a 50% staff vacancy rate" and maintained a high ratio of male officers to female officers. Factual Background, supra at 5 (quoting Sanchez Depo. I at 44:14-22).  While the Court acknowledges that these circumstances may have led to a higher risk of sexual assault at Springer Correctional, the Court declines to hold that maintaining an understaffed prison with a high male to female ratio is a sufficient basis upon which a plaintiff can show a supervisory prison official was personally involved in an alleged Constitutional violation.  To hold otherwise could result in nearly every prison warden being denied qualified immunity simply because the prison they oversaw was plagued by understaffing issues.[71]  Second, Springer Correctional had in place a "zero tolerance" policy

---

[71]In Sanchez' Deposition, Sanchez discusses the lack of control he had over understaffing at his prison:

> Q:      And so at what point does it sort of become critical to hire staffing, I mean, 50 percent sounds like a lot of vacancies, but what's the norm?

> A:      I don't necessarily know how to answer that question.  We made do with what we had, and we worked really hard to make sure that we had enough staff to cover the positions at the facility.  There were times that I was so short staffed . . . that me, as the warden, I was working a post on a Saturday night . . . .

> Q:      So, I mean, did Central office or anyone above you take any steps to try to remedy this 50 percent vacancy?

> A:      I don't feel comfortable in answering that question, and remedying -- I would report my vacancy rate.  The Central office, the deputy directors, and the director knew my vacancy rate every week.

> Q:      Tell me what --

_____

> A:     I would have to call and tell, when I hadn't had enough staff and that I would have to shut down a mandatory post.
>
> Q:     So tell me why you don't feel comfortable answering [why his superiors did not take steps to remedy the 50 percent vacancy]?
>
> A:     You're asking me to -- you're asking me to think, to answer for why they didn't help me.  I don't know why they didn't make adjustments or help.

Sanchez Depo. I at 09:48-49.   A recent report from the New Mexico Legislative Finance Committee regarding the Corrections Department shows that correctional officer vacancies are high, "at 29 percent [for public positions] and 32 percent [for private positions]."  New Mexico Legislative Finance Committee, Performance Report Card: Fourth Quarter, FY 22, Corrections Department 1-2 (2022).  Regarding gender, the Federal Bureau of Prisons reports that, as of July 15, 2023, the percentage of male staff nationwide was 71.6 percent, whereas the percentage of their female staff was significantly lower at 28.4 percent.   See Federal Bureau of Prisons, Statistics: Staff Gender (2023) https://www.bop.gov/about/statistics/statistics_staff_gender.jsp. According to the Office of Justice Program's Census of Jails, in 2019 in New Mexico, the number of male correctional officers was 1,140 versus 470 female correctional officers.   See Zhen Zeng & Todd D. Minton, Census of Jails, 2005-2019 - Statistical Tables, Office of Justice Programs (October 2023).   Given the continued issues with understaffing and with gender disparity among correctional officers, the Court declines to base its conclusion that Sanchez was personally involved in Green's alleged constitutional violation on the fifty-percent vacancy rate and the high ratio of male to female correctional officers, because doing so goes against the policies that the Tenth Circuit considers when determining whether an individual is entitled to qualified immunity.  In its qualified immunity analysis, the Tenth Circuit keeps in mind the following policy considerations:  "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).   Because of the current inevitability of understaffing, holding that a plaintiff can show a warden's personal involvement by showing that there is understaffing at his or her prison would go against qualified immunity policy and would possibly lead to a drop in candidates who are willing to serve as wardens, because of a high probability of a damages suit, and may cause wardens to forgo other important duties in a futile pursuit of filling vacancies, particularly female correctional officer vacancies.   The subjective component of the deliberate indifference test should not be applied to wardens to deter understaffing if he or she has no meaningful control over understaffing; Green has not produced evidence that Sanchez was responsible for understaffing.   As the Court further explains in this section, however, Sanchez' other actions demonstrate his personal involvement in the constitutional violations which Green alleges.

regarding sexual abuse, Factual Background, <u>supra</u> at 6 (quoting NMCD Policy I, at 4-9).  To enforce this policy, written policies mandated that, when sexual abuse is reported, the detention facility's administrator must separate the victim from the perpetrator.  <u>See</u> Factual Background, <u>supra</u> at 7 (citing NMCD Policy II at 1).  Green also offered evidence that Sanchez did not follow this policy and, rather than separating Padilla from Green after Green brought her allegations of sexual abuse directly to Sanchez, Sanchez instead promoted Padilla.  <u>See</u> Factual Background, <u>supra</u> at 13-15 (first citing Green Decl. ¶¶ 17-18, at 2-3, and then citing Green Decl. ¶ 25, at 3).  In this new position, Padilla continued to have access to Green and continued to abuse her for several months.  <u>See</u> Factual Background, <u>supra</u> at 18-19 (citing Green Decl. ¶ 28, at 4).  Viewing these facts in the light most favorable to Green, a reasonable jury could conclude that Sanchez personally was involved in the alleged constitutional misconduct.  Sanchez' failure to implement Springer Correctional's policy regarding sexual abuse allegations enabled Padilla's further sexual abuse of Green.  Sanchez' inaction and his subsequent decision to promote Padilla therefore are sufficient to establish his personal involvement with the alleged constitutional violation.  <u>See</u> <u>Keith II</u>, 843 F.3d at 840.

### 3.   <u>Green Provides Sufficient Credible Evidence to Demonstrate that Sanchez Proximately Caused Padilla to Assault Green</u>.

"The second element of the 'affirmative link' between a supervisor and an alleged constitutional deprivation requires proof of causation."  <u>Keith II</u>, 843 F.3d at 847.  "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  <u>Poolaw v. Marcantel</u>, 565 F.3d 721, 732-33 (10th Cir. 2009), <u>as amended</u> (July 24, 2009)(quoting <u>Snell v. Tunnell</u>, 920 F.2d at 700).  The Tenth Circuit has held that a

supervising official's management actions may be sufficient to establish causation, just as the official's management decisions are instructive in evaluating the question of personal involvement. See Keith II, 843 F.3d at 847. In Tafoya v. Salazar, a county jail inmate, who experienced two sexual assaults while incarcerated, alleged in a § 1983 action that a defendant-sheriff, who was "responsible for the management and supervision" of the county jail, deliberately was indifferent to prison conditions that substantially likely were to result in the sexual assault of a female inmate. See Tafoya v. Salazar, 516 F.3d at 915. As to the personal involvement question, the Tenth Circuit concludes that the sheriff's management decisions, which cultivated "egregiously undisciplined behavior" on the detention staff's part, establish the sheriff's personal involvement in the alleged constitutional violation. Tafoya v. Salazar, 516 F.3d 917, 922. The sheriff argued that his management decisions, however, also could not contribute to a finding that he proximately caused his subordinate to sexually assault the inmate, because such a conclusion would inappropriately import respondeat superior into § 1983 jurisprudence. See Tafoya v. Salazar, 516 F.3d at 922. The Tenth Circuit disagreed, however, declaring that "acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault." See Tafoya v. Salazar, 516 F.3d at 922.

Here, the Court concludes that Green has alleged sufficient facts to establish that Sanchez proximately caused Padilla to assault her sexually. Springer Correctional and NMCD "maintain[]" a written, "zero tolerance" policy that prohibits abuse, sexual misconduct, and any sexual relationship between employees and inmates. Factual Background, supra at 6 (citing NMCD Policy I, at 4-9). NMCD Policy also requires that a detention facility's administrator --

in this case, a warden -- "separate a victim of sexual abuse from the assailant once sexual abuse is reported." Factual Background, <u>supra</u> at 7 (citing NMCD Policy II, at 1). "[NMCD] . . . policy also requires that upon report of a sexual assault incident, the Warden shall make an immediate report to the PREA coordinator." Factual Background, <u>supra</u> at 7 (citing NMCD Policy II, at 1). Green alleges that, after she informed Sanchez of Padilla's abusive behavior and after NM State Police interviewed her, Green "was sent back to her cell and was not assessed or interviewed by health personnel." Factual Background, <u>supra</u> at 14 (citing Green Decl. ¶ 21, at 3). Sanchez argues, in his Reply, that he never referred Green to health personnel or took other courses of action, "because Plaintiff never reported her allegations to anyone at NMCD or [Springer Correctional]." Reply ¶ 25, at 18. Green argues that Sanchez not referring Green to a healthcare professional violates NMCD policy.[72] Green also alleges that she submitted a grievance to Springer Correctional's administration, "complaining about Officer Padilla's sexual

---

[72]The record is unclear whether Sanchez alerted the proper officials in light of Green's allegations of abuse. Green argues, in her Response, that Sanchez "failed to follow NMCD policy by failing to refer Ms. Green for a mental health and physical assessment and evaluation as required by NMCD policy," but Green does not assert specifically the existence of such a policy in her statements of facts. Response at 18. <u>See</u> Response ¶¶ 35-36, at 11. Instead, as noted, she asserts in her statements of fact only that (i) NMCD Policy requires that a detention facility's administrator -- in this case, a warden -- "separate a victim of sexual abuse from the assailant once sexual abuse is reported," and that (ii) "[NMCD] . . . policy also requires that upon report of a sexual assault incident, the Warden shall make an immediate report to the PREA coordinator." Response ¶ 36, at 11. <u>See</u> NMCD Policy II, at 1. Both assertions rely on the same NMCD policy -- Policy CD-150102. <u>See</u> NMCD Policy II, at 1. In other words, Green's assertions of fact lack the assertion that the NMCD policy requires that health personnel examine an assault victim, even though she makes the argument, in her Response, that Sanchez violated NMCD Policy by not referring Green to such personnel. <u>See</u> Response at 18. In reviewing the record attachment that Green cites for her argument, Policy CD-150102, the Court notes that the policy requires that, "[w]ithin the first 72 hours of a sexual assault incident . . . [a] facility health care professional will take a history and conduct an examination [of the victim] to document the extent of physical injury." NMCD Policy II, at 1. The Court, therefore, will adopt as a fact that NMCD Policy requires Spring Correctional to refer victims of sexual assault to a healthcare professional within seventy-two hours of him or her reporting sexual abuse.

misconduct against her," but that she "was told it had not been received" when she received no response.  Factual Background, <u>supra</u> at 14-15 (citing Green Decl. ¶¶ 23-24, at 3).  Green further alleges that, after reporting Padilla's misconduct to Sanchez, Sanchez took no action to discipline Padilla or to prevent Padilla from accessing Green.  <u>See</u> Factual Background, <u>supra</u> at 15 (citing Sanchez Depo. I at 106:22-25).   Instead, Green alleges that Sanchez "promoted Padilla to maintenance supervisor," Factual Background, <u>supra</u> at 15 (citing Green Decl. ¶ 25, at 3), which gave Padilla "access to every part of the prison."  Factual Background, <u>supra</u> at 18 (citing Sanchez Depo. I at 153:11-18).  It was during Padilla's tenure as maintenance supervisor, Green alleges, that Padilla "began to frequent [Green's] single cell and to demand that she touch her vagina in front of Padilla while he watched her."  Factual Background, <u>supra</u> at 19 (quoting Green Decl. ¶ 27, at 4).

Viewing these facts in the light most favorable to Green, the non-movant, the Court concludes that Green alleges sufficient facts to present a jury question whether Sanchez proximately caused Padilla to assault Green.  Sanchez' decision not to discipline, demote, or restrict Padilla's access to inmates following Green's and Martinez' allegations that he had abused them, amounts to "acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking."  <u>Tafoya v. Salazar</u>, 516 F.3d at 922.  During his tenure as warden, Sanchez neglected NMCD policy by not referring Green to a healthcare professional following her assault, Factual Background, <u>supra</u> at 14 (citing Green Decl. ¶ 21, at 3), and by not separating Padilla and Green, <u>see</u> Factual Background, <u>supra</u> at 15 (citing Sanchez Depo. I at 106:22-25), but instead allowing Padilla "access to every part of the prison," Factual Background, <u>supra</u> at 18 (citing Sanchez Depo. I at 153:11-18).  Following Sanchez' inaction,

Green experienced further episodes of assault.  See Factual Background, supra at 19 (quoting Green Decl. ¶ 4).  A reasonable jury could conclude, therefore, that Sanchez "set in motion a series of events" that he reasonably should have known "would cause others to deprive [Green] of her constitutional rights."  Poolaw v. Marcantel, 565 F.3d at 732-33.  Accordingly, Green has established an affirmative, causal link between Sanchez' actions and the alleged constitutional violation.  See Keith II, 843 F.3d at 847.

>
> **4.    Green Satisfies the Subjective Component of an Eighth Amendment Claim, Because she Alleges Sufficient Facts to Permit a Reasonable Jury to Conclude that Sanchez was Deliberately Indifferent to her Ongoing Risk of Sexual Assault.**

The "subjective" component of an Eighth Amendment claim pursuant to § 1983 requires that a prison official have a "sufficiently culpable state of mind," in which the official is indifferent deliberately to a substantial risk of serious harm to an "inmate's health and safety." Farmer v. Brennan, 511 U.S. at 834.  This subjective inquiry is functionalized as the deliberate indifference standard.    See Ortiz v. New Mexico, 550 F. Supp. 3d 1020, 1099 (D.N.M. 2021)(Browning, J.).  To demonstrate deliberate indifference, a plaintiff must show that (i) the defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed; (ii) the defendant actually drew that inference; and (iii) the defendant failed to take reasonable steps to alleviate the risk.  See Perry v. Durborow, 892 F.3d at 1122; Keith II, 843 F.3d at 848.  "The official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur." Tafoya v. Salazar, 516 F.3d at 916 (emphasis in original).  An official nonetheless may be "free from liability" if he or she "responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan, 511 U.S. at 844.

Moreover, a plaintiff's version of the facts "must find support in the record."   Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  Just as with any motion for summary judgment, "'[w]hen opposing parties tell two different stories, [and] one is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott v. Harris, 550 U.S. at 280).  See Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  To establish a viable claim for an Eighth Amendment violation in these circumstances, then, Green must provide sufficient credible evidence, based in the record, to permit the conclusion that Sanchez subjectively was aware that Green faced a serious risk of harm and that he deliberately disregarded that harm such that his inaction was a contributing factor in Green's subsequent assault.  See, e.g., Poore v. Glanz, 724 F. App'x 635, 641-43 (10th Cir. 2018).

Here, Green argues that Sanchez was deliberately indifferent to her alleged constitutional deprivation, because he was subjectively aware of the sexual abuse that she had already experienced while incarcerated but did nothing to alleviate the risk of continued abuse.  Green alleges specifically that while she waited in Springer Correctional's administration offices for her NMSP interview, Sanchez escorted Green into his office and "asked her what had happened." Factual Background, supra at 13 (citing Green Decl. ¶ 16, at 2).  Green told Sanchez that Padilla had directed her to reveal her breasts "in exchange for allowing her to take food out of the kitchen," to which Sanchez responded "okay" and informed Green that the NM State Police would interview her "shortly."  Factual Background, supra at 13 (Green Decl. ¶¶ 17-18, at 2-3). Green alleges that, after she had informed Sanchez of Padilla's abusive conduct towards her, Sanchez "failed to take any corrective, administrative, or disciplinary action against Padilla." Response at 18.  Instead, Sanchez "promoted Padilla to maintenance supervisor," and, in that

position, Padilla continued to harass and assault Green.  Factual Background, <u>supra</u> at 15 (citing

Green Decl. ¶ 25, at 3); Factual Background, <u>supra</u> at 19 (citing Green Decl. ¶¶ 27-28, at 4).

Green further argues that, to the extent Sanchez denies culpability based on having "no

knowledge of Ms. Green," Green needs to prove merely that Sanchez maintained "policies or

customs he knows create a substantial risk of constitutional injury" to those in Green's position.

Response at 20 (citing <u>Dodds v. Richardson</u>, 614 F.3d at 1206).  Green argues that subjecting

female inmates to an overwhelmingly male prison staff and consistently operating short-staffed,

created a substantial risk of harm of abuse to Green and other similarly situated female inmates.

<u>See</u> Response at 21.

Sanchez, meanwhile, argues that the Court should not credit Green's testimony, because

Sanchez contends that "contemporaneous documents and the Plaintiff's own pleading" blatantly

contradict Green's testimony in several ways.  Reply at 13.  Most prominently, Sanchez argues

that Green stated in two separate interviews with the NM State Police that "she did not want to

report Padilla's alleged conduct," but then states in her affidavit that "she did, in fact, report the

conduct to the Warden that same day."  Reply at 12.  Sanchez also argues that the actions which

Sanchez and his staff took to respond to "similar allegations made one day earlier by inmate

Rebecca Martinez" contradict Green's contention that Sanchez responded merely with "okay"

after she allegedly reported the abuse to him.  Reply at 13.  Sanchez argues, that under <u>Scott v.</u>

<u>Harris</u>, when contemporaneous documents -- such as the NM State Police Incident Report -- and

Green's pleading "blatantly contradict" the allegations which constitute the evidence upon which

Green relies, the Court must discredit Green's testimony and conclude that she has not created

any genuine dispute of material fact.  Reply at 11.

Sanchez argues, alternatively, that even if he subjectively was aware of Green's risk of sexual assault, his response was reasonable under the circumstances.  See MSJ at 18.  Sanchez alleges that, following Martinez' allegations, he and his staff immediately made a serious incident report and PREA notification, contacted the NM State Police, and referred the case to the NMCD Office of Professional Standards to investigate the allegations.  See Reply at 2. Sanchez contends that disciplinary action against Padilla was not warranted, because, at the time, the allegations against him were "just that -- unproven allegations[,]" which did not provide for any "just cause."  Reply at 3.  Sanchez concludes, therefore, that his conduct, including the "immediate initiation of dual investigations into the allegations[,]" is not inaction that subjects him to Eighth Amendment liability.  Reply at 4.

The Court concludes that Green's evidence is sufficient to show Sanchez exhibited deliberate indifference towards Green's  ongoing risk of sexual assault, because (i) Green's contentions are sufficiently grounded in -- and not blatantly contradicted by -- the record, and (ii) Green presents sufficient credible evidence to permit a reasonable jury to conclude that Sanchez subjectively was aware of -- but did nothing to alleviate -- Green's substantial risk of serious harm, such that his inaction was a contributing factor in Green's subsequent assault.  First, the record does not contradict blatantly Green's testimony in the Green Decl.  Scott v. Harris stands for the proposition that a non-movant's proffered "dispute" of material fact must be genuine for the non-movant to wield such dispute as a shield against summary judgment.  Scott v. Harris, 550 U.S. at 381.  In other words, while a court should accept genuine disputes, a court should not accept sham disputes, wherein a non-movant's "version of events is so utterly discredited by the record" that it amounts to "visible fiction."  Scott v. Harris, 550 U.S. at 381.  Sanchez argues, in essence, that Green merely has created a sham dispute, because the record blatantly contradicts

Green's testimony.  See Reply at 12.  Sanchez, however, misapplies the rule under Scott v. Harris.  Instead of revealing blatant contradictions, Sanchez points only to paradoxes -- statements that seem absurd or contradictory but may nonetheless be true.  It is entirely possible, for example, that, on one occasion, Green reported Padilla to Sanchez, and, on another, expressed to NM State Police officers that she did not want to report Padilla; that Sanchez responded "okay" to Green's revelation of Padilla's abuse, while taking vigorous action to respond to Martinez' allegations; or that Green submitted a grievance to Springer Correctional, though Springer Correctional shows no record of it.  These are not sham disputes.  Unlike in Scott v. Harris, where video evidence of a high-speed chase clearly refuted the non-movant's testimonial evidence that he was driving safely, Scott v. Harris, 550 U.S. at 379-81, Sanchez only reveals oddities in the record -- not blatant contradictions -- that do not allow the Court to discredit Green's testimony in favor of Sanchez' argument that no genuine dispute of material fact exists.

Second, Green alleges sufficient credible evidence to permit a reasonable jury to conclude that Sanchez exhibited deliberate indifference, because she successfully demonstrates that Sanchez subjectively was aware that Green faced a substantial risk of harm, and that he deliberately disregarded that harm such that his inaction is a contributing factor in Green's subsequent assault.  See, e.g., Poore v. Glanz, 724 F. App'x at 641-43.  Green must allege facts to show that (i) Sanchez was aware of facts from which he could infer that Green faced a substantial risk of serious harm; (ii) Sanchez actually drew that inference; and (iii) Sanchez was aware of and failed to take reasonable steps to alleviate the risk.  See Perry v. Durborow, 892 F.3d at 1122; Keith II, 843 F.3d at 848.  Green satisfies this test.  Green introduced conflicting evidence that she informed Sanchez, on March 30, 2017, that Padilla had directed her to reveal

her breasts "in exchange for allowing her to take food out of the kitchen."  Response ¶¶ 22-23, at

10.  Green alleges that Sanchez subjectively acknowledged her statement, when he responded

"okay" and informed Green that the NM State Police would interview her "shortly."  Response

¶¶ 22-23, at 10.  Moreover, Sanchez admits that he was aware, at this time, that Martinez had

made similar allegations of sexual misconduct against Padilla, which Sanchez' staff had shared

with him in a serious incident report, a memorandum, and over a late-night telephone call before

Green's allegations came to light.  See MSJ ¶ 9, at 10; Sanchez Aff. ¶ 12, at 5.  Green introduced

conflicting evidence that, despite being notified of Padilla's sexual abuse of inmates, Sanchez

"failed to take any corrective, administrative, or disciplinary action against Padilla."  Response at

18.  Instead, Sanchez "promoted Padilla to maintenance supervisor."  Response at 18.  Finally,

Green introduced conflicting evidence that, in his new position, Padilla continued to harass and

assault Green in her cell. See Response at 18.   The Court concludes that, because there is

conflicting evidence that Sanchez was made aware of, and subjectively acknowledged, Green's

allegations of Padilla's misconduct, laid against the backdrop of Martinez' similar allegations

against Padilla, Sanchez subjectively drew the inference of constitutional harm to Green.  See

Poore v. Glanz, 724 F. App'x at 641-43.  Sanchez then took no action to prevent Padilla from

continuing to access Green, which subsequently resulted in Padilla assaulting Green in her cell.

See Response at 18.  Green presents sufficient evidence, therefore, to permit a reasonable jury to

conclude Sanchez deliberately was indifferent to her harm while incarcerated, in violation of the

Eighth Amendment.

       Sanchez argues, alternatively, that even if he subjectively was aware of Green's risk of

sexual assault, his response was reasonable under the circumstances.  See MSJ at 18.  Sanchez

makes this argument on the basis that he and his staff initiated "dual investigations" into

Martinez' allegations against Padilla, which includes making a serious incident report and PREA notification, contacting the NM State Police, and referring the case to the NMCD Office of Professional Standards to investigate.  Reply at 4.  <u>See</u> Reply at 2.  While these actions may constitute a reasonable response to Martinez' allegations, Sanchez seems to argue his response to Martinez' allegations also suffice as a reasonable response to Green's allegations, too.  <u>See</u> Reply at 4.  "Obviously, as a matter of law and common sense," Sanchez argues, his "immediate initiation of dual investigations into the allegations did not constitute 'inaction' on his part, such as to subject to him liability under the Eighth Amendment."  Reply at 4.  Green argues, to the contrary, that "Sanchez continued on the job as warden for nearly one month after learning of Padilla's alleged sexual misconduct. Yet, he failed to undertake steps to ensure that Padilla did not continue to have access to inmates or to take administrative action against Padilla until the investigation concluded." Response ¶ 4, at 5.  Viewing the evidence in the light most favorable to Green, the Court concludes that there is sufficient evidence for a jury to conclude that Sanchez did not respond reasonably under the circumstances, when he initiated only an investigation into Martinez' allegations, and not into Green's, and took no actions to alleviate the ongoing risk that Padilla posed to Green or to other female inmates, although Sanchez already was "on notice of the dangerous conditions" in the facility.  <u>Tafoya v. Salazar</u>, 516 F.3d at 917.

While Sanchez contends that any disciplinary action against Padilla was not warranted, because allegations alone provided no "just cause" for firing or demoting Padilla, Reply at 3, Sanchez does not argue that he considered any other reasonable alternatives, which are not beyond imagination.  Other officers could have been posted to work alongside Padilla as a layer of supervision, for example.  Alternatively, additional officers could have been posted near Green's cell, to ensure that Padilla did not seek out opportunities for assault.  Sanchez is not

liable for not considering every possible measure, but "[a] prison official may be liable for a substantial risk of serious harm to inmates in spite of efforts reasonably calculated to reduce the risk, if he intentionally refuses other reasonable alternatives and the dangerous conditions persist." Tafoya v. Salazar, 516 F.3d at 918.   The Court concludes that Sanchez' actions in response to Green's allegations were not reasonable under the circumstances, because Sanchez' actions -- whether characterized as inaction or a refusal to consider reasonable alternatives – did not alleviate the known risk of future harm that Green faced.   See Tafoya v. Salazar, 516 F.3d at 916.   Accordingly, Green has proffered sufficient facts for a reasonable jury to conclude that Sanchez deliberately was indifferent to her ongoing risk of sexual assault and of constitutional harm.

**B.      SANCHEZ IS NOT ENTITLED TO QUALIFIED IMMUNITY, BECAUSE THE TENTH CIRCUIT HAS HELD THAT IT IS CLEARLY ESTABLISHED THAT DELIBERATE INDIFFERENCE TO A PRISON GUARD'S SEXUAL ABUSE VIOLATES THE EIGHTH AMENDMENT AND IS PARTICULARLY EGREGIOUS.**

Having determined that Green presents sufficient evidence to permit a reasonable jury to conclude that Sanchez committed an Eighth Amendment violation through his own actions and through his deliberate indifference towards Green's risk of sexual assault, the Court determines next: (i) whether freedom from sexual assault or from deliberate indifference to sexual assault in prison is a clearly established constitutional right of which a reasonable person would have known; and (ii) whether prison guard's sexual or deliberate indifference to a prison guard's sexual abuse is particularly egregious such that a reasonable prison official would know their actions were unconstitutional.

Section 1983 creates a cause of action for a plaintiff to seek monetary damages from State officials who have violated his or her constitutional or statutory rights.   See 42 U.S.C. §

1983.  Qualified immunity can shield government officials from liability only when "their conduct does not violate clearly established statutory or constitutional right of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).   When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional rights; and (ii) the right was clearly established at the time of the alleged misconduct, such that "every reasonable officer would have understood" the action would violate the Constitution. Estate of Smart by Smart v. City of Wichita, 951 F.3d at 1178, or the defendant's actions were particularly egregious such that no reasonable officer would conclude that it was constitutional, see Taylor, 141 S. Ct. at 53.

Green contends that, to determine whether a right is clearly established, "[the Court] must consider whether the right was sufficiently clear that a reasonable government employee would understand that he or she violated a right."  Response at 14 (citing Casey v. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327).  Green asserts that "[i]t is undisputed that a prison official's sexual assault against an inmate constitutes an Eighth Amendment violation."  Response at 15 (citing Farmer v. Brennan, 511 U.S. at 838-39).  Furthermore, Green argues that "it is well established that '[t]he Eighth Amendment imposes a duty upon prison officials to 'take reasonable measures to guarantee safety of inmates.''"  Response at 16-17 (first quoting Nunez v. Goord, 172 F. Supp. 2d 417, 430 (S.D.N.Y. 2001)(Marrero, J.) and then quoting Farmer v. Brennan, 511 U.S. 825, 832)).  Additionally, she states that she has "the right to be secure in her bodily integrity and free from attack by prison [guards] and supervisors."  Response at 18 (citing Hovater v. Robinson, 1 F.3d at 1068).

- 115 -

Conversely, Sanchez argues that, for a right to be clearly established, the law must be "an on-point, factually analogous decision by the United States Supreme Court, Tenth Circuit or the New Mexico Supreme Court."  MSJ at 3 (citing Davis v. Scherer, 468 U.S. 183, 194-96 (1984); Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995); Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990)(stating that to defeat qualified immunity, a "plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.")).  Sanchez supports this assertion with recent unanimous, per curiam decisions from the Supreme Court, see Reply at 3 (citing White v. Pauly, 580 U.S. at 79;  Kisela v. Hughes, 138 S. Ct. at  1152; City of Escondido v. Emmons, 139 S. Ct. at 503), and a Tenth Circuit case, see Reply at 3 (citing Malone v. Bd. of County Comm'rs, 707 F. App'x 552, 556 (10th Cir. 2017)(unpublished decision)(reversing the district court's denial of qualified immunity, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here.").  In his MSJ, Sanchez does not dispute directly that the right which Green asserts is not clearly established, but rather bases his argument on his assertion that he did not exhibit deliberate indifference towards Green's risk of sexual assault, and therefore offered both reasonable protection and a reasonable response when sexual misconduct occurred.  See MSJ at 16-17; Reply at 8.[73]

---

[73]In Sanchez' MSJ, he addresses case law regarding when a law is "clearly established." MSJ at 3-4.  Sanchez adopts the Court's summary and discussion insofar as it relates to "the pertinent law of supervisory liability under the Eighth Amendment when applied to a subordinate's sexual abuse of a female prisoner, under 42 U.S.C. § 1983, and in the context of qualified immunity." MSJ at 14, (citing Green v. Padilla, 484 F. Supp. 3d at 1151-61).

Later in the MSJ, Sanchez references the Court's decision in Green v. Padilla, and acknowledges that the Court concluded he was not entitled to qualified immunity in the context

The Court concludes above that Green satisfies the first qualified immunity prong by demonstrating that Sanchez's actions and deliberate indifference towards Green's risk of sexual assault violated Green's constitutional rights.  See supra, at 85-107.  Accordingly, the Court's next step is to review Supreme Court and Tenth Circuit case law to determine whether these constitutional rights were clearly established at the time of the alleged violation.  See Mullenix v. Luna, 577 U.S. at 11; see also Harlow v. Fitzgerald, 457 U.S. at 818; Truman v. Orem City, 1 F.4th at 1235.  The Court concludes that: (i) the Tenth Circuit previously has held that it is clearly established that deliberate indifference to a prison guard's sexual abuse violates the Eighth Amendment, see Keith II, 843 F.3d 83; and (ii) a prison official's deliberate indifference to rape and sexual assault in prison is particularly egregious such that no reasonable officer would conclude that it was constitutional, see Taylor, 141 S. Ct. at 53.

1.     **Sanchez Is Not Entitled to Qualified Immunity, Because the Tenth Circuit Has Held That It Is Clearly Established that Deliberate Indifference to Sexual Assault by Prison Guards Violates the Eighth Amendment.**

Sanchez asserts that, to show a right is clearly established, there must be a factually analogous case from the Supreme Court or the Tenth Circuit.  See MSJ at 3 (citing Davis v. Scherer, 468 U.S. at 194; Albright v. Rodriguez, 51 F.3d at 1535; Hannula v. City of Lakewood, 907 F.2d at 131).  Despite stating this position, Sanchez does not address whether Green's claimed rights are clearly established rights.  Green argues that, under the Eighth Amendment,

---

of a rule 12(b)(6) motion to dismiss because his deliberate indifference to the sexual abuse violated clearly established law.  MSJ at 5, n.1.  Green and Sanchez reserved the right to move for summary judgment.  MSJ at 5 n.1.  Asserting a qualified immunity defense through a rule 12(b)(6) motion "subjects the defendant to a more challenging standard of review than would apply on summary judgment."  Truman v. Orem City, 1 F.4th at 1235 (quoting U, 371 F.3d 1199, 1201 (10th Cir. 2004)).

she has a right to humane conditions of confinement, including "reasonable safety from serious bodily harm."  Response at 14 (quoting Tafoya v. Salazar, 516 F.3d at 916)(citing Farmer v. Brennan, 511 U.S. at 832).  She argues that "[i]t is undisputed that a prison official's sexual assault against an inmate constitutes an Eighth Amendment violation."  Response at 15 (citing Farmer v. Brennan, 511 U.S. at 838-39), and cites both to Tafoya v. Salazar, 516 F. 3d 912, and Keith II, 843 F.3d at 833, see Response at 14-15, 17.  To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct.  See Mullenix v. Luna, 577 U.S. at 11; Harlow v. Fitzgerald, 457 U.S. at 818.  The Tenth Circuit further clarifies that, when determining whether a right is clearly established, the Court should "see if existing precedent placed the statutory or constitutional question beyond debate."  Routt v. Howry, 835 F. App'x at 381.

The Tenth Circuit has "long held that nonconsensual, coerced sex between a jailer and an inmate is unconstitutional."  Brown v. Flowers, 974 F.3d 1174,1187 (10th Cir. 2020).  For this Memorandum Opinion's purposes, however, the Court addresses only Green's claims against Sanchez -- i.e., deliberate indifference to sexual assault by prison guards in violation of Green's Eighth Amendment rights -- and therefore examines whether there was a clearly established right that Sanchez' deliberate indifference violated.[74]  The Tenth Circuit has held that the Eighth Amendment encompasses a prison inmate's right to expect reasonable protection from prison officials and a reasonable response when sexual misconduct occurs.  See, Keith II, 843 F.3d at 849; Poore v. Glanz, 724 F. App'x at 642-43 ("We have held corrections supervisors liable for

---

[74]In addition to Sanchez, Green has filed claims against other defendants including several correctional officers at the facility and the prison wardens that succeeded Sanchez after he left in April.

failing to protect inmates from sexual abuse from staff on several occasions.").   It is not enough, however, to pull a right from case law and apply it to the facts at hand; the Supreme Court requires that courts connect the clearly-established-law analysis to  the case's "particularized" facts.  Anderson v. Creighton, 483 U.S. at 640.

Keith II, a 2016 Tenth Circuit case, is factually analogous to Green's case.  The plaintiff in Keith II presented a wide breadth of evidence that showcased staffs' inappropriate behavior -- specifically sexual misconduct or sexual abuse -- towards inmates, systemic problems within programs, and general misconduct throughout the facility.  See 843 F.3d at 850.  The plaintiff alleged that the warden was aware of previous allegations of sexual misconduct which another inmate filed, but that the warden ignored this initial grievance.  See Keith II, 843 F.3d at 841.   The warden in Keith II provided minimal supervision over the instructors and inmates.  See 843 F.3d at 841.  In addition, although the prison had policies and procedures to protect inmates from sexual misconduct, when faced with sexual assault allegations, the warden did not implement them appropriately.  Keith II, 843 F.3d at 833.  The Tenth Circuit concluded that the warden was aware of previous incidents of sexual misconduct and failed to address the risk of sexual assault posed to the inmates and, accordingly, that the plaintiff "has demonstrated a genuine issue of material fact about whether Warden Koerner acted with deliberate indifference to the risk of sexual misconduct by his employees."  Keith II, 843 F.3d at 849 (concluding that, based on evidence which the plaintiff provided at the summary judgment stage, a reasonable jury could infer that the warden previously was aware of the substantial risk of sexual assault at employees' hands but did not do anything to mitigate it.).  The Tenth Circuit held that there was sufficient evidence to establish a reasonable jury could infer an Eighth Amendment violation occurred.  See Keith II, 843 F.3d at 849.  Turning to qualified immunity's

clearly established prong, the Tenth Circuit concluded that, "at the time of the constitutional violation in October 2007, it was clearly established that Ms. Keith not only had a right to be free from attack by Mr. Gallardo, she also had a constitutional right to expect reasonable protection from TCF officials such as Warden Koerner and a reasonable response when sexual misconduct occurred." <u>Keith II</u>, 843 F.3d at 850.

Comparing the facts and inferences drawn in <u>Keith II</u> to the evidence in Green's case yields similarities. While warden at Springer Correctional, Sanchez operated the facility short-staffed, which diminished supervision over Padilla's conduct, allowing Padilla's easy access to Green. <u>See</u> Factual Background, <u>supra</u> at 5 (citing Sanchez Depo. I at 44:14-22). On March 29, 2017, Martinez spoke with Brashear about Padilla's sexual advances that occurred in February and March, 2017. <u>See</u> Factual Background, <u>supra</u> at 10-12 (citing Sanchez Aff. ¶ 11, at 4-5). That same night, Brashear reported these allegations to several people, including Sanchez. <u>See</u> Factual Background, <u>supra</u> at 10-11 (citing Sanchez Aff. ¶ 12, at 5). After Sanchez became aware that, in addition to Martinez, Padilla may have also assaulted Green, Sanchez spoke with Green, and she revealed further sexual abuse allegations. <u>See</u> Factual Background, <u>supra</u> at 13-14 (citing Green Decl. ¶¶ 17-18, at 2-3). Despite this knowledge, Sanchez did not initiate disciplinary action against Padilla after learning of these allegations, <u>see</u> Factual Background, <u>supra</u> at 16 (citing Sanchez Depo. I at 106:22-25), and instead promoted Padilla to a managerial position, <u>see</u> Factual Background, <u>supra</u> at 16 (citing Green Decl. ¶ 25, at 3). Sanchez did not follow NMCD Policy II, which requires administrators to separate a sexual abuse victim from the assailant after reported sexual abuse. <u>See</u> Factual Background, <u>supra</u> at 16 (citing Sanchez Depo. I at 106:22-25). As "warden[,] [Sanchez] had control over the management of the facility

during his [] tenure, including . . . decisions to hire and fire correctional officers."  Complaint ¶ 22, at 4.

The Court concludes that the Tenth Circuit has placed the question of a prison official's deliberate indifference to a prison guard's sexual assault beyond debate and therefore concludes that the right to reasonable protection from sexual assault in prison and the right to a reasonable response to sexual assault in prison is clearly established.  See Keith II, 843 F.3d at 850.  In 2017, when Sanchez learned of the allegations against Padilla, it was clearly established since 1984 that prison officials needed to make a reasonable effort to guarantee inmates' safety.  See Keith II, 843 F.3d at 850; Farmer v. Brennan, 511 U.S. at 832 (stating that the Eighth Amendment imposes a duty upon prison officials to, within reason, take measures to ensure inmate safety); Hudson v. Palmer, 458 U.S. 517, 536 (1984)("[Prison officials] are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves.").  In 2016, the Tenth Circuit clarified that these reasonable measures include "'serious investigation and response' when a prison official becomes aware of a risk to inmates, including sexual misconduct by prison employees."  Keith II, 843 F.3d at 850 (citing Tafoya v. Salazar, 516 F.3d at 920).  In the wake of Martinez and Green's allegations, Sanchez did not take reasonable measures to alleviate the risk to inmates, because (i) he did not initiate disciplinary action against Padilla, see Factual Background, supra at 16 (citing Sanchez Depo. I at 106:22-25); (ii) did not separate Padilla from Green, see Factual Background, supra at 16 (citing Sanchez Depo. I at 106:22-25); and (iii) promoted Padilla instead to a managerial position that granted him more access to inmates, including Green, see Factual Background, supra at 16 (citing Green Decl. ¶ 25, at 3); Factual Background, supra at 19 (citing Sanchez Depo. I at 153:11-18; Green Decl. ¶ 27, at 4).  Through existing case claw, the Tenth Circuit clearly has established that an inmate's

Eighth Amendment right to reasonable safety from bodily harm includes a prison official's duty to protect inmates from correctional officer's abuse.  See <u>Keith II</u>, 843 F.3d at 850.  The Court concludes, therefore, that, at the time of Sanchez' and Padilla's misconduct, it was clearly established in the Tenth Circuit that prison inmates have "a constitutional right to expect reasonable protection from [prison officials] and a reasonable response when sexual misconduct occur[s]." <u>Keith</u> II, 843 F.3d at 850.  Because Green has established that Sanchez violated her clearly established constitutional rights, Sanchez is not entitled to qualified immunity.  See <u>Keith II</u> 843 F.3d at 850; <u>Ortiz v. New Mexico</u>, 550 F. Supp. 3d at 1174.

**2. <u>Sanchez is not Entitled to Qualified Immunity Because Deliberate Indifference to Prison Assault Is Particularly Egregious Such That no Reasonable Officer Would Believe He or She Was Acting Lawfully</u>.**

Even if there is no Tenth Circuit or Supreme Court caselaw that is on-point enough to clearly establish that Sanchez' actions constitute a constitutional violation, Sanchez still would not be entitled to qualified immunity, because his actions were particularly egregious such that no reasonable prison official would believe he was acting lawfully.  Recently, the Tenth Circuit clarified that courts may implement the objective "particularly egregious" standard when faced with the question whether law is clearly established.  <u>Truman v. Orem City</u>, 1 .F.4th at 1240 (holding that, even without particularized factual precedent, it was obviously egregious for a prosecutor to provide a medical examiner with influential false evidence and then put the medical examiner on the stand to testify).  Even if there is no factually analogous case available to the Plaintiffs to show that a constitutional right is clearly established, they may show that the case's facts are "particularly egregious" such that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, [that their actions were] constitutionally permissible." <u>Truman v. Orem City</u>, 1 F.4th at 1240 (quoting <u>Taylor</u>, 141 S. Ct.

at 208).  Conduct rises to the level of "particularly egregious" when the actor's conduct "obviously offends" a "general constitutional rule already identified in decisional law." Rosales v Bradshaw, No. 20-0751, 2021 WL 5356668 at *56 (D.N.M. November 17, 2021)(Browning, J.)(quoting Hope v. Pelzer, 536 U.S. at 741).  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175.

There is a significant body of well-developed case law concerning what a prisoner's rights are under the Eighth Amendment, and one such well-established area is that of an inmate's right "to be secure in [his or her] bodily integrity and free from attack by prison guards." Barney v. Pulsipher, 143 F.3d at 1310 (quoting Hovater v. Robinson, 1 F.3d at 1068).  Sexual abuse at the hands of correctional officers "has no penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society." Graham v. Sherriff of Logan Cnty., 741 F.3d 1118, 1122-23 (10th Cir. 2013)(quoting Giron v. Corr. Corp. of America, 191 F.3d 1281, 1290 (10th Cir. 1999)(internal citation and quotations omitted in Graham v. Sherriff of Logan Cnty.).  In cases where courts have applied the "particularly egregious" standard and concluded that the plaintiff's right therefore clearly was established, the case's specific facts showed obvious unlawful conduct, obvious constitutional violations, or extreme circumstances. Taylor, 141 S. Ct. at 53-54 (concluding that confining an inmate in "deplorably unsanitary conditions" for an extended period of time was particularly egregious conduct, because any reasonable officer would have realized the confinement conditions offended the Eighth Amendment); Curry v. Gonzales, No. 20-0116, 2022 WL 2290598 at *8 (D.N.M. June 24, 2022)(Brack, J.)(concluding that the combination of the Chief of Security's failure to investigate allegations of sexual misconduct and his subsequent directions to an inmate to write a statement denying the misconduct deprived the inmate of her "rights to be secure in her bodily integrity and free from assault" and, further, that the Chief of Security's "conduct [was] so

reprehensible as to be obviously violative of [the plaintiff]'s constitutional rights" and therefore that he was not entitled to qualified immunity); Ortiz v. New Mexico, 550 F. Supp. 3d at 1175 (concluding that two correctional officers' conduct was particularly egregious when, despite knowing another correctional officer was sexually assaulting an inmate, they waited nine days to intercept the officer, and that their conduct was such that "any reasonable officer would believe they were offending the Constitution" (citing Taylor, 141 S. Ct. at 54)); McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021)(vacating and remanding in light of Taylor)(concluding that, in light of Taylor, the Fifth Circuit's conclusion that a correctional officer was entitled to qualified immunity despite spraying one inmate in the face with pepper spray, because the officer was mad at another inmate, required reexamination).

The question that the Court must answer is whether Sanchez' conduct is "particularly egregious" such that, under the circumstances, no reasonable prison official could have concluded his actions were constitutional. Truman v. Orem City, 1 F.4th at 1240. The Court already has addressed a similar question in Ortiz v. New Mexico, 550 F. Supp. 3d at 1175, and has concluded that deliberate indifference to sexual assault in prison is particularly egregious. See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175 (reasoning that allowing nine days to pass between the correctional officer's discovery of sexual assault and taking actions to stop the sexual assault was particularly egregious behavior, because a reasonable correction officer should have understood that knowingly allowing sexual assault to continue "despite being aware that it was prohibited by State law and prison policy . . . 'offends the Constitution'" (quoting Truman v. Orem City, 1 F.4th at 1240)). Simple inaction in the face of knowledge, however, does not rise to the level of particularly egregious; for a prison official's deliberate indifference to constitute the particularly egregious conduct, the Court must examine whether, cumulatively,

the official's actions "obviously offend[]" a "'general constitutional rule already identified in decisional law." Rosales v Bradshaw, 2021 WL 5356668 at *56 (quoting Hope v. Pelzer, 536 U.S. at 741). See Ortiz v. New Mexico, 550 F. Supp. 3d at 1046, 1175 (stating that not only were two correctional officers aware that another officer was sexually assaulting an inmate, but also that the two officers used the inmate as bait in hopes of catching the officer trafficking contraband into the prison and waited nine days to intercept the officer); Curry v. Gonzales, 2022 WL 2290598 at *8 (concluding that the Chief of Security's failure to investigate despite two separate sources of information warning him that a prison employee was sexually abusing an inmate and his manipulation of the inmate into signing a statement that denied these allegations was obviously violative of the inmate's constitutional rights).

Here, Sanchez' conduct obviously offends the well-developed body of case law that protects an inmate's right to "be secure in [their] bodily integrity and free from attack by prison guards." Barney v. Pulsipher, 143 F.3d at 1310 (quoting Hovater v. Robinson, 1 F.3d at 1068). Congress passed PREA to curb prison rape, to protect prisoners' Eighth Amendment right to both be free from sexual assault in prison and to be free from "deliberate indifference to the substantial risk of sexual assault in prison" as well as to "increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape." U.S.C. §§ 30301, 30302. Examining the facts, the Court concludes that the combination of Sanchez' conduct, including his awareness of two allegations of sexual assault, his decision to not separate Padilla from vulnerable inmates, and, most egregiously, his subsequent decision to promote Padilla to a position that provided him more access to inmates, including one of the women Padilla allegedly assaulted, offends established Eighth Amendment rights such that Sanchez' behavior is particularly egregious.

Furthermore, Sanchez was aware of two separate allegations of Padilla sexually assaulting inmates: (i), first on March 29, 2017, when he received a nighttime telephone call after Martinez' allegations first surfaced, and later through a "serious incident report" and the PREA coordinator's memorandum, see Factual Background, supra at 11-12 (citing Sanchez Aff. ¶ 12), at 5; and (ii) second on March 30, 2017, when Green was escorted into Sanchez' office and told Sanchez about Padilla's sexual misconduct, see Factual Background, supra at 14 (citing Green Decl. ¶¶ 16-18, at 2).  After learning that Padilla had two separate sexual assault allegations, however, a reasonable prison official should have known that any instance of sexual abuse perpetrated by a correctional officer was an obvious constitutional violation because rape "has no penological purpose," Graham v. Sherriff of Logan Cnty., 741 F.3d at 1122-23 (quoting Giron v. Corr. Corp. of America, 191 F.3d at 1290) and should have taken actions to stop the abuse from continuing.  To prevent further Eighth Amendment violations through sexual abuse, Sanchez had clear guidelines instructing him to separate Padilla from Green and Martinez.  See Factual Background, supra at 8 (citing NMCD Policy II).  Before he departed Springer Correctional on April 17, 2017, eighteen days passed during which Sanchez should have implemented NMCD Policy II, starting when Martinez first alleged Padilla's sexual abuse on March 29, 2017.  See Factual Background, supra at 10 (citing Sanchez Aff. ¶ 11, at 4-5); id. at 16 (citing Sanchez Aff. ¶ 1, at 6-7).  The Court previously held in Ortiz v. New Mexico that, where correctional officers waited nine days to separate a prison guard from the inmate he was sexually assaulting, their behavior constitutes particularly egregious conduct.  See 550 F. Supp. 3d at 1175.  From the time Green reported Padilla's sexual assault to Sanchez until Sanchez left Springer Correctional eighteen days later, double the time that had elapsed in Ortiz v. New Mexico, Sanchez did not separate Padilla from Green.  See Factual Background, supra at 10 (citing Sanchez Aff. ¶ 11, at

4-5); id. at 16 (citing Sanchez Aff. ¶ 1, at 6-7).  In fact, unlike the officers in Ortiz v. New Mexico, Sanchez never took any steps to separate Padilla and Green before leaving Springer Correctional.  See Factual Background, supra at 16 (citing Sanchez Depo. I at 106:22-25; Green Decl. ¶ 25, at 3).

What further tips Sanchez' behavior into the "particularly egregious" realm is his decision to promote Padilla in lieu of disciplining him.  Factual Background, supra at 16 (citing Green Decl. ¶ 25, at 3).  In his new position, Padilla had access to every part of the facility and to vulnerable inmates, including Green.  See Factual background, supra  at 19 (citing Sanchez Depo. I at 153:11-18; Padilla Depo. I at 11:18-23; id. at 12:10-12).  Rather than disciplining Padilla, which at a minimum required separating him from Green, Sanchez instead promoted Padilla to a position that allowed him to continue to sexually assault Green for six more months. See Factual Background, supra at 20 (quoting Green Dec. ¶ 27, at 4; id. at ¶ 28, at 4).     A reasonable prison official should have known that: (i) knowingly allowing sexual assault to happen; and (ii) enabling further sexual assault by promoting a correctional officer with two allegations of sexual assault against him "offends the Constitution."  Truman v. Orem City, 1 F.4th at 1240.  Instead, despite being aware of federal laws and prison policies that protect inmates' Eighth Amendment rights by prohibiting prison rape, and by holding both perpetrators and prison officials who fail to "detect, prevent, reduce, and punish prison rape" accountable, U.S.C.A. § 30302; see NMCD Policy I, at 4-9; NMCD Policy II, at 1, Sanchez took no action to separate Padilla and Green and enabled further sexual assault by promoting Padilla into a position that allowed him greater and easier access to vulnerable inmates.  Sanchez' actions "obviously offend" the Eighth Amendment.  See Rosales v. Bradshaw, 2021 WL 5356668 at *56 (citing Hope v. Pelzer, 536 U.S. at 741).

In light of the cumulative effect of: (i) Sanchez' knowledge of Martinez' and Green's allegations of sexual assault against Padilla; (ii) Sanchez' decision not to discipline Padilla in the face of these complaints, despite prison policy requiring intervention; and (iii) Sanchez' decision to promote Padilla to a position that allowed him continued access to vulnerable female prisoners, coupled with sexual assault in prison's long established repugnant and serious nature, Sanchez' conduct represents particularly egregious behavior.  The Court concludes, therefore, that Sanchez' deliberate indifference was particularly egregious such that any reasonable prison official should have known that they were offending the Constitution.  See Taylor, 141 S. Ct at 54.  Accordingly, Sanchez is not entitled to qualified immunity.

**II.  THE COURT WILL DENY SANCHEZ' MOTION FOR SUMMARY JUDGMENT, BECAUSE THERE ARE GENUINE DISPUTES OF MATERIAL FACT WHETHER HE VIOLATED GREEN'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS, AND, THEREFORE, HE IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Having concluded that Sanchez is not entitled to qualified immunity based on Green's sufficient factual record that would permit a reasonable jury to conclude that Sanchez violated her clearly established Eighth Amendment rights, the Court now addresses whether it should grant Sanchez' MSJ.  Rule 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of proof and must either

> put evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25.

Plustwick v. Voss of Nor. ASA, No. 11-075, 2013 WL 1945082, at *1 (D. Utah May 9, 2013), aff'd, 559 F. App'x 785 (10th Cir. 2014).  "The central inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Plustwick v. Voss of Nor. ASA, 2013 WL 1945082 at *1 (quoting Cardoso v. Calbone, 490 F.3d at 1197).  The Court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. at 158-59)).

Sanchez argues that he is entitled to summary judgment, because there is no genuine issue of material fact related to Green's claim that Sanchez violated her Eighth Amendment rights.  See MSJ at 1.  Specifically, Sanchez argues that the Court should grant summary judgment on Green's Eighth Amendment claim in his favor, because the undisputed evidence shows that (i) Sanchez was unaware of any risk of sexual assault Padilla posed to Green before March 29, 2017; (ii) any allegations of sexual assault are unproven, because there is no corroborative videotape evidence; (iii) Sanchez never was aware of Green's allegations of Padilla's sexual assault; and (iv) Sanchez enforced Springer Correctional's written policy prohibiting sexual abuse.  See MSJ at 16-18.  In Green's Response, she argues that, based on Sanchez Aff., Green Decl., NMCD Policies I and II, the Padilla Depo., and NM State Police Incident Report, there are genuine issues of material fact regarding Sanchez' personal knowledge about: (i) Green's risk of sexual assault in prison; (ii) Sanchez' inaction after Martinez and Green revealed Padilla's sexual misconduct; and (iii) the circumstances surrounding Padilla's promotion.  See Response at 22.  In Sanchez' Reply, he counters Green's assertion that there are

- 129 -

genuine issues of material facts by clarifying that the issue at hand is whether the record creates a

"'genuine dispute' about Defendant Sanchez's 'subjective awareness of prior incidents of sexual

abuse, and [. . .] his resulting inaction [that] caused subsequent abuse.'"  Reply at 1 (citing Green

v. Padilla, 484 F. Supp. 3d at 1159 (alterations in Reply, but not in Green v. Padilla).  Sanchez

reiterates his assertions that, before March 29, 2017, he was unaware of any allegations of sexual

abuse by Padilla, see Reply at 2, and that it is undisputed that there was no inaction after

Martinez' allegations, because Sanchez initiated an investigation, and because further discipline

was inappropriate given the allegation's unproven nature.  See Reply at 2-3.  Sanchez also

asserts that Green "did not allege that she had reported her allegations directly to Warden

Sanchez."  Reply at 8 (emphasis in original).  Finally, Sanchez requests that the Court not credit

Green's allegations, because both pleadings and objective, contemporaneous records contradict

them.  See Reply at 11 (citing Thomas v. Durastanti, 607 F.3d at 659; Thomson v. Salt Lake

Cnty., 584 F.3d at 1312; Farrell v. Montoya, 878 F.3d 933, 938 (10th Cir. 2017); Connor v.

Rodriguez, 891 F. Supp. 2d 1228, 1230 (D.N.M. 2011)(Johnson, J.)).

The Court, having determined that Sanchez is not entitled to qualified immunity in this

matter, considers Sanchez' MSJ as it relates to Green's claim that Sanchez violated her Eighth

Amendment rights.  The Court concludes that Green's presented evidence regarding Sanchez'

subjective awareness of a heightened risk of sexual assault and his decisions following Green

and Martinez' allegations present a sufficient disagreement as to require submission to a jury.

## A.    THERE IS A FACTUAL DISPUTE WHETHER SANCHEZ HAD SUBJECTIVE AWARENESS OF THE SUBSTANTIAL RISK OF SEXUAL ASSAULT IN SPRINGER CORRECTIONAL.

An official violates the Eighth Amendment when two elements are met: (i) the official

causes an injury that, objectively, is "sufficiently serious," and (ii) the official has a "sufficiently

culpable state of mind." <u>Farmer v. Brennan</u>, 511 U.S. at 834 (quoting <u>Wilson v. Seiter</u>, 501 U.S. at 297). The Court first will address if summary judgment is appropriate regarding whether Sanchez subjectively was aware that there was a high risk of sexual assault at Springer Correctional generally. The Court will next address if summary judgement is appropriate given Sanchez' actual knowledge of sexual assault at Springer Correctional and Green and Martinez' allegations against Padilla. The Court concludes that there is a factual dispute whether Sanchez had subjective awareness of the substantial risk of sexual assault in Springer Correctional, because of the policies he implemented, and because of Martinez and Green's sexual assault allegations.

### 1.   There Is a Genuine Dispute of Material Fact Whether Sanchez Had Subjective Awareness of the Substantial Risk of Sexual Assault at Springer Correctional In General.

Green presents the following evidence to support her assertion that Sanchez had subjective awareness that there was a high risk of sexual assault at Springer Correctional. Sanchez was the highest level of authority in Springer Correctional. <u>See</u> Factual Background, <u>supra</u> at 4 (quoting MSJ ¶ 2, at 7). As warden, Sanchez "operated the facility with a 50% staff vacancy rate." Factual Background, <u>supra</u> at 5 (quoting Sanchez Depo. I at 44:14-22). In addition to this high vacancy rate, the majority of the correctional officers whom Sanchez employed were male which meant that, for long periods of time, only male correctional officers supervised female inmates at Springer Correctional. <u>See</u> Factual Background, <u>supra</u> at 5-6 (quoting Padilla Depo. I at 48:10-49:3; <u>id.</u> at 68:21-69:20). Green asserts that the high ratio of male to female correctional officers and the "large proportion of days [where] no female officers [were] at all on the premises" lead to the inmates being "far more likely to be subjected to sexual abuse." Factual Background, <u>supra</u> at 5-6 (quoting Padilla Depo. I at 48:10-49:3; <u>id.</u> at 68:21-

- 131 -

69:20).  When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tolan v. Cotton, 572 U.S. at 651 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255).  See Hunt v. Cromartie, 526 U.S. at 550-55.  Here, the Court draws a reasonable and justifiable inference in Green's favor that female inmates are at higher risk of sexual assault when they are overwhelmingly subjected to male correctional officers.[75]

_____

[75] In the Factual Background, the Court examines Padilla's assertion that female inmates at Springer Correctional were "far more likely to be subjected to sexual abuse," because of the high number of male correctional officers, and because of the number of days when no female correctional officers were present on the campus.  Factual Background, supra at 6.  Viewing the evidence in the light most favorable to Green, the Court takes into account Padilla and Sanchez' testimony conceding that there were frequent occasions when there were no female officers on duty, see Factual Background, supra at 6 n.9 (quoting Padilla Depo. I at 49:2-3; Reply ¶ 4, at 16); that female officers were in charge of conducting inmate searches through a pat-down method, see Factual Background, supra at 6 n.9 (quoting Padilla Depo. I at 48:11-19); that when there were no female officers on the premises, in lieu of pat downs, female inmates would remove their "jackets and aprons" so that the male officers could search the articles of clothing, Factual Background, supra at 6 n.9 (quoting Padilla Depo. I at 48:11-19); and that the male officers who frequently conducted these searches had insufficient training, see Factual Background, supra at 6 n.9 (quoting Padilla Depo I. at 67:1-5).

In drawing a reasonable inference in Green's favor that these conditions led to female inmates being at a higher risk of sexual abuse, the Court first acknowledges that there is precedent establishing that prisons cannot use gender-based discrimination when assigning male correctional officers to work at female prison facilities, but these cases distinguish that it may be appropriate for prisons to assign a certain number of female correctional officers to female housing units or to ban male officers from certain tasks like body searches.  See Westchester Cnty. Corr. v. County Of Westchester, 346 F. Supp. 2d 527, 536 (S.D.N.Y. 2004)(Robinson, J.)(emphasizing that gender is not a "bona fide occupational qualification" that justifies policies banning male correctional officers from supervising female inmates, because hypothetical conjecture about "safety risks [of the sexual abuse nature] posed by a small percentage of male correctional officers").  Following the line of reasoning started in Westchester County Corrections v. County of Westchester, and applying the record at hand, the Court concludes that, in Green's case, the absence of female correctional officers led to scenarios where female inmates were required to remove articles of clothing in front of male correctional officers, and draws the reasonable inference that there was an increased risk of sexual assault against female inmates at Springer Correctional.  The Human Rights Watch, an international non-governmental organization that was founded in 1978, and that conducts research and publishes reports on

human rights abuses, published a report in December, 1996, that details comprehensively women's sexual abuse in United States prisons.  See Human Rights Watch, All Too Familiar: Sexual Abuse of Women in U.S. State Prisons (1996), https://www.hrw.org/reports/1996/Us1.htm.   The report finds that, in state prison facilities, women are "more often than not [] guarded by men."  Human Rights Watch, All Too Familiar: Sexual Abuse of Women in U.S. State Prisons.  The report also states that "male officers have used mandatory pat-frisks . . . to grope women's breasts, buttocks, and vaginal areas and to view them inappropriately while in a state of undress in the housing or bathroom areas."  Human Rights Watch, All Too Familiar: Sexual Abuse of Women in U.S. State Prisons.  In drawing a reasonable inference in Green's favor and distinguishing Green's case from Westchester Cnty. Corr. v. County Of Westchester's contention that increased male correctional officer's presence in prison leads only to a hypothetical risk of sexual assault, the Court relies on the report's findings

> One of the clear contributing factors to sexual misconduct in U.S. prisons for women is that the United States, despite authoritative international rules to the contrary, allows male correctional employees to hold contact positions over prisoners, that is, positions in which they serve in constant physical proximity to the prisoners of the opposite sex . . . .  As a result [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2], most restrictions on male officers working in women's prisons [] have been removed and, by some estimates, male officers working in women's prisons now outnumber their female counterparts by two and in some facilities, three to one.

Human Rights Watch, All Too Familiar: Sexual Abuse of Women in U.S. State Prisons.  Since the Human Rights Watch published this report, several authors have published articles affirming the Human Rights Watch's findings that a high ratio of male correctional officers to female correctional officers can lead to increased risks of sexual assault in prisons.  See Richard W. Dumond, The Impact of Prisoner Sexual Violence: Challenges of Implementing Public Law 108-79--The Prison Rape Elimination Act of 2003, 32 J. Legis. 142, 157-158 (2006)(stating that "it is increasingly apparent that women in confinement face a substantial risk of sexual assault, most often by a small number of ruthless male correctional staff," and that there were such significant concerns about this "substantial risk of sexual assault" that the National Institute of Corrections worked to develop a training curriculum to investigate allegations of staff sexual misconduct); Elana M. Stern, Comment, Accessing Accountability: Exploring Criminal Prosecution of Male Guards for Sexually Assaulting Female Inmates in U.S. Prisons, 167 U. Pa. L. Rev. 733, 739-40 (2019)(asserting that women in prisons faced a substantial risk of sexual assault in prison at the hands of male correctional officers and that the presence of male guards in women's correctional facilities "engender[s] a uniquely predatory environment," because of the unique control dynamic between correctional officers and inmates).  Construed in a light most favorable to Green, the Human Rights Watch report issues mirror several of the conditions of Green's incarceration at Springer Correctional and thus the Court draws a reasonable inference that there was an increased risk of sexual assault against female inmates at Springer Correctional.

- 133 -

The Eighth Amendment violation test's subjective prong requires "deliberate indifference to inmate health and safety," Farmer v. Brennan, 511 U.S. at 834, and does not require particularized knowledge, Tafoya v. Salazar, 516 F.3d at 916.  To establish this prong, a plaintiff must show that the prison official knew of and disregarded a large risk to inmate safety.  See Farmer v. Brennan, 511 U.S. at 837; Keith II, 843 F.3d at 837; Mata v. Saiz, 427 F.3d at 751. The Tenth Circuit has concluded that, under the Eighth Amendment deliberate indifference standard, knowledge "need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur." Tafoya v. Salazar, 516 F.3d at 916.  See Keith II, 843 F.3d at 841 (concluding that prior sexual assault misconduct and "opportunities for employees to be outside of other people's eyesight, outside of cameras," put the prison's warden on notice that there was a high risk of sexual assault); Green v. Padilla, 484 F. Supp. 3d at 1156 (concluding that, if a supervisory official is aware of "an unacceptable risk of assault," but does nothing to protect inmates, they are liable for subsequent sexual assaults). "A supervisor's knowledge of prior instances of sexual misconduct from prison staff, along with 'structural policy problems' like insufficient surveillance systems, understaffing, and undertraining, give rise to a supervisor's liability under § 1983." Green v. Padilla, 484 F. Supp. 3d at 1160 (first citing Keith v. Koerner, 707 F.3d at 1189, and then citing Poore v. Glanz, 724 F. App'x at 642-43 (gathering cases)).

Green provides evidence that Sanchez' policies at Springer Correctional created circumstances such that he should have drawn an inference that there was a substantial risk of

sexual assault at Springer Correctional.[76]   In <u>Keith II</u>, the Tenth Circuit determined that the warden was aware of facts -- prior complaints of sexual misconduct and lax supervision -- from which he could have drawn an inference that a substantial risk of sexual assault existed, but he took no steps to alleviate that risk.  <u>See</u> <u>Keith II</u>, 843 F.3d at 849.  Ultimately, the Tenth Circuit decided that the warden met the subjective awareness component and that he was deliberately indifferent.  <u>See</u> <u>Keith II</u>, 843 F.3d at 849.  Thus, the Court concludes that Green has shown an issue of fact regarding Sanchez' subjective awareness of an increased risk of sexual assault at Springer Correctional.[77]

---

[76]Green's proffered facts show that, by understaffing Springer Correctional, <u>see</u> Factual Background, <u>supra</u> at 5 (quoting Sanchez Depo. I at 44:14-22), and employing very few female officers such that, for several days a week, there were no female officers on Springer Correctional's premises, <u>see</u> Factual Background, <u>supra</u> at 6 (citing Padilla Depo. I at 48:10-49:3; <u>id.</u> at 68:21-69:20), Sanchez created circumstances that subjected female inmates at Springer Correctional to a higher risk of sexual assault at the hands of the guards, <u>see</u> Factual Background, <u>supra</u> at 6-7 n.10 (drawing an inference that female inmates are at a higher risk of sexual assault in an environment where there is a high ratio of male to female correctional officers, the male correctional officers are not sufficiently trained how to deal with female inmates, and the female inmates must remove a portion of their clothes for searches).  This evidence, when taken as true, does not establish that there is a genuine issue of material fact whether Sanchez was deliberately indifferent to the high risk of sexual assault at Springer Correctional before Martinez' and Green's allegations came to light.  <u>See</u> Factual Background, <u>supra</u> at 4 (citing Sanchez Depo I at 44:14-22); Factual Background, <u>supra</u> at 5 (citing Padilla Depo. I at 48:10-49:3; <u>id.</u> at 68:21-69:20).

[77]The Court reiterates its conclusion above that, given the prevalence and severity of understaffing in State and federal prisons, Springer Correctional's high vacancy rate and disproportionate ratio between male and female employees is insufficient on its own to establish the Eighth Amendment's personal-involvement prong for purposes of determining whether Sanchez is entitled to qualified immunity.  <u>See</u> <u>supra</u> at 101-02 n.71.  Qualified immunity is a legal question that is reserved for the Court.  <u>See</u> <u>Gonzales v. Duran</u>, 590 F.3d 855, 859 (10th Cir. 2009).  It is inappropriate to present qualified immunity questions to a jury unless exceptional circumstances exist.  <u>See</u> <u>Gonzales v. Duran</u>, 590 F.3d at 859.

A motion for summary judgment, on the other hand, demands that the Court "not [it]self weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249.  The summary judgment inquiry,

**2.** **There Is a Genuine Dispute of Material Fact Whether Sanchez Was Deliberately Indifferent to Green's Increased Risk of Sexual Assault.**

Even if the Court were to agree with Sanchez' assertion that there is no factual dispute that, before March 29, 2017, he was unaware of any general increased risk of sexual assault against female prisoners in Springer Correctional, Green's evidence creates an issue of fact whether Sanchez was aware of an increased risk of Padilla sexually assaulting Green after March 29, 2017, the day when Martinez reported Padilla's sexual abuse against her. On March 29, 2017, Martinez alleged to Brashear that Padilla made sexual advances towards her. See Factual Background, supra at 10 (citing Sanchez Aff. ¶ 11, at 4-5). Brashear reported these allegations to several people, including to the Springer Correctional PREA coordinator, to the chief security officer, and to Sanchez. See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 12, at 5). After Gonzales made the NM State Police aware of Martinez' allegations against Padilla, the NM State Police interviewed Gonzalez, Martinez, and Padilla on March 30, 2017. See Factual Background, supra at 13 (citing Sanchez Aff. ¶ 11, at 5; id. at ¶ 13, at 11). Sanchez was aware of these interviews. See Factual Background, supra at 13 (citing Sanchez Aff. ¶ 15, at 6). On March 30, 2017, the same day as the NM State Police interviews, Green was escorted to Springer

---

thus, does not require the Court to determine definitively whether Sanchez had subjective awareness regarding the heightened risk of sexual assault at Springer Correctional. To deny a motion for summary judgment, the Court must determine whether genuine factual issues exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. The Court's holding in this section states solely that there is a genuine dispute of material fact that "can be resolved only by a finder of fact because [the matter] may be reasonably resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. The Court's holding in this section does not imply that Green's evidence establishes Sanchez' subjective awareness definitively or that, by extension, future plaintiffs can simply recite hiring policies or vacancy statistics, and expect the Court to conclude that the prison's supervisory official had subjective awareness of heightened risks of sexual assault. The Court emphasizes that this ruling denying the MSJ does not indicate whether Green will succeed at trial.

Correctional's administration offices to await an interview about her allegations against Padilla. See Factual Background, supra at 13-14 (citing Green Decl. ¶¶ 14-15, at 2). It was during this waiting period that Sanchez invited Green into his office and personally "asked her what had happened." Factual Background, supra 14 (citing Green Decl. ¶ 16, at 2). Green informed Sanchez about Padilla's abuse, and Sanchez responded by saying "okay," before dismissing her to continue to wait for her interview with NM State Police. Factual Background, supra 14 (citing Green Decl. ¶¶ 17-18, at 2-3). Sanchez was present at Springer Correctional during Green's police interview on March 30, 2017. See Factual Background, supra at 14 (citing Green Decl. ¶ 19, at 3). After her interview, Green also submitted a grievance to Springer Correctional's administration, "complaining about Officer Padilla's sexual misconduct against her," but received no response, and was later "told it had not been received." Factual Background, supra at 14 (citing Green Decl. ¶¶ 23-24, at 3).

Sanchez argues that Green must allege plausibly that he "subjectively was aware that she faced a substantial risk of harm . . . ," MSJ at 15 (citing Green v. Padilla, 484 F. Supp. 3d at 1156 (quoting Poore v. Glanz, 724 Fed. App'x at 641-42)), and asserts that "generalized conditions at a prison without subjective knowledge [by the supervisory defendant] of specific incidents of sexual assault, are insufficient to state an Eighth Amendment violation," MSJ at 15 (quoting Green v. Padilla, 484 F. Supp. 3d at 1159 (citing Keith II, 843 F.3d at 838-39)). Sanchez argues that, in addition to having no awareness of "any risk of sexual assault on [Green] . . . by Christopher Padilla . . . prior to March 29, 2017," he was: (i) unaware that Green had been interviewed by police officers on March 30, 2017; and (ii) unaware that Green had made sexual assault allegations against Padilla at all. MSJ at 16-17. In his Reply, Sanchez argues that Green's assertion that he subjectively was aware of Padilla's sexual assault on Green,

because he was aware of NM State Police's presence at Springer Correctional, and because he knew the NM State Police were there to interview her, does not show subjective awareness, because he did not observe or overhear Green's interview with NM State Police.  See Reply at 8. Furthermore, Sanchez asserts that Green never reported her allegations to Sanchez directly.  See MSJ at 8.  Conversely, Green argues: (i) that "'[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur,'" Reply at 15 (first citing Tafoya v Salazar, 516 F.3d at 916, and then citing Farmer v. Brennan, 511 U.S. at 843); and (ii) that, in a deliberate indifference inquiry, the jury may infer a prison official's actual knowledge based on "circumstantial evidence, such as the obviousness of the condition."  Reply at 16 (first citing Tafoya v. Salazar, 516 F.3d at 916, and then citing Farmer v. Brennan, 511 U.S. at 842).  Furthermore, Green presents evidence in the record showing that Sanchez asked her directly what happened and that she told Sanchez about Padilla's sexual abuse.  See Factual Background, supra at 12 (citing Green Decl. ¶ 16, at 2; id. at ¶¶ 17-18, at 2-3).

In the Tenth Circuit, to show deliberate indifference, knowledge need not be particularized to a specific inmate or a specific manner of injury.  See  Tafoya v. Salazar, 516 F.3d at 916.  See Keith II, 843 F.3d at 841 (concluding that prior sexual assault incidents and "opportunities for employees to be outside of other people's eyesight, outside of cameras," put the prison's warden on notice that there was a high risk of sexual assault); Green v. Padilla, 484 F. Supp. 3d at 1156 (concluding that, if a supervisory official is aware of "an unacceptable risk of assault," but does nothing to protect inmates, they are liable for subsequent sexual assaults). In Gonzales v. Martin, the plaintiff presented evidence that the sheriff "ignore[ed] inmate complaints" and, when informed of two specific instances of jailer's sexual assault against two

female inmates, the sheriff left the prisoners in the custody and control of the jailers accused of assault.  Gonzales v. Martinez, 403 F.3d at 1187.  The Tenth Circuit states that these facts were material to the plaintiff's Eighth Amendment claim, that there was a factual dispute such that summary judgment was inappropriate, and that, from these facts, the Tenth Circuit could "fairly infer[] Sheriff Salazar's purported ignorance of the dangerous conditions in the jail was a direct result of his lackadaisical attitude toward his responsibility to run the institution."  Gonzales v. Martinez, 403 F.3d at 1187.  Specifically, the Tenth Circuit concludes:

> The undisputed evidence of the physical assaults on inmates set against the facts of Sheriff Salazar's knowledge of reported risks to inmate health or safety, including the documented lapse of security in the control room, complaints of sexual harassment and intimidation . . . surely raise a reasonable inference that Sheriff Salazar knew of and disregarded an excessive risk to Ms. Gonzales. Under these circumstances, at the least, Ms. Gonzales has raised a triable issue of material fact that Sheriff Salazar had the "requisite knowledge of a substantial risk," which, *Farmer* [*v. Brennan*] acknowledges, may be demonstrated "in the usual ways, including *inference* from circumstantial evidence."  511 U.S. at 842 (emphasis added).

Gonzales v. Martin, 403 F.3d at 1187.  The Tenth Circuit further elaborates that, when a plaintiff attempts to show the "requisite knowledge of substantial risk," he or she does not need to demonstrate a substantial risk to the plaintiff, but needs to show only that there was an "obvious substantial risk to inmate safety."  Gonzales v. Martinez, 403 F.3d at 1187 (quoting Farmer v. Brennan, 511 U.S. at 842-43.

Construing the facts in Green's favor, the evidence shows that Green and Martinez made Sanchez aware that Padilla was an "obvious substantial risk to inmate safety."  Gonzales v. Martinez, 403 F.3d at 1187 (quoting Farmer v. Brennan, 511 U.S. at 842-43).  Green's evidence shows that Sanchez was aware: (i) of Martinez' allegation against Padilla, see Factual Background, supra at 11 (citing Sanchez Aff. ¶ 12, at 5); (ii) that the NM State Police were on

Springer Correctional's premises to interview people regarding the purported sexual assault, see Factual Background, supra at 12-13 (citing Sanchez Aff. ¶ 14, at 5; id. ¶ 15, at 6); (iii) that the NM State Police interviewed Green, see Factual Background, supra at 13-14 (citing Green Decl. ¶¶ 17-18, at 2-3); and (iv) that Padilla allegedly had sexually assaulted Green, see Factual Background, supra at 13-14 (citing Green Decl. ¶¶ 17-18, at 2-3).  Precedent supports the Court's conclusion that, given her proffered evidence, Green has shown a triable issue of material fact that Sanchez had the requisite knowledge that there was a high risk of sexual assault.  See Gonzales v. Montoya, 403 F.3d at 1187; Farmer v. Brennan, 511 U.S. at 842-43; Keith II, 843 F.3d at 841; Tafoya v. Salazar, 516 F.3d at 916.

The record here shows that, on March 29, 2017, and March 30, 2017, Sanchez was aware of the sexual assault allegations and did not take the necessary steps to alleviate that risk.  See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 12, at 50); Factual Background, supra at 13 (citing Green Decl. ¶¶ 17-18, at 2-3).  Green offers evidence that, on March 29, 2017, Sanchez learned of Martinez' allegations against Padilla, see Factual Background, supra at 11 (citing Sanchez Aff. ¶ 12, at 5), and on March 30, 2017, Green told Sanchez about Padilla's alleged sexual abuse, therefore providing Sanchez with specific knowledge and putting him in a similar position to the sheriff in Gonzales v. Montoya, see Factual Background, supra 14 (citing Green Decl. ¶¶ 17-18, at 2-3); Gonzales v. Montoya, 403 F.3d at 1187 (stating that the sheriff had previously received prisoner's sexual harassment complaints, and concluding that the sheriff had knowledge of reported risks to inmate health and safety which could lead to an inference that the sheriff had the "requisite knowledge of a substantial risk" to inmates).  The similarities between Gonzales v. Montoya and Green's evidence demonstrate that there is an issue of

material fact whether Sanchez had the requisite knowledge of a high risk of sexual assault specific to Green.

Green, however, does not have to show that Sanchez had knowledge of a substantial risk to herself, but only that there was an "obvious substantial risk to inmate safety." Gonzales v. Martinez, 403 F.3d at 1187 (quoting Farmer v. Brennan, 511 U.S. at 842-43). See Tafoya v. Salazar, 516 F.3d at 916 (holding that, under the Eighth Amendment, knowledge does not need to be particularized to an inmate or to a manner of injury). The Court infers, based on Green's evidence that Sanchez was aware of both her and Martinez' allegations against Padilla, that Sanchez deliberately was indifferent to an obvious, substantial risk of sexual assault at Springer Correctional and to an obvious, substantial risk of sexual assault that Padilla posed to any female inmate, including Green, who may have been under his control if he was left in a position of power.[78] See Gonzales v. Martinez, 403 F.3d at 1187 (concluding that evidence showing that employee's physical assault against inmates in addition to the defendant's knowledge of security lapses and sexual assault complaints supported the inference that the defendant "knew of and disregarded an excessive risk" to the plaintiff). Based on Green's evidence, the Court concludes that Green has shown an issue of fact whether Sanchez subjectively was aware of an increased risk both to Green's safety in the form of Padilla's sexual abuse specifically and to inmates' safety in the form of a prison guard's sexual abuse generally.

---

[78]The Court also has considered Green's evidence regarding Sanchez' staffing policies, although it does not conclude that this evidence alone establishes Sanchez' deliberate indifference.

**B.     THERE IS A FACTUAL DISPUTE WHETHER SANCHEZ' INACTION WAS A CONTRIBUTING FACTOR IN GREEN'S SUBSEQUENT ABUSE.**

The Court next will address whether there is a genuine dispute of material fact whether Sanchez' actions and decisions did not proximately cause Green a Constitutional injury.  See Farmer v. Brennan, 511 U.S. at 834.  An official violates the Eighth Amendment when his or her conduct satisfies two elements: (i) the official causes an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  The Court concludes that there is a factual dispute whether Sanchez contributed to Green's subsequent abuse as a result of his inaction in the aftermath of Martinez' and Green's allegations against Padilla.

Sanchez argues that, for Green to state a viable Eighth Amendment claim, she must show causation -- i.e., that Sanchez' inaction after learning of previous sexual abuse caused subsequent sexual abuse.  See MSJ at 13 (citing Poore v. Glanz, 724 Fed. App'x at 641-43; Green v. Padilla, 484 F. Supp. 3d at 1156).  Sanchez asserts that there was no inaction on his part and that "a prison official may be free of liability notwithstanding that a sexual assault occurred on his or her watch if he or she 'responded reasonably to the risk, even if the harm ultimately was not averted.'"  MSJ at 18 (quoting Green v. Padilla, 484 F. Supp. 3d at 1156).  He asserts that he enforced NMCD's written policy regarding sexual assault allegations by taking "quick vigorous action" as soon as Martinez' allegations came to light.  MSJ at 18.  Sanchez does not point to the specific acts that constitute his "quick vigorous action."  MSJ at 18.

In her Reply, Green argues that, to establish a "requisite causal connection" between a supervisor's actions or inactions and any subsequent abuse the plaintiff may have suffered, a

plaintiff must show that "the defendant set in motion a series of events the defendant knew or reasonable should have known would cause others to deprive the plaintiff of her Constitutional rights." Reply at 17 (quoting Keith II, 843 F.3d at 847 (quoting Schneider v. City of Grand Junction Police Dep't., 717 F.3d at 768)). Green points to Keith II, emphasizing that the Tenth Circuit held "that a supervising official's management actions or deficiencies" can establish causation. Reply at 17 (citing Keith II, 843 F.3d at 847; Tafoya v. Salazar, 516 F. 3d at 933). Green argues that Sanchez, by not separating Padilla from Green, did not follow NMCD's sexual assault policies and thereby allowed Padilla continued access to Green. See Reply at 19. Furthermore, she asserts that Sanchez disregarded a significant risk of sexual assault against the inmates through his inaction -- his lack of discipline or corrective action against Padilla -- and his promoting Padilla to maintenance supervisor was a contributing factor in her subsequent abuse. See Reply at 18.

In his Reply, Sanchez again asserts that there was no inaction on his part when Martinez' allegations came to light. See Reply at 2. He clarifies that his response to these allegations consisted of "'a serious incident report' and PREA notification, contact[ing] the New Mexico State Police . . . , and . . . an immediate referral to the NMCD's Office of Professional Standards which investigated the allegations." Reply at 2 (no citation given for internal quotation). Sanchez counters Green's argument that he took no steps to discipline Padilla because any allegations against Padilla were unproven, there were both criminal and administrative investigations underway, and there was no "just cause" to discipline Padilla. Reply at 3 (quoting NMCA 1.7.11). See NMSA § 10-9-18. Sanchez does not address causation directly, but rather states that he initiated investigations into the matter and therefore there was no "inaction on his part." Reply at 4 (no citation given for internal quotation).

When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Tolan v. Cotton, 572 U.S. at 651 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255).  See Hunt v. Cromartie, 526 U.S. at 550-55.  Sanchez was the warden at Springer Correctional from 2012 until April 17, 2017.  See Factual Background, supra at 3 (citing Sanchez Aff. ¶ 5, at 2).  At Springer Correctional, there was a written "'zero tolerance policy' that prohibits abuse, sexual misconduct, and any type of sexual relationship between employees and inmates." Factual Background, supra at 6 (quoting NMCD Policy I at 4-9).  Among other requirements, the written policy mandated that "'a detention facility's administrator . . . separate a victim of sexual abuse from the assailant once sexual abuse is reported,'" Factual Background, supra at 7 (citing NMCD Policy II at 1), and that the warden "make an immediate report to the PREA coordinator" once he or she learns of a sexual assault, Factual Background, supra at 7 (citing NMCD Policy II at 1).  Sanchez learned about Martinez' assault on March 29, 2017.  See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 12, at 5).  When Martinez leveled her accusation against Padilla, Brashear reported the allegations to Springer Correctional's PREA coordinator and to a mental health counselor.  See Factual Background, supra at 8 (citing Sanchez Aff. ¶ 12, at 5).  The mental health counselor created an incident report and Rosenbarker, the PREA coordinator, "drafted a 'serious incident report' and a memorandum" for Sanchez and Gonzales, Springer Correctional's chief security officer.  Factual Background, supra at 10-11 (citing Sanchez Aff. ¶ 11 at 4-5; id. ¶ 12 at 5)(no citation given for internal quotation).  Gonzales notified NM State Police, informed the NMCD's Office of Professional Standards, and investigated by reviewing surveillance footage.  See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 13, at 5-6.)

The surveillance footage yielded no relevant video.  See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 13, at 5-6).

On March 30, 2017, Sanchez learned about Green's assault.  See Factual Background, supra at 13 (citing Green Decl. ¶¶ 17-18, at 2-3).  The NM State Police interviewed Green and Martinez on March 30, 2017.  See Factual Background, supra at 12-14 (citing Sanchez Aff. ¶ 15, at 6; Green Decl. ¶ 19, at 3).  Health personnel did not assess Green after her interview, see Factual Background, supra at 14 (citing Green Decl. ¶ 21, at 3), and Springer Correctional's administration did not receive the grievance about the assault she submitted, see Factual Background, supra at 14 (citing Green Decl. ¶ 23-24, at 3).  Following Green and Martinez' allegations, Sanchez "did not initiate any disciplinary action against Padilla," but rather promoted him to the maintenance supervisor position.  Factual Background, supra at 15 (first quoting Sanchez Depo. I at 106:22-25 and then citing Green Decl. ¶ 25 at 3).  In this new position, Padilla had more responsibilities and had "access to every part of the prison."  Factual Background, supra at 18 (quoting Sanchez Depo. I at 153:11-18).  He continued to have access to the inmates in the prison.  See Factual Background, supra at 18 (citing Sanchez Depo. I at 153:11-18; Padilla Depo. I at 11:18-23; id. at 12:10-12).  After Padilla was promoted, from April, 2017, through September, 2017, he visited Green in her single cell and continued to sexually abuse her.  See Factual Background, supra at 19 (citing Green Decl. ¶ 27, at 4; id. ¶ 28 at 4).  Green's cell did not have any security cameras surveilling it.  See Factual Background, supra at 19 (citing Sanchez Depo. I at 158:19-22).

The Tenth Circuit addresses the relationship between supervisory responsibility and proximate cause in Tafoya v. Salazar, 516 F.2d at 922, and Keith II, 843 F.3d at 847.  In Tafoya v. Salazar, the defendant argued that his policies and decisions did not proximately cause his co-

defendant to sexually assault the plaintiff. See 516 F.3d at 922. The Tenth Circuit holds that "acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault." Tafoya v. Salazar, 516 F.3d at 922 (citing Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1585 (11th Cir. 1995); LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993)). The Tenth Circuit concludes that a reasonable jury could find that the sheriff's lax supervision and the atmosphere this lack of supervision created were "sufficiently related," and were the proximate cause of the instance of sexual assault. 516 F.3d at 922. Relying on Tafoya v. Salazar, the Tenth Circuit in Keith II reiterates that "a supervising official's management actions may be sufficient to establish causation," Keith II, 843 F.3d at 847, and that "acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault," Keith II, 843 F.3d at 847 (quoting Tafoya v. Salazar, 516 F.3d at 922). The Tenth Circuit first addressed the defendant's management policies and whether they contributed to the plaintiff's sexual assault. See Keith II, 843 F.3d at 847. The defendant implemented policies that led to minimal supervision which, in turn, made it possible for abuse to occur. See Keith II, 843 F.3d at 842. The Tenth Circuit next addressed the defendant's response to sexual misconduct allegations. See Keith II, 843 F.3d at 841. In Keith II, the plaintiff asserted that the warden co-defendant did not respond appropriately to both recent and prior sexual misconduct allegations. See Keith II, 843 F.3d at 841. In Keith II, the plaintiff alleged that there were inappropriate sexual conversations between the co-defendant and another female inmate, and the Tenth Circuit held that this evidence in isolation was insufficient to "support a finding that Warden Koerner

failed to respond to a known risk posed by [the defendant]." 843 F.3d at 841. In concluding that the warden's decisions created conditions that proximately caused subsequent assault, the Tenth Circuit considered, in aggregate: (i) the previous sexual misconduct allegations and the defendant's inaction; (ii) the lack of supervision; (iii) the policies in place to prevent and address sexual misconduct; (iv) the defendant's failure to seriously investigate incidents of employee misconduct; and (v) the defendant's failure to "impose meaningful discipline" as the policies in place demanded. Keith II, 843 F.3d at 841-45. Ultimately, the Tenth Circuit concludes that, under Tafoya v. Salazar, a jury question existed whether the defendant's "practices created an atmosphere that proximately cause [the plaintiff's] injury," because there were "certain red flags" present that the defendant should have recognized and upon which the defendant should have acted upon. Keith II, 843 F.3d at 847.

The Court examines Springer Correctional's procedural and discipline policies in place to deal with sexual assault instances in prison -- NMCD Policy I and NMCD Policy II -- and Sanchez' subsequent actions and inactions after learning about Martinez' and Green's assault at Padilla's hands, and concludes that, although Sanchez followed some of NMCD's written policies, there is still a dispute whether he proximately caused the assault. NMCD Policy I and NMCD Policy II require: (i) employees and inmates to report abuse that they witness or experience, see Factual Background, supra at 6 (citing NMCD Policy I at 4-9); (ii) disciplinary action if an employee fails to report abuse, see Factual Background, supra at 6-7 (citing NMCD Policy I at 4-9); (iii) the facility administrator to "separate a victim of sexual abuse from the assailant once sexual abuse is reported," Factual Background, supra at 7 (quoting NMCD Policy II at 1); and (iv) the warden to, "upon report of a sexual assault incident, . . . make an immediate

report to the PREA coordinator," Factual Background, <u>supra</u> at 7 (quoting NMCD Policy II, at 1).

Sanchez argues that there was no inaction on his part and asserts that, after he learned about Martinez' allegations, he implemented NMCD's "zero tolerance policy" by making a "serious incident report" and a PREA notification, contacting the NM State Police, and referring the incident to the NMCD's Office of Professional Standards, which subsequently investigated the allegations.   Reply at 2.   Green's evidence supports Sanchez' assertions that he or his command staff took these actions.   <u>See</u> Factual Background, <u>supra</u> at 10-12 (citing Sanchez Aff. ¶ 12, at 5; Sanchez Aff. ¶ 11 at 4-5; Sanchez Aff. ¶ 13, at 5-6).   After learning about Green and Martinez' assaults, however, Sanchez did not initiate disciplinary action against Padilla, <u>see</u> Factual Background, <u>supra</u> at 16 (citing Sanchez Depo. I at 106:22-25), nor did he follow NMCD Policy II, which requires "a detention facility's administrator to separate a victim of sexual abuse from the assailant once sexual abuse is reported," Factual Background, <u>supra</u> at 7 (first citing Sanchez Depo. I at 106:22-25 and then quoting NMCD Policy II, at 1).   Sanchez not only did not separate Green from Padilla, but he also promoted Padilla to the maintenance supervisor position after the two alleged sexual assaults.   <u>See</u> Factual Background, <u>supra</u> at 16 (citing Green Decl. ¶ 25, at 3).

Green argues that Sanchez' decision to promote Padilla, and his failure to take "corrective, administrative, or disciplinary action," are sufficient to establish causation. Response at 17-18.   The Tenth Circuit holds that "acts or deficiencies that result in a jail atmosphere in which discipline and supervision is entirely lacking, may be sufficiently related to a particular instance of assault that a jury is permitted to conclude that the conditions proximately caused the assault."   <u>Tafoya v. Salazar</u>, 516 F.3d at 922; <u>Keith II</u>, 843 F.3d at 847.

Here, the Court considers whether a reasonable jury could conclude that the following factors proximately caused Green's continued abuse at Padilla's hands: (i) Sanchez' lack of investigation into Green's allegations against Padilla; (ii) Sanchez' failure to separate Padilla from Green and Martinez after allegations came to light; and (iii) Sanchez' promotion of Padilla to the maintenance supervisor position.   Martinez and Green each complained about sexual assault, an action that is more serious than the sexually inappropriate conversations alleged in Keith II.   See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 12, at 5); Factual Background, supra at 13 (citing Green Decl. ¶¶ 17-18, at 2-3).   See also Keith II, 843 F.3d at 841.  Similar to the warden in Keith II, despite hearing Green's allegations personally on March 30, 2017, Sanchez did not initiate any form of administrative or medical investigation into Green's specific allegations.  See Factual Background, supra at 14 (citing Green Decl. ¶ 21, at 3); Keith II, 843 F.3d at 842.  Finally, Sanchez did not "impose meaningful discipline" when he did not separate Padilla from Green after she alleged that he sexually assaulted her and instead, promoted Padilla to a position that allowed him increased access to Green.  Keith II, 843 F.3d at 845.  See Factual Background, supra at 15 (first citing Sanchez Depo. I at 106:22-25 and then citing Green Decl. ¶ 25 at 3).

Sanchez argues that he did not discipline Padilla, because the accusations were unproven, and because the investigations that were underway were unresolved, and thus there was no "just cause" to discipline Padilla.  Reply at 3 (quoting NMCA 1.7.11). See NMSA § 10-9-18.  The Court is unconvinced that the situation did not warrant discipline, nor is the Court convinced that Sanchez' actions were sufficient to relieve him or liability.  The Tenth Circuit in Keith II acknowledged that, when an inmate alleges sexual misconduct, a prison official may not be able to determine what happens, but that "serious allegations must be investigated," and that in some

cases these allegations may be exceedingly difficult to investigate due to lack of evidence other

than prisoner and staff statements.  Keith II, 843 F.3d at 844.  With these difficulties in mind, the

Tenth Circuit clarified:

> That does not mean, of course, that nothing can be done. A series of accusations against the same staff member can be sufficiently compelling to override the most vehement denials. Or prophylactic measures may be introduced. If accusations are sufficiently common, they may warrant installing cameras to keep track of behavior within the prison.  And rules can prohibit conduct that provides an opportunity for serious infractions.  If, for example, a staff member admits that he was alone with an inmate in a closed storage room but denies assaulting her, the staff member could be disciplined for exercising bad judgment in being alone with an inmate in such a setting and, as in this case, the warden could prohibit staff members from being alone with an inmate.

Keith II, 843 F.3d at 844.

In Sanchez' case, there were prophylactic measures that policy mandated, including, at

the very minimum, separating Padilla from Green to ensure that he did not have access to her.

See Factual Background, supra at 7 (citing NMCD Policy II at 1).  If Sanchez had instituted this

prophylactic measure correctly, it would have "prohibit[ed] conduct that provides an opportunity

for serious infractions," such as further sexual assault.  Keith II, 843 F.3d at 844.  Instead,

Sanchez did not take the mandated prophylactic measures and, in promoting Padilla, created a

situation that allowed Padilla continued access to Green.  Green has shown that Padilla "set in

motion a series of events" when he (i) became aware of concerning, serious behavior -- Martinez

and Green's allegations against Padilla -- but did not discipline Padilla or, at the very least,

prophylactically separate Padilla from Green, as NMCD policy required; and (ii) promoted

Padilla to a position that allowed him continued access to Green.[79]   Keith II, 843 F.3d at 847

(quoting Schneider v. City of Grand Junction Police Dep't., 717 F.3d at 768)).   Sanchez

reasonably should have known that this series of events would cause Padilla to deprive Green of

her Eighth Amendment right.   See Keith II, 843 F.3d at 847 (quoting Schneider v. City of Grand

Junction Police Dep't., 717 F.3d at 768).   The Court concludes that Green has shown an issue of

fact whether Sanchez contributed and proximately caused Green's subsequent abuse as a result

of his inaction in the aftermath of Martinez' and Green's allegations against Padilla.

### C.   THE COURT WILL NOT DISREGARD GREEN'S PROFFERED VERSION OF FACTS, BECAUSE THE OBJECTIVE, CONTEMPORANEOUS EVIDENCE DOES NOT BLATANTLY CONTRADICT THE RECORD.

Following the Court's conclusion that Green has shown genuine issues of material fact,

the Court addresses Sanchez' contention that the Court should disregard Green's proffered

version of the facts, because the contemporaneous record blatantly contradicts them.   The Court

concludes that the contemporaneous record does not contradict Green's version of facts, because

a lack of corroborative evidence is not a basis to apply the Scott v. Harris exception and because

Tenth Circuit precedent generally requires that the corroborative and contradictory evidence be

"objective documentary evidence."   Ortiz v. New Mexico, 550 F. Supp. 3d at 1162 (quoting

Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1164 (10th Cir. 2021)).   In his Reply, Sanchez

argues that the Court should disregard Green's version of the facts, because "contemporaneous

records" contradict them.   Reply at 11 (citing Simon v. Taylor, 252 F. Supp. 3d 1196, 1228-29

(D.N.M. 2017)(Browning, J.)).   He asserts that, "when facts are depicted in objective,

---

[79]The Court again notes that Sanchez maintained a high male-to-female correctional officer ratio and a fifty-percent vacancy rate, which created an environment at Springer Correctional where there was a higher risk of sexual assault.

contemporaneous evidence, they control over a plaintiff's affidavit which contradicts such evidence; no 'genuine' dispute is created under such circumstances."   Reply at 11 (citing Thomas v. Durasanti, 607 F.3d 655, 659 (10th Cir. 2010); Thomson v. Salt Lake County, 584 F.3d 1304, 1312 (10th Cir. 2009); Farrell v. Montoya, 878 F.3d 933, 938 (10th Cir. 2017); Connor v. Rodriguez, 891 F. Supp. 2d 1228, 1230 (D.N.M. 2011)(Johnson, J.)).   Sanchez acknowledges that evidence should be viewed in a light most favorable to the non-movant "unless, in accordance with Scott v. Harris, there exists a 'videotape or similar evidence in the record to blatantly contradict [plaintiff's] testimony,'" Reply at 12 (quoting Rhoads v. Miller, 352 F. App'x. 289, 291 (10th Cir. 2009)(alteration in Reply but not in Rhoads v. Miller)(emphasis in original).   In his Reply, Sanchez asserts that the contemporaneous record -- the police interviews from March 30, 2017, and September 1, 2017, the NMCD records, and the OPS report -- and Green's own pleading "blatantly contradict[]" Green's affidavit. Reply at 12-13.  Specifically, Sanchez asserts that: (i) her statement during her police interviews that she "did not want to report Padilla's alleged conduct" contradicts her affidavit stating that she reported the conduct to Sanchez on March 30, 2017, Reply at 12; (ii) the NMCD records show that she did not submit a grievance regarding Padilla's conduct, thereby contradicting her assertion that she filed a grievance, see Reply at 12; (iii) Sanchez' documented actions in response to Martinez' allegations contradict Green's assertion that Sanchez' only response to her allegations against Padilla was to state "okay," Reply at 13 (no internal citation given); and (iv) she did not allege that Padilla instructed her to put candy in her vagina until filing her Response, thereby contradicting her initial assertions, see Reply at 13.  Notably, Sanchez argues in his MSJ, that videotape does not corroborate Green's allegations, that other victims refused to cooperate during further investigations, and that Padilla passed a polygraph test.  See MSJ at 15.

- 152 -

Scott v. Harris concerned an incident with the police where the respondent fled from the police in his car, reaching dangerous speeds.  See 550 U.S. at 374-75.  The petitioner performed a "Precision Intervention Technique" maneuver which caused the respondent's car to roll and crash off the road, badly and permanently injuring the respondent in the process.  550 U.S. at 375.  During the ensuing civil suit, the petitioner filed a motion for summary judgment based on qualified immunity, which the district court denied, concluding that the petitioner's actions violated the respondent's Fourth Amendment rights, because the petitioner's actions constituted excessive force and ramming the vehicle was unlawful under the circumstances.  See 550 U.S. at 376.  The United States Court of Appeals for the Eleventh Circuit affirmed the district court's decision to allow the case to proceed to trial.  See 550 U.S. at 376.  The Supreme Court, in determining the facts relevant to assessing whether the petitioner's actions were constitutional, emphasizes that there existed a videotape that captured the entire event and that the videotape's contents "clearly contradict[ed] the version of the story told by respondents and adopted by the Court of Appeals."  550 U.S. at 378.  The Supreme Court compares the versions of facts presented in court proceedings to the story the video tape told.  See Scott v. Harris, 550 U.S. at 378-81.  Ultimately, the Supreme Court concludes that "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."  550 U.S. at 380-81.

Sanchez cites other cases that rely on Scott v. Harris, 550 U.S. at 378.  Thomas v. Durasanti, for example, narrows Scott v. Harris' holding, explaining that courts can exclude the plaintiff's version of the facts when "there is clear contrary video evidence of the incident at issue."  Thomas v. Dursanti, 607 F.3d at 659 (citing Scott v. Harris, 550 U.S. at 378-80).  Farrell

v. Montoya and Conner v. Rodriguez both concern instances where a dashboard camera or a police officer's belt tape recorded the criminal incident.  See Farrell v. Montoya, 878 F.3d at 935; Conner v. Rodriguez, 891 F. Supp. 2d at 1229.  The Tenth Circuit, however, "has generally limited the application of [the blatant-contradiction] exception to cases involving objective documentary evidence, such as video recording or photographs."  Ortiz v. New Mexico, 550 F. Supp. 3d at 1162 (quoting Vette v. K-9 Unit Deputy Sanders, 989 F.3d at 1164 (collecting cases)(alteration in Ortiz v. New Mexico but not Vette v. K-9 Unit Deputy Sanders)).

In Green's case, the facts show that Gonzales reviewed surveillance videos in response to Martinez' allegations, but was unable to locate any relevant footage that either corroborated the allegations or refuted them.  See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 13, at 5-6).  Notably, at the time that Gonzales was searching for relevant footage, he was looking for footage that corroborated Martinez' allegations and not Green's allegations.  See Factual Background, supra at 11 (citing Sanchez Aff. ¶ 13, at 5-6).  Thus, this case is not one where any videotape evidence exists in the record that shows events which blatantly contradict Green's proffered version of facts.  Lack of corroborating evidence -- no videotape footage, Green's additional testimony after the police interviews, and the missing grievance -- does not contradict blatantly Green's version of the facts.  See Wright v. Grant, No. 20-96, 2021 WL 3934248, at *8 (N.D. Fla. July 7, 2021)(Jones, J.)(concluding that a plaintiff is not required to present corroborative evidence to survive a motion for summary judgment, that their sworn testimony is

sufficient to "demonstrate a genuine issue of material fact," and that lack of corroborating evidence is "not a basis to apply [the limited Scott v. Harris] exception[]").[80]

Sanchez points to several records -- none of which are videotapes, audio recordings, or photographs -- that "blatantly contradict" Green's version of facts.  Reply at 12-13.  None of the records fall within the realm of "objective documentary evidence."  Ortiz v. New Mexico, 550 F. Supp. 3d at 1162 (quoting Vette v. K-9 Unit Deputy Sanders, 989 F.3d at 1164).  He mischaracterizes Green's police interview statements, arguing that, by saying that she "did not want to report Padilla's alleged conduct," she contradicted her affidavit asserting that she reported the conduct to Sanchez on March 30, 2017.  Reply at 12.  The Court will not leap to the conclusion that her statement served as an announcement that she never would report Padilla's conduct.  Her statement during the interview may have indicated hesitancy or fear.  As to Sanchez' argument that his documented actions in response to Martinez' allegations contradict Green's assertion that he took no action in the face of Green's allegations, the Court cannot conclude soundly that Sanchez' actions in response to one party's allegations ensured that he

---

[80]The Court agrees with the reasoning of the Honorable Gary R. Jones, United States Magistrate Judge for the United States District Court for the Northern District of Florida, in Wright v. Grant, 2021 WL 3934282 at *8.  Judge Jones states:

> It is hornbook law that Plaintiff is not required to present [video or witness] evidence to survive summary judgment; that is, his sworn testimony is enough to demonstrate a genuine issue of material fact unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law.

Wright v. Grant, 2021 WL 3934282 at *8 (citing Sears v. Roberts, 922 F.3d 1199, 1207 (11th Cir. 2019)).  Requiring plaintiffs to present corroborating evidence to defeat a motion for summary judgment, especially in the form of videotape evidence, would undermine decades worth of decisions where courts "routinely and properly deny summary judgment on the basis of a party's sworn testimony."  Sears v. Roberts, 922 F.3d at 1207 (quoting Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005)).

took similar actions or any actions at all in response to a separate party's allegations.  Because the Court concludes that the objective-record exception does not apply, and because the Court concludes that Green has shown a genuine issue of material fact regarding Sanchez' subjective awareness and whether his decisions proximately caused her subsequent abuse, the Court will deny the MSJ.

**III.   THE COURT DENIES SANCHEZ' STAY MOTION AND THE COURT DENIES GREEN'S REQUEST FOR DISCOVERY UNDER RULE 56(d).**

Having concluded that Sanchez is not entitled to qualified immunity and that he is not entitled to summary judgment, the Court turns to Sanchez' Stay Motion and Green's Rule 56(d) Decl.  In Sanchez' Stay Motion, he argues that "all discovery as to all claims and all defendants" should be stayed until the Court decided whether he was entitled to qualified immunity.  Stay Motion at 1.  He argues that -- until the Court reached its conclusion above regarding his qualified immunity -- he was presumed qualifiedly immune, see Stay Motion ¶ 2, at 2 (citing Hidahl v. Gilpin County Dep't of Social Services, 938 F.2d at 1155), and that the Supreme Court emphasizes in Harlow v. Fitzgerald that courts should resolve issues of qualified immunity before discovery, see Stay Motion ¶ 3, at 2 (citing Harlow v. Fitzgerald, 457 U.S. at 818-19; Siegert v. Gilley, 550 U.S. at 231 ("Until this threshold immunity question is resolved, discovery should not be allowed."); accord, Jones v. City and Cnty. of Denver, 854 F.2d at 1211.  Sanchez left room, however, for Green to file a "properly-supported affidavit under Fed. R. Civ. P. 56(d)."  Stay Motion at 1.

In the Stay Motion Response, Green does not oppose a stay of discovery pending the resolution of the qualified immunity issue, but requests that Sanchez nevertheless produce his initial disclosures and, additionally, that the Court permit her to "seek discovery pursuant to

Federal Rule 56(D) for the purposes of [her] summary judgement responses."   Stay Motion Response at 1.   Green points to records which establish that, although Green provided her initial disclosures on November 10, 2020, Sanchez had not provided the entirety of his initial disclosures.   See Stay Motion Response, ¶¶ 4-5, 8, at 1-2.   Green also states that, in response to the original Stay Motion, she requested that Sanchez include language in his Stay Motion requiring the Defendants to make their initial disclosures.   See Stay Motion Response, ¶ 10, at 2. Green requests that the Court enforce the initial disclosures in accordance with rule 26 and allow limited discovery in accordance with rule 56(d).   See Stay Motion Response at 3.

In his Stay Motion Reply, Sanchez states that he does not controvert Green's ability to request limited discovery under rule 56(d), but argues that the Court stay all discovery other than the limited amount that rule 56(d) allows.   See Stay Motion Reply at 1-2.   He asserts that "a stay of discovery includes all future discovery, including discovery under Rule 26(a)(1)."   Stay Motion Reply at 2 (citing Horton v. Bristol, 2006 WL 8440479).   He adds that, because he provided some initial disclosures, Green's purported initial disclosure issue is a moot point.   See Stay Motion Reply at 2 n.1.

Green submits her Rule 56(d) Decl., which argues that she has not received discovery or initial disclosures from Sanchez, but that Sanchez instead attaches discovery material to his MSJ. See Rule 56(d) Decl. ¶¶ 8, 10, at 2.   Green argues that she already has submitted several facts, based on "a sworn declaration and John Sanchez' sworn testimony in a different bu[t] related case" that demonstrate Sanchez' awareness and his inaction.   Rule 56(d) Decl. ¶ 13, at 3.   She also argues, however, that, to respond properly to Sanchez' MSJ, she needs limited discovery in the form of written discovery and depositions of Sanchez and Padilla.   See Rule 56(d) Decl. ¶ 14,

at 3.  She lists several subjects on which she needs further information to demonstrate that there are genuine disputes of material fact.  See Rule 56(d) Decl. ¶¶ 14-15, at 3.

Sanchez responds to Green's Rule 56(d) Decl. in his Reply, arguing that Green's discovery request does not state how the requested discovery will assist her rebuttal of Sanchez' proffered facts.  See Reply at 19.  He also notes that Green had access to the lengthy deposition he gave during Martinez' lawsuit ("Sanchez Depo."), and asserts that the Sanchez Depo. is more than adequate to answer Green's questions regarding the subjects about which she requests further information.  See Reply at 19-20.  He asserts that further deposition is unnecessary and "subvert[s] one of the goals of qualified immunity: to protect state officials from discovery." Reply at 20 (citing Harlow v. Fitzgerald, 457 U.S. at 818-19; Anderson v. Creighton, 483 U.S. at 640 n.2; Siegert v. Gilley, 500 U.S. at 231; Jones v. City and Cnty. of Denver, 854 F.2d at 1211).

## A. THE COURT DETERMINES ABOVE THAT SANCHEZ IS NOT ENTITLED TO QUALIFIED IMMUNITY AND THEREFORE WILL DENY THE STAY MOTION.

When it comes to issuing stays for part of a proceeding, the Court has broad discretion. See Clinton v. Jones, 520 U.S. at 706; Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386.  The party seeking a stay generally faces a difficult burden.  See Clinton v. Jones, 520 U.S. at 708.  "The underlying principle clearly is that '[t]he right to proceed in court should not be denied except under the most extreme circumstances.'"  Commodity Futures Trading Comm'n v. Chillcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (quoting Klein v. Adams & Peck, 43 F.2d at 339 (alteration added in Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.).

The Court will not exercise its discretion to stay the proceedings in this case.  It denied that Sanchez is entitled to qualified immunity and denied his MSJ.  Sanchez argues that the Stay Motion is necessary, because he is presumed qualifiedly immune, see Stay Motion ¶ 2, at 2

(citing Hidahl v. Gilpin County Dep't of Social Services, 938 F.2d at 1155), and thus that further discovery would "subvert one of the goals of qualified immunity: to protect state officials from discovery," Reply at 20 (citing Harlow v. Fitzgerald, 457 U.S. at 818-19; Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987); Siegert v. Gilley, 500 U.S. 226, 231 (1991); Jones v. City and Cnty. Of Denver, 854 F.2d at 1211).   Sanchez is correct that courts typically stay discovery pending a determination of an officer's qualified immunity.   See Saenz v. Lovington Mun. School Dist., 2015 WL 1906140 at *10 ("Ordinarily, once a defendant files a motion to dismiss that raises qualified immunity, the Court should stay discovery.")(citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).   The Court determines above that Sanchez is not entitled to qualified immunity.   See supra at 92.   Sanchez cannot benefit, therefore, from the protection from discovery that qualified immunity affords.   Furthermore, Sanchez does not draw the Court's attention to any circumstances extreme enough to warrant denying the parties the right to proceed with discovery.   Accordingly, the Court will deny the Stay Motion.

### B.   THE COURT WILL DENY GREEN'S REQUEST FOR DISCOVERY UNDER RULE 56(d), BECAUSE IT IS NOT NECESSARY TO DEFEND AGAINST THE MSJ.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the Court's discretion.   See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1553-54.   To be sufficient, the rule 56(d) affidavit must identify: "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment."   Adams v. C3 Pipeline Constr. Inc., 30 F.4th at 968 (quoting Gutierrez v. Cobos, 841 F.3d 895, 908 (10th Cir. 2016)).

Accordingly, a party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment. See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. The district court's discretion over a 56(d) motion is limited, however, "when the summary judgment motion is grounded on a claim of qualified immunity," Lewis v. City of Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990), and a rule 56(d) affidavit that challenges a summary judgment motion predicated on qualified immunity, therefore, cannot assert, without more, that discovery is needed to create a factual dispute; the affidavit must assert that discovery is needed to rebut specifically the validity of the movant's qualified immunity claim, see Lewis v. City of Ft. Collins, 903 F.2d at 758.

The Court denies Green's request in her Rule 56(d) Decl., because (i) the Court already has determined that Sanchez is not entitled to qualified immunity and has denied his MSJ, and discovery therefore will proceed according to the Federal Rules of Civil Procedure; and (ii) limited rule 56(d) discovery is not necessary to defend against Sanchez' MSJ, because Green alleges facts sufficient to show genuine issues of material fact based on her access to the Sanchez Depo., Padilla Depo., and the available affidavits. Here, Green submits a nine-point list of probable facts that she seeks to uncover by conducting written discovery and limited depositions of Sanchez and of Padilla. See Rule 56(d) Decl. ¶ 14, at 4-5. Many of the probable facts which Green identifies are specific and confined, such as "[w]hether Defendant Sanchez reported Ms. Green's complaints on March 30, 2017, to a PREA coordinator, as required by NMCD policy." Rule 56(d) Decl. ¶ 14, at 4. Others are more involved and far-reaching, such as Green's vague identification of all of "Sanchez's investigation of Ms. Green's complaint to him about Defendant Padilla's sexual assault of Ms. Green" as a probable fact that requires discovery." Rule 56(d) Decl. ¶ 14, at 4. Several of the identified probable facts overlap, such as "[w]hether

Defendant Sanchez took any steps to ensure that Defendant Padilla was kept separate from Ms. Green and other inmates," and "[w]hether Defendant Sanchez took steps to ensure that Defendant Padilla did not have access to female inmates after Ms. Martinez and Ms. Green came forward." Rule 56(d) Decl. ¶ 14, at 4. Nonetheless, Green contends that all of these facts are "relevant, necessary and narrowly tailored" to show a dispute of material fact "about what Defendant Sanchez truly knew" about Green's allegations, and about the steps he took "to protect inmates like Ms. Green from continued sexual assault by Padilla." Rule 56(d) Decl. ¶¶ 15-16, at 5.

Green does not argue predominantly that the facts which she identifies are not available or "cannot be presented" in a literal sense, other than by reiterating that the parties have not conducted discovery and that Sanchez has not completed his initial disclosures. Rule 56(d) Decl. ¶ 8, at 2. To the contrary, instead of characterizing the facts as unavailable, Green argues that discovery is needed "to rebut the statements by Defendant Sanchez's affidavit supporting his motion." Rule 56(d) Decl. ¶ 14, at 4. In effect, Green's argument is that she needs additional discovery to allow her to create her own version of the facts as opposed to Sanchez' version. See Rule 56(d) Decl. ¶ 14, at 4. Her argument partially anticipates Sanchez' contention that Green already has access to and uses in her Response the lengthy Sanchez Depo. taken for the related case involving Martinez. See Reply at 19-20. Sanchez argues that, because "many if not all subjects mentioned in [the Rule 56(d) Decl.]" appear in the original deposition, another deposition is "unnecessary." Reply at 19-20. Sanchez further argues that Green "does not demonstrate how discovery would enable her to rebut what specific facts." Reply at 19.

The Court denies the rule 56(d) request. Although Green has demonstrated with specificity the facts that additional discovery will yield and that they are "needed to rebut the

validity of [Sanchez'] qualified immunity claim," see Lewis v. City of Ft. Collins, 903 F.2d at 758, they are unnecessary to defend against the qualified immunity claim and the MSJ.  Sanchez raises several counterarguments, the first of which is that some of the "subjects" about which Green seeks additional discovery appear already in Sanchez' deposition from a different case. Reply at 19-20.[81]   Using the depositions and affidavits at her disposal, Green has a sufficient record with which to show genuine issues of material fact that defeat Sanchez' MSJ. Accordingly, the Court will deny the Rule 56(d) Motion.

**IT IS ORDERED** that (i) Defendant John Sanchez's Motion for Summary Judgment Based on Qualified Immunity, filed November 19, 2020 (Doc. 43) is denied; (ii) Sanchez' Motion to Stay Discovery Based on Qualified Immunity, filed December 2, 2020 (Doc. 46) is denied; and (iii) the request in the Declaration of Erlinda O. Johnson, Esq. Requesting Limited Discovery Pursuant to Fed. R. Civ. P. 56(d), To Respond To Motion For Summary Judgment Based on Qualified Immunity, filed December 12, 2020 (Doc. 50-5), is denied.

_____
UNITED STATES DISTRICT JUDGE

---

[81]Both Green and Sanchez attach the prior Sanchez Depo. as exhibits to their Response and Reply, respectively, but both only attach highly edited versions. Green attaches thirty-four pages of the 181-page document, while Sanchez attaches four of the 181.  See Sanchez Depo. The only reference to Green in those pages occurs when Sanchez is asked what he knows of Green's complaints; Sanchez says he knows "[n]othing." Sanchez Depo., at 11:23-24.  He goes on to acknowledge that he is "named in that lawsuit," but that he does not recall Green being interviewed.  Sanchez Depo. I, at 11:23.  Beyond this exchange, the Sanchez Depo. does not involve questioning related to Green, at least according to the edited versions of the transcripts that the parties submit.

*Counsel:*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

-- and --

Justine Fox-Young
Justine Fox-Young, P.C.
Albuquerque, New Mexico

*Attorneys for Plaintiffs Dawn Green, Andrea Gallegos, and Sasha Dominguez*

Douglas E. Gardner
Robles, Rael, & Anaya, P.C.
Albuquerque, New Mexico

*Attorney for Defendants Christopher Padilla, Justin N. Sanders, and Malcolm J. Gonzales*

Michael Dickman
Law Office of Michael Dickman
Santa Fe, New Mexico

*Attorney for Defendants John Sanchez, Ebeth Cruz-Martinez, Marianna Vigil, and Robert Gonzales*